ROBBINS UMEDA LLP
BRIAN J. ROBBINS (190264)
FELIPE J. ARROYO (163803)
SHANE P. SANDERS (237146)
DAVID L. MARTIN (253858)
610 West Ash Street, Suite 1800
San Diego CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

[Additional Counsel on Signature Page]

FILED

2009 JUL 10 PM 3:49

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FARRIS HASSAN, Derivatively on behalf of BIDZ.COM, INC., | Case No. CV09-04984 CBM (FFMx) |
| Plaintiff, | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND VIOLATIONS OF CALIFORNIA CORPORATIONS CODE |
| vs. | BY FAX |
| DAVID ZINBERG, LAWRENCE Y. KONG, CLAUDIA Y. LIU, LEON KUPERMAN, PETER G. HANELT, GARRY Y. ITKIN, and MAN JIT SINGH, | |
| Defendants, | |
| -and- | |
| BIDZ.COM, INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by a shareholder of BIDZ.com, Inc. ("BIDZ" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of California Corporations Code that occurred between August 2007 and the present (the "Relevant Period") and that have caused substantial monetary losses to BIDZ and other damages, such as to its reputation and goodwill.

2. BIDZ is an online jewelry retailer with a unique business model. Unlike other retailers, BIDZ sells its jewelry through an online auction format similar to eBay Inc. ("eBay"). Through its online auctions, BIDZ offers a particular piece of jewelry for sale and various online bidders bid up the price of the jewelry. According to BIDZ's fiscal 2006 Form 10-K, this process offers "customers the excitement of winning an item that may not be available in the future." Unlike eBay, however, BIDZ sells its own products. Thus, BIDZ is responsible for the legality of all aspects of the conduct of its auctions.

3. Since its inception, however, BIDZ has also been a company marked by unscrupulous dealings and relationships with various untrustworthy individuals and other entities. In the late 1990s, BIDZ became a publicly traded company through a series of illegal private stock sales. BIDZ has never completed a conventional initial public offering per the regulations of the Securities and Exchange Commission ("SEC"). Following this infamous inception, under defendants' auspices, BIDZ has contracted with a jewelry supplier managed by a convicted jewelry fence; has used a jewelry appraiser that does not follow standard industry practices; and has appointed an independent auditor that has been severely criticized by the Public Company Accounting Oversight Board ("PCAOB") for conducting deficient audits.

4. Even worse, BIDZ's Chief Executive Officer ("CEO") David Zinberg ("Zinberg") has maintained relationships with a number of convicted felons and other untrustworthy characters. These characters include Saied Aframian ("Aframian"), manager of BIDZ's largest jewelry supplier,

BIDZ's third largest shareholder, and a convicted jewelry fence; and BIDZ director and former Chief Financial Officer ("CFO") Garry Y. Itkin ("Itkin"), who during 1999 co-managed an illegal strip club in Los Angles while he served as BIDZ's CFO.

5. Defendants, throughout the Relevant Period, have not only acquiesced to these unscrupulous dealings and relationships in connection with the management of BIDZ, but have also allowed conditions to worsen.

6. During the Relevant Period, BIDZ's online auction business and, in particular, its ability to generate a high volume of traffic to its website was critical to the Company's ability to generate revenues. Despite this and despite BIDZ's long-standing dealings and relationships with unscrupulous individuals and entities, BIDZ's board of directors (the "Board") failed to maintain proper oversight over the online auction business, which resulted in seriously deficient controls.

7. Importantly, BIDZ had no safeguards to prevent "shill bidding," which is where bidders use phony bids to drive up the price of auctioned items. Further, as reflected by numerous complaints on RipoffReport.com ("Ripoff Report"), BIDZ's customers believe that BIDZ is behind the shill bidding because BIDZ receives the revenues for most of the sold items. BIDZ appears to be using shill bidding as a means of preventing particular items from selling below cost and as a means to boost revenues on other particular items. As a result of the rampant shill bidding, BIDZ eventually developed a bad reputation in the eyes of customers as reflected in numerous negative complaints posted to RipoffReport.com.

8. In addition to the shill bidding, BIDZ's general business practices appear to be woefully deficient, which has resulted in hundreds more consumer complaints. These complaints claim that BIDZ regularly ships poor quality items, mislabeled items, items that the customer did not order, and has overall poor customer service, among other issues. These complaints have contributed to the Company's consistent Better Business Bureau's ("BBB") "F" rating, which the Company continues to hold as of the filing of this complaint.

9. Throughout the Relevant Period, BIDZ and defendants made public statements that attempted to conceal these issues. These statements championed increased traffic to the Company's online auctions based upon BIDZ's website's "fun and exciting environment." Then, on November

26, 2007, Citron Research ("Citron"), an online activist shareholder website, issued a scathing report on BIDZ that disclosed the rampant shill bidding that had been taking place during the Company's online auctions, as well as the Company's undisclosed contacts with convicted felon Aframian.

10. Following this disclosure, BIDZ's stock price declined from $16.56 per share to $11.89 per share, a staggering market capitalization loss of $107 million. This market capitalization loss reflects a severe decline in investor confidence in BIDZ's corporate leadership due to the extremely suspicious relationships that defendants Zinberg and Itkin have with various convicted felons and other unscrupulous individuals. BIDZ's previously undisclosed relationships are and were material to shareholders and the Company's business operations, as they go to the very heart of the credibility that shareholders and the marketplace accorded to BIDZ and its management.

11. These relationships have damaged and will continue to damage BIDZ's corporate image and are indicative of a lack of the necessary internal controls. BIDZ's earnings potential is now limited due to serious customer concerns regarding the shill bidding that plagues the Company's online auctions. Additionally, during August 2008, a class of customers jilted by shill bidding at BIDZ sued the Company. BIDZ is also subject to investigations by the SEC and the Federal Trade Commission ("FTC").

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) BIDZ maintains its principal place of business in the District; (ii) one or more of the defendants either

resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to BIDZ, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

15. Plaintiff Farris Hassan is and was, at times relevant hereto, an owner and holder of BIDZ stock. Plaintiff is a citizen of Massachusetts.

16. Nominal defendant BIDZ is a Delaware corporation with its principal executive offices located at 3562 Eastham Drive, Culver City, California. BIDZ is an online jewelry retailer.

