Eric L. Zagar (250519)
ezagar@btkmc.com
*Co-Lead Counsel for Plaintiffs*
Barroway Topaz Kessler
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*- and –*

Nichole Browning (251937)
nbrowning@btkmc.com
*Co-Lead Counsel for Plaintiffs*
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

Brian J. Robbins (190264)
brobbins@robbinsumeda.com
Felipe J. Arroyo (163803)
farroyo@robbinsumeda.com
Shane P. Sanders (237146)
ssanders@robbinsumeda.com
*Co-Lead Counsel for Plaintiffs*
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re BIDZ.COM, INC. DERIVATIVE LITIGATION | MASTER FILE NO. CV09-04984-PSG (EX) |
| | **VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** |
| This Document Relates To:<br>    ALL ACTIONS | |
| | DEMAND FOR JURY TRIAL |

Plaintiffs, Farris Hassan and David Hughes, by the undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.     This is a shareholders' derivative action brought for the benefit of nominal defendant Bidz.com, Inc. ("Bidz" or the "Company") against the members of its Board of Directors (the "Board") and certain executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of California Corporations Code that occurred from August 2007 to the present (the "Relevant Period").

2.     Bidz is an online jewelry retailer offering its products through interactive auctions.  Unlike other retailers, Bidz sells its jewelry through an online auction format similar to eBay Inc. ("eBay"). Through its online auctions, Bidz offers jewelry for sale and various online bidders bid on the price of the jewelry. According to Bidz's Form 10-K filed with the Securities and Exchange Commission ("SEC") on March 16, 2007 ("2007 10-K"), this process offers "customers the excitement of winning an item that may not be available in the future." Bidz, unlike eBay, sells its own products. Thus, Bidz is responsible for the legality of all aspects of the conduct of its auctions.

1693992.1

3.     During the Relevant Period, Bidz's online auction business and, in particular, its ability to generate a high volume of traffic to its website was critical to the Company's ability to generate revenue. Despite this, the Individual Defendants (defined herein) failed to maintain proper oversight over the online auction business, which resulted in seriously deficient controls.

4.     Notably, Bidz had no safeguards to prevent, among other online bidding abuses described herein, "shill bidding," which is where bidders use phony bids to drive up the price of auctioned items. According to numerous complaints on RipoffReport.com, Bidz's customers believe that Bidz is behind the shill bidding because the Company receives the revenues for most of the sold items. Bidz uses shill bidding as a means of preventing particular items from selling below cost and as a means to boost revenues on other particular items. As a result of the rampant shill bidding, Bidz has gained a bad reputation in the eyes of customers, as reflected in numerous negative complaints posted on Ripoff Report (www.ripoffreport.com), a website where customers post complaints about unscrupulous companies.

5.     In general, Bidz's lack of adequate internal controls and deficient business practices has resulted in hundreds of consumer complaints. These complaints claim that Bidz regularly ships poor quality items, mislabeled items, and items that customers did not order, and that the Company has overall poor

customer service, among other issues. These complaints have contributed to the Company's consistent Better Business Bureau's ("BBB") rating of "F", which the Company continues to hold as of the filing of this complaint.

6.      Bidz also uses suspect appraisers and auditors in its general business practices. Particularly, Bidz's jewelry appraiser does not follow standard industry practices, and its auditor has been severely criticized by the Public Company Accounting Oversight Board ("PCAOB") for conducting deficient audits.

7.      In addition, Bidz's management has numerous long-standing relationships with convicted felons and other suspicious individuals.   These individuals include, among others, Saied Aframian ("Aframian"), manager of Bidz's largest jewelry supplier, Bidz's third largest shareholder, and a convicted jewelry fencer; and Bidz director and Chief Financial Officer ("CFO") defendant Garry Y. Itkin ("Itkin"), who during 1999 co-managed an illegal strip club in Los Angeles while he served as the Company's CFO.

8.      During the Relevant Period, the Individual Defendants caused Bidz to make public statements aimed at concealing their misconduct. These statements channeled increased traffic to the Company's online auction by trumpeting Bidz's website's so-called "fun and exciting environment."

9.      On November 26, 2007, however, Citron Research ("Citron") issued a scathing report that disclosed the rampant shill bidding and other online abuses that

1    had been taking place during the Company's online auctions, as well as the

2    Company's then undisclosed contracts with convicted felon Aframian.

3        10.    Following this news, Bidz's stock price dropped from $16.56 per

4    share to $11.89 per share, which represented a 27% decline. Additionally, the

5

6    Company's market capitalization dropped by $107 million. This market

7    capitalization loss reflects a severe decline in investor confidence in Bidz's

8    corporate leadership due to the suspicious relationships that defendants David

9

10    Zinberg ("Zinberg") and Itkin have with various convicted felons and other

11    individuals. Bidz's previously undisclosed relationships are and were material to

12    shareholders and the Company's business operations, as they go to the heart of the

13

14    credibility that shareholders and the marketplace accorded to Bidz and its

15    management. These relationships have damaged and will continue to damage

16    Bidz's corporate image and are indicative of a lack of necessary internal controls.

17

18    Bidz's earnings potential is now limited due to serious customer concerns regarding

19    the shill bidding that plagues the Company's online auctions.

20        11.    Furthermore, based on their knowledge of the foregoing material non-

21

22    public information regarding the Company's improper business practices and shill

23    bidding, defendants Zinberg and Claudia Liu ("Liu"), also in contravention of their

24    fiduciary duties, sold $1.8 million in illicit stock sales.

25

26

27

28

12.    As a result of the Individual Defendants' breaches of fiduciary duties, Bidz has sustained damages, including, but not limited to, investigations by the SEC and the Federal Trade Commission ("FTC").

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Bidz maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and

aiding and abetting and conspiracy in violation of fiduciary duties owed to Bidz, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

16.    Plaintiff Farris Hassan was a shareholder of nominal defendant Bidz at the time of the wrongdoing alleged herein and has been a shareholder of Bidz continuously since that time.  Plaintiff Hassan is a citizen of Massachusetts.

17.    Plaintiff David Hughes was a shareholder of nominal defendant Bidz at the time of the wrongdoing alleged herein and has been a shareholder of Bidz continuously since that time.  Plaintiff is a citizen of New York.

18.    Nominal defendant Bidz is a Delaware corporation with its principal executive offices located at 3562 Eastham Drive, Culver City, California 90232. According to its public filings, Bidz is an online retailer of jewelry, offering its products through interactive auctions.

19.    Defendant Zinberg is the Company's founder, and has served as the Company's Chief Executive Officer ("CEO"), President and Chairman of the Board since November 1998.  Zinberg previously served as the Company's Corporate Secretary from 1998 until March 2001.  Defendant Zinberg is the brother of Marina Zinberg, Vice President of the Company (and formerly the Corporate

Secretary and Treasurer).  Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares.  For fiscal years 2007 and 2008, Zinberg received total compensation of $201,244 and $433,434, respectively. Zinberg sold 90,000 shares of Bidz stock for $901,100 while in possession of material non-public information.  Zinberg is a citizen of California.

20.    Defendant Liu serves as the Company's Chief Operating Officer ("COO").  Previously, Liu served as the Company's Vice President of Operations. Prior to that, she was the Billing Manager.  For fiscal years 2007 and 2008, Liu received total compensation of $628,614 and $524,448, respectively. Liu sold 55,000 shares of Bidz stock for approximately $942,000 while in possession of material non-public information.   Liu is a citizen of California.    Liu is married to defendant Lawrence Kong ("Kong").

21.    Kong has served as the Company's CFO since January 2, 2001, has been a member of the Board since July 2003 and has served as Treasurer and Secretary since March 2006.  Kong is the husband of defendant Liu.  For fiscal years 2007 and 2008, Kong received total compensation of $814,205 and $743,663, respectively.  Kong is a citizen of California.

22.    Defendant Leon Kuperman ("Kuperman") has served as Bidz's Chief Technology Officer ("CTO") since January 2007 and President since November

2008.  For fiscal years 2007 and 2008, Kuperman received total compensation of $495,699 and $424,414, respectively.  Kuperman is a citizen of California.

23.    Defendant Peter G. Hanelt ("Hanelt") has served as a director of Bidz since February 2006.  Hanelt currently serves as chair of the Company's Nominating and Corporate Governance Committee and Audit Committee, and is a member of the Company's Compensation Committee.  Hanelt is a citizen of California.

24.    Defendant Itkin has served as a director of Bidz since May 2007, and previously served as a director from July 2003 until December 2006. Itkin previously served as the Company's acting CFO from February 1999 until 2000. Itkin is currently a member of the Company's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.  Itkin is a citizen of California.

25.    Defendant Man Jit Singh ("Singh") has served as a director of Bidz since February 2006.  Singh currently serves as chair of the Company's Compensation Committee, and is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.  Singh is a citizen of California.

26.    Collectively, defendants Zinberg, Liu, Kong, Kuperman, Hanelt, Itkin and Singh will be referred to herein as the "Individual Defendants."

# IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

27.    By reason of their positions as officers, directors, and/or fiduciaries of Bidz and because of their ability to control the business and corporate affairs of Bidz, the Individual Defendants owed Bidz and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Bidz in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bidz and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Bidz and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bidz, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Bidz, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

29.    To discharge their duties, the officers and directors of Bidz were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Bidz were required to, among other things:

(a)    remain informed as to how Bidz conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices (here, the improper and illegal practice of shill bidding, among other things), make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(b)    when put on notice of problems with the Company's business practices and operations, namely the improper and illegal practice of shill bidding and the other improper practices described below, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(c)    ensure that the Company had in place sufficient internal controls over its online auction business to prevent shill bidding and other online abuses that could potentially undermine the Company's business model;

(d)    ensure that the Company retained the services of a capable auditor;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(e)    ensure that the Company used a qualified appraiser whose practices were at least in compliance with minimum industry standards and/or that the Company had sufficient internal controls in place to prevent improper appraisals;

(f)    ensure that customers were being provided with accurate descriptions and photographs of the items they were purchasing and/or that the Company had sufficient internal controls in place to prevent any improper practices in that regard;

(g)    refrain from acting upon material inside corporate information to benefit themselves;

(h)    properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's business prospect, and results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's reporting would be true and accurate at all times;

(i)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

(j)     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority.

