1   ROBBINS UMEDA LLP
    BRIAN J. ROBBINS (190264)
2   brobbins@robbinsumeda.com
    FELIPE J. ARROYO (163803)
3   farroyo@robbinsumeda.com
    SHANE P. SANDERS (237146)
4   ssanders@robbinsumeda.com
    600 B Street, Suite 1900
5   San Diego, CA 92101
    Telephone: (619) 525-3990
6   Facsimile:  (619) 525-3991

7   BARROWAY TOPAZ KESSLER
    MELTZER & CHECK, LLP
8   NICHOLE BROWNING (251937)
    nbrowning@btkmc.com
9   580 California Street, Suite 1750
    San Francisco, CA 94104
10  Telephone: (415) 400-3000
    Facsimile:  (415) 400-3001

11  *Co-Lead Counsel for Plaintiffs*

12  [Additional Counsel on Signature Page]

13

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16
    _____   )  Master File No. CV09-04984-PSG (Ex)
17  In re BIDZ.COM, INC.              )
    DERIVATIVE LITIGATION             )  **PLAINTIFFS' OPPOSITION TO**
18  _____   )  **INDIVIDUAL DEFENDANTS'**
    This Document Relates To:         )  **MOTION TO DISMISS**
19  All Actions                       )  **PLAINTIFFS' CONSOLIDATED**
                                      )  **DERIVATIVE COMPLAINT**
20                                    )  **UNDER FEDERAL RULE OF CIVIL**
                                      )  **PROCEDURE 12(b)(6)**
21                                    )
                                      )
22                                    )  Judge: Honorable Philip S. Gutierrez
                                      )  Date Action Filed: July 10, 2009
23                                    )
                                      )  Hearing Date: April 26, 2010
24  _____   )  Hearing Time: 1:30 p.m.

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND STATEMENT OF FACTS ......................................... 1

II.   PLAINTIFFS HAVE ADEQUATELY PLED ALL OF THEIR
      CLAIMS................................................................................................. 2

    A.  Legal Standards Applicable to this Motion to Dismiss .......................... 2

    B.  Plaintiffs Have Pled a Claim for Breach of Fiduciary Duty .................. 4

        1.  Defendants Participated in and/or Consciously Permitted
            Illegal Shill Bidding at Bidz .......................................................... 4

            a.  Applicable Law.................................................................... 4

            b.  Shill Bidding Occurred at Bidz ........................................... 6

            c.  Defendants Knew About the Shill Bidding
                Practices at Bidz, Yet Took No Action to Stop or
                Remedy the Wrongdoing...................................................... 9

        2.  The Audit Committee Defendants, with the Acquiescence
            of Their Fellow Defendants, Caused Bidz to Appoint and
            Retain an Unqualified Auditor...................................................... 13

        3.  Defendants Consciously Permitted Bidz to Employ a
            Suspect Appraiser, Use Inaccurate Product Descriptions
            and Photographs, and Fail to Honor Winning Bids.................. 16

    C.  Plaintiffs Have Adequately Pled Claims for Breach of Fiduciary
       Duties for Insider Selling and Misappropriation of Information
       and for Violation of California Corporation Code §25402.................. 18

    D.  Plaintiffs Have Adequately Pled a Claim for Waste of
       Corporate Assets ................................................................................ 23

    E.  Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment ........ 24

III.  CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alvarez v. Hill,*
    518 F.3d 1152 (9th Cir. 2008) ..................................................................4

*Arnold v. Soc'y for Sav. Bancorp, Inc.,*
    678 A.2d 533 (Del. 1996) ........................................................................4

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ............................................................................3

*Bell Atl. v. Twombly,*
    550 U.S. 544, 127 S. Ct. 1955 (2007) ....................................................4

*Brophy v. Cities Service Co.,*
    70 A.2d 5 (Del. Ch. 1949) ....................................................................19

*Cahill v. Liberty Mut. Ins. Co.,*
    80 F.3d 336 (9th Cir. 1996) ....................................................................3

*Conley v. Gibson,*
    355 U.S. 41 S. Ct. 99 (1957) ..................................................................3

*David B. Shaev Profit Sharing Account v. Armstrong,*
    No. Civ. A. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006)................12

*Desimone v. Barrows,*
    924 A.2d 908 (Del. Ch. 2007)) ..............................................................3

*Eastwood Enters., LLC v. Farha,*
    No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668 (M.D. Fla. Sept.
    28, 2009) ..............................................................................................11

*Grimes v. Donaldson,*
    673 A.2d 1207 (Del. 1996) ..................................................................24

*Harlow v. Fitzgerald,*
    457 U.S. 800, ..........................................................................................3

*In re Abbott Labs. Derivative S'holders Litig.,*
    325 F.3d 795 (7th Cir. 2003) ................................................... *passim*

*In re Am. Int'l Group, Inc. v. Greenberg,*
    965 A.2d 763 (Del. Ch. 2009) ...................................................................19

*In re Caremark International Inc. Derivative Litigation,*
    698 A.2d 959 (Del. Ch. 1996) ....................................................................6

*In re Citigroup Inc. Shareholder Derivative Litigation,*
    964 A.2d 106 (Del. Ch. 2009) ....................................................................3

*In re Gilead Sciences Securities Litigation,*
    536 F.3d 1049 (9th Cir. 2008) ....................................................................3

*In re HealthSouth Corp. S'holders Litig.,*
    845 A.2d 1096, 1105 (Del. Ch. 2003) .......................................................24

*In re Lernout & Hauspie Sec. Litig.,*
    230 F. Supp. 2d 152 (D. Mass. 2002)........................................................12

*In re Lernout & Hauspie Sec. Litig.,*
    286 B.R. 33 (D. Mass. 2002) .....................................................................13

*In re Nature's Sunshine Prods. Sec. Litig.,*
    486 F. Supp. 2d 1301 (D. Utah 2007) .......................................................10

*In re Netsmart Techs., Inc. S'holders Litig.,*
    924 A.2d 171 (Del. Ch. 2007) ...................................................................19

*In re Oracle Corp. Derivative Litig.,*
    867 A.2d 904 (Del. Ch. 2004) ..............................................................19, 20

*In re Oxford Health Plans, Inc. Sec. Litig.,*
    51 F. Supp. 2d 290 (S.D.N.Y. 1999) .........................................................12

*In re Silicon Graphics Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ....................................................................19

*In re TASER Int'l S'holder Derivative Litig.,*
    No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. Mar. 17,
    2006) .......................................................................................................5, 6

*In re Veeco Instruments, Inc. Sec. Litig.,*
    434 F. Supp. 2d 267 (S.D.N.Y. 2006) .......................................................11

*In re Walt Disney Co. Derivative Litig.,*
    907 A.2d 693 (Del. Ch. 2005) ..............................................................23, 24

*In re WorldCom, Inc. Sec. Litig.,*
    352 F. Supp. 2d 472 (S.D.N.Y. 2005) ...........................................................16

*IOTEX Commc'n, Inc. v. Defries,*
    No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998) ...............................17

*La. Mun. Police Employees' Ret. Sys. v. Crawford,*
    918 A.2d 1172 (Del. Ch. 2007) ...................................................................19

*Livid Holdings, Ltd. v. Solomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir.2005) ........................................................................25

*McCall v. Scott,*
    239 F.3d 808 (6th Cir. 2001) .......................................................................12

*Michelson v. Duncan,*
    407 A.2d 211 (Del. 1979).............................................................................23

*Navarro v. Block,*
    250 F.3d 729 (9th Cir. 2001) .........................................................................2

*Rosky ex rel. Wellcare Health Plans, Inc. v. Farha,*
    No. 8:07-cv-1952-T-26 MAP, 2009 WL 3853592 (M.D. Fla. Mar.
    30, 2009) ................................................................................................13, 14

*Scheuer v. Rhodes,*
    416 U.S. 232, 94 S. Ct. 1683 (1974) .............................................................3

*Teachers' Ret. Sys. of La. v. Aidinoff,*
    900 A.2d 654 (Del. Ch. 2006) .......................................................................4

