BARROWAY TOPAZ KESSLER
 MELTZER & CHECK, LLP
NICHOLE BROWNING (251937)
nbrowning@btkmc.com
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsumeda.com
FELIPE J. ARROYO (163803)
farroyo@robbinsumeda.com
SHANE P. SANDERS (237146)
ssanders@robbinsumeda.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| In re BIDZ.COM, INC. DERIVATIVE LITIGATION<br><br>This Document Relates To:<br>     ALL ACTIONS | MASTER FILE NO. CV09-04984-PSG (EX)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO BIDZ.COM'S MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6) and 23.1**<br><br>Judge: Honorable Philip S. Gutierrez<br>Date Action Filed: July 10, 2009<br><br>Hearing Date: April 26, 2010<br>Hearing Time: 1:30 p.m |

# Table of Contents

**Page**

I.    INTRODUCTION ......................................................................... 1

II.   STATEMENT OF FACTS ............................................................. 2

    A.    Bidz's Fraudulent Business Practices ...................................... 3

    B.    Bidz's Deceptive Business Practices Come to Light ............................. 5

    C.    The Individual Defendants' False and Misleading Statements and Insider Selling .............................................. 7

III.   ARGUMENT ............................................................................. 8

    A.    Plaintiffs' Pleading Burden .......................................... 8

    B.    The Complaint Provides Particularized Allegations of the Individual Defendants' Knowing Participation in Bidz's Improper Business Practices ................................................ 11

       1.    Plaintiffs' Particularized Allegations ........................... 11

       2.    Bidz Mischaracterizes Plaintiffs' Allegations of Breaches of Fiduciary Duties of Good Faith and Loyalty ................................ 13

    C.    There Is a Reasonable Doubt that the Individual Defendants' Conduct Was a Valid Exercise of Business Judgment ....................................... 15

    D.    Demand is Excused Because There Is Reasonable Doubt that a Majority of the Board Is Disinterested ....................... 17

       1.    Defendant Zinberg Is Not Independent Because He Dominates and Controls the Board and He Financially Benefited Through Illegal Insider Sales ................ 18

       2.    A Majority of the Board Is Substantially Likely to Be Held Liable for Their Knowing Approval and Participation in the Misconduct ............................... 20

    E.    Bidz's Articles of Incorporation Do Not Exculpate the Individual Defendants from Personal Liability ................................... 24

IV.   CONCLUSION ......................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Abbott Labs. Derivative S'holders Litig.,*
   325 F.3d 795 (7th Cir. 2001) .................................................................*passim*

*Aronson v. Lewis,*
   473 A.2d 805 (Del. 1984) .....................................................................*passim*

*Ash v. McCall,*
   No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ..................... 20

*Beam v. Stewart,*
   845 A.2d 1040 (Del. 2004) ........................................................................... 17

*Biren v. Equal. Emergency Med. Group, Inc.,*
   102 Cal. App. 4th 125 (2002) ........................................................................ 15

*Brehm v. Eisner,*
   746 A.2d 244 (Del. 2000) ............................................................................. 11

*In re Brocade Commc'ns Sys., Inc. Derivative Litig.,*
   615 F. Supp. 2d 1018 (N.D. Cal. 2009) .................................................... 20, 24

*Cahill v. Liberty Mut. Ins. Co.,*
   80 F.3d 336 (9th Cir. 1996) ............................................................................ 8

*Cal. Pub. Employees' Ret. Sys. v. Coulter,*
   No. 19191, 2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ..................... 15

*In re Caremark Int'l Inc. Derivative Litig.,*
   698 A.2d 959 (Del. Ch. 1996) .................................................................*passim*

*In re Cendant Corp. Derivative Action Litig.,*
   189 F.R.D. 117 (D.N.J. 1999) ......................................................................... 8

*Cockcroft v. Kirkland,*
   548 F. Supp. 2d 767 (N.D. Cal. 2008) ............................................................ 8

*In re Cooper Cos., Inc. S'holders Derivative Litig.*,
   No. 12584, 2000 Del. Ch. LEXIS 158 (Del. Ch. Oct. 31, 2000) ..................... 22

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
   624 A.2d 1199 (Del. 1993) .............................................................. 14

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007).......................................... 16, 17, 22

*Gomez v. Bidz.com, Inc.*,
   No. 2:09-CV-03216-CBM-E (C.D. Cal., filed Aug. 22, 2008).......................... 3

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) ................................................................ 11

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003)........................................................ 10, 17

*Harris v. Carter*,
   582 A.2d 222 (Del. Ch. 1990) ........................................................... 8

*Haw. Laborers Pension Fund v. Farrell*,
   No. CV 06-06935 ODW (FMOx), 2007 U.S. Dist. LEXIS 77777
   (C.D. Cal. Aug. 22, 2007)................................................................ 9

*Ind. Elec. Workers Pension Trust Fund v. Dunn*,
   No. C-06-01711 RMW, 2008 U.S. Dist. LEXIS 34600
   (N.D. Cal. Mar. 28, 2008)............................................................... 15

*IOTEX Commc'ns, Inc. v. Defries*,
   No. 15817, 1998 Del. Ch. LEXIS 236 (Del. Ch. Dec. 21, 1998)..................... 23

*Jensen v. City of Oxnard*,
   145 F.3d 1078 (9th Cir. 1998) ......................................................... 14

*Johnson v. Hui*,
   752 F. Supp. 909 (N.D. Cal. 1990) .................................................... 19

*Kamen v. Kemper Fin. Servs., Inc.*,
   500 U.S. 90 (1991) ........................................................................ 9

*Kaplan v. Centex Corp.*,
   284 A.2d 119 (Del. Ch. 1971)........................................................... 18

*Kohls v. Duthie*,
791 A.2d 772 (Del. Ch. 2000)..........................................................................10

*Levine v. Smith*,
591 A.2d 194 (Del. 1991) ..............................................................................11

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) .........................................................................25

*McCall v. Scott*,
239 F.3d 808 (6th Cir. 2001) .....................................................................20, 24

*McPadden v. Sidhu*,
964 A. 2d 1262 (Del. Ch. 2008).....................................................................24

*Metro Commc'n Corp. BVI v. Advanced Mobilcomm Techs., Inc.*,
854 A.2d 121 (Del. Ch. 2004)........................................................................17

*Orman v. Cullman*,
794 A.2d 5 (Del. Ch. 2002) ......................................................................18, 19

*In re Oxford Health Plans, Inc., Sec. Litig.*,
192 F.R.D. 111 (S.D.N.Y. 2000) ..........................................................16, 20, 24

*Parnes v. Bally Entm't Corp.*,
722 A.2d 1243 (Del. 1999) ...........................................................................15

*Pogostin v. Rice*,
480 A.2d 619 (Del. 1984) ........................................................................11, 19

*Rales v. Blasband*,
634 A.2d 927 (Del. 1993) .....................................................................10, 19, 22

*Ryan v. Gifford*,
918 A.2d 341 (Del. Ch. 2007)...................................................................16, 23

*Seminaris v. Landa*,
662 A.2d 1350 (Del. Ch. 1995).......................................................................9

*Strougo v. Carroll*,
No. 8040, 1991 Del. Ch. LEXIS 11 (Del. Ch. Jan. 29, 1991)...........................19