17. Defendant Zinberg is BIDZ's CEO, Chairman of the Board and a director, and has been since its inception in November 1998. Zinberg was also BIDZ's President from November 1998 to November 2008 and Secretary from November 1998 to March 2001. Zinberg is the founder of BIDZ and Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares. As a result, Zinberg dominates and controls the Company. Moreover, Zinberg has extensive contacts with convicted felons and other untrustworthy characters. Because of Zinberg's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Zinberg participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Zinberg received the following compensation:

| Fiscal Year | Salary | Bonus | All Other Compensation |
|---|---|---|---|
| 2008 | $241,667 | $169,360 | $22,407 |
| 2007 | $181,250 | - | $19,994 |

Defendant Zinberg sold 60,000 shares of BIDZ stock for $658,218 while in possession of material non-public information. Defendant Zinberg is a citizen of California.

18. Defendant Lawrence Y. Kong ("Kong") is BIDZ's CFO and has been since January 2001. Kong is also BIDZ's Secretary and Treasurer and has been since March 2006 and a director and has been since July 2003. Because of Kong's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Kong participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Kong received the following compensation:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2008 | $235,000 | $302,930 | $182,413 | $23,320 |
| 2007 | $235,000 | $338,048 | $224,330 | $16,828 |

Defendant Kong is a citizen of California.

19. Defendant Claudia Y. Liu ("Liu") is BIDZ's Chief Operating Officer ("COO") and has been since October 2006. Liu was also BIDZ's Vice President of Operations from November 2002 to October 2006 and Billing Manager from October 2001 to November 2002. Because of Liu's positions, she knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Liu participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Liu received the following compensation:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2008 | $200,000 | $237,600 | $68,063 | $18,785 |
| 2007 | $200,000 | $287,700 | $125,643 | $15,271 |

Defendant Liu sold 55,000 shares of BIDZ stock for $941,475 while in possession of material non-public information. Defendant Liu is a citizen of California.

20. Defendant Leon Kuperman ("Kuperman") is BIDZ's Chief Technology Officer and has been since January 2007 and President and has been since November 2008. Kuperman was also BIDZ's Vice President of Business Development during at least November 2008. Because of Kuperman's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Kuperman participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Kuperman received the following compensation:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2008 | $300,000 | $90,000 | $28,003 | $6,411 |
| 2007 | $283,064 | $90,000 | $121,861 | $774 |

Defendant Kuperman is a citizen of California.

21. Defendant Peter G. Hanelt ("Hanelt") is BIDZ's director and has been since March 2006. Hanelt is also Chairman of BIDZ's Audit Committee and a member of the Compensation Committee and has been since at least 2007. Because of Hanelt's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Hanelt participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Hanelt is a citizen of California.

22. Defendant Itkin is BIDZ's director and has been since May 2007. Itkin was also BIDZ's director from July 2003 to December 2006 and acting CFO from February 1999 to 2000. Itkin is a member of BIDZ's Audit Committee and Compensation Committee and has been since at least 2008. During 1999, Itkin was the co-manager of an illegal strip club in Los Angeles. Because

of Itkin's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Itkin participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Itkin is a citizen of California.

23. Defendant Man Jit Singh ("Singh") is BIDZ's director and has been since March 2006. Singh is also Chairman of BIDZ's Compensation Committee and a member of the Audit Committee and has been since at least 2007. Because of Singh's positions, he knew, consciously disregarded, or was reckless and grossly negligent in not knowing that BIDZ's business model, which was dependent upon online auctions to generate revenues, was materially deficient because the Company did not have adequate safeguards to protect against shill bidding and other abuses of the Company's online auctions. During the Relevant Period, Singh participated in the issuance of improper statements, including the preparation of the improper press releases and prepared statements made during conference calls with analysts and investors. Defendant Sing is a citizen of California.

24. The defendants identified in ¶¶17,18, 21-23 are referred to as the "Director Defendants." The defendants identified in ¶¶17-20, 22 are referred to as the "Officer Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants." The defendants identified in ¶¶17, 19 are referred to as the "Insider Selling Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25. By reason of their positions as officers, directors, and/or fiduciaries of BIDZ and because of their ability to control the business and corporate affairs of BIDZ, the Individual Defendants owed BIDZ and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BIDZ in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

furtherance of the best interests of BIDZ and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26. Each director and officer of the Company owes to BIDZ and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's online auction business.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of BIDZ, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with BIDZ, each of the Individual Defendants had access to adverse non-public information about the Company's online auction business, internal controls condition, operations, and improper representations of BIDZ.

28. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BIDZ, and was at all times acting within the course and scope of such agency.

29. To discharge their duties, the officers and directors of BIDZ were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of BIDZ were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c) prevent the Company from entering into business relationships with unscrupulous individuals and entities;

(d) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e) properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's business prospects, and results and ensuring that the Company maintained an adequate system of internal controls such that the Company's reporting would be true and accurate at all times;

(f) remain informed as to how BIDZ conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(g) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations; and

(h) ensure the Company had in place sufficient internal controls over its online auction business to prevent shill bidding and other online abuses that could potentially undermine the Company's business model.

30. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BIDZ, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant

Period have been ratified by the remaining Individual Defendants who collectively comprised all of BIDZ's Board during the Relevant Period.

31. The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its condition and business prospects, as detailed below, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of class action lawsuits that allege violations of securities laws. As a result, BIDZ has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

32. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

33. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting the health of its business model; (ii) conceal that its online auctions were plagued by shill bidding and other online bidding abuses; (iii) conceal defendant Zinberg's extensive contacts with convicted felons and other untrustworthy individuals; (iv) facilitate the Insider Selling Defendants' $1.6 million in illicit stock sales; (v) enhance the Individual Defendants' executive and directorial positions at BIDZ and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (vi) deceive the investing public, including shareholders of BIDZ, regarding the Individual Defendants' management of BIDZ's operations, the Company's health and stability, and its future business prospects that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

34. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that BIDZ was misrepresenting its business prospects.

35. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

36. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

37. According to BIDZ's fiscal 2006 annual report on Form 10-K, BIDZ is "a leading online retailer of jewelry, featuring a live auction format." BIDZ also allows other merchants to offer other merchandise such as televisions through its auctions.

38. From its inception as a publicly traded Company, the Individual Defendants and the Board have allowed BIDZ to engage in shady dealings with suspicious entities. These dealings began with the Company's illegal public offering. In the late 1990s, the Company raised $20.5 million in capital through a series of private stock sales. In later filed regulatory filings, BIDZ acknowledged that these sales were in violation of federal and state securities laws. BIDZ has never completed a conventional public offering under the scrutiny of the SEC.