30.     Bidz's Audit Committee members, defendants Hanelt, Itkin and Singh, were required to adhere to the Audit Committee Charter which specifically provides that the members of the Audit Committee are to: (i) "oversee the accounting and financial reporting process of the Company and the audits of the financial statements of the Company;" (ii) "review the Company's internal controls;" and (iii) discuss with counsel any "legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements."

**CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION**

31.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

32.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting the health of its business model; (ii) conceal that its online auctions were plagued by shill bidding and other online bidding abuses; (iii) conceal that its auditor was unqualified and was known to have previously conducted numerous deficient audits; (iv) conceal the fact that the Company's jewelry appraiser did not satisfy minimum industry standards in issuing appraisals and that the Company did not have sufficient internal controls in place to prevent such improper practices; (v) conceal the fact that customers were being provided with inaccurate descriptions and photographs of the items they were purchasing and that the Company did not have sufficient controls in place to prevent such improper practices; (vi) conceal defendant Zinberg's extensive contacts with convicted felons and other untrustworthy individuals; (vii) allow the Insider Selling Defendants[1] to sell $1.8 million worth of Bidz's stock; (viii) enhance the Individual Defendants' executive and directorial positions at Bidz and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (ix) deceive the investing public, including shareholders of Bidz, regarding the Individual Defendants' management of Bidz's operations, the Company's health and stability, and its future business prospects that had been misrepresented by

[1] The Insider Selling Defendants are Zinberg and Liu.

defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

33.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true facts outlined above.

34.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully and/or recklessly causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

35.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his/her overall contribution to and furtherance of the wrongdoing.

**THE INDIVIDUAL DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY CONSCIOUSLY FAILING TO ACT IN THE FACE OF A KNOWN DUTY TO ACT**

36.     During the Relevant Period, the Individual Defendants knowingly caused or permitted Bidz to engage in improper acts and practices in its ordinary course of business. These deceptive schemes, which were designed to artificially increase Bidz's revenues and earnings, were unsustainable and were bound to be discovered. The Individual Defendants knew that the Company faced substantial risk in engaging in these practices and that if these practices were exposed, the Company would lose revenue and customer confidence. Accordingly, these improper practices, which were well known and approved by the Individual Defendants, formed an essential part of the Company's business model.

**The Individual Defendants Consciously Permitted Bidz to Engage in Shill Bidding to Artificially Inflate the Prices of the Company's Sale Items**

37.     Bidz was founded in 1998 with the goal of selling jewelry and other products online through interactive auctions.  In contrast to other online auction sites, Bidz sells its own merchandise, as opposed to that of independent sellers. As a result, Bidz is responsible for the legality of all aspects of its transactions.

38.     According to its public filings, the Individual Defendants recognized that Bidz's revenue is dependent upon its ability to generate a high volume of traffic to its website.  In particular, the Company's 2007 10-K stated:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[Bidz's] net revenue depends to a significant extent on the number of customers who visit our website to purchase merchandise and the dollar amount of their purchases. Generating increased traffic to our website and converting that traffic into buyers requires us to achieve effective results from our marketing campaigns; offer a wide variety of products that our customers can purchase at favorable prices; maintain a user-friendly shopping experience; ensure the satisfactory availability, performance, and reliability of our website, network infrastructure, and transaction processing systems; and provide high-quality customer service. Our business will be harmed if we are unable to increase our customer base and the dollar volume of the orders customers place with us.

39.    During the Relevant Period, the Individual Defendants also understood that the "satisfactory availability, performance, and reliability of [the Company's] website, network infrastructure, and transaction processing systems are critical" to the Company's ability to attract and retain customers.  In particular, the 2007 10-K stated:

Any problems with the availability, performance, or reliability of our website, network infrastructure, or transaction processing systems could result in decreased customer traffic, reduced orders, reduced

order fulfillment performance, and lower net revenue as well as negative publicity and damage to our reputation. In order to remain competitive, we must continually seek to improve and expand the functionality and features of our website, network infrastructure, transaction processing systems, and delivery and shipping functions to accommodate any substantial increase in the volume of traffic to and orders from our website. We may not be successful in these efforts, and we may not be able to project accurately the rate or timing of increases, if any, in the use of or sales from our website, or timely expand or upgrade our website, infrastructure, or systems to accommodate any such increases. Additionally, we may not be able to remedy any such availability, performance, or reliability problems in a timely manner, or at all, because we depend in part on third parties for such availability, performance, and reliability.

40.    Shill bidding (also known as "bid rigging" or "bid shilling") has been defined by Bidz's own Glossary of Terms as "[b]ogus bidding by an accomplice of the seller with the purpose of raising the price of an item."[2]  In essence, shill bidders are fake bidders who do not want to legitimately purchase the item but bid on an item for the sole purpose of driving up an item's selling price.  The end result

---

[2] *See* http://www.bidz.com/ht/help?page=glossary.

1   is that legitimate bidders end up paying more for an item than they would have if

2   the shill bidder had not bid.

3       41.    Shill bidding is illegal in California and most other states.   Bidz

4   claims that shill bidding is prohibited and does not exist on the Company's website.

5   The Company states: "[y]ou are strictly prohibited from placing bids or causing

6   bids to be placed on any Product for the purpose of artificially increasing or

7

8   otherwise manipulating the bidding process on Bidz.com or the bid price of any

9

10  Product listed on the Site, or influencing user behavior on Bidz.com."[3]

11      42.    However, Bidz has, with the knowledge and approval of the

12  Individual Defendants, actively engaged in shill bidding for years, despite the

13  Company's assertions to the contrary.   For example, during the Relevant Period,

14

15  Bidz operated "$1 no reserve auctions."   A reserve is a minimum sale price that the

16

17  final bid must reach for a sale to occur.   In Bidz's auctions, shill bids were used to

18  create a hidden reserve that would increase customer bids and prevent particular

19

20  items from selling for below cost.

21      43.    The rampant use of shill bidding at Bidz has led to numerous

22  customer complaints, some of which appear on Ripoff Report.

23      44.    On Ripoff Report's website, customers posted the following

24

25  complaints regarding Bidz's shill bidding practices:

26  _____
    [3] *See* http://www.bidz.com/ht/help?page=terms.

27

28

1
2
3
4
5

August 15, 2007 post: "Bidz does not have open auctions. Their product and price is protected so the jewelry does not sell below their cost. Sometimes they do but the company has dummy accounts that places autobids to protect the price."

6
7
8

October 30, 2007 post: "I know for sure they are using auto bidding for thei[r] own purpose of shill bidding."

9
10
11
12
13

February 3, 2008 post: "[I] have known for aw[hile] now that Bidz uses shill bidders they even took it a step further by allowing you a so called second chance offer. This occurs when you give up and the shill bidder is the winning bidder."

14
15
16
17
18
19
20
21
22
23
24
25
26

45.    According to a statement made by defendant Zinberg during a November 27, 2007 conference call, 20% of the winning bids in Bidz's auctions do not result in transactions.    Zinberg's statements have been contradicted by discovery responses produced in a class action regarding shill bidding filed against Bidz.  These discovery responses, particularly a declaration from defendant Liu, show that more than 11.3 million of 25.7 million auctions from 2004 through 2008 have failed (*i.e.,* Bidz did not receive payment), which is approximately 44% of these auctions.  This large percentage indicates that shill bidding is rampant at Bidz.  It also underscores the Individual Defendants' unwillingness to pursue

27
28

obvious examples of fraud (as well as the lack of internal controls at Bidz, which is discussed in detail below).

46.    The shill bidding appears to be accomplished through computer programs and live shill bidders.  Because a computer program is used to rapidly generate fake account names to supply the shill bids, a significant percentage of Bidz's winning bidders have, in the past, had names that follow a readily identifiable pattern.

47.    Out of a sample of 1,000 auctions taken from Bidz's auction website on July 8, 2009 between 10:30 a.m. and 1:00 p.m. Pacific Standard Time, 104 auctions, or 10.4%, were won by bidders who used account names formatted as a random word followed by four digits, such as "random1234."  These account names included: blanca3510, kitty4705, leeny0804, masonic3665, muffin0231, normab6288, pattel0607, raerea0065, rvg1116, when1017, andy2653, econway7475, happy1186, mike1017, and mmm8080, among others.

48.    Assuming that the "random1234" patterned account names in the July 8, 2009 sample are dummy accounts posting shill bidders, 10.4% of the auctions in the July 8, 2009 sample did not result in sales.  This would explain why a significant percentage of Bidz's auctions do not result in transactions.

49.    The use of computers to assist in shill bidding is also confirmed by bid histories showing that certain users are able to enter bids on three or more

products in less than a second, despite the time required to load new pages and enter bid information.

50.    There is currently a related securities class action pending against Bidz and defendants Zinberg and Kong, which is styled as *Ramon Gomez v. Bidz.com, Inc. and David Zinberg*, CV09-03216 CBM-Ex (the "Securities Class Action").   On October 13, 2009, a consolidated complaint was filed in the Securities Class Action (the "CAC").  The CAC includes the accounts of numerous Confidential Witnesses ("CWs").   One of these confidential witnesses ("CW1") further substantiates plaintiffs' allegations as to the existence of shill bidding at Bidz.

51.    According to the CAC, CW1[4] was a Bidz Senior Jewelry Buyer from March 2000 through approximately July 2003.  According to the CAC, CW1 stated that Bidz did, in fact, use shill bidders and observed that many high priced items were sold, but that those sales were never completed. Rather, high-priced items

---

[4] This confidential witness is listed as "CW2" in the CAC.  In preparing this consolidated complaint, Plaintiffs, through their counsel, conducted an independent investigation of CW1, including her/his job positions and duties, to substantiate that she/he would be privy to the information she/he asserts here and in the CAC. Though the witness Plaintiff believes to be CW2 in the CAC declined to discuss the particulars of his testimony with Plaintiffs, Plaintiffs confirmed through their independent investigation that someone with the job duties and responsibilities of CW2, as described in the CAC, would be privy to the type and kind of information offered in the CAC.

1   were won by shill bidders and re-auctioned again and again in the hopes of

2   increasing interest in Bidz's website.

3       52.    Another confidential witness ("CW2"), who worked as a customer

4   service representative at Bidz in early 2004, has provided additional support for the

5

6   existence of shill bidding at Bidz.  CW2 stated that she/he witnessed a number of

7   user accounts with balances in the high six-figure range *(i.e.,* hundreds of

8

9   thousands of dollars).  She/he also stated that these same users had purchased

10  jewelry at prices that were much higher than other customers were willing to pay.