*Tidenberg v. Bidz.com, Inc., et al.,* Case
    No. 08-05553PSG (FMOx) (C.D. Cal. Aug. 11, 2008) ..........................10, 20

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003).........................................................................3

*Van Buskirk v. Cable News Network, Inc.,*
    284 F.3d 977 (9th Cir. 2002) .........................................................................3

*Wiley v. Stipes,*
    595 F. Supp. 2d 179 .....................................................................................13

*York Linings v. Roach,*
    No. 16622-NC, 1999 WL 608850 (Del. Ch. July 28, 1999)...........................4

1

*Zimmerman v. Braddock,*
        No. CIV. A. 18473-NC, 2005 WL 2266566 (Del. Ch. Sept. 8,
        2005) ......................................................................................................... 19

3

**RULES**

4

Federal Rules of Civil Procedure
        Rule 12(b)(6)") .................................................................................................. 2
        Rule 23.1 ........................................................................................................... 2
        8(a)(2) ............................................................................................................... 3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.   **INTRODUCTION AND STATEMENT OF FACTS**[1]

Bidz.com Inc. ("Bidz" or the "Company") has long been grossly mismanaged by its directors and officers, notwithstanding the fiduciary duties those individuals owe to the Company and its shareholders.   In an effort to maximize the price of items sold and ensure profitability, Bidz has long engaged in the illegal practice of "shill bidding," or placing fake bids.   Shill bidding benefits the Company's bottom line in at least three ways: (i) it substantially reduces the number of items that are sold for below cost; (ii) it increases the ultimate price that customers pay; and (iii) it increases internet traffic by creating the appearance of substantial interest in the Company's website.   The existence of shill bidding at Bidz has been confirmed by former employees of the Company, and numerous Bidz customers have complained about the illicit practice.   In violation of their fiduciary duties, the Defendants[2] participated in and/or consciously failed to take any action to prevent or remedy the illegal shill bidding practices at Bidz.

The Defendants, and particularly the members of Bidz's Audit Committee, also breached their fiduciary duties by appointing and retaining an unqualified auditor despite clear red flags regarding the auditor's prior performance. Moreover, the defendants caused the Company to use a suspect jewelry appraiser, use inaccurate descriptions and photographs of the merchandise on its website, and refuse to honor valid sales if they were below a certain price.  Finally, while Bidz's value was artificially inflated as a result of (and while in possession of non-public information regarding) the shill bidding and other improper practices, two of the defendants—Zinberg and Liu—sold their personally held shares of Bidz common

---

[1]  Plaintiffs Farris Hassan and David Hughes ("Plaintiffs") hereby incorporate by reference their Memorandum of Points and Authorities in Opposition to Bidz's Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 23.1 ("Opp. to Bidz' MTD"), filed concurrently herewith. For a recitation of the key facts in this case, Plaintiffs respectfully refer the Court to the "Statement of Facts" section of their Opp. to Bidz's MTD.

[2]  "Defendants" or "Individual Defendants" refer to David Zinberg ("Zinberg"), Claudia Liu ("Liu"), Lawrence Kong ("Kong"), Leon Kuperman ("Kuperman"), Peter G. Hanelt ("Hanelt"), Garry T. Itkin ("Itkin"), and Man Jit Singh ("Singh").

1  stock for more than $1.8 million in proceeds.  Liu sold all of the shares that she

2  personally owned.

3      The shill bidding and other improper practices at Bidz were first publicly

4  exposed on November 26, 2007 in a report issued by Citron Research ("Citron"),

5  which documented, among other things, numerous instances of shill bidding at the

6  Company.  The market reacted negatively, as the Company's stock value dropped

7  49% in just three days following the report.  The defendants' deceptive business

8  practices have led to investigations by the U.S. Securities and Exchange

9  Commission ("SEC") and the Federal Trade Commission ("FTC") and the filing of

10  numerous lawsuits against Bidz, all of which have tarnished the Company's

11  reputation and caused it to expend millions of dollars in investigative and defense

12  costs.

13      Defendants deny that shill bidding (or any other wrongdoing, for that matter)

14  occurred at Bidz and contend that they did not participate in or know about such

15  practices.   Defendants ignore the detailed factual allegations in Plaintiffs'

16  Complaint, misconstrue the nature of Plaintiffs' claims, and apply the wrong legal

17  standards for analyzing the sufficiency of those claims.  For the reasons discussed

18  herein, Defendants' motion to dismiss must be denied in its entirety.

19  **II.   PLAINTIFFS HAVE ADEQUATELY PLED ALL OF THEIR**
20  **CLAIMS**

21      **A.   Legal Standards Applicable to this Motion to Dismiss**

22      The pleadings challenges brought by the Individual Defendants under Rule

23  12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") are governed by

24  a materially lower standard than those governing a challenge under Rule 23.1 of

25  the Federal Rules of Civil Procedure ("Rule 23.1").  A motion to dismiss filed

26  under Rule 12(b)(6) merely "tests the legal sufficiency of a claim." *Navarro v.*

27  *Block*, 250 F.3d 729, 732 (9th Cir. 2001).[3]  Since Rule 12(b)(6) is concerned with

28  _____
[3] Virtually all of the cases cited by the Defendants apply the wrong legal standard to Plaintiffs' claims.  Specifically, Defendants rely upon "demand futility" cases (*e.g.*, *In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del.

the sufficiency of a claim rather than its substantive merits, courts "look only at the face of the complaint" when deciding a motion to dismiss. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).[4]    Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).    The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 396 (1982).

The notice pleading standard under Federal Rule of Civil Procedure 8 ("Rule 8") applies because Plaintiffs seek relief under state law.[5]    Under Rule 8, the Verified Consolidated Shareholder Derivative Complaint ("Complaint") need only contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The object is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957), *abrogated on other grounds by Bell Atl. v.*

---

Ch. 2009); and *Desimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)), which were decided under the heightened pleading requirements of Rule 23.1; or federal securities fraud cases (*e.g.*, *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1055 (9th Cir. 2008)), which are evaluated under the heightened pleading burden for cases alleging fraud. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). The Court should disregard the authorities cited by the Defendants to the extent the standards applied in those cases do not apply to the instant motion.

[4] The court may consider the facts alleged in the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and matters of which the court takes judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

[5] Defendants also try to transform Plaintiffs' derivative claims into fraud claims. Individual Defendants' Motion to Dismiss Plaintiffs' Complaint Under Federal Rule of Civil Procedure 12(b)(6), Supporting Memorandum of Points and Authorities ("Ind. Defs.' Mem.") at 11. However, fraud is not an element of any of Plaintiffs' derivative claims. Rather, Plaintiffs seek damages accruing to the Company as a result of Defendants' breaches of fiduciary duties and waste of corporate assets, not personal damages resulting from reliance on material misstatements or omissions. ¶¶132-156. Moreover, allegations that the Individual Defendants acted "knowingly" do not transform this derivative case into an action for fraud.

---

*Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). A plaintiff's complaint must be upheld if the claims for relief are facially plausible. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008). Assuming, as the Court must, that the Complaint's allegations are true, the allegations exceed the applicable pleading standard.

## B.    Plaintiffs Have Pled a Claim for Breach of Fiduciary Duty

To state a cause of action for breach of fiduciary duty, plaintiffs must plead: (1) the existence of a fiduciary relationship; and (2) its breach. *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006); *York Linings v. Roach*, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999). The first element is not disputed here: Delaware law provides that "[f]iduciary duties are owed by the directors and officers to the corporation and its stockholders." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996).

With regard to the second element, however, Defendants argue that Plaintiffs have not alleged sufficient facts to show that Defendants breached the fiduciary duties they owe to Bidz. Ind. Defs.' Mem. at 10-20. Plaintiffs have alleged facts supporting an inference that Defendants breached their fiduciary duties based on: (1) the shill bidding practices at Bidz; (2) the hiring and retention of an unqualified auditor; and (3) other improper practices, including employing a suspect appraiser, using inaccurate product descriptions and photographs, and failing to honor winning bids.