*In re TASER Int'l S'holder Derivative Litig.*,
   No. CV-05-123-PHX-SRB, 2006 U.S. Dist. LEXIS 11554
   (D. Ariz. Mar. 17, 2006) ................................................................. 12

*In re the Walt Disney Co. Derivative Litig.*,
   825 A.2d 275 (Del. Ch. 2003) ................................................... 10, 20

*In re the Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) ............................................................... 17

*Tidenberg v. Bidz.com, Inc.*,
   No. 2:09-CV-05553-PSG-FMD (C.D. Cal., filed May 7, 2009) ........................ 3

*Wood v. Baum*,
   953 A.2d 136 (Del. 2008) ........................................................ 9, 10

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) ............................................ 24


**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................ 8

Fed. R. Civ. P. 15(a) ................................................................. 25

Fed. R. Civ. P. 23.1(b)(3) ............................................................. 8

1
2
3
4
5

Plaintiffs Farris Hassan and David Hughes ("Plaintiffs") submit this memorandum of points and authorities in opposition to Bidz.com, Inc.'s ("Bidz" or the "Company") Notice of Motion and Motion to Dismiss Plaintiffs' Derivative Complaint for Failure to Plead Demand Futility Under Federal Rules of Civil Procedure 12(b)(6) and 23.1 ("Motion").

6

## I.    INTRODUCTION

7
8
9
10
11
12
13
14
15
16

Plaintiffs bring this shareholder derivative action for the benefit of nominal defendant Bidz to recover the substantial damages the Company has suffered as a result of Defendants' illegal and improper business practices.[1]   The Complaint alleges with particularity breaches of fiduciary duty by Bidz's executives and directors, as these individuals consciously permitted fraudulent and deceitful business practices to occur at the Company.   Defendants' deceptive business practices have led to investigations by the Securities and Exchange Commission ("SEC") and the Federal Trade Commission ("FTC") and the filing of numerous lawsuits against Bidz, all of which have caused the Company to expend millions of dollars in investigative and defense costs and tarnished the Company's reputation.

17
18
19
20
21

Defendants seek to dismiss Plaintiffs' Complaint by arguing that Plaintiffs were not legally excused from making a pre-suit demand on the Board of Directors (the "Board").   Defendants are wrong.   As demonstrated in the Complaint, a majority of the Board had knowledge of the shill bidding and other improper practices at Bidz, yet consciously chose not to correct the problems.   Specifically, defendants

22

23
24
25
26
27

[1]      Plaintiffs allege breaches of the Individual Defendants' fiduciary duties in connection with fraudulent business practices, unjust enrichment, and violations of the California Corporations Code that occurred from August 2007 through the present (the "Relevant Period").  ¶36.
      "Individual Defendants" refers to David Zinberg, Claudia Liu, Lawrence Kong, Leon Kuperman, Peter G. Hanelt, Garry Y. Itkin and Man Jit Singh. ¶¶19-25. "Defendants" refers to Bidz and the Individual Defendants.
      All "¶" references are to the Verified Consolidated Shareholder Derivative Complaint ("Complaint") filed on November 25, 2009.

28

Zinberg, Hanelt, Itkin and Singh (four out of the five members of Bidz's Board) breached their fiduciary duties by knowingly and deliberately permitting the Company to engage in shill bidding and deceive customers, as well as by failing to implement proper controls to prevent those abuses. These defendants knew that they had a duty to prevent and correct the problems, but consciously decided not to take the necessary action to do so. These factual allegations are sufficient to raise a reasonable doubt that a majority of the Board is disinterested or independent and that the actions (and conscious inaction) of the Board were the product of a valid exercise of business judgment.[2] Demand on the Board, therefore, is excused as futile.

Defendants mischaracterize Plaintiffs' claims by arguing that this is a "*Caremark*" case alleging the Board's mere failure to oversee.[3] However, *Caremark* is not applicable here because Plaintiffs' Complaint alleges that the Board **knew** of the Company's pervasive improper tactics, including shill bidding, and ***deliberately*** failed to address the issues.

In sum, the Complaint plainly establishes a reasonable doubt that by having knowledge of the pervasive fraudulent business practices that the Company engaged in over several years, consciously failing to correct such practices, and knowingly making false disclosures regarding the Company's financial condition, the Individual Defendants face a substantial likelihood of liability for their actions and such actions are not protected by the business judgment rule. Accordingly, as explained below, a pre-suit demand would have been futile, and the Court should deny Bidz's Motion.

## II.    STATEMENT OF FACTS

Bidz was founded in 1998 and is an online retailer offering jewelry products through live interactive auctions. ¶37. Unlike other online auction sites (like eBay),

---

[2]    *See Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984) (establishing the test to determine whether demand is futile when there is board action).

[3]    *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

which brings individual sellers and buyers together, Bidz sells its own merchandise on its website.  ¶2.  Because the auctions are controlled by Bidz, the Company is responsible for the legality of all aspects of the conduct of its auctions.  *Id.*

### A.   Bidz's Fraudulent Business Practices

Bidz's success relies entirely on generating a high volume of traffic to its website.  ¶38.  During the Relevant Period, the Company engaged in a number of fraudulent and deceitful practices designed to improperly inflate revenue, increase earnings and trick unsuspecting customers.  For instance, Defendants employed secret "shill bidders" to place bogus bids on items in order to create the false perception of demand for the items and drive up the bidding and sale prices to trick buyers to pay more than they would absent the fraud.  ¶¶40-42.  Shill bidding is illegal in California and Bidz publicly stated that shill bidding was strictly forbidden on its website. ¶41.  However, confidential sources and Bidz's customers have confirmed that Bidz's website is plagued with shill bidders, which were set up using computer programs and live bidders.  ¶¶42-45, 50-52.[4]

As a result of the illegal shill bidding and fraudulent tactics, the Company has been inundated with customer complaints and the Better Business Bureau gave Bidz an "F" rating, the lowest possible rating for a company.  ¶¶43-44, 53.  Additionally, at least three lawsuits have been filed against the Company which allege the Company engages in unlawful shill bidding and other online abuses.[5]

---

[4]     In 2004 through 2008, more than 11.3 million of the 25.7 million auctions at Bidz failed, which amounts to 44% of these auctions.  ¶45. This large percentage of failed auctions, combined with a large number of "dummy" accounts with account names formatted as a random word followed by four digits (*i.e.,* "random1234") posting shill bids indicates that shill bidding is rampant on Bidz's site.  ¶¶45-48. Shill bidding is also confirmed by bid histories showing that certain users are able to enter bids on three or more products in less than a second, despite the time required to load new pages and enter bid information.  ¶49.

[5]     *See, e.g., Gomez v. Bidz.com, Inc.,* No. 2:09-CV-03216-CBM-E (C.D. Cal., filed Aug. 22, 2008); *Tidenberg v. Bidz.com, Inc.*, No. 2:09-CV-05553-PSG-FMD (C.D. Cal., filed May 7, 2009).