39. BIDZ largest jewelry supplier is Los Angeles Jewelry Production, Inc. ("LA Jewelry"), a private company managed by Aframian and owned by Aframian's family. During the 1980s, Aframian was convicted for being the prime fence in a multi-million dollar nationwide ring of stolen watches and jewelry. During 2005 and 2006, LA Jewelry accounted for approximately 45% of BIDZ inventory purchases. BIDZ typically paid for its inventory purchases by giving stock to

Aframian. Eventually, Aframian became BIDZ's third largest shareholder and currently holds 5.1% of BIDZ's common stock.

40. BIDZ uses Woodland Hills based American International Gemologists ("AIG") as the appraiser for the jewelry it sells. According to a February 19, 2008 article appearing in the Los Angeles Times, AIG admitted that it does not physically inspect every item for which it provides an appraisal. This is not standard industry practice. According to Jeanine Woodling, of the International Society of Appraisers, a solid appraisal requires an appraiser "to actually be able to see the piece."

41. Even BIDZ's so-called independent auditors, Stonefield Josephson, Inc. ("Stonefield"), are suspect. According to the PCAOB report released March 14, 2007, five out of thirteen of Stonefield's audits examined by the PCAOB "included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements." BIDZ's Audit Committee, which is charged by its charter with appointing and reviewing the qualifications of the independent auditor, has continued to appoint Stonefield as BIDZ's independent auditor despite the deficiencies identified in the PCAOB report. Those specific deficiencies include the following:

> (1) the failure, in two engagements, to perform and document adequate testing of the allowance for bad debts;
>
> (2) the failure, in three engagements, to perform and document adequate procedures related to revenues;
>
> (3) the failure, in two engagements, to perform and document adequate procedures regarding the issuers' information systems relevant to financial reporting and related computer controls; and
>
> (4) the failure to perform and document adequate testing of deferred revenues.

42. The Individual Defendants have consciously disregarded BIDZ's suspicious dealings with LA Jewelry, AIG, and Stonefield. BIDZ continues to maintain dealings with all three entities.

43. BIDZ's continuing dealings with unscrupulous entities are attributable, in large part, to BIDZ's CEO, Zinberg, who has had many personal dealings with various criminals and other untrustworthy individuals dating from before BIDZ's inception. These individuals include defendant

Itkin, BIDZ's co-founder and director, who operated an illegal strip club while serving as BIDZ's CFO in 1999, and the previously mentioned Aframian, who was convicted for fencing stolen jewelry.

44. On September 1, 2008, *Barron's* published an article disclosing that defendant Zinberg's contacts with unsavory characters are far more extensive than just Aframian and defendant Itkin. Indeed, according to the article, Zinberg's former and current associates include: (i) a person arrested for sex crimes with a minor; (ii) a felon convicted for receiving stolen property and carrying a concealed weapon; (iii) a felon convicted for engaging in health-care fraud; (iv) an individual arrested for loitering with intent to prostitute, failure to register as a sex offender, and kidnapping; (v) the executive of Circle of Friends, a health-care company suspended for fraud by California; and (vi) a felon convicted for buying stolen property and unlawful firearm sale.

45. BIDZ's and defendant Zinberg's numerous shady dealings and relationships have severely damaged the Company's reputation. Despite this, the Individual Defendants and the Board have taken no action to eliminate these relationships or to remove defendants Zinberg and Itkin from positions of authority. Instead, as alleged below, the Individual Defendants and the Board have allowed matters to worsen at BIDZ by allowing the Company to engage in rampant shill bidding and shoddy business practices.

## RAMPANT SHILL BIDDING AT BIDZ

46. In a manner similar to eBay, BIDZ sells jewelry in an online auction format in which potential bidders bid against each other to purchase particular pieces of jewelry. Unlike eBay, however, the jewelry sold on BIDZ's auction website is supplied by BIDZ and the proceeds from the sales go to BIDZ. In contrast, eBay only runs auctions in which third-parties offer particular products for sale. As a result, BIDZ is responsible for the legality of all aspects of its transactions.

47. According to the fiscal 2006 Form 10-K, BIDZ sells its jewelry via an auction format because the format offers the Company's "customers the excitement of winning an item that may not be available in the future." Moreover, according to the filing, BIDZ's website and auction format contribute to a "[p]ositive shopping experience."

48. Also according to the filing, the Individual Defendants recognized that BIDZ's ability to continue to generate a high volume of visitor traffic was critical to the Company's business model. In particular, the Form 10-K disclosed:

> [BIDZ's] net revenue ***depends to a significant extent*** on the number of customers who visit our website to purchase merchandise and the dollar amount of their purchases. Generating increased traffic to our website and converting that traffic into buyers requires us to achieve effective results from our marketing campaigns; offer a wide variety of products that ***our customers can purchase at favorable prices***; maintain a user-friendly shopping experience; ***ensure the satisfactory availability, performance, and reliability*** of our website, network infrastructure, and transaction processing systems; and provide high-quality customer service. Our business will be harmed if we are unable to increase our customer base and the dollar volume of the orders customers place with us.

49. The Individual Defendants also understood that the "satisfactory availability, performance, and reliability of [the Company's] website, network infrastructure, and transaction processing systems are critical" to the Company's ability to attract and retain customers. In particular, the Form 10-K disclosed:

> Any problems with the availability, performance, or reliability of our website, network infrastructure, or ***transaction processing systems*** could result in ***decreased customer traffic,*** reduced ***orders, reduced order fulfillment performance, and lower net revenue*** as well as ***negative publicity and damage to our reputation***. In order to remain competitive, we must continually seek to improve and expand the functionality and features of our website, network infrastructure, transaction processing systems, and delivery and shipping functions to accommodate any substantial increase in the volume of traffic to and orders from our website. We may not be successful in these efforts, and we may not be able to project accurately the rate or timing of increases, if any, in the use of or sales from our website, or timely expand or upgrade our website, infrastructure, or systems to accommodate any such increases. Additionally, we may not be able to remedy any such availability, performance, or reliability problems in a timely manner, or at all, because we depend in part on third parties for such availability, performance, and reliability.

50. Despite the Individual Defendants' knowledge regarding BIDZ's dependence upon its ability to efficiently operate its online auction business and that BIDZ was legally responsible for the legitimacy of these auctions, the Individual Defendants failed to take appropriate measures to ensure that the online auctions could control for abuses by malicious shill bidders. As a result, during the Relevant Period, BIDZ's online auctions were plagued by shill bidding, a process by which bidders use phony bids to drive up the price of auctioned items.