11
    These facts suggest that such user accounts were being used to place shill bids and
12

13  raise the price of items auctioned at Bidz.com.

14      53.    As a result of the hundreds of consumer complaints launched against
15
    Bidz, the BBB has given Bidz an "F" rating.  Bidz has held this "F" rating
16

17  throughout the Relevant Period and continues to hold this rating as of the filing of

18  this complaint.  In general, the BBB gives companies a "F" rating when a company
19
    is unreliable because: (i) they have failed to respond to complaints; (ii) their
20

21  advertising is grossly misleading; (iii) they are not in compliance with the law's

22  licensing or registration requirements; (iv) the BBB received complaints containing
23
    serious allegations; and/or (v) the company's industry is known for its fraudulent
24

25  business practices.

26

27

28

    1693992.1

1    54.    The BBB's current report on Bidz is based on various complaints

2    alleging, among other things, that the Company's listed jewelry valuations are

3    grossly inflated, a brand item is not the item received, and that particular stones are

4

5    not genuine. These complaints are consistent with complaints posted on Ripoff

6    Report regarding Bidz's overvalued items, poor quality items, and overall poor

7
     customer service.
8

9    55.    As alleged below, Bidz's problem-ridden online auctions eventually

10   attracted the attention of Citron, as well as the SEC and the FTC.    During

11
     November 2007, Citron published two reports regarding the shill bidding on Bidz's
12

13   online auctions, which resulted in a $107 million market capitalization loss and a

14   stock price drop of more than 28%.

15
         **The Individual Defendants Consciously Allowed Bidz to Use Suspect**
16                          **Accounting Auditors**

17

18   56.    In addition to consciously permitting Bidz to engage in shill bidding,

19   the Individual Defendants also consciously permitted the Company to employ

20
     dubious auditors. Bidz's auditor is Stonefield Johnson, Inc. ("Stonefield").
21

22   Stonefield has been harshly criticized by PCAOB.    Specifically, the PCAOB

23   released a report on March 14, 2007, stating that five out of thirteen of Stonefield's

24
     audits "included deficiencies of such significance that it appeared to the inspection
25

26   team that the Firm did not obtain sufficient competent evidential matter to support

27   its opinion on the issuer's financial statements."

28

57.    Despite knowing about Stonefield's troubling track record, the Individual Defendants idly stood by while Stonefield served as Bidz's auditor throughout the Relevant Period.  The failure to act on the part of the members of the Audit Committee is especially egregious.  According to the Audit Committee's Charter, the Audit Committee (defendants Hanelt, Itkin and Singh) is, and was throughout the Relevant Period, responsible for appointing and reviewing the qualifications of the independent auditor.  Nonetheless, in contravention of their duties under the Audit Committee Charter, the members of the Audit Committee have continued to appoint Stonefield as Bidz's independent auditor notwithstanding the deficiencies identified in the PCAOB report. Those deficiencies included the following:

(a)    the failure, in two engagements, to perform and document adequate testing of the allowance for bad debts;

(b)    the failure, in three engagements, to perform and document adequate procedures related to revenues;

(c)    the failure, in two engagements, to perform and document adequate procedures regarding the issuers' information systems relevant to financial reporting and related computer controls; and

(d)    the failure to perform and document adequate testing of deferred revenues.

58.    The Individual Defendants have purposefully ignored Bidz's suspect dealings with Stonefield and, as a result, Bidz continues to regularly deal with Stonefield in its business practices.

### THE INDIVIDUAL DEFENDANTS ALSO PERMITTED AND FACILITATED OTHER RAMPANT WRONGDOING AT BIDZ

59.    During the Relevant Period, the Individual Defendants utterly failed to ensure that Bidz ran its online auction business to prevent shill bidding and other online abuses that could potentially undermine the Company's business model.

60.    In addition to the shill bidding discussed above, these improper practices included: (i) the use of suspect appraisers who admittedly do not, on occasion, physically inspect the items they appraise, which is contrary to standard industry practice and results in inflated appraisals; and (ii) the shipping of items that were different than the photographs and descriptions of those items on Bidz's website, resulting from, among other things, the enhancement of pictures using Photoshop software.

61.    Here, the Individual Defendants had a heightened duty to ensure that an adequate system of internal controls was in place in light of Bidz's prior and repeated improper dealings dating back to before the Company went public, as well as the numerous suspicious relationships involving Bidz and its representatives, including Zinberg and Itkin (as discussed in detail below).

**The Individual Defendants Permitted the Use of Suspect Jewelry Appraisers Who Offered Inflated Jewelry Appraisals**

62.    The Individual Defendants' utter failure to perform their fiduciary obligations at Bidz allowed the Company to use a jewelry appraiser that failed to satisfy even the minimum industry requirements.  These improper appraisals were designed to and did further artificially increase Bidz's revenues and earnings by giving the false impression to customers that those items were worth more than they actually were.

63.    Bidz customers may obtain an appraisal of purchased items from Bidz. Bidz's appraiser for the jewelry it sells is American International Gemologists ("AIG").  According to a February 19, 2008 article appearing in the *Los Angeles Times*, AIG publicly admitted that it does not physically inspect every item that it appraises, in contravention of standard industry practice.  According to Jeanine Woodling, of the International Society of Appraisers, this "raised a red flag" since a proper appraisal requires an appraiser "to actually be able to see the piece."

64.    The owner and manager of AIG, Norman Monteau, has admitted that he has falsely appraised jewelry sold via an online auction.   The following exchange between Norman Monteau and a consumer that occurred on www.pearl-guide.com is illustrative:

**Consumer**: "Hello Norman, Everything else aside, can you answer this question[?]  Is that your signature on the two appraisals I posted?  I printed them both out and took them to a jeweler this morning after I received the response from JShepherd regarding the bogus valuations, and my jeweler confirmed everything that JShepherd said – he said they were over valued to a point beyond his comprehension…"

**Norman Monteau**: "Yes we did sign those appraisals.  They are ours.  And yes they are in error.  I will be speaking to the auction company tomorrow, we will correct the appraisals…" [5]

65.    Not only are AIG's appraisal practices shoddy and inflated, but it has also misrepresented itself in an effort to appear more credible than it is.  A photograph on AIG's website was apparently "photoshopped" to include a large logo of AIG on the building where AIG is located.  Citron went to the building and learned that it had no such sign on it.  In fact, Citron found that the only signage was a white piece of paper on the front door that nondescriptly identified the location of AIG.  The issue of the fake sign came up during a Bidz conference call on November 27, 2007, in which CEO David Zinberg informed investors that he would ask AIG to remove the inaccurate photo from its website.

---

[5] *See* http://www.pearl-guide.com/forum/ pearls-ebay-q/187-bid4assets-good-not.html.

66.    As a result of the Individual Defendants' utter failure to perform their fiduciary obligations, Bidz has retained the services of an appraiser that does not even meet the minimum industry standard of physically inspecting the items it is valuating, deceiving Bidz's customers and damaging the Company's reputation in the process.

**The Individual Defendants Permitted the Use of Inaccurate Descriptions and Photographs of Items Sold to Customers**

67.    The Individual Defendants' failure to perform their fiduciary obligations also resulted in customers being provided with inaccurate descriptions and photographs of the items they were being sold.

68.    Many customers have complained about receiving items that were different than the photographs and descriptions of these items on Bidz's website. For example, one Bidz customer stated that she purchased an emerald that "had a major crack in the corner, did not look anything like the one shown on the listing, and had a major chip on the bottom of the stone." She also stated that "these things were not described on the listing."[6]

69.    Another customer described how she bid on a blue diamond and then saw the same picture being used for a blue topaz stone. When the customer called

---

[6] *See* http://www.planetfeedback.com/bidzcom/overall+experience/lost+trust+in+bidzcom/154117).

1    the Company, she was only allowed to speak to a person named "Ken," who

2    claimed that it was just a mistake on their part.[7]

3
4    70.    The Company's practices were explained by a confidential witness

5    who worked as a jewelry photographer at Bidz from January 2002 through January

6    2005 ("CW3").  CW3 took pictures of the jewelry and prepared the pictures for

7    printing catalogues and the Company's website.  CW3 stated that photographs were

8    not taken of every item and that photos of one item were regularly used for similar

9
10    items.

11    71.    In the same vein, Bidz, with the participation and/or permission of the

12    Individual Defendants, also failed to provide customers with certificates of

13    authenticity which the customers were promised.  Indeed, CW2 stated that many

14    times customers who were promised a certificate of authenticity for the jewelry

15
16    they won either did not receive the certificates or received only photocopies of the

17    certificates.

18
19    72.    These deceptive practices were allowed to persist because the

20    Individual Defendants failed to perform their fiduciary obligation to prevent or

21    eradicate them.  As with the shill bidding and the use of AIG as the Company's

22    jewelry appraiser, there were no checks on the devious practices designed to

23
24
25
26
27    _____
     [7] *See* http://www.ripoffreport.com/e-trade/bidz-com-ken-david-z/bidz-com-ken-david-biden-cp694.htm.

28    VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                                        - 29 -
     MASTER FILE NO. CV09-04984-PSG (EX)

     1693992.1

1  deceive customers and line the pockets of the Individual Defendants.  These

2  failures represent breaches of fiduciary duty by the Individual Defendants.

3

4       **The Individual Defendants Permitted the Use of Phony Error Messages
        and Other Improper Practices Designed to Ensure that Items Would Not
5                          Be Sold Below a Certain Price**

6

7       73.    The Individual Defendants' fiduciary breaches also contributed to

8  improper practices by which Bidz would take various measures to ensure that

9  items would not be sold to a customer if the winning bid was below a certain price.

10  Specifically, when a winning bid on an item was less than the cost of the item to

11  Bidz, customers would be given bogus error messages and/or would be informed

12  Bidz, customers would be given bogus error messages and/or would be informed

13  that they could not purchase the item for reasons that were false.  This practice was

14  designed solely to ensure that Bidz would not lose money on the items it sold.

15

16       74.    CW2 confirmed these practices.  CW2 stated that employees at Bidz

17  were given access to information regarding the cost of the items that were sold and

18  knew when the items had been won for less than the cost to the Company.  CW2

19  knew when the items had been won for less than the cost to the Company.  CW2

20  further stated that, many times, when customers had purchased items at below cost,

21  they would get an error message that would prevent them from completing the

22  transaction.  CW2 was instructed by her/his superiors to make up a reason as to

23  transaction.  CW2 was instructed by her/his superiors to make up a reason as to

24  why the error message had occurred.