### 1.    Defendants Participated in and/or Consciously Permitted Illegal Shill Bidding at Bidz

Defendants claim that there is nothing in the Complaint to attribute the requisite state of mind to them (Ind. Defs.' Mem. at 15-20), but this is wrong. As explained below, Plaintiffs have alleged that Defendants knew of the ongoing shill bidding practices at Bidz, and yet took no action to stop or otherwise address such illegal activities.

#### a.    Applicable Law

Corporate officers and directors act in bad faith and breach their fiduciary

duties where they have actual knowledge of violations, yet take no steps to prevent or remedy the situation. *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 806, 809 (7th Cir. 2003). In *Abbott*, the plaintiffs alleged that the company's directors breached their fiduciary duties by ignoring continuing U.S. Food and Drug Administration ("FDA") violations at the company and taking no action to correct the problems. *Abbott*, 325 F.3d at 801-02. The district court dismissed the case for failure to adequately plead demand futility. *Id.* at 803. The Seventh Circuit reversed, holding that the presence of numerous "red flags" put the company's directors on notice that it had significant deficiencies in its effort to comply with FDA regulations. *Id.* at 809. The "red flags" included the following: the chairman of the board had received letters from the FDA over a period of years; FDA officials had met with company representatives; and there were public reports regarding the company's FDA compliance issues. *Id.* at 808. The court held that these facts were sufficient to establish that "the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith." *Id.* at 809. Even under the heightened pleading standards associated with alleging demand futility (which are not applicable in this motion to dismiss for failure to state a claim), the court found that demand futility had been adequately pled. *Id.*

Courts have applied *Abbott* broadly and made clear that plaintiffs need not allege every fact or red flag at issue in *Abbott* in order to state a claim for breach of fiduciary duty. For example, in *In re TASER Int'l S'holder Derivative Litig.*, No. CV-05-123-PHX-SRB, 2006 WL 687033, at *17 (D. Ariz. Mar. 17, 2006), plaintiffs alleged that the defendants: (i) knew about issues related to the safety of the company's taser gun; (ii) knew "that the company had spent minimal sums of money on safety testing, which "should have been a red flag to any conscientious officer or director;" (iii) were aware of media scrutiny of the taser's safety; (iv)

and, despite the foregoing, "vigorously defend[ed]" the company's safety guidance in order to boost revenues. *TASER*, 2006 WL 687033, at *17. The defendants argued that the case was unlike *Abbott* because in *Abbott*, the FDA "found actual violations," while in *TASER*, there was just a "six-month history of one-sided charges in the media." *Id*. (citations omitted). The court denied the motion to dismiss the fiduciary duty claim, reasoning that "[w]hile the problems before the TASER board [did] not rise to the sustained six-year level of regulatory problems in *Abbot*, ... the alleged facts, taken together, lead to 'reasonable inferences' that the Board was aware of the taser's safety issue problems. ... " *Id*. (citation omitted).

This action is substantially the same as *Abbott* and *TASER*. Like in those cases, and as discussed below, Plaintiffs have alleged that Defendants ***knew*** about the illegal and improper business practices at Bidz, including shill bidding, and yet failed to take any action to prevent or remedy the issues.[6]

### b.     Shill Bidding Occurred at Bidz

Numerous facts support the existence of illegal shill bidding practices at Bidz. First, defendant Zinberg has publicly admitted that Bidz was unable to verify the legitimacy of bids. ¶¶97, 123. This complete inability to verify the veracity of bids opened up the door to shill bidding and permitted improper bidding practices to flourish. For example, it fostered a situation in which a significant percentage of Bidz's winning bids had names that followed a readily identifiable pattern (*e.g.*, a random word followed by four numeric digits), indicating that the account names were fake and used solely for shill bidding.

---

[6] Defendants nonetheless contend that Plaintiffs have alleged a mere "failure of oversight" claim, similar to that alleged in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 971 (Del. Ch. 1996); Ind. Defs.' Mem. at 1-4, 9-12. Plaintiffs, however, do not assert a claim based on the lack of oversight discussed in *Caremark*, 698 A.2d at 959. Like in *Abbott* and *TASER*, the "reasonable inferences [here] determined from all of the facts taken together are exactly the opposite of *Caremark*," because defendants were aware of the problems. *Abbott*, 325 F.3d at 806 (quoting *Caremark* A.2d at 969); *see also TASER*, 2006 WL 687033, at *17. *See also* Plaintiffs' Opp. to Bidz's MTD.

¶¶46-49.  Similarly, the lack of checks on the legitimacy of bids permitted certain users to enter bids on three or more products in less than one second, notwithstanding the fact that it takes much longer than a second to load new pages and enter bid information.  ¶49.  This further supports Plaintiffs' allegations that Bidz's shill bidding was accomplished through computer programs, in addition to live shill bidders.  ¶¶46-49.

More, defendant Liu has admitted that 44% of the winning bids in Bidz's auctions did not result in sales.  ¶¶45, 123.[7]  This fact suggests that a large percentage of bids were not actual bids aimed at buying the product, but rather were shill bids aimed at driving up the price of the product, and the sales would not be completed in the event the item was won by a shill bidder.  ¶42.[8]

Confidential witnesses have confirmed the shill bidding practices at Bidz. ¶¶51-52.  The first confidential witness ("CW1"), a former Bidz Senior Jewelry Buyer, stated that Bidz did indeed use shill bidders.  ¶51.  CW1 observed that a lot of high-priced items were sold without the sales ever being completed, and that such items were won by shill bidders and re-auctioned repeatedly in an effort to increase interest in Bidz's website.  ¶51.  The second confidential witness ("CW2"), a former Bidz customer service representative, stated that he/she witnessed a number of user accounts with balances of hundreds of thousands of dollars, and

---

[7] Defendants' only response is that the fact that nearly half of winning bids did not result in sales "alone does not establish that Bidz's business model is based on shill bidding or that the Individual Defendants were aware of, and encouraged, shill bidding." Ind. Defs.' Mem. at 19. Defendants miss the point and are misapplying the relevant pleading standards.  The Court is not charged with determining whether each fact, "standing alone," is sufficient to allege a breach of fiduciary duty by defendants.  Rather, the Court is to determine whether Plaintiffs have stated their claims based on an analysis of all of the facts alleged when viewed in their totality.

[8] Defendants offer myriad excuses for the fact that at least 44% of winning bids do not result in sales in an attempt to refute Plaintiffs' shill bidding allegations. Ind. Defs.' Mem. at 19. Defendants attribute the alarming number of non-sales to "high traffic," inadequate funds, buyer's remorse, and "intervention by a parent or spouse." Ind. Defs.' Mem. at 19. Defendants fail to explain how these purported factors affect the percentage of winning bids that do not result in sales, and they are not entitled to any inference that these factors rather than the illegal shill bidding practices are responsible.

that these users purchased jewelry at prices that were much higher than any other customers were willing to pay.  ¶52.  These facts support the inference that certain accounts were devoted to shill bidding and were be used to artificially bid up the price of items (for which payment was never made), and that these items were re-auctioned when shill bidders ended up with the winning bid.  Numerous Bidz customers have also complained about shill bidding on websites such as Ripoff Report.  ¶43-44.[9]

Defendants try to discredit CW1 because this witness declined to discuss with Plaintiffs any more particulars of his testimony.  Ind. Defs.' Mem. at 5, 16 n.11.  Defendants also attack CW2, arguing that there is no information regarding CW2's "position, dates of employment or basis for knowledge."  Ind. Defs.' Mem. at 6.  But these issues are more properly addressed in discovery, not at the pleading stage.[10]  In any event, with regard to CW1, the Complaint states that Plaintiffs conducted an independent investigation of CW1 and confirmed that someone with the job duties and responsibilities of this witness would be privy to the type of

---

[9] Defendants contend that the hearsay of anonymous posters and confidential witnesses from other actions are not sufficient to establish a breach of fiduciary duty.  Ind. Defs.' Mem. at 16.  Defendants try to discredit "Ripoff Report" because it allows anyone to post a grievance.  Ind. Defs.' Mem. at 4.  Defendants also try to attack the fact that Plaintiffs identified 100 bidders with suspicious account names in a 2.5 hour period, arguing that the sample size is insignificant and that Plaintiffs cannot confirm that the suspicious accounts submitted false bids.  Ind. Defs.' Mem. at 4-5.  This is not a trial, or even a motion for summary judgment.  There is no "evidence" at issue in the context of this initial challenge by Defendants to the facial sufficiency of the pleading.  There is no requirement that Plaintiffs' allegations be sufficient to withstand evidentiary objections, or any requirements relating to the use of confidential witness accounts.  Taking all facts together, Plaintiffs have a sufficiently alleged shill bidding at Bidz.