Defendants also failed to ensure that the Company had an adequate system of internal operational controls. Specifically, the Company used American International Gemologists ("AIG"), to generate bogus appraisals to artificially inflate the price and misrepresent the quality of Bidz's merchandise. ¶62. AIG did not follow industry standards because they *did not even physically inspect* the items they claimed they were appraising, despite the fact that a proper appraisal requires an appraiser to be able to see the piece in order to properly estimate its value. ¶¶60, 62-66. These phony "appraisals" artificially increased Bidz's revenues and earnings by giving customers the false impression that the items were worth much more than they actually were. ¶62. The Company also falsified products on their website by using Photoshop software and shipped items to customers that were different than the photographs and descriptions on Bidz's website. ¶60. Bidz's customers complained that particular stones that were "certified" as genuine were in fact not genuine. ¶54. Bidz also failed to provide customers with certificates of authenticity which the customers were promised. ¶71.

The Individual Defendants also used phony error messages to ensure that items would not be sold to a customer if the winning bid was below a certain price. ¶73. Specifically, when a winning bid on an item was less than the cost of the item to Bidz, customers would be given bogus error messages and/or would be informed that they could not purchase the item for reasons that were false. *Id*. These fraudulent practices were designed solely to ensure that Bidz would not lose money on items it had up for auction. The Complaint provides numerous statements by confidential witnesses that confirm these practices. ¶¶74-75.

In further breach of their fiduciary duties, the Company employed auditors Stonefield Josephson, Inc. ("Stonefield"), who has been harshly criticized by the Public Company Accounting Oversight Board ("PCAOB") for their auditing

practices. ¶56.[6]   Specifically, the PCAOB noted that five out of thirteen of Stonefield's audits "included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."  ¶56.  Despite knowing about Stonefield's troubling track record, Defendants continued to use Stonefield as Bidz's auditor.

**B.    Bidz's Deceptive Business Practices Come to Light**

Not surprisingly, Bidz's deceptive business practices and fraud-ridden online auctions eventually attracted the attention of the media and government agencies. On November 26 and 28, 2007, Citron Research issued two reports (the "Reports") disclosing the shill bidding and other fraudulent abuses that pervaded Bidz's online auctions.   ¶¶95-99.[7]   The Reports detailed the Company's deceitful business practices, including shill bidding:

> One common complaint that Citron observed in customer postings was shill bidding. This led us to do our own homework. Citron focuses on presenting public domain information. Therefore, when we suggested shill bidding, the investing public ran with the ball and found the same problems on the Bidz website that were found by Citron. As evident in yesterday's conference call investors have already seen these auction items:  $6,000  flashlight/TV combo…$11,000 Television.

> The problem is still ongoing as we see in the live auction for a television with an MSRP of $1,499 yet the current bid on the television as of publication is $2,776.

---

[6]     As Defendants point out in their brief, Plaintiffs inadvertently misspelled the name of Stonefield Josephson, Inc. *Id*. Plaintiffs clarify that the auditor was Stonefield Josephson.  Defendants do not dispute that Stonefield was Bidz's auditor during the Relevant Period.  *See* Motion at 9.

[7]     The Reports also disclosed that Saied Aframian, the owner of LA Jewelry, Bidz's largest supplier and one of its largest shareholders, is a convicted felon and served time for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry.  ¶¶77, 95.  During 2005 and 2006, LA Jewelry accounted for approximately 45% of Bidz's inventory purchases. ¶77.

In an informal study, Citron offers…a pattern in the auction of over 30 TV's over more than 3 months. Most of these TV's are bid on hundreds of times by the same three bidders.

What makes this…so interesting is that all of these televisions were sold by Clear Solution Partners. The owner of Clear Solution Partners is Bidz.com co-founder Matthew Mills. Not only is he the co-founder and vendor of these televisions, he has also been an outspoken proponent of the stock as evident in the Barron's Blog.

*      *      *

The question that investors are left with is: Are the patterns of bidding on the televisions any indication of patterns of bidding on jewelry? ***Do the hundreds of repetitive bids on the TV's (often by the same bidder on separate auctions at nearly the same second) represent flying fingers of a rogue actor, or a feature of the auction software that only company insiders know about?***

¶99.

Following the disclosure of this negative news, the Company's stock dropped 27% from $16.56 to $11.89 per share, which resulted in a $107 million market capitalization loss. ¶¶55, 96, 100.  On November 27, 2007, Bidz held a conference call to address Citron Research's November 26, 2007 report.  ¶97.  During the call, Zinberg defended the Company's business practices and denied the report's allegations of shill bidding.

On September 1, 2008, *Barron's* published an article on Bidz's and defendant Zinberg's contacts with individuals with criminal or questionable histories.  ¶¶78-79. The article alleged that Zinberg had contacts with:  (i) a person "whose felonies include failure to register as a sex offender;" (ii) a felon convicted for "receiving stolen property" and is doing time on a "concealed weapons conviction;" (iii) a felon convicted for "defrauding Medicare and paying kickbacks to doctors for business;" (iv) "a sex offender with prior arrests for assault and battery, and kidnapping;" (v) the executive of Circle of Friends, a health care company suspended "amid a fraud investigation" by California; and (vi) a felon convicted for "buy[ing] stolen

1
2
3
4

property."  ¶79.  The article also noted that Itkin owned an illegal strip club while serving as Bidz's Chief Financial Officer ("CFO") in 1999.  ¶78.  The disclosure of the auction abuses and nefarious business contacts led to investigations by the SEC and the FTC.  ¶55.

5
6

### C.    The Individual Defendants' False and Misleading Statements and Insider Selling

7
8
9
10
11
12
13
14
15
16
17
18

As a result of Bidz's lack of oversight and internal controls over its online auctions, the Company issued false and misleading statements through the Relevant Period.  ¶¶83-88.  These public statements (i) failed to disclose that Bidz's business model was based on shill bidding designed to boost sale prices and to protect particular items from selling below cost; (ii) failed to disclose that the Company's auctions did not have adequate controls to prevent shill bidding and other abuses; (iii) failed to disclose the Company's auditor was unqualified; (iv) failed to disclose Bidz's appraiser did not inspect the items it purportedly appraised; (v) failed to disclose that customers were being deceived with inaccurate descriptions and photographs of the products on Bidz's website; and (vi) failed to disclose that Bidz entered into a related party transaction with LA Jewelers pursuant to which LA Jewelers guaranteed Bidz a 20% gross profit upon Bidz's sale of LA Jeweler's products.  ¶¶90-94.

19
20
21
22
23
24
25

The Individual Defendants and other Bidz insiders sold massive amounts of Company stock while simultaneously issuing false and misleading statements in order to improperly inflate revenue and earnings.  ¶112.  Based on their knowledge of the non-public information regarding the Company's improper business practices, Zinberg and Liu sold approximately 145,000 shares of Bidz stock, garnering total proceeds in excess of $1.8 million.  *Id.*[8]

26
27
28

---

[8]    On August 16, 2007, Bidz announced that it had adopted the SEC Rule 10b5-1 trading plan, under which Zinberg would sell up to 30,000 shares *per month*.  ¶111. In order to present the appearance of propriety, all of Zinberg's sales were conducted pursuant to the SEC Rule 10b5-1 trading plan.  ¶114.  However, Zinberg entered into

As a direct and proximate result of the Individual Defendants' actions, Bidz has expended and will continue to expend significant sums of money, including, but not limited to: (i) costs incurred in investigating and defending Bidz and certain officers in lawsuits filed against the Company, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment; (ii) costs incurred from compensation paid to the defendants who have breached their duties to Bidz; and (iii) costs incurred in connection with the SEC and FTC investigations.  ¶109.