51. Typically shill bids are placed by the sellers of products in an auction to increase the amount the seller hopes to earn in the auction. In regards to BIDZ's auctions, since BIDZ sells most of the auctioned items, BIDZ stands to gain a short term benefit in the form of increased revenues from the shill bidding. This led to the strong suspicion amongst BIDZ's customers that the rampant shill bidding at BIDZ is being intentionally conducted by BIDZ managers and employees.

52. Customers suspect that these BIDZ managers and employees have been using shill bids to boost revenue and prevent items from selling below cost. During the Relevant Period, BIDZ conducted what are referred to as "$1 no reserve" auctions. A reserve is a minimum sale price that the final bid must reach for a sale to occur. In BIDZ's auctions, shill bids may have been used as a hidden reserve to bid up the price of an auction to prevent an item from selling for below cost.

53. The rampant use of shill bidding at BIDZ has led to a number of customer complaints, some of which appear on Ripoff Report, a website where consumers gather to complain about unscrupulous companies. One BIDZ customer asserted in an August 15, 2007 post that "bidz does not have open auctions. there product and price is protected so the jewelry does not sell below their cost. sometimes they do but the company had dummy accounts that places autobids to protect the price." Another customer complained in an October 30, 2007 post that "I know for sure they are using auto bidding for thei[r] own purpose of shill bidding." Yet another customer complained in a February 3, 2008 post that "[I] have known for aw[hile] now that bidz uses shill bidders they even took it a step further by allowing you a so called second chance offer .this occurs when you give up and the shill bidder is the winning bidder."

54. According to BIDZ's auction website, the Company conducts new auctions every five seconds. This means BIDZ conducts 17,280 auctions per day. The Company's website, however, claims that the Company only sells "10,000 items per day." In other words, up to 7,280 auctions, or 43% of BIDZ's auctions, do not result in closed sales. And according to a statement made by defendant Zinberg during a November 27, 2007 conference call, 20% of the winning bids in BIDZ's auctions do not result in transactions. One explanation for the 20% of winning bidders backing out is that those bidders are actually shill bidders as claimed by the customers posting to Ripoff Report.

This would occur in situations where legitimate bidders back out of an auction after shill bidders either prevented an item from selling below cost or attempted to boost revenue on a particular item.

55. Assuming that BIDZ employees and managers are behind the shill bidding as suspected by BIDZ customers, it is very likely that these employees and managers utilize some kind of computer program to rapidly generate fake account names to supply the shill bids. If that is the case, then a significant percentage of BIDZ's winning bidders would have names following a particular pattern used by the computer program.

56. Out of a sample of 1,000 auctions, taken from BIDZ's auction website on July 8, 2009 between 10:30 a.m. and 1:00 p.m. Pacific Standard Time, 104 auctions, or 10.4%, were won by bidders who used account names formatted as a random word followed by four digits, such as "random1234." These account names included: blanca3510, kitty4705, leeny0804, masonic3665, muffin0231, normab6288, pattel0607, raerea0065, rvg1116, when1017, andy2653, econway7475, happy1186, mike1017, and mmm8080, among others.

57. Assuming that the random1234 patterned account names in the July 8 sample are dummy accounts posting shill bidders, 10.4% of the auctions in the July 8, 2009 sample did not result in sales. This would explain why up to 20% of BIDZ's auctions do not result in transactions.

58. The prevalence of shill bidding has resulted in severe damage to BIDZ's reputation and customer perception of the integrity of the Company's online auction format. BIDZ's tarnished reputation is reflected in part by the "F" rating that the BBB has given the Company. BIDZ has held this "F" rating throughout the Relevant Period and continues to hold this rating as of the filing of this complaint. In general, the BBB gives companies an "F" rating when a particular company is unreliable because: (i) they have failed to respond to complaints; (ii) their advertising is grossly misleading; (iii) they are not in compliance with the law's licensing or registration requirements; (iv) the BBB received complaints containing serious allegations; and/or (v) the company's industry is known for its fraudulent business practices. The BBB's current report on BIDZ is based on various complaints that the Company's listed jewelry valuations are grossly inflated; a brand item sold is not the item received; and that particular stones are not genuine, among others. These complaints are

consistent with complaints posted on Ripoff Report regarding overvalued items; poor quality items; customers not receiving items they were billed for; and overall poor customer service.

59. As alleged below, BIDZ's shoddy online auctions eventually attracted the attention of Citron, as well as the SEC and FTC. During November 2007, Citron published two reports regarding the shill bidding on BIDZ's online auctions, which resulted in a $107 million market capitalization loss.

60. As a result of BIDZ's lack of oversight and internal controls over its online auctions, the Company issued improper statements throughout the Relevant Period regarding the health of its business model. These statements are alleged below.

**IMPROPER STATEMENTS**

61. On August 13, 2007, BIDZ issued an earnings press release announcing it fiscal second quarter 2007 financial results. In the press release, BIDZ disclosed growth in the demand for the Company's jewelry products. In particular, defendant Zinberg stated that "[t]raffic to [the Company's] site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year." The press release provided as follows:

> Net revenue for the second quarter of 2007 was $39.1 million, a 20.6% increase compared with $32.4 million reported for the second quarter of 2006. This increase was due primarily to the growth in demand for the Company's jewelry products and the increase in the average order value, which grew by 28.6% year-over-year to $171. During the second quarter, the Company had an average of nearly 2,700 orders per day as compared to an average of 2,800 orders per day in the prior year's quarter, and the acquisition cost per new buyer declined to $38 versus $49 in the second quarter of 2006.
>
> * * *
>
> "The second quarter was an exciting one for Bidz.com as our stock began trading on the Nasdaq in June, and we are proud to be reporting strong sales and earnings growth to our shareholders," said David Zinberg, President and Chief Executive Officer of Bidz.com. "Traffic to our site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year."
>
> Mr. Zinberg continued, "We are very pleased with the momentum we are seeing and particularly the leverage and scalability of our model which resulted in a significant increase in our bottom-line. ***We are keenly focused on continuing to achieve strong growth and profitability and further leveraging our model to deliver earnings, cash flow and shareholder returns.***"

* * *

Business Outlook

The Company expects revenues for the third quarter of 2007 to be in the range of $37-39 million, and expects income before income tax of approximately $3.0-3.2 million. For the full year of 2007, the Company confirms its revenue guidance of $170-$180 million, and anticipates gross margin of approximately 25-26%. The Company expects income before income tax for 2007 of $14-$15 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 11%, and expects to end the year with approximately 24.5 million shares outstanding.