25       75.    CW2 also stated that when that item was to be sold below cost, she/he

26

27  falsely informed customers that the item they had won was oversold or damaged.

28

Again, this practice was permitted to persist because of the Individual Defendants'

utter failure to prevent such practices.

**The Individual Defendants Knew of the Dubious History of Improper Practices at Bidz**

76.    The Individual Defendants' duty to perform their fiduciary obligations was especially important here because Bidz's history is replete with known improper dealings and suspicious relationships.

77.    First, Bidz has numerous relationships with individuals of questionable backgrounds. According to a Citron article released on November 26, 2007, Aframian, owner/manager of Bidz's largest jewelry supplier, LA Jewelry, was the "prime fence in a multi-million dollar nationwide ring of stolen watches and jewelry." Aframian was convicted of receiving stolen property in 1985 and served two years in prison.  During 2005 and 2006, LA Jewelry accounted for approximately 45% of BIDZ inventory purchases.  Bidz typically paid for its inventory purchases by giving stock to Aframian.  Eventually, Aframian became Bidz's third largest shareholder and currently holds approximately 5.1% of Bidz's common stock.

78.    On September 1, 2008, *Barron's* published an article entitled *Putting Bidz.com Shares on Sale*.[8]  Notably, the article alleges that defendant Itkin owned an illegal strip club, the Sunset Strip, while serving as Bidz's CFO in 1999.

79.    The *Barron's* article also contained numerous revelations regarding ties to Bidz and/or defendant Zinberg's contacts with questionable individuals, including: (i) a person "whose felonies include failure to register as a sex offender;" (ii) a felon convicted for "receiving stolen property" and is doing time on a "concealed weapons conviction;" (iii) a felon convicted for "defrauding Medicare and paying kickbacks to doctors for business;" (iv) "a sex offender with prior arrests for assault and battery, and kidnapping;" (v) the executive of Circle of Friends, a health care company suspended "amid a fraud investigation" by California; and (vi) a felon convicted for "buy[ing] stolen property."

80.    Bidz's and defendant Zinberg's numerous shady dealings and relationships have severely damaged the Company's reputation. Despite this, the Individual Defendants and the Board have taken no action to eliminate these relationships or to remove defendants Zinberg and Itkin from positions of authority.

81.    In addition to these suspicious relationships, Bidz has engaged in known improper practices dating back to before the Company even went public.

---

[8] Bill Alpert, *Putting Bidz.com Shares on Sale*, Barron's, Sept. 1, 2008, http://online.barrons.com/article/SB122006128601185513.html

1   For example, Bidz admitted in a June 29, 2006 Form S-1/A filed with the SEC that

2   between 1999 and mid-2003, the Company raised $20.5 million in capital through

3   a series of private stock sales to approximately 830 investors.  In later regulatory

4

5   filings, Bidz acknowledged that these sales were in violation of federal and state

6   securities laws because, among other reasons, the securities were not registered and

7   were sold by unlicensed brokers.  Bidz has never completed a conventional public

8

9   offering under the scrutiny of the SEC.

10      82.    In light of the Company's history of improper dealings and numerous

11  relationships   with   shady   individuals   and   entities,   it   was   imperative   for   the

12

13  Individual Defendants, in furtherance of their fiduciary duties owed to Bidz, to

14  ensure that Bidz would not be engaging in illegal and improper practices during

15  their tenure with the Company.  The Individual Defendants failed to do so, thereby

16

17  breaching their fiduciary duties.

18  **THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING**

19  **STATEMENTS**

20      83.    As a result of Bidz's lack of oversight and internal controls over its

21  online auctions, the Company issued improper statements throughout the Relevant

22

23  Period regarding the health of its business model.  The weaknesses inherent in

24  Bidz's business model have been demonstrated by the Company's recent financial

25  performance.  As reported in the Company's Form 10-Q filed on November 9,

26

27  2009, revenues for the third quarter of 2009 were 55.2% lower than for the third

28

quarter in 2008. Bidz had 20,000 less new customers for this period. Additionally, gross profit was off by 45.86%, and pretax income was a mere $67,000 compared to $5.5 million a year ago.

84. On August 13, 2007, Bidz issued an earnings press release announcing its fiscal second quarter 2007 financial results. In the press release, Bidz disclosed growth in the demand for the Company's jewelry products. In particular, defendant Zinberg stated that "[t]raffic to [the Company's] site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year." The press release provided as follows:

> Net revenue for the second quarter of 2007 was $39.1 million, a 20.6% increase compared with $32.4 million reported for the second quarter of 2006. This increase was due primarily to the growth in demand for the Company's jewelry products and the increase in the average order value, which grew by 28.6% year-over-year to $171. During the second quarter, the Company had an average of nearly 2,700 orders per day as compared to an average of 2,800 orders per day in the prior year's quarter, and the acquisition cost per new buyer declined to $38 versus $49 in the second quarter of 2006.

*       *       *

'The second quarter was an exciting one for Bidz.com as our stock began trading on the Nasdaq in June, and we are proud to be reporting strong sales and earnings growth to our shareholders,' said David Zinberg, President and Chief Executive Officer of Bidz.com. 'Traffic to our site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year.'

Mr. Zinberg continued, 'We are very pleased with the momentum we are seeing and particularly the leverage and scalability of our model which resulted in a significant increase in our bottom-line. *We are keenly focused on continuing to achieve strong growth and profitability and further leveraging our model to deliver earnings, cash flow and shareholder returns.*'

\*       \*       \*

Business Outlook

The Company expects revenues for the third quarter of 2007 to be in the range of $37-39 million, and expects income before income tax of approximately $3.0-3.2 million. For the full year of 2007, the

1
2
3
4
5
6
7
8

Company confirms its revenue guidance of $170-$180 million, and anticipates gross margin of approximately 25-26%. The Company expects income before income tax for 2007 of $14-$15 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 11%, and expects to end the year with approximately 24.5 million shares outstanding.

9
10
11
12
13

85.    Also on August 13, 2007, Bidz hosted an investor conference call to discuss its fiscal second quarter 2007 financial results. During the call, Zinberg, in his prepared statement, stated that Bidz sold "an average of 8700 items per day." Specifically, Zinberg stated as follows:

14
15
16
17
18
19
20
21
22
23
24

In 1999, we started Bidz.com as [a] jewelry focused auction site and had revenues of approximately $125,000 that year, compared to projected revenues of 170 to $180 million this year. During the second quarter of 2007, we sold an average of 8700 items per day, more than any other online jewelry site. Our consumer traffic continues to grow rapidly as well. According to www.Compete.com, an online auction-ranking sites our monthly visitors grew almost 70% to 6.9 million in June, 2007. This was significantly higher than any of our peers.

25
26
27

The growth we've achieved was recently noted by the Entrepreneur Magazine. In [the] July edition we ranked 81 in their Annual Hot 500

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

list of the Fastest Growing Small Business, which is a significant accomplishment for us. The magazine evaluated 90 million companies when generated [sic] that list. Our auctions create a fun and exciting environment and keep customers coming back. Our short auction times provide immediate gratification for our customers.   As most items are posted and sold in 30 minutes or less.

Additionally, our auctions select [sic] live auctions that don't end at [any] specific time, they end when the bidding stops. We find that competition creates added exciting [sic] for consumers while allowing us to maximize profitability on each transaction. ***We expect our revenue growth to continue and are keenly focused on improving our core metrics to increase margins and profitability.***

86.    Also during the August 13, 2007 conference call, defendant Kong, in his prepared statement, attributed increases in the Company's average order values to "improvements in [Bidz's] site." Specifically, Kong stated as follows:

As David said, we had a very strong second quarter. Net revenues in the second quarter of 2007 were $39.1 million, a 20.6% increase compared to the same period of 2006. The increase in revenue was mainly due to the growth and demand for our jewelry products and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[sic] option of higher priced items. Income before tax in the second quarter was $3.7 million compared to $151,000 a year ago. The $3.7 million is substantially above our original guidance of 2.8 million to $3.3 million.  We are focused on continuing to meet and exceed investor expectations, as well as our own profit goes [sic]. Earnings per share in the second quarter of 2007 was $0.12 per diluted share compared to $0.01 per diluted share in the same period of 2006. The increase in net income and earnings per share was due to the increase in revenue and higher gross profit margins.  In the second quarter of 2007, we reduced our marketing expenditure and focused on attracting buyers that were willing to spend more. As a result, our acquisition costs for  new buyer dropped to $38 from $49 in the prior year. This is a dramatic improvement and a key metric we will continue to focus on. ***Our average order value in the second quarter increased 28.6% year-over-year*** to $171 from $133 a year ago, and the number of items sold per day increased 12.3% to 8,678. The increase in average order value is due to the increase in the number of items per order to 3.2 compared to 2.7 in the prior year. ***This increase is due to continuing improvements in our site***[,] [i]ncreased traffic, which

creates more demand for our items, our compelling auction format and significantly increased selection of products.

87.    On November 12, 2007, Bidz issued a fiscal third quarter 2007 earnings press release. In the press release, Bidz reported "strong results," which defendant Zinberg attributed to the Individual Defendants' "continued focus on executing [Bidz's] business and achieving results…" Specifically, the earnings press release provided as follows:

The Company's pre-tax income for the third quarter of 2007 was $5.2 million, above the Company's original guidance of $3.0-$3.2 million, and compared to $1.0 million in the prior period in 2006. Net income for the third quarter of 2007 increased to $3.6 million, or $0.14 per fully diluted share on 26.3 million weighted average shares outstanding, compared to net income of $997,000, or $0.04 per fully diluted share on 23.8 million weighted average shares outstanding in the same period of 2006. The increase in net income was due primarily to higher gross profit margins on increased revenues.

'We are very pleased to announce such strong results for the third quarter,' said, David Zinberg, President and Chief Executive Officer of Bidz.com. 'Our unique value proposition and continued focus on executing our business and achieving results has driven this

performance. Our new initiatives have significantly increased sales and resulted in record gross margins for the quarter.'

Mr. Zinberg continued, 'Looking forward, we continue to innovate to further drive sales growth and profitability. We are optimistic about the upcoming holiday period and as a result have increased our guidance for the year. We look forward to continuing to diligently execute our strategic plan in 2008 and beyond.'