[10] Defendants argue that "[s]tatements of confidential witnesses without any indicia of reliability should be excluded."  Ind. Defs.' Mem. at 16 n.11, citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  *Zucco*, however, involved the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading requirements, not breach of fiduciary duty claims.  *Zucco*, 552 F.3d at 995.  Further, as discussed herein, Plaintiffs have alleged sufficient facts to establish the reliability of the confidential witnesses at this stage of the proceedings.

1    information alleged in the Complaint.  ¶51.[11]   The testimony of the confidential

2    witnesses, taken together with all of the other facts, lends further support for

3    Plaintiffs' allegations that Defendants knew about the illegal shill bidding practices

4    at Bidz, but took no action to remedy the problems.

5         Citron further confirmed the shill bidding at Bidz in its November 26 and

6    November 28, 2007 reports, which detail the existence of shill bidding and other

7    online abuses occurring in connection with Bidz's online auctions.  Citron, *Citron*

8    *Adds Some Color and Clarity to BIDZ.com*, Citron Reports (Nov. 26, 2007)

9    http://www.citronresearch.com/index.php/2007/11/26/; ¶¶9, 95.[12]   The day after

10   the November 26, 2007 report was issued, defendant Zinberg held a conference

11   call with analysts and investors to address the allegations, but *he was unable to*

12   *refute the specific examples of shill bidding*.  ¶¶45, 97.  Since that time, the SEC

13   and the FTC have commenced investigations into Bidz.  ¶¶101-04.

14             **c.    Defendants Knew About the Shill Bidding Practices at**
                       **Bidz, Yet Took No Action to Stop or Remedy the**
15                     **Wrongdoing**

16        The Complaint is replete with allegations that Defendants knew of the illegal

17   practice of shill bidding at Bidz, which was at the core of the Company's business

18   model, and yet consciously decided not to take any action to address the situation.

19   Defendants knew that, as a seller of its merchandise, the Company is responsible

20   for the legality of all aspects of its transactions.  ¶37.  Defendants also knew that

21   Bidz's revenue is dependent on its ability to generate a high volume of traffic to its

22   website, and that the Company's website and transaction processes, therefore, had

---

[11]  Plaintiffs also conducted an investigation into CW2's "positions, dates of employment, [and] basis for knowledge," and would be willing to produce such information if necessary at a later stage of this litigation.

[12]  In this report, Citron provided detailed examples of shill bidding, including the sale of a television for $11,000 and the sale of a yellow diamond ring for $500,000. ¶99.  Defendants try to discredit Citron by arguing that Citron takes short positions in the companies that are the subject of its reports, thereby "betting" that the stock price will fall.  Ind. Defs.' Mem. at 7.  This does nothing to undermine the facts supporting the existence of shill bidding at Bidz, nor create any lesser duty for Defendants to investigate the illegal practices and take the necessary action to protect the Company's interests.  Defendants cite no authority to the contrary.

1   to be reliable.  ¶¶38-39.  Defendants, thus, were aware of at least the major issues

2   concerning the Company's online auction practices.[13]  These issues included (as

3   discussed above): (i) the Company's inability to determine whether bids were

4   legitimate; (ii) the fact that nearly half of all winning bids did not result in sales;

5   (iii) the use of suspicious accounts to drive up the price of bids; (iv) the repeated

6   re-auctioning of items won by shill bidders; and (v) the use of auto-bidding.  ¶¶43-

7   52.[14]

8        Defendants' fiduciary duties required particular diligence here because of the

9   long history of shady dealings and suspicious relationships among Bidz

10  management.  For example, Saied Aframian, the owner of LA Jewelry—Bidz's

11  largest supplier and one of its largest shareholders that accounted for

12  approximately 45% of Bidz inventory purchases in 2005 and 2006—is a convicted

13  felon and served time for being the prime fence for a multi-million dollar

14  nationwide ring of stolen watches and jewelry.  ¶¶77, 95.  Further, defendant

15  Zinberg has long had contacts with: (i) a person "whose felonies include failure to

16  register as a sex offender;" (ii) a felon convicted for "receiving stolen property"

17  and is doing time on a "concealed weapons conviction;" (iii) a felon convicted for

18  "defrauding Medicare and paying kickbacks to doctors for business;" (iv) "a sex

19  _____

[13] Defendant Liu is certainly no stranger to Bidz's improper auction practices.  In
20  an August 11, 2009 declaration filed in a consumer class action relating to shill
    bidding, Liu stated: "[I]n my capacity as Bidz.com's chief operating officer, and
21  based on my position with the company since October of 2001, I am familiar with
    the company's current and historical auction statistics."  *See* Declaration of Claudia
22  Liu in Support of Bidz.com's Motion for Rule 11 Sanctions, *Tidenberg v.
    Bidz.com, Inc., et al.*, Case No. 08-05553PSG (FMOx) (C.D. Cal. Aug. 11, 2008),
23  attached as Exhibit B to the Declaration of Shane P. Sanders in Support of
    Plaintiffs' Memoranda of Law in Opposition to the Motions to Dismiss Filed by
24  Bidz.Com and the Individual Defendants ("Sanders Decl.").  She also discussed the
    number of auctions that took place on Bidz's website from 2004 to 2008, the
25  average sale price for the items sold in these auctions, and the number of auctions
    in which the winning bidder failed to pay for the item won.  *Id.*

26  [14] The illegal insider sales by Liu and Zinberg were suspicious in amount and
    timing, which further supports Plaintiffs' allegations that those defendants were
27  aware of the shill bidding.  ¶¶113-15.  *See also In re Nature's Sunshine Prods. Sec.
    Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) (a strong inference of
28  knowledge of wrongdoing "may be shown from insider trades at times and in
    quantities that were suspicious in light of the insider's total stock holdings").

offender with prior arrests for assault and battery, and kidnapping;" (v) the executive of Circle of Friends, a health care company suspended "amid a fraud investigation" by California; and (vi) a felon convicted for "buy[ing] stolen property." ¶79.[15]  Defendants knew about the various improper dealings at Bidz by virtue of the amount and duration of the improprieties.  Defendants, thus, were required to be and were extremely aware of the issues and problems associated with the Company's business practices—particularly in the context of online auctions, the Company's primary business.[16]

At the absolute latest, Defendants knew about the rampant shill bidding by November 2007, when Citron issued its report detailing the shill bidding practices at Bidz.  ¶¶96, 98.  The SEC and the FTC are also conducting investigations into Bidz, which further put Defendants on notice of the shill bidding practices at the Company. ¶¶101-04.  Indeed, "[c]ourts commonly hold that pending government investigations are relevant and provide notice of a possible" wrongdoing. *See, e.g., Eastwood Enters., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668, at *4 (M.D. Fla. Sept. 28, 2009) (finding an inference of scienter was pled where there was an ongoing government investigation, noting that the investigations "by various government agencies only serve to bolster the inference of scienter at this stage of this action").[17]

---

[15] Defendant Itkin also owned and operated an illegal strip club while serving as Bidz's Chief Financial Officer in 1999.  ¶78.