## III.    ARGUMENT

### A.    Plaintiffs' Pleading Burden

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must assume all allegations are true and draw all inferences in plaintiffs' favor.  *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). Thus, the inquiry on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is one of pleading burdens, not of Plaintiffs' ultimate ability to prove the case.  *See Cockcroft v. Kirkland*, 548 F. Supp. 2d 767, 777 (N.D. Cal. 2008). Under Fed. R. Civ. P. 23.1(b)(3), Plaintiffs must plead with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority" or "the reasons for not obtaining the action or not making the effort." In conducting its analysis, the Court must review the Complaint in its entirety, rather than parsing each allegation of the Complaint and considering it in isolation.  *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) (The trial court must not rely on any one factor but examine the totality of the circumstances and consider all of the relevant factors.); *In re Cendant*

---

the trading plan while he was in possession of material non-public information regarding Bidz's deceptive business practices.  *Id.*  Zinberg attempted to downplay the news of the Rule 10b5-1 trading plan by announcing that he was "voluntarily reducing" his salary to $1 and proclaiming he would not receive any future bonuses. ¶115.  However, his annual salary and eligibility for bonus resumed March 1, 2008 and he ultimately received $433,434 in compensation in 2008 which was more than double his 2007 compensation.  *Id.*

1    *Corp. Derivative Action Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999).[9]  There is no

2    requirement that a plaintiff plead evidence.  *Aronson*, 473 A.2d at 816 (holding that a

3    plaintiff is required "only [to] allege specific facts…not plead evidence" of demand

4    futility).

5         Here, Plaintiffs did not make a demand on the Board because such a demand

6    was futile.  In analyzing whether Plaintiffs have sufficiently alleged demand futility,

7    the Court must apply the test outlined in *Aronson* because Plaintiffs allege that a

8    majority of Bidz's Board had actual **knowledge** of illegal wrongdoing, yet

9    consciously decided not to take any steps to prevent or remedy the situation.  *In re*

10   *Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 805-807 (7th Cir. 2001)

11   (applying *Aronson* test to demand futility inquiry where the board **consciously failed**

12   **to act in the fact of known violations**); *Wood v. Baum*, 953 A.2d 136, 140 (Del.

13   2008) ("The *Aronson* test applies to claims involving a contested transaction *i.e.*,

14   where it is alleged that the directors made a **conscious business decision** in breach of

15   their fiduciary duties.");[10] *Haw. Laborers Pension Fund v. Farrell*, No. CV 06-06935

16   ODW (FMOx), 2007 U.S. Dist. LEXIS 77777, at *10-*11 (C.D. Cal. Aug. 22,

17   2007).

18        Under the *Aronson* test, a pre-suit demand is excused if the plaintiffs allege

19   facts raising a reasonable doubt that: (1) a majority of the board is disinterested or

20   independent or (2) the challenged acts were the product of the Board's valid exercise

21   of business judgment.  *Aronson*, 473 A.2d at 814.  "If a derivative plaintiff can

22   demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test,

23   then he has demonstrated that demand would have been futile." *Seminaris v. Landa*,

---

[9]      As Bidz acknowledges, Delaware law governs this Court's analysis of the pre-suit demand requirement in this shareholder derivative action because Bidz is incorporated in Delaware.  Motion at 13; *see, e.g., Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991).

[10]     Unless otherwise noted, all emphasis is added and internal citations are omitted.

662 A.2d 1350, 1354 (Del. Ch. 1995).  Contrary to Bidz's assertion (Motion at 14), the test set forth in *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993), does not apply here.  *Rales* applies when a plaintiff has alleged "unconsidered inaction."   Here, Plaintiffs do not allege an "unconsidered" failure to oversee the Company, but rather the Board's ***conscious decision*** to permit known misconduct to persist, *i.e.* the shill bidding and use of suspect appraisers and auditors.  *Abbott*, 325 F.3d at 805-07 (*Rales* test applies where there is "unconsidered inaction" on the part of the board; *Aronson* test applies where the board was "aware of the problems…and decided no action was required"); *Wood*, 953 A.2d at 140 ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties.")  Therefore, the *Aronson* test applies.[11]

Under *Aronson's* second prong, in assessing whether any Board actions were the product of sound business judgment, the court presumes "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. The presumption of the business judgment rule may be rebutted by pleading particularized facts that need only raise a reasonable doubt the "action was taken honestly and in good faith." *In re the Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

Under *Aronson's* first prong, there are two kinds of allegations from which the Court may determine that there is a reasonable doubt regarding the disinterestedness of a director.   First, while the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the particularized allegations in the complaint present "a substantial likelihood" of liability on the part of a director.  *Kohls v. Duthie*, 791 A.2d 772, 779 (Del. Ch.

---

[11]    Even if *Rales* applied, it is the same as the first prong of *Aronson*, which Plaintiffs have satisfied, as demonstrated *infra*.  *See Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003).

2000).  Second, there is a reasonable doubt regarding a director's disinterestedness if the plaintiff alleges that the director has received a personal financial benefit from the alleged misconduct.  *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984).

The reasonable doubt inquiry is fact-intensive and turns on the totality of the factual allegations in each particular case.  *Brehm v. Eisner*, 746 A.2d 244, 268 (Del. 2000) ("Because of the absence of a precise formula in [Rule 23.1] for pleading compliance with the demand requirement, the sufficiency of a complaint under Rule 23.1 is determined on the basis of the facts of each case.").  "[T]he pleader is not required to plead evidence.  What the pleader must set forth are particularized factual statements that are essential to the claim."  *Id.* at 254;  *see also Pogostin*, 480 A.2d at 625; *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991).  A motion to dismiss should not be granted if any set of facts can be discerned from the complaint that would show futility.  *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988).  As explained below, the Complaint clearly meets these standards.

**B.**   **The Complaint Provides Particularized Allegations of the Individual Defendants' Knowing Participation in Bidz's Improper Business Practices**

### 1.   Plaintiffs' Particularized Allegations

In its Motion, Bidz completely ignores Plaintiffs' well-pleaded allegations and attempts to rewrite Plaintiffs' Complaint and portray Defendants as innocent and ill-informed directors.  Motion at 18.  Plaintiffs, however, allege with particularity that the Individual Defendants knowingly abandoned their fiduciary duties and mismanaged the Company by consciously permitting the improper practices alleged in the Complaint.