62. Also on August 13, 2007, BIDZ hosted an investor conference call to discuss its fiscal second quarter 2007 financial results. During the call, defendant Zinberg in his prepared statement stated that BIDZ sold "an average of 8700 items per day ...." Specifically, Zinberg stated as follows:

> In 1999, we started Bidz.com as jewelry focused auction site and had revenues of approximately $125,000 that year, compared to projected revenues of 170 to $180 million this year. During the second quarter of 2007, we sold an average of 8700 items per day, more then any other online jewelry site. Our consumer traffic continues to grow rapidly as well. According to Compete.com, an online auction-ranking site, our monthly net visitors grew almost 70% to 6.9 million in June, 2007. This was significantly higher then any of our peers. The growth we've achieved was recently noted by Entrepreneur Magazine. In July edition we ranked 81 in their Annual Hot 500 list on the Fastest Growing Small Business, which is a significant accomplishment for us. The magazine evaluated 90 million companies when generated that list. ***Our auctions create a fun and exciting environment and keep customers coming back.*** Our short auction times provide immediate gratification for our customers. As most items are posted and sold in 30 minutes or less. Additionally, our auction select live auctions that don't end at specific time, they end when the bidding stops. We find that competition creates added excitement for consumers while allowing us to maximize profitability on each transaction. ***We expect our revenue growth to continue and our keenly focused on improving our core metrics to increase margins and profitability.***

63. Also during the August 13, 2007 conference call, defendant Kong, in his prepared statement, attributed increases in the Company's average order values to "improvements in [BIDZ's] site." Specifically, Kong stated as follows:

> As David said, we had a very strong second quarter. Net revenues in the second quarter of 2007 were $39.1 million, a 20.6% increase compared to the same period of 2006. The increase in revenue was mainly due to the growth in demand for all jewelry products an option of higher priced items. Income before tax in the second quarter was $3.7 million compared to $151,000 a year ago. The $3.7 million is substantially above our original guidance of 2.8 to $3.3 million. We are focused on continuing to meet and exceed investor expectations, as well as our own profit goes. Earnings per share in the second quarter of 2007 was $0.12 per diluted share compared to $0.01 per diluted share in the same period of 2006. The increase in net income and earnings per share was due to the increase in revenue and higher gross profit margins. In the second quarter of 2007, we reduced our marketing expenditure and focused on attracting buyers that were willing to spend more. As a result, our acquisition costs for new buyer dropped to $38 from $49 in the prior year. This is a

> dramatic improvement and a key metric we will continue to focus on. ***Our average order value in the second quarter increased 28.6% year-over-year*** to $171 from $133 a year ago, and the number of items sold per day increased 12.3% to 8,678. The increase in average order value is due to the increase in number of items per order to 3.2 compared to 2.7 in the prior year. ***This increase is due to continuing improvements in our site.*** Increased traffic, which creates more demand for our items, our compelling auction format and significantly increased selection of products.

64. On August 16, 2007, BIDZ issued a press release in which it disclosed that defendant Zinberg had adopted a 10b5-1 trading plan under which he would sell up to 30,000 shares per month. Zinberg entered into this trading plan while in possession of material non-public information concerning BIDZ. Namely, Zinberg knew that BIDZ's online auction website was plagued by shill bidding; that the Company had a long-term undisclosed business relationship with a convicted jewelry fence; and that he had personal connections to numerous convicted felons and other untrustworthy individuals.

65. On November 12, 2007, BIDZ issued its fiscal third quarter 2007 earnings press release. In the press release, BIDZ reported "strong results," which defendant Zinberg attributed to the Individual Defendants' "continued focus on executing [BIDZ's] business and achieving results ...." Specifically, the earnings press release provided as follows:

> The Company's pre-tax income for the third quarter of 2007 was $5.2 million, above the Company's original guidance of $3.0-$3.2 million, and compared to $1.0 million in the prior period in 2006. Net income for the third quarter of 2007 increased to $3.6 million, or $0.14 per fully diluted share on 26.3 million weighted average shares outstanding, compared to net income of $997,000, or $0.04 per fully diluted share on 23.8 million weighted average shares outstanding in the same period of 2006. The increase in net income was due primarily to higher gross profit margins on increased revenues.
>
> "We are very pleased to announce such strong results for the third quarter," said, David Zinberg, President and Chief Executive Officer of Bidz.com. "Our unique value proposition and continued focus on executing our business and achieving results has driven this performance. Our new initiatives have significantly increased sales and resulted in record gross margins for the quarter."
>
> Mr. Zinberg continued, "Looking forward, we continue to innovate to further drive sales growth and profitability. We are optimistic about the upcoming holiday period and as a result have increased our guidance for the year. We look forward to continuing to diligently execute our strategic plan in 2008 and beyond."

* * *

> Business Outlook
>
> The Company expects revenues for the fourth quarter of 2007 to be in the range of $56-$58 million, and expects pre-tax income of approximately $5.6-$6.0 million. For the full year of 2007, the Company has increased its revenue guidance to $180-$182 million and has increased its expected gross margin guidance to approximately 27-28%. The Company now expects pre-tax income for 2007 of $18.0-$18.5 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 20.2%, and expects to end the year with approximately 26.4 million fully diluted shares outstanding.

66. On November 12, 2007, BIDZ hosted an investor conference call to discuss if fiscal third quarter 2007 earnings. During the call, defendant Zinberg touted the Company's supposed "continued focus on being simply the best online auctioneer of jewelry." Specifically, defendant Zinberg stated as follows:

> Our third quarter revenues were $40.1 million, exceeding our previous guidance of 37 to $39 million and represent a year-over-year growth of 48%. Pretax income was $5.2 million versus our guidance of 3 to $3.2 million and represent year-over-year growth of 409%. We're very pleased with this strong performance and are as a result raising our previous 2007 guidance substantially.
>
> From an execution standpoint, we continue to make significant progress in terms of key transaction metrics, such as value, visitor traffic, customer acquisition, cost and market share. Specifically, we are averaging over [8800] paid items per day, $173 average order size, 2700 average orders per day, 3.3 items purchased per transaction. And as per compete.com, our traffic has increased 169% year-over-year. We believe the reason for our success is our ***continued focus on being simply the best online auctioneer of jewelry***. We provide a ***unique value proposition*** for both our buyers and suppliers. Our prices are determined by customers with auctions starting at $1. We have short auction time and provide immediate gratification.