                                *       *       *

Business Outlook

The Company expects revenues for the fourth quarter of 2007 to be in the range of $56-$58 million, and expects pre-tax income of approximately $5.6-$6.0 million. For the full year of 2007, the Company has increased its revenue guidance to $180-$182 million and has increased its expected gross margin guidance to approximately 27-28%. The Company now expects pre-tax income for 2007 of $18.0-$18.5 million. The Company expects its effective tax rate for the full year of 2007 to be approximately 20.2%, and expects to end the year with approximately 26.4 million fully diluted shares outstanding.

88.    On November 12, 2007, Bidz hosted an investor conference call to discuss its fiscal third quarter 2007 earnings. During the call, Zinberg touted the Company's purported "continued focus on being simply the best online auctioneer of jewelry."  Specifically, Zinberg stated as follows:

Our third quarter revenues were $40.1 million, exceeding our previous guidance of 37 million to $39 million and represents a year-over-year growth of 48%. Pre tax income was $5.2 million versus our guidance of 3 million to $3.2 million and represent year-over-year growth of 409%. We are very pleased with this strong performance and as a result  raising our previous 2007 guidance substantially.

From an execution standpoint, we continue to make significant progress in terms of key transaction metrics such as value, visitor traffic, customer acquisition, cost and market share. Specifically, we are averaging over 8800 paid items per day, $173 average order size, 2700 average orders per day, 3.3 items purchased per transaction. As per compete.com, our traffic has increased 169% year-over-year.

We believe the reason for our success *is our continued focus on being simply the best online auctioneer of jewelry. We provide a unique value proposition for both our buyers and suppliers*. Our

prices are determined by customers with auctions starting at $1. We

have short auction time and provide immediate gratification.

89.    The statements described above were false and misleading because

they failed to disclose and misrepresented materially adverse facts, which were

known by the Individual Defendants.

90.    First, the statements failed to disclose that Bidz's business model was

based on shill bidding designed to boost sale prices and to protect particular items

from selling below cost.   The statements similarly failed to disclose that the

Company's online auctions did not have adequate controls to prevent shill bidding

and other abuses.

91.    Next, the statements failed to disclose that the Company's auditor,

Stonefield, was unqualified and had been harshly criticized by PCAOB for its

numerous deficient audits.

92.    The statements also failed to disclose that Bidz's appraiser, AIG, did

not even physically inspect the jewelry items it purportedly appraised (in direct

contravention of industry standards) and/or that Bidz lacked the necessary internal

controls to prevent such practices.

93.    Further, the statements failed to disclose that customers were being

provided with inaccurate descriptions and photographs of the items they were

1  purchasing and/or that Bidz lacked the necessary internal controls to prevent such

2  practices.

3       94.    Finally, these statements failed to properly disclose that in May 2007,

4  Bidz entered into a related party transaction with LA Jewelers pursuant to which

5  LA Jewelers guaranteed Bidz a 20% gross profit upon Bidz's sale of LA Jeweler's

6  products.  Under Generally Accepted Accounting Principles ("GAAP"), Bidz was

7

8  required to disclose its related party transaction with LA Jewelers. GAAP requires

9  the  disclosure  of  related  party  transactions  because  related  parties,  such  as

10  controlled entities, principal stockholders or management, can execute transactions

11

12  that improperly inflate earnings by masking their economic substance or distort

13  reported results through lack of disclosure.  By failing to disclose this related party

14  transaction, the forgoing statements regarding the Company's financial condition

15

16  and  outlook  were  false  and  misleading  when  made  because:  (i)  profits  were

17  artificially inflated due to improper accounting of related party transactions with

18  LA Jewelers; and (ii) profit and earnings guidances were based, in part, on the

19

20  future completion of related party transactions.

21

**THE TRUTH IS REVEALED**

22

23       95.    On November 26, 2007, Citron published an article entitled "Citron

24  Adds Some Color and Clarity to Bidz.com" that revealed the shill bidding scheme

25

26

27

28  ────────────────────────────────────────

1  and other fraudulent business practices occurring at the Company.   The article, in

2  relevant part, stated:

> Bidz.com is an online auction provider of off price jewelry and second
> tier accessories. What makes their model unique is that everything is
> sold via auction. Yet, the auctions are not third party auctions as
> facilitated by Ebay, rather they are auctions that are controlled by the
> company. In this report, Citron will expose what we believe to be
> many red flags at BIDZ. Citron will make a few comparisons to
> previous reports written on other companies as the issues at BIDZ
> seem to closely mirror issues we have discussed in the past.
>
> *       *       *
>
> Instead of generating cash, BIDZ seems to be generating a lot of
> inventory. So instead of investors seeing a higher cash balance, they
> are seeing warehouses filled with 'closeout and distress sale' jewelry.
>
> *       *       *
>
> Most investors would prefer to see efficiencies to kick in with rising
> revenues, but instead, actual reported inventory levels are instead
> spiraling at least 300% higher than the run rate of revenue.
>
> *       *       *

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BIDZ['s] largest supplier for years has been LA Jewelry, owned and operated by Saied Aframian, who also happens to be one of BIDZ['s] largest shareholders. Not surprisingly, LA Jewelry is also BIDZ['s] largest creditor, and a large participant in BIDZ['s] co-op advertising program. These 'related party' transactions are all over BIDZ['s] financials including:

- Over $5.3m accounts payables to a related party (nearly 20% of AP)

- Purchase of 11.6% of its merchandise from a related party

- Participation in co-op marketing (12%) by related party

- Guarantee agreement with the same party related for 'minimum profit' on inventory purchased from the party.

- The related party owns 1,228,000 shares of BIDZ['s] stock.

Saied Aframian is a convicted felon and has served time in the Federal System for fencing stolen goods. Not just petty crime either, but for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry.

We are not suggesting that BIDZ sells stolen goods; rather we are observing the background of some of the individuals behind BIDZ who are most responsible for its reported profits. ***The question is whether all these related party transactions cast reasonable doubt over BIDZ['s] reported financials as a fair reflection of the health of the business.***

Considering the deal to guarantee margins to the company coincided with the public offering of BIDZ, Citron concludes that Mr. Aframian was well aware that there could be a lot more money made from his stock than from selling jewelry. Any time we have seen a company work on guaranteed margins by a large shareholder, the results have been dismal: *i.e.* Escala and Syntax Brillian, two stocks previously covered by Citron, now trading 90% and 60% lower respectively from date of initial report.

Speaking of the public offering, BIDZ filed a registration and began to trade on a public exchange. But Citron notes that in 2006, after paying for the preparations for an IPO, it then cancelled. Their stated reason was because insiders refused to sign lockup agreements. This alone should be a red flag.

*     *     *

1   Citron believes that the company is not being forthright with their

2   customers when it comes to 'retail value' or 'appraised value'. All of

3   the jewelry from BIDZ shows an appraisal from AIG Labs. This

4   appraisal makes consumers feel as if they are getting a good deal on a

5

6   credible piece of jewelry that might have a decent resale value. Going

7   to the website of AIG we see their name on a big building, which

8   conveys an illusion of credibility.

9

10  Citron paid a visit to AIG labs and an illusion it is. There is no name

11  on the building (except in Photoshop…). As a matter of fact, the only

12  signage they have is a white piece of paper on the front door to

13

14  identify them. It appears to Citron that AIG is more of an 'appraisal

15  mill', that enables Bidz.com to sell low priced items to an unknowing

16

17  public.

18                        *        *        *

19  One common complaint that we see online is 'shill bidding'. On

20  Wednesday, November 28, Citron will expose what we believe to be

21

22  is some extremely questionable bids and bidding practices that occur

23  on Bidz.com. This part 2 will have much supporting documentation

24

25  that the investing public should be made aware of. Unlike eBay and

26  other well-known auction sites, you cannot even click to contact or

27

28

check the track record of bidders. And since the company is selling its own goods, rather than conducting auctions for independent sellers, the company is responsible for the legality of all aspects of the conduct of its auctions.

96.    As a result of this report, on November 26, 2007, the Company's stock dropped $3.38 per share from to close at $16.56 per share, a one day decline of 17% on unusually heavy trading volume.

97.    On November 27, 2007, Bidz held a conference call to address Citron's negative article. During the conference call, defendant Zinberg defended the Company's business practices and completely denied Citron's allegations of shill bidding. A November 27, 2007 article in *Barron's*, entitled *Bidz Conference Call: CEO Zinberg Didn't Know Supplier was Convicted Felon; Gets no Revenue from TV Sales*, highlighted the relevant parts of the conference call as follows:

- Zinberg says Citron's report was 'untruthful,' and that the company is considering legal action against Citron.

                    *      *      *

- Zinberg asserted that comparisons between the cash and inventory positions of Bidz.com and Blue Nile (NILE) and Overstock (OSTK) are not valid since the companies do not have the same business models.

- On the company's rising inventory levels, he says that this is a conscious strategy, and that the company has been historically under-inventoried. He also says the company is moving into manufacturing some of its own items, which will require that inventory be held longer.

  *    *    *

- On the relationship with Aframian, he says that he has never had any reason to question his integrity, but that the company is now re-evaluating his relationship with him. He says the company has cut its reliance on L.A. Jewelry to 12% of revenue from 35% a year ago. He also says the company could easily replace the goods they get from L.A. Jewelry from other wholesalers. He added that Aframian is a manager, but not an owner, of L.A. Jewelry. He says the company checks out its suppliers with the Jewelry Board of Trade. He also said that he has known Aframian for 7 years.

  *    *    *

- On the company's "F" rating from the Better Business Bureau, he says there are 241 complaints on file compared to more than

8 million items sold in the last 3 years. He says the merchandise return rate is 3%-4%.

- On appraisal service AIG Labs, also known as American International Gemologists, he says he asked the company to take down the picture of its office building with the AIG logo, since the building does not actually display that logo. He also said Bidz is negotiating with other appraisal services.

*     *     *

- On possible shill bidding on the site, he says that shill bidding is against company policy.

*     *     *

- Zinberg says about 25% of its jewelry is sold below cost.

- Zinberg had no explanation for why people would bid more than $11,000 for a TV worth less than a tenth of that.

- Zinberg insisted there was nothing strange about the many bids now on the site for a large yellow diamond ring listed on company's home page with multiple bids north of $500,000. He says the company has no way of knowing if the bidders can actually pay for such a large purchase.

- •    Zinberg says about 20% of winning auction bids do not result in transactions; but he says they only book revenue on shipment of goods once cash is received.