[16] The members of the Audit Committee, in particular, had a heightened duty to ensure that Bidz was being operated in a legitimate manner.  The Audit Committee was responsible for, *inter alia*, reviewing the Company's internal controls, overseeing the financial reporting processes, and ensuring that the Company abides by all relevant laws. ¶124.  The Audit Committee members, however, consciously permitted shill bidding and other improper practices to continue and participated in the dissemination of false and misleading statements that concealed the issues at the Company.  These actions constituted a breach of the Audit Committee members' fiduciary duties that were owed to the Company.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006) ("plaintiffs' allegations that the [Audit] Committee failed to exercise appropriate attention to potentially illegal corporate activities … constitute a breach of loyalty").

[17] Defendants try to minimize the significance of the SEC and FTC investigations by arguing that the investigations have not concluded yet and are wholly irrelevant to the instant case.  Ind. Defs.' Mem. at 7-8.  These investigations trigger, at a

"'[T]he magnitude and duration of the alleged wrongdoing is [also] relevant in determining whether the failure of the directors to act constitutes a lack of good faith.'"  *Abbott*, 325 F.3d at 809 (quoting *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001).  Here, despite the above facts, which demonstrate Defendants' knowledge of shill bidding at Bidz, Defendants consciously allowed the Company to engage in the illegal practice for years.  ¶¶41-42.[18]  The Citron reports came out more than two years ago.  ¶¶95-99.  Yet, Defendants have consistently, and to this day, deny that shill bidding ever occurred at Bidz, and have not taken any action to prevent, correct, or otherwise remedy the problem.  ¶97.  Defendants' failure to act for such a long duration further supports a determination that Defendants breached their fiduciary duties.[19]

---

minimum, a duty to investigate and take action as necessary in the best interests of the Company.  *See, e.g.*, *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 165, 168 (D. Mass. 2002) (finding that an ongoing SEC inquiry was a red flag indicative of misconduct); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (finding that an active investigation by New York Attorney General was a relevant "red flag" provided notice of misconduct); *David B. Shaev Profit Sharing Account v. Armstrong*, No. Civ. A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006) ("A claim that a[] ... board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning.").

[18]  Defendants' rebuttal apparently is that they are not liable because "Bidz's published policy is that shill bidding is 'strictly prohibited.'"  Ind. Defs.' Mem. at 16.  Unfortunately for Defendants, the fact that the Company publicly states that it prohibits illegal activity does not allow Defendants to breach their fiduciary duties by acting directly contrary to that policy.

[19]  Worse, during this time, Defendants caused or permitted Bidz to issue improper statements that failed to disclose that: (i) Bidz's business model was based on shill bidding, which increased sale prices and protected items from selling for below cost; and (ii) "[t]he price of all [its] products is dictated by the buyer alone based on that buyer's valuation of the product," when shill bidding was actually inflating the price of the products sold on Bidz's website.  ¶¶42, 83, 90.  *See also* Bidz's Annual Report (Form 10-K), p. 3, filed with the SEC on March 16, 2007, attached as Exhibit A to the Sanders Decl.  Defendants cite *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008), for the proposition that "execution of financial reports, without more, is insufficient to create an inference that a director had actual or constructive notice of impropriety or illegality."  Ind. Defs.' Mem. at 17.  As detailed above, Plaintiffs have alleged much more than simply that Kong (and his fellow Defendants) approved the Company's financials in order to show their knowledge of the shill bidding practices at Bidz.

For the foregoing reasons, Plaintiffs have sufficiently alleged that Defendants breached their fiduciary duties in connection with the illegal practice of shill bidding.

### 2. The Audit Committee Defendants, with the Acquiescence of Their Fellow Defendants, Caused Bidz to Appoint and Retain an Unqualified Auditor

Plaintiffs allege that the Audit Committee members breached their duties of due care, good faith, and loyalty by consciously permitting shill bidding and other misconduct to occur and by appointing an unqualified auditor.  ¶¶124, 135-36. When directors on a Board committee consciously ignore their committee responsibilities, they breach the fiduciary duties owed to the company. *Wiley v. Stipes*, 595 F. Supp. 2d 179, 186 (D.Puerto Rico 2009).  In *Wiley*, the plaintiff brought breach of fiduciary duty claims against committee members who were tasked with reviewing and ratifying the bank's loans. *Id*.  Plaintiff alleged that the committee members failed to prevent the granting of fraudulent loans and failed to correct financial statements that did not properly disclose the impact of the loans. *Id*.  Defendants moved to dismiss for failure to adequately plead the claims.  The court ruled that the committee members breached their duty of loyalty to the company by failing to act in the face of a known duty to do so. *Id*.  The court reasoned that the committee members were responsible for reviewing and ratifying the loans, were aware or should have been aware of the fraudulent loans, and failed to prevent the granting of additional improper loans and failed to correct inaccurate financial statements. *Id*.

Similarly, audit committee members breach their fiduciary duties when they fail to ensure that the corporation's auditor is qualified and adequately performing its duties. *See Rosky ex rel. Wellcare Health Plans, Inc. v. Farha*, No. 8:07-cv-1952-T-26 MAP, 2009 WL 3853592, at *4 (M.D. Fla. Mar. 30, 2009); *see also In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 38-39 (D. Mass. 2002).  In *Rosky*, plaintiffs brought claims against the directors for breach of their fiduciary duties in

connection with improper accounting practices and for willfully ignoring pervasive accounting and internal control problems. *Rosky*, 2009 WL 3853592, at *1. Plaintiffs alleged that the audit committee charter required the directors on the committee to oversee the company's compliance with legal and regulatory requirements and the integrity of its financial statements. *Id.*, at *3. Under more exacting demand futility pleading standards, the court ruled that the directors on the audit committee faced a substantial likelihood of liability because the complaint provided sufficient factual details regarding the specific responsibilities of the audit committee and the committee's allowing the company to engage in illegal activities. *Id.* at *1-*3. In reaching its decision, *Rosky* relied on *Lernout*, in which the plaintiffs brought securities fraud claims against audit committee members for, among other things, being aware of questionable transactions and failing to implement a system of internal controls. *Id.* at 37-38. The defendants argued that they reasonably relied on the independent auditor, which continued to give the company a clean audit. *Id.* The court denied the defendants' motion to dismiss even under the heightened pleading standards applicable to federal securities claims, reasoning that the audit committee had a duty to oversee the auditors and was reckless in performing its role. *Id.*

Here, Bidz's Audit Committee was responsible for evaluating the qualifications of and appointing the Company's independent auditor. ¶124. Defendants Hanelt, Itkin, and Singh—the members of Bidz's Audit Committee— failed to fulfill their duties by selecting, appointing, and failing to adequately evaluate Stonefield, the Company's auditor. ¶¶57, 124. Stonefield's audits were severely deficient, as described in a report issued by the Public Company Accounting Oversight Board ("PCAOB"). These deficiencies included finding that Stonefield had failed to "obtain **sufficient competent evidential matter** to support its opinion on the issuer's financial statements." ¶56 (emphasis added). The deficiencies related to areas that were problematic for Bidz, including a lack of

computer controls necessary to prevent shill bidding on Bidz's online auctions. ¶29. However, in contravention of their duties, defendants Hanelt, Itkin, and Singh, failed to review the performance of the independent auditors[20] and recommended that the Board retain Stonefield to audit the Company's financial statements for Fiscal 2007, 2008, and 2009. ¶¶57, 124. *See also* Bidz's Form 14A, p. 37, filed with the SEC on April 30, 2007, attached as Exhibit C to the Sanders Decl. The Audit Committee members' actions constituted a breach of their fiduciary duties.[21] *See Wylie*, *supra*; *see also Rosky*, *supra*; *see also Lernout*, *supra* (denying motion to dismiss claims against three members of the audit committee because they failed in their "duty to oversee the auditors, that this, to guard the guardians").

Defendants argue that the PCAOB issued "nearly identical" negative reports for the big four accounting firms and that "the PCAOB has made similar criticisms of every major auditing firm in the country." Ind. Defs.' Mem. at 14.[22] Defendants' contentions are inaccurate because the PCAOB did not find the same pervasiveness of problems in the audits of the major accounting firms that they found in Stonefield's audits. Stonefield has fifty-five issuer clients, and the PCAOB found that in five of the thirteen reviewed audits, or nearly 40%,

---

[20] To the extent that any of the Audit Committee members were actually unaware of the PCAOB report, it would be the very picture of recklessness for those uninformed directors to appoint Stonefield as the auditor without taking any action to ascertain the qualifications and track record of the auditor.