Corporate officers and directors act in bad faith and face a substantial likelihood of liability where they have actual knowledge of violations, yet take no

steps to prevent or remedy the situation. *Abbott*, 325 F.3d at 806, 809.[12]   For example, in *In re TASER Int'l S'holder Derivative Litig.*, No. CV-05-123-PHX-SRB, 2006 U.S. Dist. LEXIS 11554 (D. Ariz. Mar. 17, 2006), plaintiffs brought shareholder derivative breach of fiduciary duty claims alleging that the defendants: (i) knew about issues related to the safety of the company's taser gun; (ii) knew that the company had spent minimal sums of money on safety testing, which "should have been a red flag to any conscientious officer or director"; (iii) were aware of media scrutiny of the taser's safety; and (iv) despite the foregoing, "vigorously defended" the company's safety guidance in order to boost revenues. *Id.* at *53. The court denied the defendants' motion to dismiss the fiduciary duty claim, reasoning that while the problems before the TASER board did not "rise to the sustained six-year level of regulatory problems in *Abbott*, … the alleged facts, taken together, lead to 'reasonable inferences' that the board was aware of the taser's safety issue problems." *Id.* at *53-*54.

Like in *Abbott* and *TASER*, Plaintiffs here allege that Defendants **knew** about the illegal and improper business practices at Bidz, including shill bidding, and yet failed to take any action to prevent or remedy the issues.  The Company was unable to verify the legitimacy of bids on its items (a fact admitted by Zinberg), which permitted shill bidding and other improper practices to persist.  ¶¶45-49, 123.[13]

---

[12]   In *Abbott*, the Seventh Circuit reversed the district court's ruling that plaintiffs had failed to plead demand futility, holding that the presence of numerous "red flags" put the company's directors on notice that it had significant deficiencies in its effort to comply with FDA regulations.  *Id.* at 809.  The court held that these facts were sufficient to establish that "the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith." *Id.*

[13]   For example, a significant percentage of the Company's winning bids had names that followed a readily identifiable pattern (*e.g.*, a random word followed by four numeric digits), indicating that the account names were fake and used solely for shill bidding.  ¶¶46-49.  Similarly, certain users entered bids on three or more products in less than one second, notwithstanding the fact that it takes much longer

Plaintiffs allege that the Individual Defendants knew about the shill bidding and improper practices at Bidz, because the Company's viability is dependent on Bidz's ability to generate traffic to its website and the reliability of its website and transaction processes is critical to the Company's success. ¶¶38-39. Plaintiffs allege specific ways in which the Individual Defendants used computers to assist in shill bidding, including, but not limited to, generating dummy accounts to supply the shill bids. ¶¶46-49.  Plaintiffs also allege with sufficient particularity that the Individual Defendants knowingly permitted Bidz to provide inaccurate descriptions and photographs of items that they sold. ¶¶67-70. The Individual Defendants also took measures to ensure that items would not be sold below a certain price.

At the absolute latest, Defendants knew about the rampant shill bidding by November 2007, when Citron Research issued its Reports detailing the improper bidding practices at Bidz.  ¶¶9, 99.  However, despite this knowledge, the Individual Defendants knowingly allowed the Company to engage in shill bidding for years. ¶¶41-42.

In addition to consciously permitting Bidz to engage in shill bidding and other unethical business practices in its auctions, the Individual Defendants knowingly allowed Bidz to employ a suspect auditor, which was severely criticized by PCAOB for performing deficient audits, and a jewelry appraiser that publicly admitted to not following minimum industry standards and conducting bogus appraisals of jewelry. ¶¶56-58, 62-66.  Thus, Plaintiffs have pled with particularity that the Individual Defendants participated in the illegal and improper business practices at Bidz.

### 2. Bidz Mischaracterizes Plaintiffs' Allegations of Breaches of Fiduciary Duties of Good Faith and Loyalty

---

than a second to load new pages and enter bid information, which supports Plaintiffs' allegations that computer programs were used to effectuate the shill bidding.  ¶49.

1    Bidz completely mischaracterizes Plaintiffs' allegations as a mere "failure to

2   oversee Bidz's operations" and erroneously suggests that the Complaint asserts so-

3   called "*Caremark*" claims alleging a failure of oversight by the Board.  (Motion at 4,

4   16).   However, Plaintiffs do not allege a failure of oversight by the Board, but

5   instead allege that the Individual Defendants breached their duty of good faith and

6   loyalty by *knowingly* permitting the improper business practices at Bidz.  Therefore,

7   this case fits squarely in line with the facts of *Abbott, not Caremark*. [14]

8    Here, as in *Abbott*, Plaintiffs allege that the Board—in particular defendants

9   Zinberg, Hanelt, Itkin and Singh, all of whom served on the Board during the

10  Relevant Period—knew that the Company: (i) engaged in shill bidding; (ii)

11  employed suspect accounting auditors; (iii) employed jewelry appraisers who offered

12  inflated or bogus jewelry appraisals; (iv) permitted the use of inaccurate descriptions

13  and photos of items sold to customers; and (v) permitted the use of phony error

14  messages so that auctioned items would not be sold below a certain price.  These

15  allegations have been confirmed by numerous consumer reports, multiple

16  confidential witnesses and customers of Bidz.  Nevertheless, the Board consciously

17  decided not to take action to address any of these deceptive and illegal business

18  practices, which were ultimately revealed to the public by the Citron Research

19  Reports.   Simultaneously, the Board caused the Company to issue false and

20

21

22

---

23  [14]    In *Abbott,* the Seventh Circuit explained the difference between a *Caremark*
    claim and the claim asserted by plaintiffs in *Abbott*, stating that a *Caremark* claim is
24  "'predicated upon ignorance of liability creating activities,' where there were no facts
    to indicate the directors '*consciously permitted a known violation of law by the*
25  *corporation to occur*.'"   *Abbott*, 325 F.3d at 806.  In contrast, the court noted the
    plaintiffs in *Abbott* "were aware of known violations" and, therefore, were "clearly
26  distinguished" from the "unconsidered" inaction in *Caremark*.  *Id*. ("The facts in
    *Abbott* do not support the conclusion that the directors were 'blamelessly unaware of
27  the conduct leading to the corporate liability.'").

28

misleading statements to the Company's shareholders and the public regarding the nature of the Company's business practices.[15]  ¶¶83-88.

Considering the totality of Plaintiffs' allegations, particularly given the detail of the allegations in the Complaint, and the fact that Plaintiffs are entitled to all reasonable inferences, Plaintiffs adequately allege that each of the Individual Defendants is responsible for their breaches of fiduciary duties, and their decision to engage in the misconduct is not protected by the business judgment rule.

### C.   There Is a Reasonable Doubt that the Individual Defendants' Conduct Was a Valid Exercise of Business Judgment

The presumptive validity of a business judgment is rebutted "where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"  *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999).   "It is an inquiry into 'the substantive nature of the challenged transaction and the board's approval thereof.' The review is a fact-based one.  Plaintiffs must allege facts sufficient to rebut a presumption that the decision was a result of a valid exercise of business judgment." *Ind. Elec. Workers Pension Trust Fund v. Dunn*, No. C-06-01711 RMW, 2008 U.S. Dist. LEXIS 34600, at *30 (N.D. Cal. Mar. 28, 2008).   "Board actions that are deemed *ultra vires* are not entitled to the protection of the business judgment rule.… [U]ltra vires acts are those acts which a corporation cannot, in any case, ***lawfully*** accomplish, *i.e.*, 'illegal acts or acts beyond the authority of the corporation.'"  *Id.* at *36-*37.