## THE TRUTH IS REVEALED

67. On November 26, 2007, Citron issued a report on BIDZ in which it highlighted extreme customer concern over shill bidding during the Company's online auctions. The report also discussed the Company's extensive contacts with Aframian, the beneficial owner of over 5 percent of BIDZ's stock and a convicted felon who served time for fencing stolen goods. The November 26, 2007 Citron report provided as follows:

> BIDZ largest supplier for years has been LA Jewelry, owned and operated by Saied Aframian, who also happens to be one of BIDZ largest shareholders. Not surprisingly, LA Jewelry is also BIDZ largest creditor, and a large participant in BIDZ co-op advertising program. These "related party" transactions are all over BIDZ financials including:
>
> - Over $5.3m accounts payables to a related party (nearly 20% of AP)

- Purchase of 11.6% of its merchandise from a related party
- Participation in co-op marketing (12%) by related party
- Guarantee agreement with the same related party for "minimum profit" on inventory purchased from the party.
- The related party owns 1,228,000 shares of BIDZ's stock.

***Saied Aframian is a convicted felon and has served time in the Federal System for fencing stolen goods. Not just petty crime either, but for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry.***

* * *

One common complaint that we see online is "shill bidding". On Wednesday, November 28, Citron will expose what we believe to be is some extremely questionable bids and bidding practices that occur on BIDZ.com. This part 2 will have much supporting documentation that the investing public should be made aware of. Unlike eBay and other well-known auction sites, you cannot even click to contact or check the track record of bidders. And since the company is selling its own goods, rather than conducting auctions for independent sellers, the company is responsible for the legality of all aspects of the conduct of its auctions.

68. On November 27, 2007, BIDZ held an investor conference call during which defendant Zinberg attempted to refute Citron's assertions regarding the shill bidding and Saied Aframian's criminal past. With respect to the shill bidding, defendant Zinberg adamantly denied that "Bidz.com participates in shill bidding." Yet, when analysts questioned defendant Zinberg about a yellow diamond that supposedly sold for half a million dollars, the following comical exchange took place:

Sherman McCoy - Pierce Capital Management – Analyst

Hi, guys. Thanks for taking the call. I just wanted to get back to that yellow diamond you guys have posted there. There's 19 different people that bid over half a million dollars on it. I met with three separate gemologists that visited your website, all local here in Los Angeles. ***Three out of three said the highest they could ever appraise that diamond for is $150,000 if there was anyone stupid enough to buy it.*** I think you could go to 20 jewelers and ask them. You're telling me there's 19 people that went and bid over half a million dollars without making a phone call to their local jeweler asking them what it would be worth?

David Zinberg - Bidz.com - President & CEO

***Yes, you are correct.***

Sherman McCoy - Pierce Capital Management – Analyst

Yes, I'm correct that 19 different people bid a half a million dollars.

David Zinberg - Bidz.com - President & CEO

Correct.

Sherman McCoy - Pierce Capital Management – Analyst

And you've verified funds? They have the assets or they give you their Visa card?

David Zinberg - Bidz.com - President & CEO

We do not verify funds. ***We have no way of verifying funds.*** But we verify that they are legitimate people with intention to buy the jewelry.

Sherman McCoy - Pierce Capital Management – Analyst

***Are they legitimate people with half a million dollars, though?***

David Zinberg - Bidz.com - President & CEO

***That we cannot verify***.

Sherman McCoy - Pierce Capital Management – Analyst

So you have no idea. It could just be 19 --

David Zinberg - Bidz.com - President & CEO

Correct.

Sherman McCoy - Pierce Capital Management – Analyst

-- people that bought jewelry from you for $400 and paid for it.

David Zinberg - Bidz.com - President & CEO

Correct.

69. Also during the November 27, 2007 conference call, defendant Zinberg confirmed Citron's claims regarding Aframian. Incredibly, defendant Zinberg claimed that he was unaware of Aframian's criminal record until the day before despite the fact that Zinberg had known and worked with Aframian for over seven years.

70. On November 28, 2007, Citron issued a follow-up report on BIDZ in which it highlighted the $500,000 big yellow diamond ring as well as a flashlight/TV combo listed for $6,000

and a television listed for $11,000. The report also determined that a number of the suspect items were bid on hundreds of times by the same three bidders.

71. On August 22, 2008, a class of consumers sued BIDZ alleging that the Company is engaged in a systematic program of shill bidding.

72. On February 23, 2009, BIDZ disclosed that the SEC had initiated a formal investigation "relating to certain aspects of its inventory accounting practices, as well as other matters." On May 11, 2009, BIDZ disclosed that it was also under investigation by the FTC with respect to the Company's email marketing practices.

## REASONS THE STATEMENTS WERE IMPROPER

73. BIDZ's Relevant Period statements, described above, failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded or were reckless and grossly negligent in not knowing:

(a) BIDZ's online auctions did not have adequate controls to prevent shill bidding and other abuses;

(b) BIDZ was shill bidding to boost sale prices and to protect particular items from selling below cost;

(c) BIDZ's general business practices were shoddy, which resulted in numerous consumer complaints regarding the quality and other issues; and

(d) BIDZ had no way to verify the legitimacy of particular bids.

## DAMAGES TO BIDZ CAUSED BY THE INDIVIDUAL DEFENDANTS

74. As a result of the Individual Defendants' improprieties, BIDZ disseminated improper statements concerning its online auctions and financial health. These improper statements as well as defendants Zinberg and Itkin's extensive contacts with criminals and other untrustworthy characters have devastated and are continuing to devastate BIDZ's credibility as reflected by the Company's $107 million market capitalization loss. As long as defendants Zinberg and Itkin continue to be associated with BIDZ and BIDZ continues to be associated with LA Jewelry, AIG, and Stonefield, potential investors will be unwilling to put their faith in the veracity of BIDZ's business model.

75. Moreover, BIDZ's credibility with its customers has been irreparably damaged as a result of the uncontrolled shill bidding that the Individual Defendants have allowed to occur during the Company's online auctions. The prevalence of shill bidding in addition to defendants Zinberg's and Itkin's nefarious business contacts have created an environment of distrust that limits the Company's revenue potential from its online auction business model. BIDZ also faces potential liability to customers who purchased jewelry that was overpriced as a result of the shill bidding.