\*    \*    \*

- •    [Zinberg] had no explanation for why one bidder bought 14 televisions at above-market prices.

98.    After the conference call, Bidz's stock price continued to decline, indicating that investors were not reassured by Zinberg's defense of the Company's practices.

99.    Then, on November 28, 2007, Citron followed up with an article entitled "Citron Research Comments on Bidz.com Part II."  The article stated, in relevant part:

Citron Research believes the bidding process at Bidz.com leaves a lot of unanswered questions. While Citron does find the Bidz site entertaining with a unique interface, they have much to prove before it can be anointed with the big earnings multiples associated with proven business models. This report will outline some of the obvious bidding irregularities that we have observed on the Bidz website.

This report will not be a refutation to the conference call and will not address any new issues.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Let us offer one important correction. In the initial report we stated that CEO Zinberg pays himself 30,000 shares per month. This was not correct. He has been selling 30,000 shares per month from his own holdings. Mr. Zinberg stated during yesterday's conference call that he has reduced that number to 10,000 shares per month; as of today, there has been no public filing of this change yet.

One common complaint that Citron observed in customer postings was shill bidding. This led us to do our own homework. Citron focuses on presenting public domain information. Therefore, when we suggested shill bidding, the investing public ran with the ball and found the same problems on the Bidz website that were found by Citron. As evident in yesterday's conference call investors have already seen these auction items:

$6,000 flashlight/TV combo . . . $11,000 Television…

The problem is still ongoing as we see in the live auction for a television with an MSRP of $1,499 yet the current bid on the television as of publication is $2,776.

In an informal study, Citron offers the linked table, which outlines not only the obvious irregular bidding above, but also a pattern in the

auction *of over 30 TV's over more than 3 months. Most of these TV's are bid on hundreds of times by the same three bidders.*

What makes this attached spreadsheet so interesting is that all of these televisions were sold by Clear Solution Partners. The owner of Clear Solution Partners is Bidz.com co-founder Matthew Mills. Not only is he the co-founder and vendor of these televisions, he has also been an outspoken proponent of the stock as evident in the Barron's Blog.

The hundreds of unique bidders over $500,000 for the big yellow diamond ring on BIDZ homepage has now been the topic of much discussion and there is no need to restate those questions. *Citron notes that Bidz itself stated in the conference call that it does not know whether bidders are bona fide until after an auction closes.* Therefore, Citron cannot prove that the bidding on any jewelry is fake either. Jewelry is an item that thwarts direct comparison pricing, especially on the internet.  The question that investors are left with is: Are the patterns of bidding on the televisions any indication of patterns of bidding on jewelry? *Do the hundreds of repetitive bids on the TV's (often by the same bidder on separate auctions at nearly the same second) represent flying fingers of a rogue actor, or a feature of the auction software that only company insiders know about?*

1

2

3

4

Bidz.com is in need of a system that allows for more transparency of the Bidz and the integrity that comes from unedited consumer feedback within their own site.

5

6

7

8

100.   As a result of the news, the Company's stock dropped an additional $1.80 per share to close on November 28, 2007 at $10.10 per share on usually heavy trading volume.

9

**THE SEC AND FTC INVESTIGATIONS**

10

11

12

13

101.   On or about February 23, 2009, the Company filed a Form 8-K with the SEC that revealed the SEC had launched a formal investigation "relating to certain aspects of its inventory accounting practices."

14

15

16

17

18

19

20

102.   On October 27, 2009, the SEC expanded the scope of its investigation and issued a subpoena requiring Bidz to produce documents relating to minimum gross profit guarantees and co-op marketing contributions.   Bidz has used co-op marketing contributions to improperly inflate gross margins.   This practice is a significant component of a securities class action pending against Bidz.

21

22

23

24

25

26

103.   In May 2009, the Company received a Civil Investigative Demand for information from the FTC relating to Bidz's email marketing practices.   Consumers have reported that Bidz engaged in an email-spamming campaign that bombarded them with numerous emails from Bidz.   The FTC appears to be following-up and investigating these reports.

27

28

104.   The investigations by these federal agencies underscore the pervasiveness of the problems at Bidz.

**DAMAGES TO BIDZ CAUSED BY THE INDIVIDUAL DEFENDANTS**

105.   As a result of the Individual Defendants' improprieties, Bidz disseminated improper statements concerning its online auctions and financial health.   These improper statements as well as defendants Zinberg and Itkin's extensive contacts with criminals and other untrustworthy characters, have devastated, and are continuing to devastate, Bidz's credibility as reflected by the Company's $107 million market capitalization loss.  As long as defendants Zinberg and Itkin continue to be associated with Bidz and Bidz continues to be associated with LA Jewelry, AIG, and Stonefield, potential investors will be unwilling to put their faith in the veracity of Bidz's business model.

106.   Moreover, Bidz's credibility with its customers has been irreparably damaged as a result of the uncontrolled shill bidding that the Individual Defendants have allowed to occur during the Company's online auctions.   The prevalence of shill bidding in addition to defendants Zinberg's and Itkin's nefarious business contacts have created an environment of distrust that limits the Company's revenue potential from its online auction business model.

107.   Bidz also faces potential liability to customers who purchased jewelry that was overpriced as a result of the shill bidding.  Indeed, on August 22, 2008, a

1    class of consumers sued Bidz alleging that the Company engages in a systematic

2    program of shill bidding.

3        108.   Further, on or about September 30, 2009, another class of consumers

4

5    filed an action against Bidz for misrepresentations regarding the 100% money back

6    guarantee contained on its website.  The putative class plaintiffs allege that despite

7

8    the Company's guarantee, Bidz charges a restocking fee and shipping expenses to

9    customers who return items.

10       109.   As a direct and proximate result of the Individual Defendants' actions,

11

12   Bidz has expended and will continue to expend significant sums of money.  Such

13   expenditures include, but are not limited to:

14       (a)   costs incurred in investigating and defending Bidz and certain officers

15

16             in lawsuits filed against the Company, plus potentially hundreds of

17             millions of dollars in settlement or to satisfy an adverse judgment;

18       (b)   costs incurred from compensation and benefits paid to the defendants

19

20             who have breached their duties to Bidz;

21       (c)   tens of millions of dollars worth of potential damages in connection

22             with the consumer class action; and

23

24       (d)   costs incurred in connection with the SEC and FTC investigations.

25       110.   Moreover, these actions have irreparably damaged Bidz's corporate

26   image and goodwill.  For at least the foreseeable future, Bidz will suffer from what

27

28

is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Bidz's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### THE INDIVIDUAL DEFENDANTS' INSIDER SELLING

111.    On August 16, 2007, Bidz filed a Form 8-K with the SEC.  The Form 8-K, signed by defendant Kong, stated that defendant Zinberg had adopted a Rule 10b5-1 trading plan, under which he would sell up to 30,000 shares per month. The press release stated in relevant part:

> Bidz.com, Inc. (NASDAQ: BIDZ), a leading online auctioneer of jewelry, today announced that its Chairman and Chief Executive Officer, ***David Zinberg, adopted an individual pre-arranged stock trading plan in accordance with Rule 10b5-1 of the Securities and Exchange Act of 1934, as amended.  Additionally, Mr. Zinberg's annual salary is voluntarily being reduced to $1 per year and he is not expected to receive any bonus or stock option grants.***

> Commenting on the announcement, Mr. Zinberg, Chairman and Chief Executive Officer said, 'Bidz.com was founded in 1998 and we are extremely proud of our achievements over the last nine years.  We have shareholders who have been supportive of our efforts from the

beginning as well as many new shareholders who have invested in the Company now that we trade on the Nasdaq. I want to further align my interests with all of our investors and believe the best way to do so is to reduce my salary and tie my compensation to the performance of the Company which should result in share price appreciation.'

Mr. Zinberg continued, 'We are very pleased with the momentum we are seeing in the business and particularly the leverage and scalability of our model. Bidz is a results driven company that is focused on profitable growth while continuing to innovate and deliver compelling customer value, and increasing market share. We look forward to delivering strong results that drive shareholder value over the coming quarters and years.'

Rule 10b5-1 allows officers and directors of public companies to adopt written pre-arranged stock trading plans when they are not in possession of material, nonpublic information. Once a Rule 10b5-1 trading plan is established, the insider retains no discretion over sales under the plan, and the trades are executed through a broker in accordance with the terms of the plan at later dates without regard to any subsequent material non-public information that the insider may receive.

*Mr. Zinberg has not previously sold any shares of his holdings of Bidz.com's common stock or common stock underlying options.* The pre-arranged stock trading plan has been adopted to allow Mr. Zinberg to sell a portion of his shares of common stock (and/or shares of common stock acquired upon the exercise of vested stock options) over time as part of his long-term strategy for individual asset diversification and liquidity.

Sales under the plan are subject to certain prearranged minimum sale prices. Mr. Zinberg's plan provides for sales of up to 30,000 shares each month commencing August 15, 2007 (360,000 shares in the aggregate during the plan term). The plan terminates on July, 31, 2008 and shares not sold in a particular month may be carried over and sold in successive months during the term.

112.   During the Relevant Period, defendants Zinberg and Liu, based on their knowledge of material non-public information regarding the Company's improper auction practices, sold approximately 145,000 shares of Bidz common stock garnering total proceeds of $1,843,100 as follows:

| Name | Transaction Date | Number of Shares Sold | Stock Price | Total Proceeds |
|------|-----------------|----------------------|-------------|----------------|
| Zinberg | 08/15/07 | 13,899 | $8.18 | $114,000 |
| | 08/16/07 | 8,600 | $8.04 | $69,000 |
| | 08/17/07 | 7,501 | $8.04 | $60,000 |
| | 09/04/07 | 24,600 | $8.93 | $220,000 |

| | 09/05/07 | 5,400 | $8.60 | $46,000 |
|---|---|---|---|---|
| | 10/01/07 | 30,000 | $13.07 | $392,100 |
| Liu | 11/16/07 | 37,500 | $16.79 | $630,000 |
| | 11/19/07 | 17,500 | $17.82 | $312,000 |
| **TOTAL** | | **145,000** | | **$1,843,100** |

113.   The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Zinberg and Liu, but were rather suspicious in that:

(a)   Defendant Zinberg entered into a 10b5-1 plan for the first time on August 16, 2007 (effective August 15, 2007) and had sold no shares of his stock prior to August 15, 2007.