[21] The two director defendants not on the Audit Committee, Zinberg and Kong, also breached their fiduciary duties by permitting Stonefield to be retained. All of the directors on Bidz's board were responsible for the Company's financial reporting and controls, including the retention of a qualified auditor. ¶29. In contravention of these duties, and notwithstanding the deficiencies identified in the PCAOB's report, Zinberg and Kong acquiesced in the appointment of Stonefield as the Company's auditor for Fiscal 2007, 2008, and 2009. ¶¶29, 58, 135, 136; *see also* Bidz's Form 14A, p. 37-38, filed with the SEC on April 30, 2007, attached as Exhibit C to the Sanders Decl.

[22] As discussed in detail in Plaintiffs' Opposition to Defendants' Joint Request for Judicial Notice in Support of Defendant Bidz's and the Individual Defendants' Motions to Dismiss Plaintiff's Complaint, filed concurrently herewith, this attempt to introduce external documents to re-draft the complaint in a light more favorable to them is inappropriate at the pleading stage and should be rejected.

Stonefield had failed to obtain sufficient competent evidential matter. ¶56.[23]  This high percentage indicated deficiencies on a magnitude that was not present in the reports of the big four accounting firms. *Id*.

Additionally, several auditing firms similar in size to Stonefield did not receive the same type of criticism that was leveled at Stonefield.[24]  These reports indicate that many firms did not have the substantial deficiencies that were present in Stonefield's audits.   Thus, Defendants' contentions regarding the PCAOB inspections are incorrect, raise issues outside the Complaint, and are more properly addressed in discovery. *See* Ind. Defs.' Mem. at 14.[25]

Plaintiffs have adequately alleged that the Audit Committee members and the other directors breached their fiduciary duties in connection with the retention of Stonefield as Bidz's auditor.

### 3.   Defendants Consciously Permitted Bidz to Employ a Suspect Appraiser, Use Inaccurate Product Descriptions and Photographs, and Fail to Honor Winning Bids

The Individual Defendants also breached their duties of due care, good faith, and loyalty by permitting the use of a suspect appraiser, permitting the use of inaccurate descriptions and photographs, sending customers forged certificates of authenticity, and failing to disclose these actions.  ¶¶62, 67, 71, 73, 77, 83, 89.

---

[23]  A failure to obtain sufficient competent evidential matter undermines the significance of the audit and constitutes a violation of Generally Accepted Auditing Standards ("GAAS"), which auditors are required to follow. *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 479 (S.D.N.Y. 2005).  As explained in *WorldCom*, GAAS mandate that "'*[s]ufficient competent evidential matter* is to be obtained … to afford a reasonable basis for an opinion regarding the financial statements under audit.'" *Id*. (emphasis added) (citation omitted).  If these actions are not taken, the audit does not comply with GAAS. *Id*.

[24]  Examples of such firms are O'Connor Davies Munns & Dobbins, LLP; Kaufman, Rossin & Co.; and Novogradac & Company LLP.   *See* http://www.pcaobus. org/Inspections/Public_Reports/index.aspx, last viewed on February 18, 2010.  These three firms were found during a quick perusal of the PCAOB's website.  Additional review would likely turn up several more firms that did not receive the same type of criticism aimed at Stonefield.

[25]  Stonefield's self-serving rebuttal that "nothing came to our attention that caused us to believe that our previously issued auditor's reports should not be relied on" is of no consequence.  Stonefield's attempt to preserve their reputation and regain some credibility in front of the PCAOB does not neutralize the numerous deficiencies identified in the PCAOB's report.

Where Defendants have knowledge of violations of law, yet take "no steps in an effort to prevent or remedy the situation," they act in bad faith and in breach of their fiduciary duties. *Abbott*, 325 F.3d at 809.

Here, the Individual Defendants permitted the use of a suspect jewelry appraiser, American International Gemologists ("AIG"), who issued inflated and inaccurate appraisals. ¶62. AIG did not physically inspect every item it appraised, in contravention of standard industry practices. *Id*. The Individual Defendants also permitted Bidz to use inaccurate descriptions and photographs of its merchandise. ¶67. Further, the Individual Defendants also permitted Bidz to send customers photocopies of certificates of authenticity. ¶71. Finally, the Individual Defendants permitted the use of phony error messages to prevent items from being sold below cost. ¶73.[26]

Defendants knew of these improper practices.[27] Specifically, Defendants knew that AIG did not physically inspect every item that it appraises, in contravention of standard industry practice. ¶63. As Jeanine Woodling of the International Society of Appraisers put it, this "raised a red flag" because a proper appraisal requires an appraiser "to actually be able to see the piece." *Id*. Defendants consciously ignored this fact. ¶¶63-66. Further, Bidz's business

---

[26] Additionally, the Individual Defendants issued improper statements throughout the Relevant Period regarding the Company's financial condition and the health of its business model. ¶83. These statements failed to disclose the use of phony error messages and other efforts to prevent items from being sold below a certain price. ¶¶73, 89. The Individual Defendants caused Bidz to issue the following statement on more than one occasion: "Regardless of the closing price, once an auction is closed, the final bidder will receive the product." *See* Bidz's Annual Report (Form 10-K), p. 3, filed with the SEC on March 16, 2007, attached as Exhibit A to the Sanders Decl.; *see also* Bidz's Form 10-12G/A, p. 4, filed with the SEC on June 30, 2005, attached as Exhibit D to the Sanders Decl. This statement is false because customers were often given bogus error messages and/or were informed they could not purchase the item when a winning bid was less than the cost of the item to Bidz. ¶¶73, 89.

[27] At this initial stage, Plaintiffs need only provide allegations of a breach of fiduciary duty "from which it can reasonably be inferred that [the improper practice] ...was knowable and that the defendant was in a position to know it." *See IOTEX Commc'n, Inc. v. Defries*, No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998).

practice was to use false photographs for items on the website and not provide certificates of authenticity to customers as promised.    ¶¶68-72.    Also, the Company's website was designed to give error messages to winning bidders if their bid was below a certain price, and employees of Bidz were actually instructed to create fake excuses for why the error messages were given.    ¶¶73-75.

In November 2007, Citron issued a report detailing the use of a suspect appraiser, the purchase of inventory from a convicted fence, and other misconduct. ¶¶9, 99.    As a result, Bidz's stock price dropped 49% in three days.    *See* Chart of Daily Closing Stock Price for Bidz.com Common Stock from May 1, 2007 to March 4, 2010, attached as Exhibit G to the Sanders Decl.    Defendants cannot argue in good faith that they have been unaware of the improper practices, at least since the report came out in November 2007.    Defendants have brazenly continued to breach their fiduciary duty by failing to act to prevent or correct the problems as of that time.