---

[15]    Bidz's denials of these allegations raise issues of fact that cannot and should not be resolved on a motion to dismiss.  *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1087 (9th Cir. 1998) (denying motion to dismiss because "[c]learly, material and important issues of fact remain to be determined" even though those facts may ultimately show no wrongdoing); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1209 (Del. 1993) ("Since bad faith is an issue of fact, the issue cannot be resolved on pleadings which, on their face, allege bad faith.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   The Individual Defendants' conscious decision not to act in the face of known improper business practices in violation of applicable laws cannot receive protection under the business judgment rule.[16] Here, the Individual Defendants deliberately permitted improper business policies and procedures within Bidz, including shill bidding, which is illegal in California.  The Individual Defendants, in particular the members of the Audit Committee, employed suspect accounting auditors and jewelry appraisers, condoned the use of inaccurate descriptions and photos of items sold to customers, and the use of phony error messages and other improper practices designed to ensure that items would not be sold below a certain price. ¶¶37-75. The Board's decision to approve and promote such improper and illegal practices within Bidz is not protected by the business judgment rule.  *See In re Oxford Health Plans, Inc., Sec. Litig.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (stating that violations of regulatory laws is not a protected business judgment).   Indeed, the Individual Defendants' misconduct has subjected the Company to investigations by the SEC and FTC.  ¶¶101-04.  *See, e.g.*, *Desimone*, 924 A.2d at 934-35 (knowingly exposing the company to regulatory consequences is not a protected business judgment).  Such egregious misconduct was not, and could not possibly have been, the product of a good faith exercise of business judgment because there is no legitimate business reason to engage in such blatantly unseemly conduct.

   As the Delaware Chancery Court stated in *Desimone*:

---

[16]   *See Biren v. Equal. Emergency Med. Group, Inc.*, 102 Cal. App. 4th 125, 137 (2002) (citing *FDIC v. Benson*, 867 F. Supp. 512, 522 (S.D. Tex. 1994)) (stating that directors are not protected by the business judgment rule if "they knew their acts were illegal or they 'knowingly committed acts outside the scope of their authority.'"); *Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch. LEXIS 144, at *34 (Del. Ch. Dec. 18, 2002) ("In addition, the business judgment rule may not be invoked to shelter unauthorized actions of a board of directors."); *see, e.g., Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007) (stating that it is a breach of fiduciary duty to cause a company to act unlawfully); *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (Bad faith "may be shown where 'the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, *where the fiduciary acts with the intent to violate applicable positive law*, or where the fiduciary intentionally fails to act in the face of known duty to act, demonstrating a conscious disregard for his duties.'")

> [B]y consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused. Although directors have wide authority to take lawful action on behalf of the corporation, ***they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators***. Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. ***The knowing use of illegal means to pursue profit for the corporation is director misconduct***.

*Id.*; *see also, In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown . . . where [a] fiduciary acts with intent to violate applicable positive law."); *Guttman*, 823 A.2d at 506 n.34 ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."); *Metro Commc'n Corp. BVI v. Advanced Mobilcomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity."). Because the Individual Defendants' conscious decision to not act in the face of these illegal and improper business practices can never be borne out of valid business judgment, demand on the Individual Defendants is futile under the second prong of *Aronson*.

### D. Demand is Excused Because There Is Reasonable Doubt that a Majority of the Board Is Disinterested

Although Plaintiffs only need to establish demand futility under one of *Aronson's* two prongs, demand is excused under both prongs. With regard to the first prong, because the Board consisted of five directors at the time this Action was commenced, Plaintiffs need only raise a reasonable doubt as to the disinterestedness of a majority, or three of them. *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). Plaintiffs' particularized allegations easily raise a reasonable doubt as to all five members of Bidz's Board and, therefore, demand must be excused.

1

2

### 1.   Defendant Zinberg Is Not Independent Because He Dominates and Controls the Board and He Financially Benefited Through Illegal Insider Sales

Defendants concede that with respect to demand futility purposes, Zinberg is a company insider.  There are other reasons why Zinberg is disinterested with regard to demand futility. First, the Board is dominated and controlled by Zinberg who co-founded Bidz and to this day remains in charge of Bidz as President, Chief Executive Officer and Chairman.  ¶19.  Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares.  ¶122.  Zinberg's domination of Bidz is confirmed by confidential witnesses who are former employees of the Company and were in positions to know about Zinberg's control. For example, one confidential witness who worked in Bidz's billing department during the Relevant Period stated that Zinberg was "always walking around, looking over people's shoulders and making them feel nervous." *Id*. Zinberg exerted this same dominant position with the Board as they also were "nervous" and "afraid" around him, especially if it came to deciding whether to file a lawsuit against him. In fact, in May 2004, Zinberg caused Bidz to grant him stock options to purchase 6 million shares of common stock.[17]  The 2005 Proxy states that the reason for Zinberg's option grant was in "consideration of his services to the Company."  While stock options granted to other executives at this exact time were granted in accordance with Bidz's stock option plans, the 2005 Proxy provides that Zinberg's 6 million shares were the ***exception*** and that his options "***vested immediately***." *See* Sanders Decl., Exhibit E.  Accordingly, Zinberg's domination and control of the Board and the Company is so complete that he can, at any time, force the Board to issue him millions of dollars of shares that vest

---

[17]    *See* Form 14A at 9-10 filed with the SEC on December 13, 2005 (the "2005 Proxy") (attached as Exhibit E to the Declaration of Shane P. Sanders in Support of Plaintiffs' Memoranda of Law in Opposition to the Motions to Dismiss Filed by Bidz.com and the Individual Defendants ("Sanders Decl.")).

immediately and that do not have to be granted in accordance with Bidz's stock option plans.[18] As succinctly noted by Chancellor Chandler, a director may be compromised if he is beholden to an interested person. *See Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002).

Second, Zinberg is interested due to his illegal insider sales. "Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Pogostin*, 480 A.2d at 624 (citing *Aronson*, 473 A.2d at 812). Hence, there is a reasonable doubt regarding a director's disinterestedness if the plaintiff alleges that the director had participated in transactions that benefited the director personally, *i.e.*, insider trading transactions. *See id.; see also Johnson v. Hui*, 752 F. Supp. 909, 913 (N.D. Cal. 1990) (holding that directors who engaged in insider selling are incapable of properly considering a demand).[19]

During the Relevant Period, based on his knowledge of material non-public information regarding the Company's improper auction practices, Zinberg sold 90,000 shares of Bidz's common stock and reaped $901,100 in proceeds. ¶112. Zinberg is clearly disinterested because he personally benefitted from his illegal insider sales of Bidz's common stock. *Strougo v. Carroll*, No. 8040, 1991 Del. Ch.

---

[18]  *See Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971) (stock ownership, at least when it amounts to a majority, can be sufficient proof of domination or control).

[19]  Additionally, Zinberg and Itkin are incapable of considering a demand against each other because of their disabling conflicts and relationships. ¶126. Zinberg and Itkin share a longstanding personal and professional relationship with respect to their work at Asset Lenders of America and Union Pawn Brokers, Inc. *Id.* Additionally, both served as Registered Agents for multiple business entities that have the same address. *Id.* As such, Zinberg's and Itkin's loyalty to the corporation and its shareholders is compromised by their personal and professional relationships, and therefore, a reasonable doubt exists as to their independence. *See Orman*, 794 A.2d at 24 n.47 (*citing Aronson*, 473 A.2d at 815).