76. Further, as a direct and proximate result of the Individual Defendants' action, BIDZ has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending BIDZ and certain officers in class action lawsuits filed against the Company, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from compensation and benefits paid to the defendants who have breached their duties to BIDZ;

(c) tens of millions of dollars worth of potential damages in connection with the consumer class action; and

(d) costs incurred in connection with the SEC and FTC investigations.

77. Moreover, these actions have irreparably damaged BIDZ's corporate image and goodwill. For at least the foreseeable future, BIDZ will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that BIDZ's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## INSIDER SELLING

78. While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of BIDZ stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| LIU | 11/16/2007 | 37,500 | $16.79 | $629,625.00 |
| | 11/19/2007 | 17,500 | $17.82 | $311,850.00 |
| **Total** | | **55,000** | | **$941,475.00** |
| | | | | |
| ZINBERG | 9/4/2007 | 24,600 | $8.93 | $219,678.00 |
| | 9/5/2007 | 5,400 | $8.60 | $46,440.00 |
| | 10/1/2007 | 30,000 | $13.07 | $392,100.00 |
| **Total** | | **60,000** | | **$658,218.00** |
| | | | | |
| **TOTAL** | | **115,000** | | **$1,599,693.00** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79. Plaintiff brings this action derivatively in the right and for the benefit of BIDZ to redress injuries suffered, and to be suffered, by BIDZ as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of California Corporations Code, as well as the aiding and abetting thereof, by the Individual Defendants. BIDZ is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80. Plaintiff will adequately and fairly represent the interests of BIDZ in enforcing and prosecuting its rights.

81. Plaintiff is and was an owner of BIDZ stock during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

82. The current Board of BIDZ consists of the following five individuals: defendants Zinberg, Kong, Hanelt, Itkin, and Singh.

83. Defendant Zinberg dominates and controls BIDZ. Zinberg co-founded the Company with defendant Itkin and he and his sister, Marina Zinberg, control over 62% of the Company's shares. Defendant Zinberg has exercised his domination and control over BIDZ to allow defendant Itkin to serve as BIDZ's CFO during 1999 despite the fact that, at that time, he was co-managing an illegal strip club with Oleg Khersonsky, who, according to a September 1, 2008 *Barron's* article, has been arrested for assault with a deadly weapon and for a sex crime with a minor. Zinberg has further exercised his domination and control to allow Itkin to maintain his position on the Board despite his illicit dealings. Moreover, Zinberg has exercised his domination and control to maintain his own

position as CEO of BIDZ despite his own dealings with numerous illicit characters including persons arrested for sex crimes, buying and selling stolen property, carrying concealed weapons, health care fraud, tax fraud, prostitution, and kidnapping. Because of Zinberg's domination and control, demand is futile as to defendants Kong, Hanelt, Itkin, and Singh.

84. As alleged above, despite BIDZ's and defendant Zinberg's long standing dealings and relationships with shady businesses and individuals, including the Company's largest supplier, appraiser, and independent auditor, the Board has taken no action to prevent, limit, or eliminate these dealings and relationships. Moreover, BIDZ's and Zinberg's long standing suspicious dealing and relationships were red flags indicating that the Company's internal controls with respect to preventing fraud were severely deficient. Despite these red flags, the Board has taken no action to prevent BIDZ's shill bidding or to correct BIDZ's shoddy business practices. Accordingly, demand is futile.

85. During the Relevant Period, as disclosed in the Company's fiscal 2006 Form 10-K, the Board was aware that BIDZ's revenues were dependent to a significant extent on the Company's online auction business model. Moreover, the Board was aware that the Company was dependent on the "satisfactory availability, performance, and reliability" of the Company's online website. Finally, the Board was aware that BIDZ is legally responsible for the jewelry sold during the online auctions because BIDZ supplies the jewelry and the sales proceeds accrue to BIDZ. Nevertheless, the Board failed to exercise proper oversight over the Company's online auctions and allowed rampant shill bidding to ruin the Company's reputation with its customers and investors. For example, as admitted by defendant Zinberg during the November 27, 2007 conference call, BIDZ had no means to verify if particular bids were legitimate. Accordingly, BIDZ's statements concerning the Company's business prospects lacked a reasonable basis. Because of the Board's utter failure to exercise oversight and maintain sufficient internal controls over the Company's online auctions, defendants Zinberg, Kong, Hanelt, Itkin, and Singh each face a sufficiently substantial likelihood of liability for breach of their fiduciary duties. Demand is futile.

86. Defendants Hanelt and Singh (the "Audit Committee Defendants") were, during the Relevant Period, members of the Audit Committee. The Audit Committee's charter provides that the

Audit Committee is responsible for (i) reviewing and discussing information presented in the Company's earnings press releases; and (ii) evaluating the qualifications of and appointing the independent auditor. Thus, the Audit Committee Defendants were responsible for overseeing and directly participating in the dissemination of BIDZ's improper press releases that concealed BIDZ's inadequate controls over its online auctions and flawed business model. Despite their knowledge, the Audit Committee Defendants recommended the publication of the improper statements alleged above. Moreover, the Audit Committee Defendants appointed Stonefield as the Company's independent auditor despite the PCAOB's March 14, 2007 report identifying significant deficiencies in Stonefield's prior audits. Accordingly, the Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith because they participated in the preparation of improper financial statements and earnings press releases that contained improper material information; and they appointed an independent auditor with questionable qualifications. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

87. The principal professional occupation of defendant Kong is his employment with BIDZ, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, BIDZ paid defendant Kong the following compensation during the Relevant Period:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2008 | $235,000 | $302,930 | $182,413 | $23,320 |
| 2007 | $235,000 | $338,048 | $224,330 | $16,828 |

Accordingly, defendant Kong lacks independence from defendant Zinberg by virtue of his domination and control and defendants, Hanelt, Itkin, and Singh by virtue of their positions as members of the Compensation Committee. The Compensation Committee has the authority to review and approve corporate goals and objectives relevant to executive compensation, including evaluating the executive's performance, and determining and approving the executive's compensation level. This lack of independence renders defendant Kong incapable of impartially considering a demand to commence and vigorously prosecute this action.