(b)   Defendant Liu had sold no shares of her stock prior to November 16, 2007.

(c)   All of these defendants' stock sales occurred soon after the Company's positive press releases and reports, which made no mention of the Company's improper conduct, described *supra*.

114.   In order to present the appearance of propriety, all of the sales made by defendant Zinberg listed above were conducted pursuant to the Rule 10b5-1 plan he entered into on August 16, 2007.  However, defendant Zinberg entered the 10b5-1 plan while he was already in possession of material non-public information regarding Bidz's improper business practices. Consequently, defendant Zinberg's 10b5-1 plan was never valid.

115.   Defendant Zinberg attempted to remove attention from his new trading plan by voluntarily reducing his salary to $1 and proclaiming that he would not receive any future bonuses.  However, his annual salary and eligibility to earn bonuses resumed as of March 1, 2008, and he ultimately received $433,434 in compensation in 2008 which was more than double his 2007 compensation of $201,244.

**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

116.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

117.   Plaintiffs bring this action derivatively in the right and for the benefit of Bidz to redress breaches of fiduciary duty by and unjust enrichment of the Individual Defendants.

118.   Plaintiffs will adequately and fairly represent the interests of Bidz and its shareholders in enforcing and prosecuting its rights.

119.   Plaintiffs are owners of Bidz common stock and were owners of Bidz common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

120.   As a result of the facts set forth herein, plaintiffs have not made any demand on Bidz's Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of

1    making an independent and disinterested decision to institute and vigorously
2    prosecute this action.

3
         121.   At the time this action was commenced, the Board consisted of five
4
5    directors, defendants Zinberg, Kong, Hanelt, Itkin and Singh.   A majority of the
6    Board is incapable of making an independent and disinterested decision to institute
7
     and vigorously prosecute this action for the following reasons.
8

9        122.   Defendant Zinberg dominates and controls Bidz and its Board.
10   Defendant Zinberg co-founded the Company with defendant Itkin.   Defendant
11
     Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares.
12
13   Defendant Zinberg has exercised his domination and control in various ways.   For
14   example, defendant Zinberg exercised his domination and control over Bidz by
15   allowing defendant Itkin to serve as Bidz's CFO during 1999, despite the fact that
16
17   Itkin was co-managing an illegal strip club (the other co-manager of the illegal
18   strip club was Oleg Khersonsky, who, according to a September 1, 2008 *Barron's*
19
     article, was arrested for assault with a deadly weapon and for a sex crime with a
20
21   minor).   Defendant Zinberg further exercised his domination and control to allow
22   Itkin to maintain his position on the Board despite those illicit dealings.   The fact
23
     that Zinberg himself remains in charge of Bidz is further evidence of his
24
25   domination and control over the Company, given his own dealings with numerous
26   illicit characters including persons arrested for sex crimes, buying and selling

27

28

stolen property, carrying concealed weapons, health care fraud, tax fraud, prostitution, and kidnapping. Finally, defendant Zinberg's daily interactions with his fellow employees are indicative of his domination and control. For example, a confidential witness ("CW4"), who worked in Bidz's billing department from June 2002 until August 2004, and who had a close relationship with Marina Zinberg, stated that Zinberg was "always walking around, looking over peoples' shoulders and making them feel nervous." Defendant Zinberg exercises the same domination and control over his fellow directors, and they, too, would be "nervous" and "afraid" of crossing him, particularly when it comes to deciding whether to file a lawsuit against him. In light of the foregoing, there is a reasonable doubt as to whether defendants Kong, Hanelt, Itkin, and Singh could exercise their disinterested and independent judgment in connection with any demand to bring suit, especially in light of the fact that doing so would implicate Zinberg. Thus, demand on the Board is futile.

123. The following facts, among others discussed above, demonstrate that the Board knew of serious wrongdoing at Bidz and/or knew that the Company's internal controls were so inadequate that numerous improper practices were allowed to persist, and yet took no action in response thereto: (i) during the Relevant Period, as disclosed in the Company's fiscal year 2006 Form 10-K, Bidz's revenues were dependent to a significant extent on the Company's online auction

business model; (ii) the Company was dependent on the "satisfactory availability, performance, and reliability" of the Company's website; (iii) Bidz is legally responsible for the jewelry sold during the online auctions because Bidz supplies the jewelry and the sales proceeds accrue to Bidz; (iv) 44% of the winning bids in Bidz's auctions did not result in transactions, strongly supporting the position that shill bidding was indeed Company practice; and (v) Bidz and certain of its representatives had numerous and long-standing relationships with individuals and entities that were suspicious, to say the least, which created a heightened duty on the part of the Board to be conscientious in fulfilling their fiduciary duties. Nonetheless, the Board failed to take any action to curb the shill bidding and other deceptive practices described above.  The Board also failed to ensure that adequate controls were in place to prevent such practices.  For example, as admitted by defendant Zinberg during the November 27, 2007 conference call, Bidz had no means to verify if particular bids were legitimate.  As a result of their failures, the members of the Board, among other things, caused or consciously permitted Bidz to: participate in the illegal practice of shill bidding; appoint an unqualified auditor that was known to have conducted numerous deficient audits in the past; use a jewelry appraiser that did not satisfy minimum industry standards in issuing appraisals; provide customers with inaccurate descriptions and photographs of the items they were purchasing; and refuse to honor winning bids if they were less

than the cost of the item to the Company.  The Board has simply taken no action to prevent or correct Bidz's shill bidding or these many other shoddy business practices.  For these reasons, defendants Zinberg, Kong, Hanelt, Itkin, and Singh each face a sufficiently substantial threat of liability.  Thus, there is a reasonable doubt as to the disinterestedness of a majority of the Board, and any demand on the Board would be futile.

124.    Defendants Hanelt and Singh were, during the Relevant Period, members of the Audit Committee.  The Audit Committee's charter provides that the Audit Committee is responsible for: (i) reviewing and discussing information presented in the Company's earnings press releases; (ii) overseeing the financial reporting processes of the Company; (iii) reviewing the Company's internal controls; (iv) evaluating the qualifications of and appointing the independent auditor; and (v) ensuring that the Company abides by all relevant laws.  For the reasons discussed above, Hanelt and Singh knew that the Company's business model was based upon shill bidding, and that the practice was rampant throughout the Company.  Nonetheless, Hanelt and Singh oversaw and directly participated in the dissemination of Bidz's improper press releases that concealed Bidz's inadequate controls over its online auctions and flawed business model.  Moreover, Hanelt and Singh appointed Stonefield as the Company's independent auditor despite the PCAOB's March 14, 2007 report identifying significant deficiencies in

Stonefield's prior audits.  Accordingly, these defendants breached their fiduciary duties of due care, loyalty, and good faith because they participated in the preparation of improper financial statements and earnings press releases that contained improper material information; and they appointed an independent auditor with questionable qualifications.  Thus, Hanelt and Singh face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

125.  Defendant Zinberg faces a substantial likelihood of being held liable for breaching his fiduciary duties of loyalty and good faith and violating California Corporations Code § 25402 by engaging in illegal insider trading of Bidz securities as alleged herein, and therefore is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

126.  Defendants Zinberg and Itkin have a long history of relationships with each other, both personal and professional.  For example, Zinberg and Itkin were CEO and CFO, respectively, of both Asset Lenders of America and Union Pawn Brokers, Inc. ("Union Pawn").  Additionally, both have served as Registered Agents for various business entities that have shared the same address.  For example, Zinberg served as the Registered Agent for Union Pawn, while Itkin served as the Registered Agent for AFB Trading One, Inc. ("AFB").  Union Pawn and AFB shared the same address.  Due to their long history of personal and

professional interconnecting relationships, defendants Zinberg and Itkin are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other.

127.   Defendant Itkin is the former CFO of Bidz.  Currently, the SEC is looking into past accounting practices of the Company.  Due to the possibility that Itkin will be held liable for the Company's past accounting practices, he is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.   Further, during fiscal year 2008, Itkin received substantial compensation as a Bidz director, which totaled $110,038. Itkin is dependent upon this compensation because his ability to procure employment outside of Bidz is limited due to his illegal prior acts.  Accordingly, there is a reasonable doubt that Itkin would take action against the other Individual Defendants because to do so would jeopardize his directorial compensation. Demand is futile as to defendant Itkin.

128.   The principal professional occupation of defendant Kong is his employment with Bidz, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.   Specifically, Bidz paid defendant Kong the following compensation during the Relevant Period:

| Fiscal Year | Salary | Bonus | Option Awards | All Other Compensation |
|---|---|---|---|---|
| 2008 | $235,000 | $302,930 | $182,413 | $23,320 |
| 2007 | $235,000 | $338,048 | $224,330 | $16,828 |

Accordingly, defendant Kong lacks independence from defendant Zinberg by virtue of his domination and control and defendants, Hanelt, Itkin, and Singh by virtue of their positions as members of the Compensation Committee.  The Compensation Committee has the authority to review and approve corporate goals and objectives relevant to executive compensation, including evaluating the executive's performance, and determining and approving the executive's compensation level.  This lack of independence renders defendant Kong incapable of impartially considering a demand to commence and vigorously prosecute this action.

129.   Defendant Kong is married to Defendant Liu, and both are former employees of JSL Foods, Inc.  As a result of these longstanding personal and professional relationships, Kong is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against Liu.

130.   Plaintiffs have not made any demand on shareholders of Bidz to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Bidz is a publicly held company with over 23.2 million shares outstanding, and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

## AGAINST ALL INDIVIDUAL DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

131. Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

132. The Individual Defendants owed and owe Bidz fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bidz the highest obligation of good faith, fair dealing, loyalty, and due care.

133. As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

1    134.   The Individual Defendants, and each of them, violated and breached

2    their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and

3    supervision.