For all of the foregoing reasons, Plaintiffs have adequately pled a claim for breach of fiduciary duty.[28]

### C.    Plaintiffs Have Adequately Pled Claims for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information and for Violation of California Corporation Code §25402

Plaintiffs have adequately pled claims against defendants Zinberg and Liu for a breach of fiduciary duty for insider selling and violations of California Corporations Code §25402.    It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, *i.e.*

---

[28]    Defendants claim that an exculpatory provision in Bidz's Certificate of Incorporation shields them from monetary liability for breaches of the duty of care. Ind. Defs.' Mem. at 10-11.    For the reasons outlined in Plaintiffs' Opp. to MTD, the Company's Certificate of Incorporation does not exculpate Defendants from liability, including that it does not eliminate liability for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law.    *See also Abbott*, 325 F.3d at 809 (a "lack of good faith" is established where "the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses"); *TASER*, 2006 WL 687033, at *17 (same).

insider selling. *Brophy v. Cities Service Co.*, 70 A.2d 5, 7 (Del. Ch. 1949).  Under Delaware law,[29]  a breach of fiduciary duty claim premised on insider trading arises where "1) the corporate fiduciary possessed material, non-public company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763, 800 (Del. Ch. 2009), citing *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).[30]  Information is considered material when there is a substantial likelihood it would be significant to a person deciding whether to buy or sell stock.  *In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd.*, 872 A.2d 960 (Del. 2005).[31]

Plaintiffs' allegations in this case are similar to the allegations in *Zimmerman v. Braddock*, No. CIV. A. 18473-NC, 2005 WL 2266566 (Del. Ch. Sept. 8, 2005), *rev'd on other grounds*, 906 A.2d 776 (Del. 2006).  In *Zimmerman*, the plaintiff alleged that several defendants sold their personally held shares while in possession of material, non-public information regarding weaknesses in the company's online business model.  *Zimmerman*, 2005 WL 2266566, at *5.  The plaintiff alleged that the defendants' knowledge was based on access to reports

---

[29] Similarly, to state a claim under California Corporations Code Section 25402 ("§25402"), Plaintiffs must allege that an officer, director, or controlling person of a corporation purchased or sold shares while in possession of non-public, material, adverse information.  This cause of action need only be pled "in ordinary and concise language." C.C.P. §425.10(a)(1).  A complaint under §25402 does not require allegations of particularity.  *See* Cal. Civ. Prac. Bus. Litig. §7:69.

[30] Once again, Defendants cite to the wrong legal standard. Defendants incorrectly assert that the Plaintiffs have to establish "scienter" to support claims of insider trading and cite to *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) as the applicable standard. Ind. Defs. Mem. At 20-21. However, *scienter* is applied to federal securities cases, not whether a plaintiff has adequately pled breach of fiduciary duty.

[31] In other words, something is material if it substantially "'alter[s] the "total mix" of information available'".  *La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1186 (Del. Ch. 2007) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A. 2d 929, 944 (Del. 1995)).  Importantly, "[o]nce a board broaches a topic in its disclosures," fiduciaries must give "materially complete information.  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007).

containing information sufficient to reveal the difficulties faced by the company and their positive statements designed to keep the stock trading at an artificially high price. *Id*. at 5. The court ruled that the plaintiff alleged a *prima facie* case for insider selling, determining that it was reasonable to infer that the defendants had direct and imputed knowledge of the company's problems. *Id*., at *8. The court also found that while the company's problems were partially disclosed, it was reasonable to infer that the public was not aware of them because they were overshadowed by the defendants' positive statements. *Id*.

Here, defendants Zinberg and Liu were in possession of material, nonpublic information about Bidz's improper business practices. These defendants knew that: Bidz's business model was based on shill bidding, which increased sale prices and protected items from selling for below cost (¶90); Bidz used phony error messages and other efforts to prevent items from being sold below cost (¶¶73, 89); the Company's auditor, Stonefield, was unqualified and had been harshly criticized by PCAOB for its numerous deficient audits (¶91); Bidz's appraiser, AIG, did not physically inspect the jewelry items it purportedly appraised (¶92); and customers were being provided with inaccurate descriptions and photographs of the items they were purchasing (¶93). *See also* ¶¶112-15.[32]  This information was material because it affected Bidz's core business and related to the viability of the Company's business model.  Its materiality was aptly demonstrated when Bidz's stock price dropped by almost fifty percent after Citron revealed much of this information in November 2007. *See Oracle*, 867 A.2d at 934  (information is material if there is a substantial likelihood it would be significant to a person

---

[32] The long history of illegal practices at Bidz further put defendants Zinberg and Liu on notice of the wrongdoing. For example, between 1999 and mid-2003, the Company raised $20.5 million in capital through a series of *illegal* private stock sales to approximately 830 investors.  ¶81. As the CEO of the Company since November 1998, Zinberg knew about, and likely participated in, the illegal private placements that provided most of the Company's cash flow. ¶19.  Further, Liu has admitted to having an in-depth knowledge of the Company's practices.  *See* Declaration of Claudia Liu in Support of Bidz.com's Motion for Rule 11 Sanctions, *Tidenberg v. Bidz.com, Inc., et al.*, Case No. 08-05553PSG (FMOx) (C.D. Cal. Aug. 11, 2008), attached as Exhibit B to the Sanders Decl.

deciding whether to buy or sell stock) (*quoting Rosenblatt*, 493 A. 2d at 944).

While in possession of this information, defendants Zinberg and Liu sold 145,000 of their shares of Bidz common stock, garnering total proceeds of $1,843,100. The stock sales were not part of any regular pattern or practice by defendants Zinberg and Liu—neither defendant had sold ***any*** shares of Bidz stock prior to August 15, 2007. ¶113. The insider selling directors' trades during the relevant period were dramatically out of line with other periods. Further, all of these stock sales occurred right after the Company's positive press releases and reports, which made no mention of the Company's improper conduct, and during the four months leading up to Bidz's highest ever stock price. *Id*. Finally, defendant Liu disposed of ***all*** of her personally held shares of Bidz stock. *See* Bidz's Form 4, filed with the SEC on November 20, 2007, attached as Exhibit F to the Sanders Decl. These facts further support Plaintiffs' insider selling claims, which "may be shown from insider trades at times and in quantities that were suspicious in light of the insider's total stock holdings." *Nature's Sunshine*, 486 F. Supp. 2d at 1310-11 (finding that plaintiffs had sufficiently pled scienter where plaintiffs alleged that defendant "had not traded previous to the time period in question, despite having been CEO for many years" and "traded in significant quantities of stock during the period").[33]

Defendants contend that "neither Zinberg nor Liu sold stock at the high price of approximately $20 per share in the Relevant Period." Ind. Defs.' Mem. at 22.[34]

---

[33] In order to present the appearance of propriety, the sales made by defendant Zinberg were conducted pursuant to a Rule 10b5-1 plan that he entered into on August 16, 2007. ¶114. However, defendant Zinberg entered into the 10b5-1 plan while he was already in possession of material non-public information regarding Bidz's improper business practices. *Id*. Defendant Zinberg attempted to remove attention from his new trading plan by voluntarily reducing his salary to $1 and proclaiming that he would not receive any future bonuses. ¶115. However, his annual salary and eligibility to earn bonuses resumed as of March 1, 2008, and he ultimately received $433,434 in compensation in 2008, which was more than double his 2007 compensation of $201,244. *Id*.

[34] There is no requirement for Plaintiffs to demonstrate that insider sales took place at the highest stock price. Further, any arguments that Defendants make that rely on facts outside of the Complaint are not appropriate on a motion to dismiss.

Defendants are incorrect and ignore several important facts. On May 9, 2007, Bidz's stock price closed at $5.13, but soon began to increase due to the improper statements made by Zinberg and the Individual Defendants. *See* Chart of Daily Closing Stock Price for Bidz.com Common Stock from May 1, 2007 to March 4, 2010, attached as Exhibit G to the Sanders Decl. From May 9, 2007 to November 26, 2007, when the report was issued by Citron, the stock price rose 288%. *Id*. This dramatic increase was unprecedented. Zinberg's sale of stock for $13.07 on October 1, 2007, represented a 158% increase in less than five months and was sold at or near the historic high. Liu's sale of stock for $17.82 on November 19, 2007 was near the high of $20 per share and represented a 247% increase in less than seven months. *Id*.

Just four days after Liu's sale, Bidz's stock closed at its highest price ever on November 23, 2007: $19.94. *Id*. The very next trading day, Citron issued its report, and the stock price closed at $16.56 on extremely heavy trading. *Id*. One day later, Zinberg held a conference call with analysts and investors, and the stock price closed at $11.89, which constituted a two-day decline of 40%. *Id*. The next day, Citron released additional facts regarding shill bidding, and Bidz's stock dropped to $10.10, representing a 49% decline in three trading days. *Id*.