LEXIS 11, at *13 (Del. Ch. Jan. 29, 1991) (holding that demand is excused as to the directors who participated in insider trading).

### 2. A Majority of the Board Is Substantially Likely to Be Held Liable for Their Knowing Approval and Participation in the Misconduct

Directors are not disinterested where they face a "substantial likelihood" of liability. *See Rales*, 634 A.2d at 936. It has consistently been held that directors charged with overseeing subordinates are "interested" where they face a substantial likelihood of personal liability. *Aronson*, 473 A.2d at 815. To meet this standard, which is sufficient to satisfy demand futility, unlike a "mere threat of liability," which is not, "the alleged facts need only give rise to a reason to doubt business judgment protection, not 'a judicial finding that the directors' actions are not protected by the business judgment rule.'" *Disney*, 825 A.2d at 289 (*quoting Grobow*, 539 A.2d at 186).[20]

The substantial likelihood test is satisfied where a plaintiff alleges facts to support the inference that "an ***unconsidered failure of the board to act*** in circumstances in which due attention would, arguably, have prevented the loss." *Abbott*, 325 F.3d at 808 (*quoting Caremark*, 698 A.2d at 967) (emphasis in original). "[A] sustained or systemic failure of the board to exercise oversight…will establish the lack of good faith that is a necessary condition to [director] liability." *Caremark*, 698 A.2d at 971. Thus, courts have held that "where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors." *Oxford Health Plans*, 192 F.R.D. at 117; *see also McCall v. Scott*, 239 F.3d 808, 819 (6th Cir. 2001) (majority of directors were interested when they ignored "'red flags'

---

[20]  Bidz confuses the concepts of "mere threat of liability" with "substantial likelihood of liability," and contends, incorrectly, that Plaintiffs allege that a majority of directors are only subject to a "mere threat" of litigation. Motion at 5-6.

that warned of systematic" fraud "employed and encouraged by…management" to improperly inflate the corporation's bottom line, resulting in a federal investigation); *Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144, at *55-*57 (Del. Ch. Sept. 15, 2000) (majority of the directors on a board knew that the corporation had been accused of engaging in imprudent or unlawful conduct and breached their fiduciary duty of good faith by declining to take corrective action); *In re Brocade Commc'ns Sys., Inc. Derivative Litig.*, 615 F. Supp. 2d 1018, 1047-78 (N.D. Cal. 2009).

The Complaint alleges with particularity that the Board permitted Bidz to engage in shill bidding, use suspect accounting auditors and jewelry appraisers, use inaccurate descriptions and photos of items sold to customers, and use phony error messages, as described herein.  Furthermore, Plaintiffs have sufficiently alleged that the Individual Defendants had knowledge of the improper conduct at Bidz.  The Individual Defendants were keenly aware that the Company was engaging in illegal and deceptive practices because those practices were at the core of the Company's business model.  ¶36.  The Individual Defendants also had knowledge regarding the improper business practices at Bidz because: (i) during the Relevant Period, as disclosed in the Company's fiscal year 2006 Form 10-K (Sanders Decl., Exhibit B), Bidz's revenues were dependent to a significant extent on the Company's online auction business model; (ii) the Company was dependent on the "satisfactory availability, performance, and reliability" of the Company's website; (iii) Bidz is legally responsible for the jewelry sold during the online auctions because Bidz supplies the jewelry and the sales proceeds accrue to Bidz; (iv) 44% of the winning bids in the Company's auctions did not result in transactions, strongly supporting the position that shill bidding was indeed Company practice; and (v) Bidz and certain of its representatives had numerous and long-standing relationships with individuals and entities that were suspicious, to say the least, which created a heightened duty on the part of the Board to be conscientious in fulfilling their fiduciary duties.  ¶123.

However, in breach of their fiduciary duties, the Individual Defendants continued to support and encourage the Company's improper and illegal conduct year after year. ¶42.

Plaintiffs also provide further particularized allegations as to Audit Committee members[21] Hanelt, Singh and Itkin[22] and their approval of the alleged misconduct. Hanelt, Singh and Itkin were responsible for: (i) reviewing and discussing information presented in the Company's earnings press releases; (ii) overseeing the financial reporting processes of the Company; (iii) reviewing the Company's internal controls; (iv) evaluating the qualifications of and appointing the independent auditor; and (v) ensuring that the Company abides by all relevant laws. ¶124. Thus, Hanelt, Singh and Itkin knew that the Company's business model was based upon shill bidding, and that the practice was rampant throughout the Company. *Id.* Nonetheless, Hanelt, Singh and Itkin oversaw and directly participated in the

---

[21] Plaintiffs inadvertently omitted Itkin as a member of the Audit Committee in the demand futility section of the Complaint. However, the Complaint alleges Itkin was an Audit Committee member during the Relevant Period. *See* ¶¶24, 30, 57. Bidz does not dispute that Itkin was a member of the Audit Committee during the Relevant Period. Motion at 12 n.9.

[22] Itkin is the former CFO of Bidz. As a result of the Individual Defendants' misconduct, Bidz is currently being subjected to investigations by the SEC and the FTC. ¶¶101-04. Thus, due to the possibility that Itkin will be held liable for the Company's past accounting practices, Itkin is legally incapable of disinterestedly and independently considering a demand. *See, e.g., Desimone*, 924 A.2d at 934-35 (directors can be held liable for exposing a company to regulatory consequences). Furthermore, Plaintiffs have raised a reasonable doubt as to the independence of Itkin whose principal employment is with Bidz. ¶127. For fiscal year 2008, Itkin received a total compensation of $110,038 for being a Bidz director. *Id.* Under such circumstances, Itkin cannot "be expected to act independently considering his substantial financial stake in maintaining his current offices," and thus there exists a reasonable doubt as a matter of law regarding his independence from the other directors who control his compensation. *See Rales*, 634 A.2d at 937 (holding that a director whose principal employment is with the company cannot be expected to act independently of the other directors); *see, e.g., In re Cooper Cos., Inc. S'holders Derivative Litig.*, No. 12584, 2000 Del. Ch. LEXIS 158, at *19-*20 (Del. Ch. Oct. 31, 2000) (finding a reasonable doubt is raised as to the independence of directors whose employment is controlled by an interested director). Thus, there is clearly a reasonable doubt regarding Itkin's independence stemming from his employment with Bidz.

dissemination of Bidz's improper press releases that concealed Bidz's inadequate controls over its online auctions and flawed business model. Additionally, Audit Committee members Hanelt, Singh and Itkin were responsible for appointing and reviewing the qualifications of the independent auditor. ¶57.  However, Hanelt, Singh and Itkin appointed Stonefield as the Company's independent auditor despite the PCAOB's March 14, 2007 report identifying significant deficiencies in Stonefield's prior audits.  ¶124.

Where, as here, the committee members charged with egregious conduct also comprise a majority of the board, a plaintiff raises reasonable doubt as to the board's disinterestedness. *See Ryan*, 918 A.2d at 355-56. As such, the Complaint provides particularized allegations that, in breach of their fiduciary duty of good faith, the Individual Defendants, especially Audit Committee members Hanelt, Singh and Itkin, willfully ignored the obvious and pervasive problems with Bidz's online auctions and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  ¶¶123-24.