88. According to a September 1, 2008 *Barron's* article, defendant Itkin co-managed an illegal strip club. Defendant Itkin's illegal prior acts create a reasonable doubt as to his ability to honestly and in good faith consider a demand. Moreover, during fiscal 2008, Itkin received substantial compensation as a BIDZ director, which totaled $110,038. Itkin is dependent upon this compensation because his ability to procure employment outside of BIDZ is limited due to his illegal prior acts. Accordingly, there is a reasonable doubt that Itkin would take action against the other Individual Defendants because to do so would jeopardize his directorial compensation. Demand is futile as to defendant Itkin.

89. Plaintiff has not made any demand on shareholders of BIDZ to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) BIDZ is a publicly held company with over 23.2 million shares outstanding, and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against All Defendants for Breach of Fiduciary Duty**

90. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91. The Individual Defendants owed and owe BIDZ fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe BIDZ the highest obligation of good faith, fair dealing, loyalty, and due care.

92. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

93. Each of the Individual Defendants knew or were reckless or grossly negligent in not knowing that they had caused the Company to improperly misrepresent the Company's controls over its online auction process and defendant Zinberg's dealings with convicts and other untrustworthy

individuals. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, BIDZ has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

95. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96. At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold BIDZ common stock on the basis of such information. Namely, the Insider Selling Defendants knew about BIDZ's lacking internal controls over its online auctions and about defendant Zinberg's dealings with convicts and other untrustworthy individuals.

97. The information described above was proprietary non-public information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold BIDZ common stock.

98. At the time of their stock sales, the Insider Selling Defendants knew that the Company's business prospects were materially overstated. The Insider Selling Defendants' sales of BIDZ common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

99. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## COUNT III

### Against the Insider Selling Defendants for Violation of California Corporations Code §25402

100. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101. At the time that the Insider Selling Defendants sold their BIDZ common stock as stated herein, by reason of their high executive and/or directorship positions with BIDZ the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts concerning BIDZ's lacking internal controls over its online auctions and about defendant Zinberg's dealings with convicts and other untrustworthy individuals.

102. At the time of such sales, that information was not generally available to the public or the securities markets. Had such information been generally available, it would have significantly reduced the market price of BIDZ shares at that time.

103. The Insider Selling Defendants had actual knowledge of material, adverse, non-public information and thus sold their BIDZ common stock in California in violation of California Corporations Code §25402.

104. Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants are liable to BIDZ for damages in an amount up to three times the difference between the price at which BIDZ common stock was sold by them and the market value which BIDZ common stock would have had at the time of the sale if the information known to the Insider Selling Defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

105. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106. As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (i) by paying bonuses to certain of its executive officers; and (ii) by incurring

potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

107. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**COUNT V**

**Against All Defendants for Unjust Enrichment**

108. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BIDZ.

110. Plaintiff, as a shareholder and representative of BIDZ, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

111. Plaintiff, on behalf of BIDZ, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Determining and awarding BIDZ treble damages pursuant to California Corporations Code §25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code §25402;

C. Directing BIDZ to seek the resignation of defendants Zinberg, Itkin, and other BIDZ employees and directors with histories of criminal or illegal acts or strong ties to other individuals with histories of criminal or illegal acts;

D. Directing BIDZ to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect BIDZ and its

shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1. a proposal to create a Board committee with oversight over the Company's online auctions;

2. a proposal to remove executives and directors who have been convicted for felonies or crimes that involve dishonesty such as fraud or theft;

3. a proposal to strengthen the Company's internal controls over the Company's online auctions;

4. a proposal to create an ethics committee charged with review of the Company's and its executives' and directors' dealings and relationships with suspicious entities or individuals;

5. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

6. a provision to permit the shareholders of BIDZ to nominate at least three candidates for election to the Board;

7. a proposal to ensure the accuracy of the qualifications of BIDZ's directors, executives, and other employees and to evaluate these persons' associations with convicts and other unscrupulous individuals;

8. a proposal to control insider selling;

9. a proposal to appropriately test and then strengthen the internal audit and control functions; and

10. a proposal to remove Stonefield as the Company's independent auditor.

E. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of BIDZ has an effective remedy;

F. Awarding to BIDZ restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: July 10, 2009

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
DAVID L. MARTIN

BRIAN J. ROBBINS

610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

KENDALL LAW GROUP, LLP
JOE KENDALL
HAMILTON P. LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

Attorneys for Plaintiff

416698

VERIFICATION

*I, Farris Hassan, hereby declare as follows:*

I am a shareholder of BIDZ.com, Inc. I was a shareholder at the time of the wrongdoing complained of and I remain a shareholder. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of BIDZ.com, Inc. I have reviewed the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: July 10, 2009

[signature]

FARRIS HASSAN

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Farris Hassan, Derivatively on behalf of BIDZ.COM, INC., PLAINTIFF(S) v. David Zinberg, Lawrence Y. Kong, Claudia Y. Liu, Leon Kuperman, Peter G. Hanelt, Garry Y. Itkin, and Man Jit Singh, Defendants, and BIDZ.COM, INC., DEFENDANT(S). | CASE NUMBER CV09-04984 CBM (FFMx) |
| | **SUMMONS** BY FAX |

TO: DEFENDANT(S): ______________________________

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ ____________ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Brian J. Robbins, whose address is Robbins Umeda LLP, 610 West Ash Street, Suite 1800, San Diego, CA 92101. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JUL 10 2009

By: LA'REE HORN
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

1192

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Farris Hassan | David Zinberg, Lawrence Y. Kong, Claudia Y. Liu, Leon Kuperman, Peter G. Hanelt, Garry Y. Itkin, and Man Jit Singh, Defendants and BIDZ.COM, Inc., a Delaware corporation, Nominal Defendant. |
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) Brian J. Robbins, Robbins Umeda LLP, 610 West Ash Street, Suite 1800, San Diego, CA 92101 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only** (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No ☐ **MONEY DEMANDED IN COMPLAINT: $**________

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. s. 1332(a)(2)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS | TORTS | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | PERSONAL INJURY | PERSONAL PROPERTY | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 340 Marine | BANKRUPTCY | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☑ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

FOR OFFICE USE ONLY: Case Number: CV09-04984

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☐ Yes
If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 09-cv-03216-CBM E

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Plaintiff is a citizen of Massachusetts |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature] **Date** July 10, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Frederick F. Mumm.

The case number on all documents filed with the Court should read as follows:

**CV09- 4984 CBM (FFMx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] Western Division
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] Southern Division
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] Eastern Division
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.