4

5    135.   As Bidz officers, defendants Zinberg (CEO, President, and Chairman

6    of the Board), Liu (COO and former Vice President of Operations), Kong (CFO,

7    Treasurer, Secretary, and member of the Board), and Kuperman (Chief Technology

8    Officer and President) breached their fiduciary duties of care, loyalty, and good

9    faith by causing or permitting the Company to engage in the illegal practice of shill

10   bidding and to retain and use an unqualified accounting auditor.  These defendants

11   also breached their fiduciary duties of care, loyalty, and good faith by causing or

12   allowing Bidz to, among other things, use a jewelry appraiser that did not satisfy

13   minimum industry standards in issuing appraisals; provide customers with

14   inaccurate descriptions and photographs of the items they were purchasing; and

15   refuse to honor winning bids if they were less than the cost of the item to the

16   Company.

17

18   136.   Defendants Hanelt, Itkin, and Singh (along with Zinberg and Kong),

19   as members of the Bidz Board, also breached their fiduciary duties of care, loyalty,

20   and good faith by causing or permitting the Company to: engage in the illegal

21   practice of shill bidding; retain and use an unqualified accounting auditor; use a

22   jewelry appraiser that did not satisfy minimum industry standards in issuing

23

24

25

26

27

28

1  appraisals; provide customers with inaccurate descriptions and photographs of the

2  items they were purchasing; and refuse to honor winning bids if they were less

3
   than the cost of the item to the Company.
4

5       137.   The Individual Defendants also breached their fiduciary duties of care,

6  good faith, and loyalty by causing or permitting Bidz to issue improper public

7
   statements that failed to disclose the wrongdoing described above and/or failed to
8

9  disclose that the Company did not have adequate internal controls in place to

10 prevent or halt such wrongdoing.

11
        138.   As a direct and proximate result of the Individual Defendants'
12

13 foregoing breaches of fiduciary duties, the Company has sustained damages,

14 including, but not limited to, costs and expenses incurred with litigation associated

15
   with the Company's improper business practices, and loss of reputation and
16

17 standing in the industry.

18                                   **COUNT II**

19
        **AGAINST DEFENDANTS ZINBERG AND LIU FOR BREACH OF**
20              **FIDUCIARY DUTIES FOR INSIDER SELLING AND**
21                  **MISAPPROPRIATION OF INFORMATION**

22      139.   Plaintiffs incorporate by reference all preceding and subsequent

23
   paragraphs as if fully set forth herein.
24

25

26

27

28  Verified Consolidated Shareholder Derivative Complaint                    - 71 -
    Master File No. CV09-04984-PSG (EX)

    1693992.1

140.   At the time of each of the stock sales set forth herein, defendants Zinberg and Liu knew, but did not disclose publicly, the material information regarding their illicit and deceptive business practices described herein.

141.   Each of these defendants sold Bidz common stock on the basis of and because of their knowledge of this material non-public information.

142.   At the time of their stock sales, defendants Zinberg and Liu knew that when the material information regarding their improper conduct at Bidz was publicly disclosed, the price of the Company's common stock would dramatically decrease.  Defendants Zinberg's and Liu's sales of Bidz common stock based on their knowledge of this material non-public information were a breach of their fiduciary duties of loyalty and good faith.

143.   Since the use of the Company's proprietary information for their own gain constitutes a breach of their fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds defendants Zinberg and Liu thereby obtained.

## COUNT III

### AGAINST DEFENDANTS ZINBERG AND LIU FOR VIOLATION OF CALIFORNIA CORPORATION CODE § 25402

144.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

1    145.   Upon information and belief, Bidz has had at least five-hundred

2    shareholders of record at all times relevant hereto.

3    146.   At the time that defendants Zinberg and Liu sold their shares of the

4    Company's common stock in California as set forth herein, by reason of their high

5    

6    executive and/or directorial positions with the Company, defendants Zinberg and

7    Liu had access to highly material information regarding the Company, including

8    

9    the information set forth herein regarding their illicit and deceptive business

10   practices perpetrated at Bidz.

11   147.   At the time of such sales, that information was not generally available

12   to the public or the securities markets.   Had such information been generally

13   

14   available, it would have significantly reduced the market price of the Company's

15   shares at that time.

16   

17   148.   Defendants Zinberg and Liu, and each of them, had actual knowledge

18   of material, adverse non-public information regarding the Company, and thus sold

19   their shares of the Company's common stock in California in violation of

20   

21   California Corporations Code § 25402.

22   149.   Pursuant to California Corporations Code § 25502.5, defendants

23   

24   Zinberg and Liu, and each of them, are liable to the Company for damages in an

25   amount up to three times the difference between the price at which the stock was

26   sold by these defendants, and each of them, and the market value which the stock

27   

28

---

1    would have had at the time of the sale if the information known to these defendants

2    had been publicly disseminated prior to that time and a reasonable time had

3    elapsed for the market to absorb the information.

4

5                              **COUNT IV**

6             **AGAINST ALL INDIVIDUAL DEFENDANTS**
                 **FOR WASTE OF CORPORATE ASSETS**
7

8        150.  Plaintiffs  incorporate  by  reference  all  preceding  and  subsequent

9    paragraphs as if fully set forth herein.

10

11       151.  As  a  result  of  the  misconduct  described  above,  the  Individual

12   Defendants  wasted  corporate  assets:  (i)  by  paying  bonuses  to  certain  of  its

13   executive officers; and (ii) by incurring potentially hundreds of millions of dollars

14
     of legal liability and/or legal costs to defend defendants' unlawful actions.
15

16       152.  As a result of the waste of corporate assets, the Individual Defendants

17   are liable to the Company.

18

19                              **COUNT V**

20        **AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST**
                            **ENRICHMENT**
21

22       153.  Plaintiffs  incorporate  by  reference  all  preceding  and  subsequent

23   paragraphs as if fully set forth herein.

24

25       154.  By their wrongful acts and omissions, the Individual Defendants were

26   unjustly enriched at the expense of and to the detriment of Bidz.

27

28

155.   Plaintiffs, as shareholders and representatives of Bidz, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

156.   Plaintiffs, on behalf of Bidz, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Determining and awarding Bidz treble damages pursuant to California Corporations Code §25502.5(a) for defendant Zinberg and Liu's violations of California Corporations Code §25402;

C.     Directing Bidz to seek the resignation of defendants Zinberg, Itkin, and other Bidz employees and directors with histories of criminal or illegal acts or strong ties to other individuals with histories of criminal or illegal acts;

D.     Directing Bidz to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bidz and its shareholders from a repeat of the damaging events described

herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      (i)    a proposal to create a Board committee with oversight over the Company's online auctions;

      (ii)    a proposal to remove executives and directors who have been convicted for felonies or crimes that involve dishonesty such as fraud or theft;

      (iii)    a proposal to strengthen the Company's internal controls over the Company's online auctions;

      (iv)    a proposal to create an ethics committee charged with review of the Company's and its executives' and directors' dealings and relationships with suspicious entities or individuals;

      (v)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      (vi)    a provision to permit the shareholders of Bidz to nominate at least three candidates for election to the Board;

(vii)    a proposal to ensure the accuracy of the qualifications of Bidz 's directors, executives, and other employees and to evaluate these persons' associations with convicts and other unscrupulous individuals;

(viii)   a proposal to control insider selling;

(ix)    a proposal to appropriately test and then strengthen the internal audit and control functions; and

(x)    a proposal to remove Stonefield as the Company's independent auditor.

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of Bidz has an effective remedy;

F.    Awarding to Bidz restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

1

## JURY DEMAND

2

Plaintiffs demand a trial by jury.

3

November 24, 2009                          s/Nichole T. Browning

4                                          NICHOLE T. BROWNING
                                           BARROWAY TOPAZ KESSLER
5                                          MELTZER & CHECK, LLP
                                           580 California Street, Suite 1750
6                                          San Francisco, CA  94104
                                           Telephone:  (415) 400-3004
7                                          Facsimile:   (415) 400-3001

8                                          – and –

9                                          ERIC L. ZAGAR
                                           280 King of Prussia Road
10                                         Radnor, PA  19087
                                           Telephone: (610) 667-7706
11                                         Facsimile:  (610) 667-7056

12                                         *Co-Lead Counsel for Plaintiffs*

13                                         BRIAN J. ROBBINS
                                           FELIPE J. ARROYO
14                                         SHANE P. SANDERS
                                           DAVID L. MARTIN
15                                         ROBBINS UMEDA LLP
                                           600 B Street, Suite 1900
16                                         San Diego, CA 92101
                                           Telephone: (619) 525-3990
17                                         Facsimile:  (619) 525-3991

18                                         *Co-Lead Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    - 78 -
MASTER FILE NO. CV09-04984-PSG (EX)

1693992.1

## VERIFICATION

I, David E. Hughes, hereby verify that I have authorized the filing of the attached Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 11/19/2009

David E. Hughes

## VERIFICATION

I, Shane P. Sanders, hereby declare as follows:

1.     I am a member of the law firm of Robbins Umeda LLP, counsel for plaintiffs in the action entitled *In re Bidz.com, Inc. Derivative Litigation*, No. CV09-04984-PSG.   I have read the foregoing Verified Consolidated Shareholder Derivative Complaint and know the contents thereof.   I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification on behalf of plaintiff Farris Hassan because Mr. Hassan is absent from the County of San Diego where I maintain my office.

Executed this November 24, 2009, at San Diego, California

_____
SHANE P. SANDERS

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on November 24, 2009, I electronically filed the Verified

3  Consolidated Shareholder Derivative Complaint with the Clerk of the Court using the

4  CM/ECF system which will send notification of such filing to the e-mail addresses denoted

5  on the attached Electronic Mail Notice List.   I further certify that I have mailed the

6  foregoing document via the United States Postal Service to the party on the attached

7  Manual Notice List.  Executed on November 24, 2009.

8

9                                     s/ Nichole Browning

10                                     NICHOLE BROWNING
                                       BARROWAY TOPAZ KESSLER
11                                       MELTZER & CHECK, LLP
                                       580 California Street, Suite 1750
12                                     San Francisco, CA 94104
                                       Telephone: (415) 400-3004
13                                     Facsimile: (415) 400-3001

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 2:09-cv-04984-PSG-E**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Andrew John Demko**
  ademko@gibsondunn.com
- **Joel A Feuer**
  jfeuer@gibsondunn.com
- **Mark T Hiraide**
  mhiraide@phlcorplaw.com
- **Joe Kendall**
  provost_dallas@yahoo.com
- **Hamilton Lindley**
  administrator@kendalllawgroup.com
- **David L Martin**
  dmartin@robbinsumeda.com
- **Brian J Robbins**
  notice@robbinsumeda.com
- **S Benjamin Rozwood**
  brozwood@robbinsumeda.com,notice@robbinsumeda.com
- **Shane P Sanders**
  ssanders@robbinsumeda.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Lisa M Hiraide**
Petillon Hiraide & Loomis LLP
21515 Hawthorne Boulevard  Suite 1260
Torrance, CA 90503