The Individual Defendants contend that Zinberg continued to sell stock at relatively the same pace following the publishing of the Citron report in November 2007. Ind. Defs.' Mem. at 21. However, the Individual Defendants have ignored the fact that after the Citron report was issued, Zinberg held a conference call with analysts and investors and intentionally misled them regarding shill bidding and the other misconduct at Bidz. Zinberg's cover-up was not entirely effective, but it did prevent the stock price from immediately losing all of its value. In the ensuing months, as the stock price marched steadily downward, Zinberg saw the writing on the wall and sold many of his shares in an effort to cash out while the stock still

1   maintained some value.[35]

2   **D.      Plaintiffs Have Adequately Pled a Claim for Waste of Corporate**
3   **Assets**

4   To state a claim for corporate waste, Plaintiffs must allege that no person of
5   ordinary, sound business judgment would deem it worth that which the corporation
6   has paid.  *Grobow*, 539 A.2d at 189.   The essence of a claim for waste "is the
7   diversion of corporate assets for improper or unnecessary purposes."  *Michelson v.*
8   *Duncan*, 407 A.2d 211, 217 (Del. 1979).  A waste claim will stand where plaintiffs
9   allege that defendants "'irrationally squandere[d] or [gave] away corporate assets.'"
10  Ind. Defs.' Mem. at 24 (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d
11  27, 74 (Del. 2006)("*Disney I*")).   Defendants also acknowledge that a corporate
12  waste claim should stand where there was not "a ***good faith judgment*** that in the
13  circumstances the transaction is worthwhile."  *Brehm v. Eisner*, 746 A. 2d 244, 263
14  (Del. 2000) (emphasis in original).   Finally, a claim for waste is not an exculpable
15  claim under Delaware law since it involves acting in bad faith.  *See In re Walt*
16  *Disney Co. Derivative Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005) ("The Delaware
17  Supreme Court has implicitly held that committing waste is an act of bad faith.")
18  (citing *White v. Panic,* 783 A.2d 543, 553-55 (Del. 2001)).

19  Here, Plaintiffs allege that Defendants wasted Bidz's corporate assets in that:
20  (i) they caused or allowed the Company to pay bonuses to its executive officers
21  while those officers were mismanaging the Company based on an illegal and
22  unsustainable business model; and (ii) by engaging in the wrongdoing described

---

23  [35] The Individual Defendants also incorrectly state that prior to being listed on the
24  NADSAQ on June 6, 2007, "there was not an established market in which to sell
    Bidz's securities." Ind. Defs.' Mem. at 21. Defendants conveniently ignore the fact
25  that prior to June 6, 2008, Bidz's stock traded on Over the Counter Bulletin Board.
    *See* Bidz's Form 10-Q, p. 6, filed with the SEC on May 2, 2007, attached as Exhibit
26  H to the Sanders Decl. They also neglect to mention the tens of millions of dollars
    of Bidz's stock that was traded illegally as early as 1999.  From 1999 through mid-
    2003, $20.5 million of Bidz's stock had been sold to approximately 830 investors.
27  ¶81.  *See* Bidz's Form 10-12G/A, p. 4, filed with the SEC on June 30, 2005,
    attached as Exhibit D to the Sanders Decl.  By March 31, 2005, there were 1,132
28  holders of record, and 23,312,500 shares of common stock were outstanding.  *Id.*
    Because there was a market to sell stock prior to June 6, 2008, Liu's and Zinberg's
    absence of sales prior to the Relevant Period is pertinent.

above, they caused Bidz to incur potentially hundreds of millions of dollars of legal liability and/or costs to defend that wrongdoing. ¶¶150-152. These actions cannot be said to have been taken for a necessary or proper purpose, nor do they represent a "good faith judgment" that the actions were "worthwhile." *Brehm*, 746 A.2d at 263. Rather, Defendants "irrationally squandere[d]" Bidz's corporate assets. *Disney I*, 906 A.2d at 74.[36] For these reasons, Plaintiffs have stated a claim for waste.

### E.    Plaintiffs Have Adequately Pled a Claim for Unjust Enrichment

"Unjust enrichment [is] the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003), *aff'd Judgment*, 847 A.2d 1121 (Del. 2004). To plead a claim, plaintiffs must plead that "the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit." *Id.* (citing *Schock v. Nash*, 732 A.2d 217, 232-33 (Del. 1999)).

Here, Plaintiffs allege that defendants Zinberg, Kong, Itkin, Liu, and Kuperman were unjustly enriched by virtue of receiving millions of dollars in undeserved compensation, including bonuses, while they were mismanaging the Company based on an illegal business model and, consequently, exposing the Company to enormous actual and potential damages. ¶¶19-22, 127-28, 153-56. Plaintiffs also allege that defendants Zinberg and Liu sold almost $2 million of their personally held shares of Bidz stock, immediately before news of the

---

[36] Defendants cite one case in trying to attack Plaintiffs' corporate waste claim: *Grimes v. Donaldson*, 673 A.2d 1207, 1215 (Del. 1996) *overruled by Brehm*, 746 A.2d 244. Ind. Defs.' Mem. at 24. However, *Grimes* stands for the unremarkable proposition that the business judgment rule may protect a compensation decision where the decision is made by "an independent and informed board, acting in good faith." *Grimes*, 673 A.2d at 1215. Here, the Board was not acting in good faith, as it was aware that the Company was littered with illegal and improper practices, including shill bidding. Yet, Defendants caused or allowed failing executives to be paid handsomely. Moreover, for the reasons discussed in Plaintiffs' Opp. to Bidz's MTD, the Board was not "independent" in this case.

1   existence of shill bidding at the Company began to emerge, while in possession of

2   non-public knowledge of those illegal practices.  ¶¶19-20, 111-15, 153-56.

3        Pursuant to these facts, there is no reasonably conceivable set of

4   circumstances in which it can be argued that defendants Zinberg, Kong, Itkin, Liu,

5   and Kuperman have not received unjust benefits.  Indeed, these illicit proceeds,

6   totaling millions of dollars, were made at the expense of the Company and its

7   shareholders. As a result, the Plaintiffs have adequately set forth that defendants

8   Zinberg, Kong, Itkin, Liu, and Kuperman have been unjustly enriched.

9   **III.   CONCLUSION**

10        For the foregoing reasons, the Individual Defendants' motion to dismiss

11   should be denied in its entirety.[37]

12   DATED: March 8, 2010                    ROBBINS UMEDA LLP
                                             BRIAN J. ROBBINS
13                                           FELIPE J. ARROYO
                                             SHANE P. SANDERS
14
15                                           _____
                                                  SHANE P. SANDERS
16
                                             600 B Street, Suite 1900
17                                           San Diego, CA 92101
                                             Telephone: (619) 525-3990
18                                           Facsimile: (619) 525-3991

19                                           BARROWAY TOPAZ KESSLER
                                               MELTZER & CHECK, LLP
20                                           NICHOLE BROWNING (251937)
                                             580 California Street, Suite 1750
21                                           San Francisco, CA 94104
                                             Telephone: (415) 400-3000
22                                           Facsimile: (415) 400-3001

23                                           KENDALL LAW GROUP, LLP
                                             JOE KENDALL
24
   _____
25   [37] Plaintiffs are confident that the Complaint is more than sufficient under the
   applicable standards to adequately plead his claims.  However, should the Court
26   grant any part of the Individual Defendants' motion to dismiss or require more
   specific pleadings, Plaintiffs respectfully request that this Court permit
27   amendment, consistent with Fed. R. Civ. P. 15(a) (leave to amend should be
   "freely given when justice so requires"). *See also Livid Holdings, Ltd. v. Solomon*
28   *Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir.2005) (if the allegations are
   insufficient to state a claim, a court should grant leave to amend "unless it is clear
   that the complaint could not be saved by any amendment").

HAMILTON P. LINDLEY
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000
Facsimile:  (214) 744-3015

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of San Diego, State of California, and not a party to this action.  My business address is Robbins Umeda LLP, 600 B Street, Suite 1900, San Diego, CA 92101.

I hereby certify that on March 8, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 8, 2010 at San Diego, California.

_____
SHANE P. SANDERS

465034