Bidz challenges Plaintiffs' well-pled allegations, arguing that Plaintiffs show no particularized allegations with respect to the Individual Defendants' knowledge in that "they do not show when, how, or precisely what each [] director knew about the alleged wrongdoing." Motion at 16. Bidz is wrong.  Under Delaware law, Plaintiffs need only provide allegations of breach of fiduciary duty "from which it can reasonably be inferred that [the improper practice] was knowable and that the defendant was in a position to know it." *See IOTEX Commc'ns, Inc. v. Defries*, No. 15817, 1998 Del. Ch. LEXIS 236, at *13 (Del. Ch. Dec. 21, 1998).  As stated above, Plaintiffs have provided particularized allegations as to the rampant and pervasive business practices established at Bidz and how these practices have been in place at Bidz for many years.  ¶42.  Additionally, Plaintiffs have pled with particularity the Individual Defendants' duties as directors and committee members, particularly

Audit Committee members Hanelt, Singh and Itkin.   These factual allegations demonstrate that the Company's improper conduct was "knowable," and all of the Individual Defendants, particularly the Audit Committee members, were in a position to know it, all of which establishes their knowledge.  *See IOTEX*, 1998 Del. Ch. LEXIS 236, at *13.

Thus, contrary to Bidz's argument, Plaintiffs have pled specific facts as opposed to mere conclusory allegations that should have alerted Bidz's Board that the Company engaged in shill bidding and employed a number of other improper business practices.  Plaintiffs' factual allegations are supported by the confidential witness testimony from former Bidz employees with knowledge of the true state of Bidz's business practices during the Relevant Period, and the Citron Research Reports, among other things.  From those facts, a reasonable inference is that Bidz's Board, if they were fulfilling their express duties to be familiar with the Company's business practices, should have known about Bidz's illegal and unethical practices.  Even if the knowledge is not imputed to the entire Board, there can be no question but that the directors who served on the Audit Committee, as well as Zinberg (a majority for demand futility purposes), are exposed to a substantial risk of liability for consciously disregarding their responsibilities in breach of their duties of loyalty and good faith.  *See Brocade*, 615 F. Supp. 2d at 1047-48; *Abbott*, 325 F.3d at 808; *Oxford Health Plans*, 192 F.R.D. at 117; *McCall*, 239 F.3d at 819.

### E.   Bidz's Articles of Incorporation Do Not Exculpate the Individual Defendants from Personal Liability

Bidz argues that "Bidz's Articles of Incorporation limit director liability to breaches of fiduciary duty to the full extent permissible by Delaware law."  Motion at 16-17.  Bidz is incorrect.  As Bidz concedes, the Company's directors are not exculpated for ***intentional or bad faith misconduct***, as Plaintiffs allege here.  *Id.* at 17; *see McPadden v. Sidhu*, 964 A. 2d 1262, 1274 (Del. Ch. 2008) (court held that

"intentional dereliction of duty or the conscious disregard for [the director's] responsibilities" is a breach of fiduciary duty outside of a corporation's exculpatory charter provision); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1017 (N.D. Cal. 2007) ("If the facts that plaintiff has pled are taken as true, the exculpatory provision will give individual defendants no quarter."). Plaintiffs allege that the Board knowingly and deliberately allowed Bidz's improper business practices, which is not protected by the business judgment rule or Section 102(b)(7) of the Delaware General Corporation law. Therefore, the exculpatory clause would not protect the Individual Defendants from liability for their blatant violations of applicable laws and breaches of fiduciary duty of loyalty and good faith. The Court should disregard Bidz's arguments and conclude that demand is excused under both prongs of *Aronson*.

## IV.   CONCLUSION

For all the reasons set forth herein, Plaintiffs respectfully request that the Court deny Bidz's Motion in its entirety.[23]

March 8, 2010                                      Respectfully Submitted,

                                                  /s/ Nichole T. Browning
                                                  NICHOLE T. BROWNING
                                                  BARROWAY TOPAZ KESSLER
                                                  MELTZER & CHECK, LLP
                                                  580 California Street, Suite 1750
                                                  San Francisco, CA  94104
                                                  Telephone:  (415) 400-3000
                                                  Facsimile:   (415) 400-3001

                                                      *– and –*

---

[23]    Plaintiffs are confident that the Complaint is more than sufficient under the applicable standards to plead demand futility. However, should the Court disagree, Plaintiffs respectfully request that this Court permit amendment, consistent with Fed. R. Civ. P. 15(a) (leave to amend should be "freely give[n] when justice so requires"). *See also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (if the allegations are insufficient to state a claim, a court should grant leave to amend "unless it is clear that the complaint could not be saved by any amendment").

1   ERIC L. ZAGAR
    LIGAYA T. HERNANDEZ
2   280 King of Prussia Road
    Radnor, PA  19087
3   Telephone: (610) 667-7706
    Facsimile:  (610) 667-7056
4
    *Co-Lead Counsel for Plaintiffs*
5
    BRIAN J. ROBBINS
6   FELIPE J. ARROYO
    SHANE P. SANDERS
7   DAVID L. MARTIN
    ROBBINS UMEDA LLP
8   600 B Street, Suite 1900
    San Diego, CA 92101
9   Telephone: (619) 525-3990
    Facsimile:  (619) 525-3991
10
    *Co-Lead Counsel for Plaintiffs*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

        I hereby certify that on March 8, 2010, I electronically filed the foregoing with

3

the Clerk of the Court using the CM/ECF system which will send notification of

4

such filing to the e-mail addresses denoted on the attached Electronic Mail Notice

5

List.

6

        I certify under penalty of perjury under the laws of the United States of

7

America that the foregoing is true and correct.  Executed on March 8, 2010.

8

                                        /s/ Nichole T. Browning
9                                         NICHOLE T. BROWNING
                                        BARROWAY TOPAZ KESSLER
10                                        MELTZER & CHECK, LLP
                                        580 California Street, Suite 1750
11                                        San Francisco, CA  94104
                                        Telephone:  (415) 400-3000
12                                        Facsimile:   (415) 400-3001

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 2:09-cv-04984-PSG-E**

**<u>Electronic Mail Notice List</u>**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Nichole Browning**
  nbrowning@btkmc.com,knguyen@btkmc.com,shebard@btkmc.com

- **Andrew John Demko**
  ademko@gibsondunn.com

- **Joel Alan Feuer**
  jfeuer@gibsondunn.com

- **Ligaya Hernandez**
  lhernandez@btkmc.com

- **Mark T Hiraide**
  mhiraide@phlcorplaw.com

- **Joe Kendall**
  Jkendall@kendalllawgroup.com

- **Hamilton Lindley**
  administrator@kendalllawgroup.com

- **David L Martin**
  dmartin@robbinsumeda.com

- **Brian J Robbins**
  notice@robbinsumeda.com

- **S Benjamin Rozwood**
  brozwood@robbinsumeda.com,notice@robbinsumeda.com

- **Shane P Sanders**
  ssanders@robbinsumeda.com

**<u>Manual Notice List</u>**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`