1  Brian J. Robbins (190264)
2  Felipe J. Arroyo (163803)
   Shane P. Sanders (237146)
3  ROBBINS UMEDA LLP
   600 B Street, Suite 1900
4  San Diego, CA 92101
5  Telephone: (619) 525-3990
6  Facsimile:  (619) 525-3991
   brobbins@robbinsumeda.com
7  Eric L. Zagar (250519)
8  Robin Winchester
   Ligaya Hernandez
9  BARROWAY TOPAZ KESSLER
10 MELTZER & CHECK, LLP
   280 King of Prussia Road
11 Radnor, PA  19087
12 Telephone: (610) 667-7706
   Facsimile:  (610) 667-7056
13
   *Co-Lead Counsel for Plaintiffs*
14

15           UNITED STATES DISTRICT COURT

16           CENTRAL DISTRICT OF CALIFORNIA

17
18 In re BIDZ.COM, INC. DERIVATIVE     )   MASTER FILE NO. CV09-04984-PSG
   LITIGATION                          )   (EX)
19                                     )
                                       )   **VERIFIED AMENDED**
20 _____ )   **CONSOLIDATED SHAREHOLDER**
   This Document Relates To:           )   **DERIVATIVE COMPLAINT**
21      ALL ACTIONS                    )
                                       )   DEMAND FOR JURY TRIAL
22 _____ )

23
24
25
26
27
28

1    Plaintiffs Farris Hassan and David Hughes, by the undersigned attorneys,

2  submit this Verified Amended Consolidated Shareholder Derivative Complaint

3  (the "Complaint") against the defendants named herein.

4                          **NATURE OF THE ACTION**

5    1.    This is a shareholder derivative action brought for the benefit of

6  nominal defendant Bidz.com, Inc. ("Bidz" or the "Company") against the members

7  of its Board of Directors (the "Board") and certain executive officers.  This action

8  seeks to remedy defendants' breaches of fiduciary duties, unjust enrichment, and

9  violations of California Corporations Code that occurred from August 2007 and

10  continue to the present (the "Relevant Period").

11    2.    Bidz's primary business is to auction jewelry and other items via its

12  website, www.bidz.com.  Unlike other retailers, Bidz sells its jewelry through an

13  online auction format similar to eBay Inc. ("eBay").  Through its online auctions,

14  Bidz offers jewelry for sale and various online bidders bid on the price of the

15  jewelry.  As a result, Bidz is responsible for the legality of all aspects of the

16  conduct of its auctions.  During the Relevant Period, Bidz's online auction business

17  and, in particular, its ability to generate a high volume of traffic to its website, was

18  critical to the Company's ability to generate revenue.

19    3.    For years, Bidz has engaged in the illegal practice of "shill bidding,"

20  or placing fake bids.  Bidz used shill bidding to increase the price that customers

21  pay, create a hidden reserve price, and increase interest in its website.

22    4.    Bidz accomplished its shill bidding practices through various means.

23  For example, certain accounts were devoted solely to shill bidding.  Indeed, many

24  user accounts had balances in the high six figures and were used to artificially bid

25  up the price of jewelry, which would then be re-auctioned if one of these accounts

26  ended up with the winning bid—a fact confirmed by a Bidz employee.  Shill

27  bidding was also accomplished through computer programs, as demonstrated by

28  the fact that certain bidders were able to enter bids on multiple products within a

fraction of a second, which could not be accomplished by a bona fide user who must navigate between pages to bid on separate items.  Public complaints by Bidz customers further substantiate the existence of these shill bidding practices at the Company.

5.     Certain of the defendants have also admitted facts showing the existence of shill bidding at Bidz.  Defendant Claudia Y. Liu ("Liu") has admitted that **44% of winning bids in the Company's auctions did not result in sales**, demonstrating that many bids were not actual "bids" aimed at buying the product, but rather were shill bids aimed at driving up the price of the product (and the sales would not be completed in the event the item was won by a shill bidder). Defendant David Zinberg ("Zinberg") has publicly admitted that Bidz was **unable to verify the legitimacy of bid**s, which permitted shill bidding and other improper bidding practices to persist.

6.     The use of shill bidding at Bidz was first exposed to the public in November 2007 by Citron Research ("Citron"), which documented numerous instances of shill bidding and other improper practices at the Company.

7.     The day after Citron's first report on the illegal shill bidding at Bidz, defendant Zinberg, Bidz's Chief Executive Officer ("CEO"), held a conference call to address the allegations.  While he claimed that shill bidding was technically against the Company's policies, he was **unable to refute the specific examples of shill bidding**.

8.     Illustrating the significance of the reliability of Bidz's online auction processes to the Company's business, **the stock price dropped 49% in just three days** following Citron's report and the conference call.  The reports of shill bidding eventually led to the filing of a consumer class action, which was previously before this Court.

9.     Bidz also engaged in other wrongdoing during the Relevant Period, including: (a) appointing and retaining an unqualified auditor despite known issues

1  with the auditor's prior performance; (b) using a suspect jewelry appraiser; (c)
2  using inaccurate descriptions and photographs of the merchandise on its website;
3  and (d) refusing to honor valid sales if they were below a certain price.

4      10.    In a carefully worded Form 10-K filed with the U.S. Securities and
5  Exchange Commission ("SEC") on March 9, 2010, Bidz reported for the first time
6  "material weaknesses … in [its] disclosure controls and internal control over
7  financial reporting as of December 31, 2009."   Specifically, the Company
8  acknowledged material weaknesses with its "anti-fraud controls," "Information
9  Technology (IT) specifically in user security configurations," and "management
10  oversight."   These weaknesses are categorically exactly the type of wrongdoing
11  that plaintiffs raise here and further underscore the problems at the Company that
12  allowed shill bidding and the other improper practices discussed herein to occur.

13      11.    All of the defendants knew about the existence of shill bidding (and
14  other improper practices) at Bidz, and yet took no action to prevent or remedy the
15  situation.   Each of the defendants knew the following information: Bidz's core
16  business revolved around its online auction processes; the Company's revenue was
17  dependent on its ability to generate a high volume of traffic to its website; and,
18  therefore, the Company's website and transaction processes had to be reliable.
19  Each of the defendants knew that, as a seller of its own merchandise, the Company
20  is responsible for the legality of all aspects of its transactions.   Each of the
21  defendants is and was, therefore, aware of major issues concerning the Company's
22  online auction practices, including the numerous irregularities with the Company's
23  auction practices that show the existence of shill bidding.   Additional facts also
24  support each individual defendant's specific knowledge of the shill bidding and
25  other improper practices at Bidz, as detailed below.

26      12.    Moreover, defendants are and were keenly aware of the Company's
27  long history of questionable dealings and suspicious relationships.   Saied Aframian
28  ("Aframian"), the owner of L.A. Jewelry—Bidz's largest supplier and one of its

largest shareholders that accounted for approximately 45% of Bidz inventory purchases in 2005 and 2006—is a convicted felon and served time for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry. Defendant Zinberg also has multiple prior dealings with convicted felons, including individuals convicted of corporate fraud practices. In light of these troubling facts, defendants had a heightened duty to become and remain aware of potential wrongdoing in connection with the Company's business practices— particularly in the Company's core business, online auctions.

13.    While in possession of knowledge concerning the ongoing illegal shill bidding and other practices at the Company, defendants Zinberg and Liu sold approximately 145,000 shares of Bidz common stock, garnering total proceeds of $1,843,100. These stock sales were not part of any regular pattern or practice by defendants Zinberg and Liu. The stock sales were unusual because defendant Zinberg entered into a 10b5-1 plan for the first time on August 16, 2007 (effective August 15, 2007) and had sold no shares of his stock prior to August 15, 2007; and defendant Liu had sold no shares of her stock prior to November 16, 2007. Each of these defendants' stock sales occurred soon after the Company's positive press releases and reports, which made no mention of the Company's improper conduct.

14.    The rampant fraud and wrongdoing at Bidz has caught the attention of the SEC, which conducted *three investigations* into Bidz. The first occurred in 2005 and concerned illegal stock sales. The second occurred in February 2009 and focused on improper inventory accounting practices and other matters. This investigation is ongoing and has intensified, requiring each member of management to be questioned by the SEC. The third investigation relates to accounting for marketing contributions and began in October 2009.

15.    Additionally, the Federal Trade Commission ("FTC") has investigated e-mail marketing campaigns that were approved by defendant Zinberg and violated the CAN-SPAM Act of 2003 by failing to honor recipients' opt-out requests.

16.     From the beginning, Bidz has struggled to remain a going concern. During its first four years, it relied on the sale of unregistered securities via unlicensed brokers to obtain working capital.  Bidz also used its unregistered stock to buy significant quantities of merchandise and pay for the development of its online auction platform.  With revenues dwindling and profits sliding to zero, Bidz has only represented that its cash reserves are sufficient to last for the rest of the year.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Bidz maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Bidz, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

20.     Plaintiff Farris Hassan was a shareholder of nominal defendant Bidz at the time of the wrongdoing alleged herein and has been a shareholder of Bidz continuously since that time.  Plaintiff Hassan is a citizen of Massachusetts.

21.     Plaintiff David Hughes was a shareholder of nominal defendant Bidz at the time of the wrongdoing alleged herein and has been a shareholder of Bidz continuously since that time.  Plaintiff Hughes is a citizen of New York.

22.     Nominal defendant Bidz is a Delaware corporation with its principal executive offices located at 3562 Eastham Drive, Culver City, California 90232. Bidz was founded in 1998.  Bidz's primary business is to auction jewelry and other items via its website, www.bidz.com.  Bidz's predecessor was Asset Lenders of America ("ALA") and was previously known as Union Pawn.  ALA owned and operated numerous pawn shops.  Bidz's Form 10-K filed with the SEC on March 29, 2006, described ALA as a "collateral lending and bail bond company."

23.     Defendant Zinberg is the Company's founder, and has served as the Company's CEO since November 1998.  Zinberg also served as the Chairman of the Board from November 1998 until March 2010.  In March 2010, he was replaced by defendant Peter G. Hanelt ("Hanelt") as the Chairman of the Board. Additionally, Zinberg served as President from November 1998 until November 2008.  In November 2008, he was replaced as President by defendant Leon Kuperman ("Kuperman").  Zinberg currently retains the title of CEO and director. Zinberg previously served as the Company's Corporate Secretary from 1998 until March 2001.  From 1988 to 1997, Zinberg served as the CEO of ALA.  Defendant Zinberg is the brother of Marina Zinberg, Vice President of the Company (and formerly the Corporate Secretary and Treasurer).  Zinberg and his sister, Marina Zinberg, control over 62% of the Company's shares.  For fiscal years 2007 and 2008, Zinberg received total compensation of $201,244 and $433,434, respectively. Zinberg sold 90,000 shares of Bidz stock for $901,100 while in

1   possession of material non-public information.  Zinberg is a citizen of California.

2       24.   Defendant Garry Y. Itkin ("Itkin") has worked side-by-side with

3   defendant Zinberg since 1994.  He was the Chief Financial Officer ("CFO") of

4   Asset Lenders of America, the predecessor of Bidz, from the end of 1994 to 1999.

5   From February 1999 to December 2000, he served as Bidz CFO.  Itkin is currently

6   a director of Bidz and has served as such from July 2003 until December 2006 and

7   from May 2007 to the present time.  Itkin is paid handsomely for his service as a

8   director, taking in more than $100,000 annually. Itkin is currently a member of the

9   Company's Audit Committee, Compensation Committee, and Nominating and

10  Corporate Governance Committee.   Itkin is an "insider director" because he

11  previously worked as the CFO of Bidz.  Itkin is a citizen of California.

12      25.   Lawrence Kong ("Kong") has served as the Company's CFO for more

13  than nine years.  He first became the CFO on January 2, 2001, replacing Itkin.  He

14  has been a director since July 2003 and has served as Treasurer and Secretary since

15  March 2006.  Kong is the husband of defendant Liu.  For fiscal years 2007 and

16  2008, Kong received total compensation of $814,205 and $743,663, respectively.

17  Kong is a citizen of California.

18      26.   Defendant Kuperman has served as Bidz's Chief Technology Officer

19  ("CTO") since January 2007 and President since November 2008.   Kuperman

20  replaced defendant Zinberg as President in November 2008.  For fiscal years 2007

21  and 2008, Kuperman received total compensation of $495,699 and $424,414,

22  respectively.  Kuperman is a citizen of California.

23      27.   Defendant Liu has worked at Bidz for almost nine years.  She first

24  began her employment in October 2001.  She currently serves as the Company's

25  Chief Operating Officer ("COO").  Previously, Liu served as the Company's Vice

26  President of Operations.  Prior to that, she was the Billing Manager.  For fiscal

27  years 2007 and 2008, Liu received total compensation of $628,614 and $524,448,

28  respectively. Liu sold 55,000 shares of Bidz stock for approximately $942,000

1    while in possession of material non-public information.   Liu is married to

2    defendant Kong.  Liu is a citizen of California.

3        28.    Defendant Hanelt has served as a director of Bidz since February

4    2006.  In March 2010, Hanelt replaced defendant Zinberg as the Chairman of the

5    Board.   Hanelt currently serves as chair of the Company's Nominating and

6    Corporate Governance Committee and Audit Committee, and is a member of the

7    Company's Compensation Committee.  Hanelt is a citizen of California.

8        29.    Defendant Man Jit Singh ("Singh") has served as a director of Bidz

9    since February 2006.   Singh currently serves as chair of the Company's

10   Compensation Committee, and is a member of the Company's Audit Committee

11   and Nominating and Corporate Governance Committee.   Singh is a citizen of

12   California.

13       30.    Collectively, defendants Zinberg, Liu, Kong, Kuperman, Hanelt, Itkin,

14   and Singh will be referred to herein as the "Individual Defendants."

15                **DUTIES OF THE INDIVIDUAL DEFENDANTS**

16       31.    By reason of their positions as officers, directors, and/or fiduciaries of

17   Bidz and because of their ability to control the business and corporate affairs of

18   Bidz, the Individual Defendants owed Bidz and its shareholders fiduciary

19   obligations of good faith, loyalty, and candor, and were and are required to use

20   their utmost ability to control and manage Bidz in a fair, just, honest, and equitable

21   manner.  The Individual Defendants were and are required to act in furtherance of

22   the best interests of Bidz and its shareholders so as to benefit all shareholders

23   equally and not in furtherance of their personal interest or benefit.  Each director

24   and officer of the Company owes to Bidz and its shareholders the fiduciary duty to

25   exercise good faith and diligence in the administration of the affairs of the

26   Company and in the use and preservation of its property and assets, and the highest

27   obligations of fair dealing.

28       32.    The Individual Defendants, because of their positions of control and

authority as directors and/or officers of Bidz, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Bidz, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

33. To discharge their duties, the officers and directors of Bidz were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Bidz were required to, among other things:

(a) remain informed as to how Bidz conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices (here, the improper and illegal practice of shill bidding, among other things), make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(b) when put on notice of problems with the Company's business practices and operations, namely the improper and illegal practice of shill bidding and the other improper practices described below, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(c) ensure that the Company had in place sufficient internal controls over its online auction business to prevent shill bidding and other online abuses that could potentially undermine the Company's business model;

(d) ensure that the Company retained the services of a capable auditor;

(e) ensure that the Company used a qualified appraiser whose practices were at least in compliance with minimum industry standards;

(f) ensure that customers were being provided with accurate descriptions and photographs of the items they were purchasing;

(g) refrain from acting upon material inside corporate information to benefit themselves;

(h)   properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's business prospects and results;

(i)   exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

(j)   exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority.

## SHILL BIDDING AT BIDZ

34.   Bidz has long engaged in the illegal practice of "shill bidding," or placing fake bids.  Shill bidding causes legitimate bidders to pay more for an item than they otherwise would have.  Shill bidding is illegal in California and most states.

35.   Shill bidding benefits Bidz's bottom line in at least three ways: (i) it substantially reduces the number of items that are sold for below cost; (ii) it increases the ultimate price that customers pay; and (iii) it increases internet traffic by creating the appearance of substantial interest in the Company's website.

36.   The claimed starting price for almost all of Bidz's auctions is just $1. Bidz claims that its auctions do not have a reserve price (i.e., a minimum price), and that some people have won items for just one dollar.  However, Bidz would lose money if items were frequently sold for just $1.  The combination of no reserve auctions plus a starting price of $1 creates substantial risk for the Company.  To mitigate this risk, Bidz uses shill bidders to create a hidden reserve price, which substantially reduces the number of items that are sold for below cost.

37.   The risk created by the $1 auctions was noted by analyst Merriman Curhan Ford, which stated the following in a report dated May 22, 2008: "Since

1   Bidz.com starts every auction at $1.00, it obviously runs the risk of every item
2   selling for only $1.00—which would significantly impact the company's revenues
3   and gross margins."

4          38.    This risk was also noted by Stanford Group Company ("Stanford") in
5   a report dated October 8, 2008.  They stated, "Auctions opening bidding at $1
6   without reserve prices have the potential to result in sales below Bidz' purchase
7   price…."

8          39.    Bidz uses shill bidding to increase interest in its website by placing
9   high-priced items on its homepage, which are bid on and won by shill bidders.
10  These items are re-listed and re-auctioned several times to create the appearance of
11  substantial interest in the Company's website.

12                      **How the Shill Bidding Was Perpetrated**

13         40.    Bidz effectuated its shill bidding scheme using various methods.  For
14  example, specific accounts were dedicated exclusively to shill bidding.  Numerous
15  user accounts had balances in the high six-figure range, and users with high
16  balances won auctions at prices that were much higher than other customers were
17  willing to pay.  Further, many high-priced items were won by shill bidders and
18  repeatedly re-auctioned to increase interest in Bidz's website.  These facts, which
19  are discussed in detail below, are indicative of shill bidding and have been
20  substantiated by former Bidz employees.

21         41.    For example, a confidential witness ("CW1"), who worked as a
22  customer service representative at Bidz in early 2004, has provided additional
23  support for the existence of shill bidding at Bidz.  CW1 stated that she/he
24  witnessed a number of user accounts with balances in the high six-figure range
25  (*i.e.*, hundreds of thousands of dollars).  She/he also stated that these same users
26  had purchased jewelry at prices that were much higher than other customers were
27  willing to pay.  These facts support the inference that such user accounts were
28

1   being used to place shill bids and raise the price of items auctioned at Bidz and that

2   those so-called winning shill bids were never paid.[1]

3          42.    The shill bidding at Bidz is accomplished not only through live shill

4   bidders, but also through the use of computer programs.  For example, Bidz has

5   used a computer program to rapidly generate fake account names to supply the

6   shill bids.  As a result, a significant percentage of Bidz's winning bidders have

7   names that follow a readily identifiable pattern.

8          43.    Out of a sample of 1,000 auctions taken from Bidz's auction website

9   on July 8, 2009 between 10:30 a.m. and 1:00 p.m. Pacific Standard Time, 104

10  auctions, or 10.4%, were won by bidders who used account names formatted as a

11  random word followed by four digits, such as "random1234."  These account

12  names included: blanca3510, kitty4705, leeny0804, masonic3665, muffin0231,

13  normab6288, pattel0607, raerea0065, rvg1116, when1017, andy2653,

14  econway7475, happy1186, mike1017, and mmm8080, among others.

15         44.    The use of computers to assist in shill bidding is also confirmed by

16  bid histories showing that certain users are able to enter bids on three or more

17  products in *less than a second*, despite the time required to load new pages and

18  enter bid information.

19

20

21  _____

    [1]  Further supporting plaintiffs' allegations of shill bidding are statements made by

22  a former Bidz employee in a related securities class action pending against the

23  Company and defendants Zinberg and Kong, *Ramon Gomez v. Bidz.com, Inc. and

    David Zinberg*, CV09-03216 CBM-Ex (C.D. Cal.) (the "Securities Class Action").

24  On October 13, 2009, a consolidated complaint was filed in the Securities Class

    Action (the "CAC").  According to a former Bidz Senior Jewelry Buyer from

25  March 2000 through approximately July 2003, Bidz did, in fact, use shill bidders,

26  and he/she observed that many high priced items were sold, but that those sales

    were never completed. This former employee stated that high-priced items were

27  won by shill bidders and re-auctioned again and again in the hopes of increasing

28  interest in Bidz's website. CAC at ¶122.

45.    Bidz developed and maintains a sophisticated website.   An analyst report by Stanford on October 8, 2008 stated that "Bidz' online auction software is internally developed," which provides Bidz with "additional flexibility."

46.    Bidz's Form 10-12G, filed with the SEC on April 22, 2005, states that Bidz's user interface was "based on internally-developed proprietary software." The public filing also stated, "[o]ur system also handles all other aspects of the auction process including notifying users via email when they initially register for the service, they place a successful bid, they are outbid and when an auction ends. The system maintains user registration information, billing accounts, current auctions and historical listings."

47.    The Stanford report on October 8, 2008 also stated that Bidz maintains a "23 person technology and development staff" that is a "significant expense" for the Company.  During the fourth quarter of 2007—the same quarter that shill bidding was revealed—the report revealed that Bidz "re-wrote its core auction platform."

48.    In a report dated November 28, 2007, Roth Capital Partners ("Roth") stated that modifications to Bidz's auction system made the "company's model more susceptible to manipulation."   Roth repeated its warnings regarding manipulation of the Company's model on several occasions: May 7, 2008; August, 6, 2008; November 11, 2008, February 23, 2009, and March 10, 2010.

49.    The numerous improper auction practices have been confirmed by Bidz customers.  For example, on Ripoff Report's website, customers posted the following complaints regarding Bidz's shill bidding practices:

August 15, 2007 post: "Bidz does not have open auctions. Their product and price is protected so the jewelry does not sell below their cost. Sometimes they do but the company has dummy accounts that places autobids to protect the price."

October 30, 2007 post: "I know for sure they are using auto bidding for thei[r] own purpose of shill bidding."

February 3, 2008 post: "[I] have known for aw[hile] now that Bidz uses shill bidders they even took it a step further by allowing you a so called second chance offer. This occurs when you give up and the shill bidder is the winning bidder."

50.    As a result of the hundreds of consumer complaints launched against Bidz, the Better Business Bureau ("BBB") has given Bidz an "F" rating.  Bidz has held this "F" rating throughout the Relevant Period and continues to hold this rating as of the filing of this Complaint.  In general, the BBB gives companies a "F" rating when a company is unreliable because: (i) they have failed to respond to complaints; (ii) their advertising is grossly misleading; (iii) they are not in compliance with the law's licensing or registration requirements; (iv) the BBB received complaints containing serious allegations; and/or (v) the company's industry is known for its fraudulent business practices.

51.    The BBB's current report on Bidz is based on various complaints alleging, among other things, that the Company's listed jewelry valuations are grossly inflated, a brand item is not the item received, and that particular stones are not genuine. These complaints are consistent with complaints posted on Ripoff Report regarding Bidz's overvalued items, poor quality items, and overall poor customer service.

52.    The reports of shill bidding eventually led to the filing of a consumer class action, which was recently before this Court.  This action was styled *Tidenberg v. Bidz.com, Inc., et al.*, Case No. 08-05553PSG (FMOx) (C.D. Cal. Aug. 11, 2008).  This action was ultimately settled by Bidz paying the plaintiff, after having opposed the plaintiff's motion for class certification.  However, Bidz lost its motion for judgment on the pleadings.  The Court denied the motion because the court found that the allegations "support a reasonable inference that Defendant is engaged in shill bidding…"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The Individual Defendants' Own Statements Support
the Existence of Shill Bidding at the Company**

53.    Certain   of   the   Individual   Defendants   have   admitted   facts
demonstrating the existence of shill bidding at Bidz.  Defendant Liu stated in a
declaration submitted in the related shill bidding consumer class action that more
than 11.3 million of 25.7 million auctions from 2004 through 2008—or 44%—
have failed (i.e., Bidz did not receive payment).  This further supports an inference
that many bids were not actual "bids" designed to purchase the product, but rather
were shill bids designed to drive up the price of the product.  Such sales would not
be completed in the event the item was won by a shill bidder.

54.    Further,   defendant   Zinberg   has   publicly   admitted   that   Bidz   was
***unable to verify the legitimacy of bid****s*, which permitted shill bidding and other
improper bidding practices to persist.

**The Citron Report Confirms Shill Bidding at Bidz**

55.    On November 26, 2007, Citron issued a detailed report disclosing shill
bidding at Bidz.  The report was titled, "Citron Adds Some Color and Clarity to
Bidz.com."  The article referred to "shill bidding" and "extremely questionable
bids and bidding practices" at Bidz.  It compared Bidz to other public companies
that incorporated fraudulent practices into their business model, and were later
damaged severely when the truth was revealed.  The report noted that, "[u]nlike
eBay and other well-known auction sites, you cannot even click to contact or check
the track record of bidders."  The article stated that additional facts regarding shill
bidding would be published two days later.  The article stated, in relevant part:

> Bidz.com is an online auction provider of off price jewelry and second
> tier accessories. What makes their model unique is that everything is
> sold via auction. Yet, the auctions are not third party auctions as
> facilitated by Ebay, rather they are auctions that are controlled by the
> company. In this report, Citron will expose what we believe to be
> many red flags at BIDZ. Citron will make a few comparisons to

previous reports written on other companies as the issues at BIDZ seem to closely mirror issues we have discussed in the past.

\* \* \*

Instead of generating cash, BIDZ seems to be generating a lot of inventory. So instead of investors seeing a higher cash balance, they are seeing warehouses filled with 'closeout and distress sale' jewelry.

\* \* \*

Most investors would prefer to see efficiencies to kick in with rising revenues, but instead, actual reported inventory levels are instead spiraling at least 300% higher than the run rate of revenue.

\* \* \*

BIDZ['s] largest supplier for years has been  LA Jewelry, owned and operated by Saied Aframian, who also happens to be one of BIDZ['s] largest shareholders. Not surprisingly, LA Jewelry is also BIDZ['s] largest creditor, and a large participant in BIDZ['s] co-op advertising program. These 'related party' transactions are all over BIDZ['s] financials including:

- Over $5.3m accounts payables to a related party (nearly 20% of AP)
- Purchase of 11.6% of its merchandise from a related party
- Participation in co-op marketing (12%) by related party
- Guarantee agreement with the same party related for 'minimum profit' on inventory purchased from the party.
- The related party owns 1,228,000 shares of BIDZ['s]  stock.

Saied Aframian is a convicted felon and has served time in the Federal System for fencing stolen goods. Not just petty crime either, but for being the prime fence for a multi-million dollar nationwide ring of stolen watches and jewelry.

We are not suggesting that BIDZ sells stolen goods; rather we are observing the background of some of the individuals behind BIDZ who are most responsible for its reported profits. ***The question is whether all these related party transactions cast reasonable doubt over BIDZ['s] reported financials as a fair reflection of the health of the business.***

Considering the deal to guarantee margins to the company coincided with the public offering of BIDZ, Citron concludes that Mr. Aframian was well aware that there could be a lot more money made from his stock than from selling jewelry. Any time we have seen a company work on guaranteed margins by a large shareholder, the results have been dismal: *i.e.* Escala and Syntax Brillian, two stocks previously covered by Citron, now trading 90% and 60% lower respectively from date of initial report.

Speaking of the public offering, BIDZ filed a registration and began to trade on a public exchange. But Citron notes that in 2006, after paying for the preparations for an IPO, it then cancelled. Their stated reason was because insiders refused to sign lockup agreements. This alone should be a red flag.

\*       \*       \*

Citron believes that the company is not being forthright with their customers when it comes to 'retail value' or 'appraised value'. All of the jewelry from BIDZ shows an appraisal from AIG Labs. This appraisal makes consumers feel as if they are getting a good deal on a credible piece of jewelry that might have a decent resale value. Going to the website of AIG we see their name on a big building, which conveys an illusion of credibility.

Citron paid a visit to AIG labs and an illusion it is. There is no name on the building (except in Photoshop…). As a matter of fact, the only signage they have is a white piece of paper on the front door to identify them. It appears to Citron that AIG is more of an 'appraisal mill', that enables Bidz.com to sell low priced items to an unknowing public.

\*       \*       \*

One common complaint that we see online is 'shill bidding'. On Wednesday, November 28, Citron will expose what we believe to be is some extremely questionable bids and bidding practices that occur on Bidz.com. This part 2 will have much supporting documentation that the investing public should be made aware of. Unlike eBay and other well-known auction sites, you cannot even click to contact or check the track record of bidders. And since the company is selling its own goods, rather than conducting auctions for independent sellers,

the company is responsible for the legality of all aspects of the conduct of its auctions.

56.    On November 28, 2007, Citron issued the second part of its report.  It stated that customer complaints about shill bidding led Citron to conduct an investigation into shill bidding.   During its investigation, Citron found several examples of blatant shill bidding.   These included the auction of over thirty televisions that were bid on hundreds of times by the same three bidders.   The televisions were won for prices that were substantially higher than the suggested sales price.  For example, shill bidders had driven up the price of a television worth $1,499 to a whopping $2,776.  All of these televisions were sold by Clear Solution Partners, which is owned by Bidz.com co-founder Matthew Mills.  Citron's report also discussed a flashlight/TV combo that was won for more than $6,000, and a yellow diamond ring that had bids approaching $500,000.   The reports stated, in relevant part:

> Citron Research believes the bidding process at Bidz.com leaves a lot of unanswered questions. While Citron does find the Bidz site entertaining with a unique interface, they have much to prove before it can be anointed with the big earnings multiples associated with proven business models. This report will outline some of the obvious bidding irregularities that we have observed on the Bidz website.

> This report will not be a refutation to the conference call and will not address any new issues.

> Let us offer one important correction. In the initial report we stated that CEO Zinberg pays himself 30,000 shares per month. This was not correct. He has been selling 30,000 shares per month from his own holdings. Mr. Zinberg stated during yesterday's conference call that he has reduced that number to 10,000 shares per month; as of today, there has been no public filing of this change yet.

> One common complaint that Citron observed in customer postings was shill bidding. This led us to do our own homework. Citron focuses on presenting public domain information. Therefore, when we suggested shill bidding, the investing public ran with the ball and

found the same problems on the Bidz website that were found by Citron. As evident in yesterday's conference call investors have already seen these auction items:

$6,000 flashlight/TV combo . . . $11,000 Television…

The problem is still ongoing as we see in the live auction for a television with an MSRP of $1,499 yet the current bid on the television as of publication is $2,776.

In an informal study, Citron offers the linked table, which outlines not only the obvious irregular bidding above, but also a pattern in the auction *of over 30 TV's over more than 3 months. Most of these TV's are bid on hundreds of times by the same three bidders.*

What makes this attached spreadsheet so interesting is that all of these televisions were sold by Clear Solution Partners. The owner of Clear Solution Partners is Bidz.com co-founder Matthew Mills. Not only is he the co-founder and vendor of these televisions, he has also been an outspoken proponent of the stock as evident in the Barron's Blog.

The hundreds of unique bidders over $500,000 for the big yellow diamond ring on BIDZ homepage has now been the topic of much discussion and there is no need to restate those questions. *Citron notes that Bidz itself stated in the conference call that it does not know whether bidders are bona fide until after an auction closes.* Therefore, Citron cannot prove that the bidding on any jewelry is fake either. Jewelry is an item that thwarts direct comparison pricing, especially on the internet. The question that investors are left with is: Are the patterns of bidding on the televisions any indication of patterns of bidding on jewelry? *Do the hundreds of repetitive bids on the TV's (often by the same bidder on separate auctions at nearly the same second) represent flying fingers of a rogue actor, or a feature of the auction software that only company insiders know about?*

Bidz.com is in need of a system that allows for more transparency of the Bidz and the integrity that comes from unedited consumer feedback within their own site.

57.     On November 27, 2007, the day after Citron's first report was issued, Bidz went on the offensive and arranged a conference call with analysts and investors to refute the allegations of shill bidding.  The tone of the conference call

1   was described as "tense and hostile" by Roth, an analyst that followed Bidz.

2   During the call, CEO defendant Zinberg claimed that shill bidding was against the

3   Company's policies, but was unable to refute the specific examples of shill bidding.

4   The relevant parts of the conference call are summarized as follows:

- Defendant Zinberg says Citron's report was 'untruthful,' and that the Company is considering legal action against Citron.

  *     *     *

- Defendant Zinberg asserted that comparisons between the cash and inventory positions of Bidz.com and Blue Nile (NILE) and Overstock (OSTK) are not valid since the companies do not have the same business models.

- On the Company's rising inventory levels, defendant Zinberg says that this is a conscious strategy, and that the Company has been historically under-inventoried. He also says the Company is moving into manufacturing some of its own items, which will require that inventory be held longer.

  *     *     *

- On the relationship with Aframian, defendant Zinberg says that he has never had any reason to question his integrity, but that the Company is now re-evaluating his relationship with him. He says the Company has cut its reliance on L.A. Jewelry to 12% of revenue from 35% a year ago. He also says the Company could easily replace the goods they get from L.A. Jewelry from other wholesalers. He added that Aframian is a manager, but not an owner, of L.A. Jewelry. He says the Company checks out its suppliers with the Jewelry Board of Trade. He also said that he has known Aframian for seven years.

  *     *     *

- On the Company's "F" rating from the BBB, defendant Zinberg says there are 241 complaints on file compared to more than 8 million items sold in the last three years. He says the merchandise return rate is 3%-4%.

- On appraisal service AIG Labs, also known as American International Gemologists, defendant Zinberg says he asked the Company to take down the picture of its office building with the AIG logo, since the building does not actually display that logo. He also said Bidz is negotiating with other appraisal services.

\* \* \*

- On possible shill bidding on the site, he says that shill bidding is against Company policy.

\* \* \*

- Defendant Zinberg says about 25% of its jewelry is sold below cost.

- Defendant Zinberg had no explanation for why people would bid more than $11,000 for a TV worth less than a tenth of that.

- Defendant Zinberg insisted there was nothing strange about the many bids now on the site for a large yellow diamond ring listed on Company's home page with multiple bids north of $500,000. He says the Company has no way of knowing if the bidders can actually pay for such a large purchase.

- Defendant Zinberg says about 20% of winning auction bids do not result in transactions; but he says they only book revenue on shipment of goods once cash is received.

\* \* \*

- [Defendant Zinberg] had no explanation for why one bidder bought fourteen televisions at above-market prices.

58.    Roth noted in a report on November 28, 2007, that defendant Zinberg "had a tough[] time addressing the questionable bidding practices."

59.    On November 23, 2007, Bidz's stock closed at its highest price ever: $19.94.  The next trading day, Citron issued its report, and the stock price closed at $16.56 on extremely heavy trading.  One day later, defendant Zinberg held a conference call with analysts and investors, and the stock price closed at $11.89,

1   which constituted a two-day decline of 40%.   The next day, Citron released
2   additional facts regarding shill bidding, and Bidz's stock dropped to $10.10,
3   representing a 49% decline in three trading days.

4          60.   This dramatic decline was noticed by Stanford, which stated in an
5   analyst report on October 8, 2008 which stated that revelations of shill bidding and
6   other improper practices caused Bidz's stock price to go from an intra-day high of
7   "$22 to $9 in two days."

8          61.   Bidz's business model, which includes shill bidding, is unsustainable
9   in light of increased public scrutiny.   The Company's recent financial performance
10  has been abysmal.   Revenues for the third quarter of 2009 were down by 55.2%,
11  and gross profits were off by 45.9%.   Pretax income fell more than 98% to just
12  $67,000 from $5.5 million.   The Company experienced a net loss of $111,000 in
13  the first quarter of 2010—the first quarterly net loss it has experienced since at
14  least 2004.   The number of new buyers in the first quarter of 2010 was down
15  20.6%, from 51,021 in 1Q:09 to 40,501 in 1Q:10.   This fact reflects that Bidz is not
16  able to continue growing under its business model because, due to increased public
17  scrutiny, potential new customers are avoiding the Company.   Also in the first
18  quarter of 2010, revenue was down over 14%, while gross profit was down almost
19  30%.

20         62.   Bidz's primary service—auctioning items on its website—relies on
21  shill bidding to be profitable.   Realizing the inherent problems with its business
22  model, Bidz has created a new website that will not use an auction format and will
23  not require shill bidding to stay afloat.   This website is www.Modnique.com and
24  focuses on selling high-end clothing at low, fixed prices.

25  **The Company's Admitted Material Weaknesses Helped Foster the Illegal Shill**
26  **Bidding Practices**

27         63.   In a carefully worded Form 10-K filed with the SEC on March 9,
28  2010, Bidz belatedly admitted the existence of "material weaknesses" resulting

from certain control deficiencies related to: (i) maintaining an effective control environment at the entity level; (ii) maintaining an effective control environment over Information Technology (IT) specifically in user security configurations, training and end user acceptance, quality control testing, design and monitoring of change controls, and security evaluations; and (iii) maintaining an effective control environment over management oversight and anti-fraud controls specifically in processing of, among other things, financial transactions, vendor review, and payment processing.  These weaknesses track the kind of wrongdoing plaintiffs raise here and further underscore the issues and conditions at the Company that allowed shill bidding and the other improper practices discussed herein to occur.

**Each of the Individual Defendants Had Knowledge of the Shill Bidding, yet Took No Action to Prevent or Remedy the Illegal Practices**

64.    All of the Individual Defendants knew about the existence of shill bidding (and other improper practices) at Bidz, and yet took no action to prevent or remedy the situation.

65.    Each of the Individual Defendants knew that Bidz's core business revolved around its online auction processes, that the Company's revenue is dependent on its ability to generate a high volume of traffic to its website, and, therefore, that the Company's website and transaction processes had to be reliable. Each of the Individual Defendants also knew that, as a seller of its own merchandise, the Company is responsible for the legality of all aspects of its transactions.  Each of the Individual Defendants, therefore, would have been and was aware of at least major issues concerning the Company's online auction practices, including the numerous irregularities with the Company's auction practices showing the prevalence of shill bidding.

66.    For example, as defendant Zinberg has admitted, the Company was unable to determine whether bids were legitimate, which opened the door to shill bidding and other improper practices.  The Individual Defendants knew that, at a

1    minimum, this would foster shill bidding and other improper practices at Bidz.

2         67.    Further, nearly half of all winning bids did not result in sales.  There

3    were also high six figure accounts that were used to bid on expensive items, but the

4    sales would not be completed if those accounts ended up with the winning bid.

5    This resulted in far less revenue to Bidz than it should have been bringing in.

6    Given the staggering number of winning bids not resulting in sales, and the

7    importance of the profits derived from online auctions to Bidz's business, the

8    Individual Defendants were at least aware of potential malfeasance and had a duty

9    to investigate.

10        68.    Notably, Bidz has a structure in place for such information to reach

11   the members of the Board and the Company's executive officers.  According to the

12   Company's "Corporate Governance Principles," there are "regularly-scheduled

13   presentations" to the Board from "finance, sales and marketing, and the major lines

14   of business and operations of the Company."  The Board is given "complete access

15   to any information about the Company that it deems necessary or appropriate to

16   carry out its duties."   Further, "[t]he CEO and other executive officers are

17   responsible for running the Company's day-to-day operations ***and appropriately***

18   ***informing the Board of the status of such operations***."

19        69.    At a minimum, the Individual Defendants were on notice of the shill

20   bidding practices at Bidz when the Citron reports emerged in November 2007 and

21   exposed the shill bidding and other improper practices at the Company.  The

22   Citron reports were not some sort of mere negative speculation by a short seller.

23   Indeed, the seriousness with which the Citron reports were received is evidenced

24   by the 49% drop in the Company's value over a three day period after the first

25   Citron report and the fact that defendant Zinberg felt the need to publicly respond

26   and attempt to deny the existence of shill bidding the very next day.

27        70.    The court's ruling in the factually related consumer class action further

28   put the Individual Defendants on notice of the shill bidding practices at the

1  Company.   In that case, the court denied Bidz's motion for judgment on the

2  pleadings, finding that the allegations "support a reasonable inference that

3  Defendant is engaged in shill bidding…."  The Securities Class Action based on

4  shill bidding and other misconduct is also pending.  The Individual Defendants

5  undoubtedly were aware of the Company's shill bidding practices after the Citron

6  report and the court's ruling in the related consumer class action.

7       71.   In addition to the above facts, the following facts show each

8  Individual Defendant's specific knowledge of the shill bidding practices at Bidz.

9       72.   Defendant Zinberg, as Bidz's CEO and former Chairman, was aware

10  of the percentage of auctions that did not ultimately result in sales of the products,

11  a fact he represented in his November 27, 2007 conference call.  Bidz admitted in

12  its Form 10-K filed with the SEC on March 9, 2010, that "a large number of failed

13  auctions in which winning bidders do not complete their purchases could adversely

14  affect [its] results of operations."  Defendant Zinberg's intimate knowledge of these

15  facts would and did put him on notice of the fact that almost half of winning bids

16  did not result in sales and that the shill bidding practices at Bidz were responsible

17  for that astounding number.   Not surprisingly, defendant Zinberg attempted to

18  downplay the number of ultimately unsuccessful winning bids in order to deny

19  shill bidding, claiming it was only 20%.  In reality, as declared to by defendant

20  Liu, 44% of auctions did not result in sales.

21       73.   Defendant Liu, as Bidz's COO, is admittedly extremely

22  knowledgeable about Bidz's auction practices.  In an August 11, 2009 declaration

23  filed in the related shill bidding consumer class action, Liu stated: "[I]n my

24  capacity as Bidz.com's chief operating officer, and based on my position with the

25  company since October of 2001, I am familiar with the company's current and

26  historical auction statistics."  She also discussed the number of auctions that took

27  place on Bidz's website from 2004 to 2008, the average sale price for the items

28  sold in these auctions, and the number of auctions in which the winning bidder

1   failed to pay for the item won.  Defendant Liu also stated that 44% of winning
2   auction bids did not ultimately result in sales.  Defendant Liu's intimate familiarity
3   with Bidz's online auction practices alerted her to the plethora of issues exposing
4   the shill bidding practices at the Company.

5        74.   Defendants Kong and Itkin, as Bidz's current and former CFOs,
6   respectively, were responsible for, among other things, managing the Company's
7   financial risks, record-keeping, and financial reporting, including presenting and
8   reporting accurate historical financial information.  Defendants Kong and Itkin are
9   and were familiar with the Company's revenue, which is based primarily on the
10  amount of auction sales completed.  As noted above, 44% of winning auction bids
11  did not ultimately result in sales, and the Company's revenue was far below what it
12  should have been based on the amount of winning bids.  These facts did not go
13  unnoticed by defendants Kong and Itkin.  Defendants Kong and Itkin also could
14  not have been blind to the fact that winning bids on expensive items to six-figure
15  accounts were not being completed.  Finally, defendants Kong and Itkin were
16  aware of at least the Company's major auction statistics, including the number of
17  auctions that took place on Bidz's website, the average sale price for the items sold
18  in these auctions, and the number of auctions in which the winning bidder failed to
19  pay for the item won.  These facts, taken together and over a substantial period of
20  time, painted an unmistakable picture of shill bidding and other improper practices
21  at the Company.

22       75.   Defendants Itkin, Singh, and Hanelt, as members of Bidz's Audit
23  Committee during the Relevant Period, had the responsibility and duty to, among
24  other things: (i) "[o]versee the accounting and financial reporting processes of the
25  Company and the audits of the financial statements of the Company;" (ii) "review
26  the Company's internal controls" (which the Company has now disclosed were
27  materially deficient); (iii) "evaluate whether management is setting the appropriate
28  tone at the top by communicating … the importance of internal controls as well as

1   their roles and responsibilities;" (iv) "discuss … risk assessment and management
2   … [and] significant financial risk exposures and the actions management has taken
3   to monitor or control such risk exposures;" and (v) discuss with counsel any "legal
4   matters brought to the Committee's attention that could reasonably be expected to
5   have a material impact on the Company's financial statements."   In reviewing
6   Bidz's internal controls and risk exposures, defendants Itkin, Singh, and Hanelt
7   would have and did come to know about, among other things, the fact that that
8   44% of winning auction bids (the key to the Company's financial success) did not
9   ultimately result in sales, that sales of high end items to hundred thousand dollar
10  accounts were not being completed, and that, as a result, the Company's revenues
11  were far below what they should have been based on the amount of winning bids.
12  This is particularly true for defendant Singh, who was previously a CEO of a
13  predictive web analytics firm, which tracks internet activity—such as whether
14  winning bids ultimately result in sales.  More, in light of the history of fraudulent
15  activity and shady relationships involving Bidz and its management, as well as the
16  Audit Committee members' ongoing evaluation of the "tone at the top," defendants
17  Itkin, Singh, and Hanelt would have and did uncover the existence of shill bidding
18  and the admitted material weaknesses concerning, among other things, control
19  deficiencies related to: (i) maintaining an effective control environment at the
20  entity level; (ii) maintaining an effective control environment over IT specifically
21  in user security configurations, training and end user acceptance, quality control
22  testing, design and monitoring of change controls, and security evaluations; and
23  (iii) maintaining an effective control environment over management oversight and
24  anti-fraud controls specifically in processing of, among other things, financial
25  transactions, vendor review, and payment processing.

26          76.    Defendant Kuperman, as Bidz's CTO during the Relevant Period, is
27  and was intimately familiar with the Company's website and transaction processes.
28  Defendant Kuperman was thus aware of Bidz's auction statistics, including the

number of auctions that took place on Bidz's website, the average sale price for the items sold in these auctions, and the number of auctions in which the winning bidder failed to pay for the item won (particularly given a number like 44%). Defendant Kuperman also would have been and was aware of blatant irregularities involving the Company's website and transaction processes, including auto-bidding and easily identifiable fake user names used to shill bid. Defendant Kuperman also would have been and was aware of the material weaknesses concerning Bidz's "anti-fraud controls" and "user security configurations."

77. Notwithstanding the above, the Individual Defendants took no action to prevent or remedy the illegal shill bidding practices at Bidz.

## OTHER IMPROPER PRACTICES

### The Individual Defendants Consciously Allowed Bidz to Use Suspect Accounting Auditors

78. Bidz's independent auditor is Stonefield Josephson, Inc. ("Stonefield"). Stonefield has been harshly criticized by the Public Company Accounting Oversight Board ("PCAOB"), which was created by the Sarbanes-Oxley Act of 2002 and is authorized to conduct inspections of registered public accounting firms.

79. The PCAOB began inspecting Stonefield in 2005 and released an inspection report on March 14, 2007. The PCAOB reviewed thirteen of Stonefield's audits of financial statements of issuers. The PCAOB's report indicated that the following deficiencies, *inter alia*, were present: (i) a failure to perform and document adequate procedures regarding the issuers' information systems relevant to financial reporting and related computer controls; and (ii) a failure to perform and document adequate testing of deferred revenues. These deficiencies relate to areas that have been problematic for Bidz, including a lack of computer controls necessary to prevent shill bidding on Bidz's online auctions.

80. Additionally, the PCAOB found significant deficiencies in five of the

13 audits, or nearly 40%.  For these audits, the PCAOB found that Stonefield had failed to "obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."

81.    Generally Accepted Accounting Standards require that "*[s]ufficient competent evidential matter* is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."   American Institute of Certified Public Accountants, *Professional Standards* §326.01 (1997) (emphasis added).  A failure to obtain sufficient competent evidential matter substantially undermines the significance of the audit.  If these actions are not taken, the audit has little value.

82.    The Board is responsible for the Company's financial accounting, reporting, and controls, including the retention of a qualified auditor.   In contravention of their duties as members of the Board, the director defendants appointed and retained Stonefield to audit the Company's consolidated financial statements for the fiscal year ending December 31, 2007, and recommended that stockholders ratify this appointment.  This was reported in Bidz's Schedule 14A, which was filed with the SEC on April 30, 2007.  Notwithstanding the deficiencies identified in the PCAOB report, the director defendants also appointed Stonefield to audit financial statements for Fiscal 2008 and 2009, and recommended to shareholders that they ratify their appointment of Stonefield.

83.    The two director defendants not on the Audit Committee, Zinberg and Kong, also breached their fiduciary duties by permitting Stonefield to be retained.  All of the directors on the Board were responsible for the Company's financial reporting and controls, including the retention of a qualified auditor.   In contravention of these duties, and notwithstanding the deficiencies identified in the PCAOB's report, Zinberg and Kong acquiesced in the appointment of Stonefield as the Company's auditor for Fiscal 2007, 2008, and 2009.

84.     Bidz's Audit Committee (comprised of defendants Hanelt, Itkin, and Singh) is tasked with reviewing the qualifications of the independent auditor.  This responsibility is clearly defined in the Audit Committee's Charter, which states that a principal function of the committee is to select and evaluate the independent auditors and oversee their performance.  In contravention of their duties under the Audit Committee Charter, the members of the Audit Committee recommended that the Board retain Stonefield to audit the Company's financial statements for Fiscal 2007, 2008, and 2009, notwithstanding the deficiencies identified in the PCAOB report.

**The Individual Defendants Permitted the Use of Suspect Jewelry Appraisers Who Offered Inflated Jewelry Appraisals**

85.     The Individual Defendants' utter failure to perform their fiduciary obligations at Bidz allowed the Company to use a jewelry appraiser that failed to satisfy even the minimum industry requirements.  These improper appraisals were designed to and did further artificially increase Bidz's revenues and earnings by giving the false impression to customers that those items were worth more than they actually were.

86.     The Individual Defendants permitted the use of a suspect jewelry appraiser, American International Gemologists ("AIG"), who issued inflated and inaccurate appraisals.  AIG did not follow industry standards because they did not physically inspect the items they claimed they were appraising, despite the fact that a proper appraisal requires an appraiser to be able to see the piece in order to properly estimate its value.  These phony "appraisals" artificially increased Bidz's revenues and earnings by giving customers the false impression that the items were worth much more than they actually were.  Additionally, the owner and manager of AIG, Norman Monteau, admitted that he had falsely appraised jewelry sold via an online auction.  Using AIG to appraise Bidz's merchandise deceived customers and damaged the Company's reputation.

87. According to a February 19, 2008 article appearing in the *Los Angeles Times*, AIG publicly admitted that it does not physically inspect every item that it appraises, in contravention of standard industry practice. According to Jeanine Woodling, of the International Society of Appraisers, this "raised a red flag" since a proper appraisal requires an appraiser "to actually be able to see the piece."

88. The owner and manager of AIG, Norman Monteau, has admitted that he has falsely appraised jewelry sold via an online auction. The following exchange between Norman Monteau and a consumer that occurred on www.pearl-guide.com is particularly illustrative:

> **Consumer**: "Hello Norman, Everything else aside, can you answer this question[?] Is that your signature on the two appraisals I posted? I printed them both out and took them to a jeweler this morning after I received the response from JShepherd regarding the bogus valuations, and my jeweler confirmed everything that JShepherd said – he said they were over valuated to a point beyond his comprehension…"

> **Norman Monteau**: "Yes we did sign those appraisals. They are ours. And yes they are in error. I will be speaking to the auction company tomorrow, we will correct the appraisals…." [2]

89. Not only are AIG's appraisal practices shoddy and inflated, but it has also misrepresented itself in an effort to appear more credible than it is. A photograph on AIG's website was apparently "photoshopped" to include a large logo of AIG on the building where AIG is located. Citron went to the building and learned that it had no such sign on it. In fact, Citron found that the only signage was a white piece of paper on the front door that nondescriptly identified the location of AIG. The issue of the fake sign came up during a Bidz conference call on November 27, 2007, in which CEO defendant Zinberg informed investors that he would ask AIG to remove the inaccurate photo from its website.

90. As a result of the Individual Defendants' utter failure to fulfill their

---

[2] *See* http://www.pearl-guide.com/forum/ pearls-ebay-q/187-bid4assets-good-not.html.

1   fiduciary obligations, Bidz has retained the services of an appraiser that does not

2   even meet the minimum industry standard of physically inspecting the items it is

3   valuating, deceiving Bidz's customers and damaging the Company's reputation in

4   the process.

5   **The Individual Defendants Permitted the Use of Inaccurate Descriptions and Photographs of Items Sold to Customers**

6   91.   The Individual Defendants' failure to perform their fiduciary

7   obligations also resulted in customers being provided with inaccurate descriptions

8   and photographs of the items they were being sold.

9   92.   Many customers have complained about receiving items that were

10  different than the photographs and descriptions of these items on Bidz's website.

11  For example, one Bidz customer stated that she purchased an emerald that "had a

12  major crack in the corner, did not look anything like the one shown on the listing,

13  and had a major chip on the bottom of the stone."  She also stated that "these things

14  were not described on the listing."[3]

15  93.   Another customer described how she bid on a blue diamond and then

16  saw the same picture being used for a blue topaz stone.  When the customer called

17  the Company, she was only allowed to speak to a person named "Ken," who

18  claimed that it was just a mistake on their part. [4]

19  94.   The Company's practices were explained by a confidential witness

20  who worked as a jewelry photographer at Bidz from January 2002 through January

21  2005 ("CW2").  CW2 took pictures of the jewelry and prepared the pictures for

22  printing catalogues and the Company's website.  CW2 stated that photographs were

23  not taken of every item and that photos of one item were regularly used for similar

24

25  [3]  *See* http://www.planetfeedback.com/bidzcom/overall+experience/

26  lost+trust+in+bidzcom/154117).

27  [4]  *See* http://www.ripoffreport.com/e-trade/bidz-com-ken-david-z/bidz-com-ken-

28  david-biden-cp694.thm.

items.

95.    In the same vein, Bidz, with the participation and/or permission of the Individual Defendants, also failed to provide customers with certificates of authenticity which the customers were promised.  Indeed, CW1 stated that many times customers who were promised a certificate of authenticity for the jewelry they won either did not receive the certificates or received only photocopies of the certificates.

96.    The missing and forged certificates were likely caused, at least in part, by Bidz's acquisition of up to 45% of its inventory from L.A. Jewelry, whose owner was convicted for selling stolen goods.

97.    Bidz has belatedly admitted that its product descriptions can be misleading.  In a Form 10-Q filed with the SEC on November 9, 2009, Bidz finally admitted that "mistakes or omissions of important information in our descriptions may occur" that may result in "negative publicity about and diminished customer confidence in our website."  Bidz has now confirmed what the plaintiffs have alleged all along.

98.    These deceptive practices were allowed to persist because the Individual Defendants failed to perform their fiduciary obligation to prevent or eradicate them.

**The Individual Defendants Permitted the Use of Phony Error Messages and Other Improper Practices Designed to Ensure that Items Would Not Be Sold Below a Certain Price**

99.    The Individual Defendants' fiduciary breaches also contributed to improper practices by which Bidz would take various measures to ensure that items would not be sold to a customer if the winning bid was below a certain price. Specifically, when a winning bid on an item was less than the cost of the item to Bidz, customers would be given bogus error messages and/or would be informed that they could not purchase the item for reasons that were false.  This practice was designed solely to ensure that Bidz would not lose money on the items it sold.

100.   CW1 confirmed these practices.  CW1 stated that employees at Bidz were given access to information regarding the cost of the items that were sold and knew when the items had been won for less than the cost to the Company.  CW1 further stated that, many times, when customers had purchased items at below cost, they would get an error message that would prevent them from completing the transaction.  CW1 was instructed by her/his superiors to make up a reason as to why the error message had occurred.

101.   CW1 also stated that when that item was to be sold below cost, she/he falsely informed customers that the item they had won was oversold or damaged. Again, this practice was permitted to persist because of the Individual Defendants' utter failure to prevent such practices.

**The Individual Defendants Consciously Permitted Bidz to Sell Counterfeit Merchandise, Which Impacted Bidz's Ability to Obtain Financing**

102.   The Individual Defendants knew about and consciously permitted Bidz to sell counterfeit Cartier watches on Bidz's website.  This practice was challenged by Cartier, which filed an action against defendants Zinberg and Bidz.

103.   Cartier alleged that defendants Zinberg and Bidz had infringed upon its patents and trademarks by selling watches that copied its design known as the "Tank."  This was reported in Bidz's Form 10-K filed with the SEC on February 25, 2009.  Zinberg and Bidz settled this lawsuit in August 2008 by paying Cartier a significant sum of money.

104.   Prior to the resolution of this lawsuit, Bidz's ability to secure a much needed $10 million line of credit was made contingent upon the lender's approval of Bidz's plan to resolve the litigation.  This was reported in Bidz's Form 10-Q filed with the SEC on August 14, 2006.

105.   Thus, the sale of counterfeit items on Bidz's website impacted Bidz's ability to secure financing and meet its cash flow requirements.  Given the

1  importance of resolving this litigation, each of the directors and officers of Bidz

2  was aware of the sale of counterfeit Cartier watches.

3  **FALSE AND MISLEADING STATEMENTS**

4  106.   The Individual Defendants caused the Company to issue improper

5  statements throughout the Relevant Period.

6  107.   Bidz's Form 10-K filed with the SEC on March 16, 2007, falsely

7  stated that "[t]he price of all our products is dictated by the buyer alone based on

8  that buyer's valuation of the product."  This statement is false because shill bidding

9  inflated the price of the products sold on Bidz's website. Additionally, these

10  statements failed to disclose the use of phony error messages and other efforts to

11  prevent items from being sold below a certain price.

12  108.   Bidz's March 16, 2007 Form 10-K also incorrectly stated,

13  "[r]egardless of the closing price, once an auction is closed, the final bidder will

14  receive the product."  This statement was false because customers were often given

15  bogus error messages and/or were informed they could not purchase the item when

16  a winning bid was less than the cost of the item to Bidz.   The Individual

17  Defendants caused Bidz to repeat the false statement in its Form 10-12G/A filed on

18  June 30, 2005.

19  109.   Additionally, the Individual Defendants caused the Company to issue

20  improper statements concerning the health of Bidz's business model.   These

21  statements were false because they failed to reveal the shill bidding and other

22  improper practices.  The inherent weaknesses in Bidz's business model have been

23  demonstrated by the Company's recent financial performance.  As reported in the

24  Company's Form 10-Q filed with the SEC on November 9, 2009, revenues for the

25  third quarter of 2009 were 55.2% lower than for the third quarter in 2008.  Bidz

26  had 20,000 less new customers for this period.  Additionally, gross profit was off

27  by 45.86%, and pretax income was a mere $67,000 compared to $5.5 million a

28  year ago.

110.   On August 13, 2007, Bidz issued an earnings press release announcing its fiscal second quarter 2007 financial results. In the press release, Bidz disclosed growth in the demand for the Company's jewelry products. In particular, defendant Zinberg stated that "'[t]raffic to [the Company's] site continues to grow driving an increasing number of items sold and importantly, the average order value in the second quarter increased approximately 29% year-over-year.'"

111.   In the press release, defendant Zinberg also stated: "'We are very pleased with the momentum we are seeing and particularly the leverage and scalability of our model which resulted in a significant increase in our bottom-line. We are keenly focused on continuing to achieve strong growth and profitability and further leveraging our model to deliver earnings, cash flow and shareholder returns.'"

112.   Also on August 13, 2007, Bidz hosted an investor conference call to discuss its fiscal second quarter 2007 financial results. During the call, defendant Zinberg, in his prepared statement, stated that Bidz sold "an average of 8700 items per day." Specifically, Zinberg boasted, "[w]e expect our revenue growth to continue and [are] keenly focused on improving our core metrics to increase margins and profitability."

113.   Also during the August 13, 2007 conference call, defendant Kong, in his prepared statement, attributed increases in the Company's average order values to "improvements in [Bidz's] site." Specifically, Kong stated, "[o]ur average order value in the second quarter increased 28.6% year-over-year to $171 from $133 a year ago, and the number of items sold per day increased 12.3% to 8,678." He also stated that the increase in average order value "is due to continuing improvements in our site[,] [i]ncreased traffic, which creates more demand for our items, our compelling auction format and significantly increased selection of products."

114.   On November 12, 2007, Bidz issued a fiscal third quarter 2007 earnings press release. In the press release, Bidz reported "strong results," which defendant Zinberg attributed to the Individual Defendants' "continued focus on executing [Bidz's] business and achieving results…."

115.   On November 12, 2007, Bidz hosted an investor conference call to discuss its fiscal third quarter 2007 earnings. During the call, defendant Zinberg touted the Company's purported "continued focus on being simply the best online auctioneer of jewelry." Specifically, Zinberg boasted, "[w]e believe the reason for our success is our continued focus on being simply the best online auctioneer of jewelry. We provide a unique value proposition for both our buyers and suppliers. Our prices are determined by customers with auctions starting at $1. We have short auction time and provide immediate gratification."

116.   The statements described above were false and misleading because they failed to disclose and misrepresented materially adverse facts, which were known by the Individual Defendants.

117.   First, the statements failed to disclose that Bidz's business model was based on shill bidding designed to boost sale prices and to protect particular items from selling below cost.

118.   Next, the statements failed to disclose that the Company's auditor, Stonefield, was unqualified and had been harshly criticized by PCAOB for its numerous deficient audits.

119.   The statements also failed to disclose that Bidz's appraiser, AIG, did not even physically inspect the jewelry items it purportedly appraised (in direct contravention of industry standards) and/or that Bidz lacked the necessary internal controls to prevent such practices.

120.   Further, the statements failed to disclose that customers were being provided with inaccurate descriptions and photographs of the items they were

1  purchasing and/or that Bidz lacked the necessary internal controls to prevent such

2  practices.

3      121.   Finally, these statements failed to properly disclose that in May 2007,

4  Bidz entered into a related party transaction with L.A. Jewelers pursuant to which

5  L.A. Jewelers guaranteed Bidz a 20% gross profit upon Bidz's sale of L.A.

6  Jeweler's products.

7      122.   Under Generally Accepted Accounting Principles ("GAAP"), Bidz

8  was required to disclose its related party transaction with L.A. Jewelers. GAAP

9  requires the disclosure of related party transactions because related parties, such as

10  controlled entities, principal stockholders or management, can execute transactions

11  that improperly inflate earnings by masking their economic substance or distort

12  reported results through lack of disclosure.

13      123.   By failing to disclose this related party transaction, the foregoing

14  statements regarding the Company's financial condition and outlook were false and

15  misleading when made because: (i) profits were artificially inflated due to

16  improper accounting of related party transactions with L.A. Jewelers; and (ii) profit

17  and earnings guidance were based, in part, on the future completion of related

18  party transactions.

19                **SEC AND FTC INVESTIGATIONS**

20      124.   Bidz has been formally investigated by the SEC on at least three

21  occasions.  The first time was in 2005.

22      125.   Bidz admitted in its Form 10-12G filed on April 22, 2005, that the

23  SEC was investigating Bidz's sales of $20.5 million of unregistered securities via

24  unlicensed brokers.  The public filing stated:

25          The Company has reported these violations to the SEC who are
26          presently investigating this matter.  The Company intends to seek
            financing in order to offer rescission to all of its investors.  It is not
27          likely, however, that the Company will secure financing necessary for
            a full rescission offer until and unless the SEC takes some final action
28          with respect to the foregoing violations … Consequently, there is

substantial uncertainty concerning what action the SEC and state regulators may take against the Company and what effect any such action will have on the Company's business and its ability to obtain additional financing.

126. The SEC's second formal investigation relates to "inventory accounting practices" and "other matters."  Bidz has never disclosed what these "other matters" include, but a reasonable inference is that such matters include shill bidding.

127. In a Form 8-K filed with the SEC on February 23, 2009, Bidz stated the following:

> The Company was notified recently by the SEC of a formal investigation relating to certain aspects of its inventory accounting practices, as well as other matters. The Company intends to fully cooperate with the SEC regarding this matter. The Company remains confident its inventory accounting is correct and in full accordance with GAAP.

128. The intensity of the investigation has increased recently.  Bidz revealed in a Form 10-K filed with the SEC on March 9, 2010, that the SEC has not just requested documents, but it has also taken depositions of Bidz's management.  The public filing stated: "We have been cooperating fully with the SEC regarding this matter, *our management and certain employees have complied with subpoenas for testimony*."

129. The SEC's third investigation relates to Bidz's "co-op marketing contributions and minimum gross profit guarantees."  Bidz disclosed the following in a Form 10-Q filed with the SEC on November 9, 2009:

> On October 27, 2009, the SEC issued a subpoena to produce documents relating to the Company's co-op marketing contributions and minimum gross profit guarantees.

130. In addition to the SEC's investigations, the FTC has inquired into Bidz's e-mail marketing practices.  Bidz reported the following in its Form 10-Q filed with the SEC on August 10, 2009:

In May 2009, the Company received a Civil Investigative Demand for information from the FTC relating to email marketing practices. We have been cooperating fully with the FTC regarding this matter, and we do not believe that the investigation will adversely affect management, our results of operations or our financial position.

131.   As later explained in a letter issued by the FTC on April 2, 2010, its investigation "focused on the failures of Bidz.com and its network of e-mail marketers to honor opt-out requests."

132.   A former employee at Bidz ("CW3") stated that e-mail campaigns were conducted on a frequent basis and were approved by defendant Zinberg. CW3 was the Business Development Manager at Bidz for approximately six months in 2007.   He/She was in charge of Bidz's e-mail and online marketing activities.

133.   CW3 stated that Bidz sent out as many as ten mass e-mails per week, and that repeat e-mails were sent to the same people if prior e-mail blasts were successful.

134.   In a letter dated April 2, 2010, the FTC stated that it would not recommend enforcement at the present time but would reserve its right to take future action against Bidz.   It also stated that it "will continue to monitor Bidz.com's marketing activities to ensure full and complete compliance with CAN-SPAM."

135.   Bidz's violations of federal law that were examined by the SEC and the FTC have exposed the Company to potential fines, harmed the Company's reputation, diverted management's attention, and caused the Company to spend resources defending itself and responding to subpoenas and requests for information.

## THE SHILL BIDDING AND OTHER IMPROPER PRACTICES FIT THE COMPANY'S PATTERN

### Defendant Zinberg's Fraudulent Practices

136.    Bidz's predecessor was ALA, which was also known as Union Pawn. Defendants Zinberg and Itkin served together as two of the three directors of Union Pawn.  Zinberg was the CEO, and Itkin was the CFO and Treasurer.  ALA owned and operated numerous pawn shops.  Bidz's Form 10-K filed with the SEC on March 29, 2006, described ALA as a "collateral lending and bail bond company."

137.    Defendant Itkin facilitated the sale of unregistered securities while he was at Union Pawn.  On one occasion, he sold five hundred shares for $5,000 to Yelena Simonyan on December 1, 1994.  The stock for was an ownership interest in a pawn shop called Zinberg Pawn Brokers, Inc.  On that same date, Itkin was a signatory to a shareholder agreement that was part of a transaction in which Yelena Simonyan agreed to pay $1,150,000 to acquire 25% of Union Pawn.

138.    Defendant Zinberg was also a signatory to this shareholder agreement and also promoted the sale of unregistered securities in Union Pawn and other businesses.

139.    Yelena Simonyan later accused defendant Zinberg of defrauding her of her investment of $1,150,000.  She also claimed that he attempted to force her to "sign certain paperwork to relinquish any and all ownership interest in Union [Pawn] in order to keep the chain of title clean since Zinberg wanted to take Union [Pawn]… public by organizing his pawn shops into an on-line Web site called BIDZ.com."

140.    This lawsuit, which was filed in Los Angeles Superior Court, was eventually settled.  As part of the settlement, defendant Zinberg was liable to pay Yelena Simonyan $700,000, and Bidz was required to issue her more than 30,000 shares.

141.    A similar situation played out a few years later when defendant

Zinberg attempted to take back the ownership interest that Michael Henderson possessed in Bidz.  At one point, Michael Henderson owned 50% of the class B shares of common stock in Bidz, which gave him a one-half ownership of the Company.   When Michael Henderson passed away, his mother alleged that Zinberg claimed ownership of much of Henderson's stock.  Zinberg asserted that prior to his death, Henderson had resigned from Bidz and given much of his stock to Zinberg.

142.  Bidz reported the following concerning Henderson's shares in its Form 10-12G, filed with the SEC on April 22, 2005:

> The Company is a defendant in a lawsuit brought by Victoria Williams, the mother and Administrator of the Estate of Michael Henderson. Henderson was a principal shareholder, director and officer of the Company prior to his resignation as director and officer on July 27, 2000. The suit is against the Company and David Zinberg, chief executive officer and major shareholder and seeks, among other things, to rescind a Severance Agreement entered between the Company and Michael Henderson, to require the Company to issue 11,250 shares [all numbers are in thousands] of the Company's Common Stock to plaintiff, and to voluntarily dissolve the Company. ***Under the Severance Agreement, Michael Henderson agreed that he would retain only 1,090 shares*** [all numbers are in thousands] ***of the Company's Common Stock and that the remaining 10,160 shares*** [all numbers are in thousands] ***held by him would be reissued to David Zinberg.*** In May 2004, the Company and Mr. Zinberg reached a tentative settlement in principle with the plaintiff, pursuant to which the plaintiff will receive a total of 970 shares of Common Stock, which includes 900 shares of Common Stock originally issued to him in 2000 under the Severance Agreement, 40 shares of Mr. Zinberg's shareholdings, and an additional 30 shares to be issued by the Company. As part of the settlement, Mr. Zinberg also agreed to surrender 4,145 shares [all numbers are in thousands] to the Company for cancellation. The settlement is conditioned upon the execution of a written final settlement agreement.

143.  As a result of the settlement of the lawsuit, defendant Zinberg relinquished his claims of ownership over Henderson's shares.   Immediately

1    afterwards, he required Bidz to issue him options to purchase 6,000,000 shares.

2        144.   This is confirmed by Bidz's Form 10-12G, which states, "Following

3    the settlement, in May 2004, the Company granted a seven-year option to Mr.

4    Zinberg for the purchase of 6,000 shares [all numbers are in thousands] of

5    Common Stock at an exercise price of $6.00 per share, which represents the fair

6    value of the stock on the date of the issuance."

7        145.   Defendant Zinberg still owns these options to this day.   Zinberg

8    attempted to justify his receipt of this massive and unprecedented stock grant by

9    stating that they were received "in consideration of his services to the Company."

10       146.   In reality, defendant Zinberg forced Bidz to give him the stock to

11   compensate him for his inability to obtain Mr. Henderson's shares.

12       147.   When this massive stock grant was issued in May 2004, defendants

13   Kong, Itkin, and Zinberg were all on the Board.   Kong and Itkin's willingness to

14   grant Zinberg these stock options without a proper corporate purpose demonstrates

15   that Zinberg dominates and controls these directors.

16   **Bidz Used Illegal Stock Sales by Unlicensed Brokers to Provide Working
     Capital During Its First Four Years**

17       148.   Bidz admitted in a June 29, 2006 Form S-1/A filed with the SEC that

18   between 1999 and mid-2003, the Company raised ***$20.5 million*** in capital through

19   a series of private stock sales to approximately ***830 investors***.   In later regulatory

20   filings, Bidz acknowledged that these sales were in violation of federal and state

21   securities laws because, among other reasons, the securities were ***not registered***

22   ***and were sold by unlicensed brokers***.   Bidz has never completed a conventional

23   public offering under the scrutiny of the SEC.

24       149.   Additionally, as explained in a Form 10-Q filed with the SEC on

25   August 22, 2005, Bidz illegally issued $5.5 million worth of its shares in exchange

26   for services and other non-cash consideration between 1999-2004.   According to

27   an early private placement memorandum dated April 20, 1999, Bidz used its

28

1  unregistered securities to partly pay for the development of its online auction

2  platform.

3      150.   Additionally, Bidz used its unregistered securities to buy merchandise.

4  Bidz gave 400,000 shares to Aframian, a convicted fence, in order to purchase

5  merchandise from him.   This was confirmed by the analyst Stanford, which

6  reported on October 8, 2008 that "Mr. Aframian also received 400,000 shares as

7  part of the initial supply agreement in 2001…."

8      151.   Bidz used the illegal stock sales to provide it with working capital

9  during its early years.   Without these fraudulent sales, the Company would likely

10  not have survived.   Analyst Roth stated in a report on November 28, 2007: "BIDZ

11  had a difficult start.   The company accumulated a significant deficit in its earlier

12  years…."

13      152.   As the CEO of the Company since November 1998, defendant

14  Zinberg knew about and participated in the illegal private placements that provided

15  most of the Company's cash flow.   Zinberg was the CEO in 1999, when Bidz

16  illegally sold 978,070 shares of stock for $3.9 million.   This was reported in Bidz's

17  Form 10-Q filed with the SEC on August 22, 2005.   He was also the CEO in 2000,

18  when Bidz illegally sold 1,198,191 shares for $4.8 million.   Additionally, Zinberg

19  was the CEO in 2001 when Bidz illegally sold 580,621 shares of stock for $2.6

20  million; in 2002, when Bidz illegally sold 1,051,924 shares for $5.25 million; and

21  in 2003, when Bidz illegally sold 753,262 shares for $3.96 million.

22      153.   Defendant Zinberg promoted unregistered shares in Bidz via a

23  "Confidential Private Placement Memorandum" dated April 20, 1999.   This

24  memorandum was for $10 million (2.5 million shares at $4 per share).   Zinberg

25  falsely represented in the memorandum that Bidz planned to become a publicly

26  traded company in 2000.

27      154.   The memorandum stated that the proceeds would be used, in part, to

28  pay for "management compensation."   It also stated that employees of the

Company who referred stock purchases would be "paid referral fees." Thus, defendant Zinberg had a financial incentive to personally go out and promote the stock. Additionally, the memorandum stated that marketing and other costs from the offering were expected to use up to 20% or $2 million of the proceeds from the offering. Thus, the referral bonuses were likely significant.

155. The placement memorandum listed defendant Itkin as the CFO of Bidz and also stated that he served as the CFO of ALA. Itkin likely used this placement memorandum to illegally promote Bidz unlicensed securities.

156. Defendant Itkin knew about Bidz's illegal stock sales and exchanges. He served as the CFO of Bidz in 1999. During that year, Bidz illegally sold 978,070 shares of stock for $3.9 million. He was also the CFO in 2000, when Bidz illegally sold 1,198,191 shares for $4.8 million. This was reported in Bidz's Form 10-Q filed with the SEC on August 22, 2005.

157. Defendant Kong was the CFO in 2001, when Bidz illegally sold 580,621 shares of stock for $2.6 million. He was also the CFO in 2002, when Bidz illegally sold 1,051,924 shares for $5.25 million. Further, Kong was the CFO in 2003, when Bidz illegally sold 753,262 shares for $3.96 million.

158. Bidz survived for its first few years because of fraudulent stock sales, which generated more than $20 million. It also survived though massive shill bidding, which increased the price obtained for the items sold on its website. With increased scrutiny on Bidz's fraudulent activities, the Company is unlikely to remain a going concern for much longer.

159. Bidz has a long history of engaging in fraudulent practices. As increased scrutiny is placed on Bidz in the form of derivative actions, multiple SEC investigations, an FTC investigation, a consumer action concerning shill bidding, and the Securities Class Action regarding shill bidding and other wrongdoing, more and more allegations of fraudulent activity are being revealed.

160. Lately, nearly every public filing of Bidz has included a new

revelation of fraud or wrongdoing.  For example, Bidz belatedly admitted in its Form 10-Q filed with the SEC on May 13, 2010, five days prior to the filing of this Complaint, that it materially misstated its accounting for stock options to its employees.  The 10-Q states the following:

> We had granted one year loans to employees in November 2007 to purchase 154,000 shares when they exercised their stock options. These loans were extended for 15 months in November 2008, and then another year in February 2010. Stock option expenses related to the loan extensions are calculated to be $66,000, $680,000 and $(60,000) for years 2007, 2008 and 2009, respectively after considering the tax effect and related penalties and interest.

161.   Additionally, in its Form 10-K filed with the SEC on March 9, 2010, Bidz recently revealed a number of material weaknesses that apparently went undiscovered for years.  Notably, this bare-boned disclosure in the Form 10-K did not disclose which individuals were responsible for Bidz's "material weaknesses" nor the Company has taken any action against those individuals for allowing theses "material weaknesses" to occur.  Rather, Bidz simply states the following:

> [W]e identified control deficiencies that represent material weaknesses.… These control deficiencies related to: (i) maintaining an effective control environment at the entity level specifically in having adequate processes related to the conversion of the Company's operating system to the Microsoft AX ERP system and in executing a Company wide risk assessment program related to the conversion process; (ii) maintaining an effective control environment over Information Technology (IT) specifically in user security configurations, training and end user acceptance, quality control testing, design and monitoring of change controls, and security evaluations for the Microsoft AX ERP system, and (iii) maintaining an effective control environment over management oversight and anti-fraud controls specifically in processing of financial transactions, vendor review and payment processing, employee hiring and termination procedures, and timely review of payroll timecards and reports. As a result of the foregoing, management concluded that the Company's internal control over financial reporting as of December 31, 2009 was not effective.

1   162.   These recent revelations confirm the pervasive wrongdoing that has

2   taken place it Bidz ever since its founding.

3   **DAMAGES TO BIDZ CAUSED BY THE INDIVIDUAL DEFENDANTS**

4   163.   As a result of the Individual Defendants' improprieties, Bidz

5   disseminated improper statements concerning its online auctions and financial

6   health.   These improper statements, as well as defendants Zinberg and Itkin's

7   extensive contacts with criminals and other untrustworthy characters, have

8   devastated and continue to devastate Bidz's credibility, as reflected by the

9   Company's $107 million market capitalization loss.  As long as defendants Zinberg

10  and Itkin continue to be associated with Bidz, and Bidz continues to be associated

11  with L.A. Jewelry, AIG, and Stonefield, potential investors will be unwilling to put

12  their faith in the veracity of Bidz's business model.

13  164.   Moreover, Bidz's credibility with its customers has been irreparably

14  damaged as a result of the uncontrolled shill bidding that the Individual Defendants

15  have allowed to occur.   The prevalence of shill bidding, in conjunction with

16  defendants Zinberg and Itkin's nefarious business contacts, has created an

17  environment of distrust that limits the Company's revenue potential from its online

18  auction business model.

19  165.   Bidz was also required to spend significant sums of money defending

20  itself against a class action filed by a customer who purchased jewelry from Bidz.

21  The customer filed a complaint on August 22, 2008, alleging that Bidz engaged in

22  a systematic program of shill bidding, which caused consumers to pay inflated

23  prices.   In that action, the court found that the allegations "support a reasonable

24  inference that Defendant is engaged in shill bidding…"   Bidz ultimately paid to

25  settle the action.

26  166.   Further, on or about September 30, 2009, another class of consumers

27  filed an action against Bidz for misrepresentations regarding the 100% money back

28  guarantee contained on its website.  The putative class plaintiffs allege that despite

1   the Company's guarantee, Bidz charges a restocking fee and shipping expenses to

2   customers who return items.

3        167.   As a direct and proximate result of the Individual Defendants' actions,

4   Bidz has expended and will continue to expend significant sums of money.  Such

5   expenditures include, but are not limited to:

6        (a)   costs incurred in investigating and defending Bidz and certain officers
7              in lawsuits filed against the Company, plus potentially hundreds of
8              millions of dollars in settlement or to satisfy an adverse judgment;

9        (b)   costs incurred from compensation and benefits paid to the defendants
10             who have breached their duties to Bidz;

11       (c)   costs incurred in connection with the consumer class action; and

12       (d)   costs incurred in connection with the multiple SEC and FTC
             investigations.

13       168.   Moreover, these actions have irreparably damaged Bidz's corporate

14  image and goodwill.  For at least the foreseeable future, Bidz will suffer from what

15  is known as the "liar's discount," a term applied to the stocks of companies who

16  have been implicated in illegal behavior and have misled the investing public, such

17  that Bidz's ability to raise equity capital or debt on favorable terms in the future is

18  now impaired.

19              **THE INDIVIDUAL DEFENDANTS' INSIDER SELLING**

20       169.   During the Relevant Period, defendants Zinberg and Liu, based on

21  their knowledge of material non-public information regarding the Company's

22  improper auction practices, sold approximately 145,000 shares of Bidz common

23  stock garnering total proceeds of $1,843,100 as follows:

24
25

| Name | Transaction Date | Number of Shares Sold | Stock Price | Total Proceeds |
26
|------|------------------|-----------------------|-------------|----------------|
27  | Zinberg | 08/15/07 | 13,899 | $8.18 | $114,000 |
28  | | 08/16/07 | 8,600 | $8.04 | $69,000 |

| | | | | |
|---|---|---|---|---|
| | 08/17/07 | 7,501 | $8.04 | $60,000 |
| | 09/04/07 | 24,600 | $8.93 | $220,000 |
| | 09/05/07 | 5,400 | $8.60 | $46,000 |
| | 10/01/07 | 30,000 | $13.07 | $392,100 |
| Liu | 11/16/07 | 37,500 | $16.79 | $630,000 |
| | 11/19/07 | 17,500 | $17.82 | $312,000 |
| **TOTAL** | | **145,000** | | **$1,843,100** |

170.   The stock sales described above were not part of any normal or regular pattern or practice of such sales by defendants Zinberg and Liu, but rather were suspicious in that:

    (a)   Defendant Zinberg entered into a 10b5-1 plan for the first time on August 16, 2007 (effective August 15, 2007) and had sold no shares of his stock prior to August 15, 2007;

    (b)   Defendant Liu had sold no shares of her stock prior to November 16, 2007;

    (c)   All of these defendants' stock sales occurred soon after the Company's positive press releases and reports, which made no mention of the Company's improper conduct, described *supra*.

171.   In order to present the appearance of propriety, all of the sales made by defendant Zinberg listed above were conducted pursuant to the Rule 10b5-1 plan he entered into on August 16, 2007.  However, Zinberg entered the 10b5-1 plan while he was already in possession of material non-public information regarding Bidz's improper business practices. Consequently, Zinberg's 10b5-1 plan was never valid.

172.   Defendant Zinberg attempted to remove attention from his new trading plan by voluntarily reducing his salary to $1 and proclaiming that he would not receive any future bonuses.  However, his annual salary and eligibility to earn bonuses resumed as of March 1, 2008, and he ultimately received $433,434 in

compensation in 2008 which was more than double his 2007 compensation of $201,244.

173. All of these defendants' stock sales occurred soon after the Company's positive press releases and reports, which made no mention of the Company's improper conduct.

174. Defendant Zinberg entered the 10b5-1 plan while he was already in possession of material non-public information regarding Bidz's improper business practices.

175. Defendants had numerous opportunities to sell their shares via private placements or the Over the Counter Bulletin Board. This was discussed in Bidz's Form 10-Q filed with the SEC on May 2, 2007. From 1999 through mid-2003, $20.5 million of Bidz's stock had been sold to approximately 830 investors. This was reported in Bidz's Form 10-12G/A filed with the SEC on June 30, 2005. By March 31, 2005, there were 1,132 holders of record, and 23,312,500 shares of common stock were outstanding. This was reported in Bidz's Form 10-12G/A filed with the SEC on June 30, 2005.

176. Neither defendant had sold *any* shares of Bidz stock prior to August 15, 2007.

177. The insider selling directors' trades during the Relevant Period were dramatically out of line with other periods. Further, all of these stock sales occurred right after the Company's positive press releases and reports, which made no mention of the Company's improper conduct, and during the four months leading up to Bidz's highest ever stock price.

178. Prior to June 6, 2008, Bidz's stock traded on Over the Counter Bulletin Board. This was reported in Bidz's Form 10-Q filed with the SEC on May 2, 2007. Tens of millions of dollars of Bidz's stock was traded illegally as early as 1999. From 1999 through mid-2003, $20.5 million of Bidz's stock had been sold to approximately 830 investors. This was reported in Bidz's Form 10-12G/A filed

1    with the SEC on June 30, 2005.  By March 31, 2005, there were 1,132 holders of

2    record, and 23,312,500 shares of common stock were outstanding.  Because there

3    was a market to sell stock prior to June 6, 2008, defendant Liu and Zinberg's

4    absence of sales prior to the Relevant Period is suspicious.

5        179.   Defendant Liu's sales disposed of ***all*** of her shares of Bidz stock.  *See*

6    Bidz's Form 4, filed with the SEC on November 20, 2007.

7        180.   On May 9, 2007, Bidz's stock price closed at $5.13, but soon began to

8    increase due to the improper statements made by defendant Zinberg and the rest of

9    the Individual Defendants.  From May 9, 2007 to November 26, 2007, when the

10   report was issued by Citron, the stock price rose 288%.  This dramatic increase

11   was unprecedented.   Zinberg's sale of stock for $13.07 on October 1, 2007,

12   represented a 158% increase in less than five months and was sold at or near the

13   historic high.  Defendant Liu's sale of stock for $17.82 on November 19, 2007 was

14   near the high of $20 per share and represented a 247% increase in less than seven

15   months.

16       181.   Just four days after defendant Liu's sale, Bidz's stock closed at its

17   highest price ever on November 23, 2007: $19.94.  The very next trading day,

18   Citron issued its report, and the stock price closed at $16.56 on extremely heavy

19   trading.  One day later, defendant Zinberg held a conference call with analysts and

20   investors, and the stock price closed at $11.89, which constituted a two-day decline

21   of 40%.  The next day, Citron released additional facts regarding shill bidding, and

22   Bidz's stock dropped to $10.10, representing a 49% decline in three trading days.

23       182.   After the Citron report was issued, defendant Zinberg held a

24   conference call with analysts and investors and intentionally misled them regarding

25   shill bidding and the other misconduct at Bidz.  Zinberg's cover-up was not entirely

26   effective, but it did prevent the stock price from immediately falling precipitously.

27   In the ensuing months, as the stock price marched steadily downward, Zinberg saw

28   the writing on the wall and sold many of his shares in an effort to cash out while

1   the stock still maintained some of its value.

2   <center>**DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**</center>

3   183.   Plaintiffs incorporate by reference and reallege each and every

4   allegation set forth above, as though fully set forth herein.

5   184.   Plaintiffs bring this action derivatively in the right and for the benefit

6   of Bidz to redress breaches of fiduciary duty by and unjust enrichment of the

7   Individual Defendants.

8   185.   Plaintiffs will adequately and fairly represent the interests of Bidz and

9   its shareholders in enforcing and prosecuting its rights.

10   186.   Plaintiffs are owners of Bidz common stock and were owners of Bidz

11   common stock at all times relevant to the Individual Defendants' wrongful course

12   of conduct alleged herein.

13   187.   As a result of the facts set forth herein, plaintiffs have not made any

14   demand on Bidz's Board to institute this action against the Individual Defendants.

15   Such a demand would be a futile and useless act because the Board is incapable of

16   making an independent and disinterested decision to institute and vigorously

17   prosecute this action.

18   188.   At the time this action was commenced, the Board consisted of five

19   directors, defendants Zinberg, Kong, Hanelt, Itkin, and Singh.   A majority of the

20   Board is incapable of making an independent and disinterested decision to institute

21   and vigorously prosecute this action for the following reasons.

22   <center>**Defendant Zinberg Dominates and Controls the Board**</center>

23   189.   Defendant Zinberg dominates and controls Bidz and its Board as

24   follows:

25       (a)   Defendant Zinberg co-founded the Company with defendant Itkin.

26   Defendant Zinberg and his sister, Marina Zinberg, control over 62% of the Company's outstanding shares.   In analyzing the relationship between Zinberg and Bidz's Board, the Stanford November 11, 2008 report states:

27

28

Zinberg is [] Bidz'[s] main purchasing manager, giving him and his family almost total control over the operation and success of the company. Any negative event befalling Mr. Zinberg would likely have an immediate, negative impact on Bidz'[s] stock price. [Bidz's] lack of an independent board and majority ownership by management may also be perceived as negative factors.

(b)    As alleged herein, the Company disclosed that defendant Zinberg had caused the Company to issue him 6 million options that immediately vested. These options were given for no legitimate business reason. Moreover, while all other options granted to executives were granted under the Company's approved stock option plans, defendant Zinberg's were not. Thus, Zinberg's ability to essentially grant himself millions of options is a prime example of his control over the Board.

**Each Member of the Board Faces a Substantial Likelihood of Liability in Connection with the Shill Bidding Practices at Bidz**

190.    The following facts, among others discussed above, demonstrate that the Board knew of serious wrongdoing at Bidz, yet took no action in response thereto:

(a)    The members of the Board knew that, as disclosed in the Company's fiscal year 2006 Form 10-K, Bidz's revenues were dependent to a significant extent on the Company's online auction business model and that the Company was dependent on the "satisfactory availability, performance, and reliability" of the Company's website. The Board members also knew that Bidz is legally responsible for the jewelry sold during the online auctions because the Company supplies the jewelry and the sales proceeds accrue to Bidz. As a result of these facts, the members of the Board had knowledge of at least major issues concerning the Company's online auction practices, including the numerous irregularities with the Company's auction practices showing the prevalence of improper practices, namely shill bidding.

(b)    The members of the Board knew that the Company was unable to determine whether bids were legitimate. The Board members knew that, at a

1   minimum, such inadequate controls would permit shill bidding and other improper

2   practices at Bidz.

3        (c)     The members of the Board knew that 44% of the winning bids

4   in Bidz's auctions did not result in transactions.  As Bidz admitted in its Form 10-K

5   filed with the SEC on March 9, 2010, "a large number of failed auctions in which

6   winning bidders do not complete their purchases could adversely affect [its] results

7   of operations."  The fact that almost half of winning bids did not result in sales

8   would not and did not go unnoticed by the members of the Board, and it indicates

9   that shill bidding was indeed Company practice.

10       (d)     The Board members knew that there were hundred thousand

11  dollar accounts that were used to bid on high-priced jewelry, but that the sales

12  would not be completed if those accounts ended up with the winning bid.  This

13  resulted in far less revenue to Bidz than it should have made given the number of

14  winning bids.  Because of the substantial number of winning bids not resulting in

15  sales, and the significance of the profits made from online auctions to the

16  Company's business, the members of the Board were aware of, and had a duty to

17  investigate and take action to prevent of remedy, shill bidding and the other

18  improper practices.

19       (e)     Defendants Kong and Itkin, as Bidz's current and former CFOs,

20  respectively, were responsible for, among other things, managing the Company's

21  financial risks, record-keeping, and financial reporting, including presenting and

22  reporting accurate historical financial information.  Defendants Kong and Itkin are

23  and were familiar with the Company's revenue, which is based primarily on the

24  amount of auction sales completed.  As noted above, 44% of winning auction bids

25  did not ultimately result in sales, and the Company's revenue was far below what it

26  should have been based on the amount of winning bids.  These facts did not go

27  unnoticed by defendants Kong and Itkin.  Defendants Kong and Itkin also could

28  not have been blind to the fact that winning bids on expensive items to six-figure

1   accounts were not being completed.   Finally, defendants Kong and Itkin were

2   aware of at least the Company's major auction statistics, including the number of

3   auctions that took place on Bidz's website, the average sale price for the items sold

4   in these auctions, and the number of auctions in which the winning bidder failed to

5   pay for the item won.   These facts, taken together and over a substantial period of

6   time, painted an unmistakable picture of shill bidding and other improper practices

7   at the Company.

8           (f)       Defendants Itkin, Singh, and Hanelt, as members of Bidz's

9   Audit Committee during the Relevant Period, had the responsibility and duty to,

10  among other things: (i) "[o]versee the accounting and financial reporting processes

11  of the Company and the audits of the financial statements of the Company;" (ii)

12  "review the Company's internal controls;" (iii) "evaluate whether management is

13  setting the appropriate tone at the top by communicating … the importance of

14  internal controls as well as their roles and responsibilities;" (iv) "discuss … risk

15  assessment and management … [and] significant financial risk exposures and the

16  actions management has taken to monitor or control such risk exposures;" and (v)

17  discuss with counsel any "legal matters brought to the Committee's attention that

18  could reasonably be expected to have a material impact on the Company's financial

19  statements."   In reviewing Bidz's internal controls and risk exposures, defendants

20  Itkin, Singh, and Hanelt would have and did come to know about, among other

21  things, the fact that that 44% of winning auction bids (the key to the Company's

22  financial success) did not ultimately result in sales, that sales of high end items to

23  hundred thousand dollar accounts were not being completed, and that, as a result,

24  the Company's revenues were far below what they should have been based on the

25  amount of winning bids.   This is particularly true for defendant Singh, who was

26  previously a CEO of a predictive web analytics firm, which tracks internet

27  activity—such as whether winning bids ultimately result in sales.   More, in light of

28  the history of fraudulent activity and shady relationships involving Bidz and its

management, as well as the Audit Committee members' ongoing evaluation of the "tone at the top," defendants Itkin, Singh, and Hanelt would have and did uncover the existence of shill bidding, and the admitted material weaknesses concerning, among other things, control deficiencies related to: (i) maintaining an effective control environment at the entity level; (ii) maintaining an effective control environment over IT specifically in user security configurations, training and end user acceptance, quality control testing, design and monitoring of change controls, and security evaluations; and (iii) maintaining an effective control environment over management oversight and anti-fraud controls specifically in processing of, among other things, financial transactions, vendor review, and payment processing.

(g)    The Board members were on notice of the shill bidding practices at Bidz, at the absolute latest, when the Citron reports emerged in November 2007.   The Citron reports represented compelling evidence of shill bidding at the Company, as reflected by the 49% decline in the Company's value in the three days following the first Citron report, as well as by the fact that defendant Zinberg felt the need to publicly deny the existence of shill bidding the very next day.

(h)    The Board members' knowledge of shill bidding was further cemented by the filing of a factually related consumer class action based on shill bidding and the court's finding in that case that the allegations "support[ed] a reasonable inference that [Bidz] is engaged in shill bidding…."

(i)    There is and was a structure in place for the above information to reach the members of the Board.   According to the Company's "Corporate Governance Principles," there are "regularly-scheduled presentations" to the Board from "finance, sales and marketing, and the major lines of business and operations of the Company."   The Board is given "complete access to any information about the Company that it deems necessary or appropriate to carry out its duties."   Further, "[t]he CEO and other executive officers are responsible for running the

Company's day-to-day operations and appropriately informing the Board of the status of such operations."

(j)      Bidz and certain of its representatives had numerous and long-standing relationships with individuals and entities that were suspicious, to say the least, which created a heightened duty on the part of the Board to be conscientious in fulfilling their fiduciary duties.

(k)      Notwithstanding the above, the Board failed to take any action to curb the shill bidding and other deceptive practices described above.  The Board has simply taken no action to prevent or correct Bidz's shill bidding or these many other shoddy business practices.  For these reasons, defendants Zinberg, Kong, Hanelt, Itkin, and Singh each face a sufficiently substantial threat of liability.

**Each Member of the Board Faces a Substantial Likelihood of Liability for Retaining and/or Allowing Bidz to Use Suspect Accounting Auditors**

191.   Defendants Hanelt, Itkin, and Singh were, during the Relevant Period, members of the Audit Committee.  The Audit Committee's charter provides that the Audit Committee is responsible for, among other things, evaluating the qualifications of and appointing the independent auditor.  Defendants Hanelt, Itkin, and Singh appointed Stonefield as the Company's independent auditor despite the PCAOB's March 14, 2007 report, identifying significant deficiencies in Stonefield's prior audits.  Accordingly, Hanelt, Itkin, and Singh breached their fiduciary duties of due care, loyalty, and good faith because they appointed an independent auditor with questionable qualifications.  Thus, Hanelt, Itkin, and Singh face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

192.   In addition to the Audit Committee members, defendants Zinberg and Kong also breached their fiduciary duties by permitting Stonefield to be retained.  All of the directors on Bidz's Board were responsible for the Company's financial reporting and controls, including the retention of a qualified auditor.  In contravention of these duties, and notwithstanding the deficiencies identified in the

PCAOB's report, Zinberg and Kong acquiesced in the appointment of Stonefield as the Company's auditor for Fiscal Years 2007, 2008, and 2009.  For these reasons, defendants Zinberg and Kong face a substantial threat of personal liability, and demand on them would thus be futile.

**Defendant Zinberg Faces a Substantial Likelihood of Liability for Insider Selling**

193.   Defendant Zinberg faces a substantial likelihood of being held liable for breaching his fiduciary duties of loyalty and good faith and violating California Corporations Code §25402 by engaging in illegal insider trading of Bidz securities as alleged herein, and therefore is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

**There Is a Reasonable Doubt as to the Disinterestedness and Independence of Defendants Zinberg and Itkin Due to Their Long-Standing Personal and Business Relationships**

194.   Defendants Zinberg and Itkin have a long history of relationships with each other, both personal and professional.  For example, Zinberg and Itkin were CEO and CFO, respectively, of both ALA and Union Pawn.  Additionally, both have served as Registered Agents for various business entities that have shared the same address.  For example, Zinberg served as the Registered Agent for Union Pawn, while Itkin served as the Registered Agent for AFB Trading One, Inc. ("AFB").  Union Pawn and AFB shared the same address.  Due to their long history of personal and professional interconnecting relationships, defendants Zinberg and Itkin are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other.

**There Is a Reasonable Doubt as to the Disinterestedness of Defendant Itkin Because He Faces Liability for Past Accounting Practices that May Be Exposed in This Case**

195.   Defendant Itkin is not disinterested because he was the former CFO of Bidz from February 1999 until 2000 and the SEC is currently looking into past accounting practices of the Company.  Due to the likelihood that Itkin will be held liable for the Company's past accounting practices, and that taking action based on

the allegations herein will likely expose him to greater liability in connection with those accounting practices, he is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

**Demand on Bidz Shareholders Would Be Futile**

196.   Plaintiffs have not made any demand on shareholders of Bidz to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)   Bidz is a publicly held company with over 23.2 million shares outstanding, and thousands of shareholders;

(b)   making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)   making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**COUNT I**

**Against All Individual Defendants**
**for Breach of Fiduciary Duty**

197.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

198.   The Individual Defendants owed and owe Bidz fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bidz the highest obligation of good faith, fair dealing, loyalty, and due care.

199.   As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

1      200.   The Individual Defendants, and each of them, violated and breached
2 their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and
3 supervision.

4      201.   As Bidz officers, defendants Zinberg (CEO, President, and Chairman
5 of the Board), Liu (COO and former Vice President of Operations), Kong (CFO,
6 Treasurer, Secretary, and member of the Board), and Kuperman (CTO and
7 President) breached their fiduciary duties of care, loyalty, and good faith by
8 causing or permitting the Company to engage in the illegal practice of shill bidding
9 and to retain and use an unqualified accounting auditor.  These defendants also
10 breached their fiduciary duties of care, loyalty, and good faith by causing or
11 allowing Bidz to, among other things, use a jewelry appraiser that did not satisfy
12 minimum industry standards in issuing appraisals; provide customers with
13 inaccurate descriptions and photographs of the items they were purchasing; and
14 refuse to honor winning bids if they were less than the cost of the item to the
15 Company.

16      202.   Defendants Hanelt, Itkin, and Singh (along with Zinberg and Kong),
17 as members of the Bidz Board, also breached their fiduciary duties of care, loyalty,
18 and good faith by causing or permitting the Company to: engage in the illegal
19 practice of shill bidding; retain and use an unqualified accounting auditor; use a
20 jewelry appraiser that did not satisfy minimum industry standards in issuing
21 appraisals; provide customers with inaccurate descriptions and photographs of the
22 items they were purchasing; and refuse to honor winning bids if they were less
23 than the cost of the item to the Company.

24      203.   The Individual Defendants also breached their fiduciary duties of care,
25 good faith, and loyalty by causing or permitting Bidz to issue improper public
26 statements that failed to disclose the wrongdoing described above and/or failed to
27 disclose that the Company did not have adequate internal controls in place to
28 prevent or halt such wrongdoing.

204.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, costs and expenses incurred with litigation associated with the Company's improper business practices, and loss of reputation and standing in the industry.

## COUNT II

**Against Defendants Zinberg and Liu for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

205.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

206.   At the time of each of the stock sales set forth herein, defendants Zinberg and Liu knew, but did not disclose publicly, the material information regarding their illicit and deceptive business practices described herein.

207.   Each of these defendants sold Bidz common stock on the basis of and because of their knowledge of this material non-public information.

208.   At the time of their stock sales, defendants Zinberg and Liu knew that when the material information regarding their improper conduct at Bidz was publicly disclosed, the price of the Company's common stock would dramatically decrease.  Defendants Zinberg and Liu's sales of Bidz common stock based on their knowledge of this material non-public information were a breach of their fiduciary duties of loyalty and good faith.

209.   Since the use of the Company's proprietary information for their own gain constitutes a breach of their fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds defendants Zinberg and Liu thereby obtained.

# COUNT III

### Against Defendants Zinberg and Liu for Violation
### of California Corporation Code §25402

210.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

211.   Upon information and belief, Bidz has had at least five-hundred shareholders of record at all times relevant hereto.

212.   At the time that defendants Zinberg and Liu sold their shares of the Company's common stock in California as set forth herein, by reason of their high executive and/or directorial positions with the Company, defendants Zinberg and Liu had access to highly material information regarding the Company, including the information set forth herein regarding their illicit and deceptive business practices perpetrated at Bidz.

213.   At the time of such sales, that information was not generally available to the public or the securities markets.   Had such information been generally available, it would have significantly reduced the market price of the Company's shares at that time.

214.   Defendants Zinberg and Liu, and each of them, had actual knowledge of material, adverse non-public information regarding the Company, and thus sold their shares of the Company's common stock in California in violation of California Corporations Code §25402.

215.   Pursuant to California Corporations Code §25502.5, defendants Zinberg and Liu, and each of them, are liable to the Company for damages in an amount up to three times the difference between the price at which the stock was sold by these defendants, and each of them, and the market value which the stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT IV

### Against All Individual Defendants
### for Waste of Corporate Assets

216.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

217.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (i) by paying bonuses to certain of its executive officers; and (ii) by incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

218.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT V

### Against All Individual Defendants for Unjust Enrichment

219.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

220.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bidz.

221.   Plaintiffs, as shareholders and representatives of Bidz, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

222.   Plaintiffs, on behalf of Bidz, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Determining and awarding Bidz treble damages pursuant to California Corporations Code §25502.5(a) for defendants Zinberg and Liu's violations of California Corporations Code §25402;

C.      Directing Bidz to seek the resignation of defendants Zinberg, Itkin, and other Bidz employees and directors with histories of criminal or illegal acts or strong ties to other individuals with histories of criminal or illegal acts;

D.      Directing Bidz to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bidz and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     a proposal to create a Board committee with oversight over the Company's online auctions;

(ii)    a proposal to remove executives and directors who have been convicted for felonies or crimes that involve dishonesty such as fraud or theft;

(iii)   a proposal to strengthen the Company's internal controls over the Company's online auctions;

(iv)    a proposal to create an ethics committee charged with review of the Company's and its executives' and directors' dealings and relationships with suspicious entities or individuals;

(v)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(vi)    a provision to permit the shareholders of Bidz to nominate at least three candidates for election to the Board;

(vii)   a proposal to ensure the accuracy of the qualifications of Bidz's directors, executives, and other employees and to evaluate these persons' associations with convicts and other unscrupulous individuals;

(viii)   a proposal to control insider selling;

(ix)   a proposal to appropriately test and then strengthen the internal audit and control functions; and

(x)   a proposal to remove Stonefield as the Company's independent auditor.

E.   Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting defendants' assets so as to assure that plaintiffs on behalf of Bidz have an effective remedy;

F.   Awarding to Bidz restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.   Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  May 18, 2010

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS

SHANE P. SANDERS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990

1

Facsimile: (619) 525-3991

2

3

BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP

4

ERIC L. ZAGAR

5

ROBIN WINCHESTER
LIGAYA HERNANDEZ

6

280 King of Prussia Road

7

Radnor, PA 19087
Telephone: (610) 667-7706

8

Facsimile:   (610) 667-7056

9

10

*Co-Lead Counsel for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 600 B Street, Suite 1900, San Diego, California 92101.

2.     That on May 18, 2010, declarant served by depositing a true and correct copy thereof of the following document:

VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT
in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this May 18, 2010, at San Diego, California.

_____

SHANE P. SANDERS

259103

*Hassan v. BIDZ.COM, Inc.*, Case No. CV09-04984-PSG (Ex)

## COUNSEL FOR PLAINTIFFS

| | |
|---|---|
| Brian J. Robbins (190264)<br>Felipe J. Arroyo (163803)<br>Shane P. Sanders (237146)<br>David L. Martin (253858)<br>ROBBINS UMEDA LLP<br>600 B Street, Suite 1900<br>San Diego CA 92101<br>Telephone: (619) 525-3990<br>Facsimile:  (619) 525-3991 | Eric L. Zagar (250519)<br>Robin Winchester<br>Ligaya Hernandez<br>BARROWAY TOPAZ KESSLER<br>MELTZER & CHECK, LLP<br>280 King of Prussia Road<br>Radnor, PA  19087<br>Telephone: (610) 667-7706<br>Facsimile:  (610) 667-7056 |
| **COUNSEL FOR DEFENDANTS** | |
| Joel A. Feuer<br>GIBSON, DUNN & CRUTCHER<br>2029 Century Park East<br>Los Angeles CA 90067<br>Telephone: (310) 551-8808<br>Facsimile:  (310) 552-7058<br>jfeuer@gibsondunn.com<br><br>Attorneys for David Zinberg,<br>Lawrence Y. Kong, Claudia Y. Liu,<br>Leon Kuperman, Peter G. Hanelt,<br>Garry Y. Itkin and Man Jit Singh | Lisa Hiraide<br>PETILLON HIRAIDE & LOOMIS<br>  LLP<br>865 S. Figueroa Street, Suite 2300<br>Los Angeles, California 90017<br>Telephone: (213) 622-0527<br>Facsimile:  (310) 543-0550<br><br>Attorney for BIDZ.com |

## VERIFICATION

I, David E. Hughes, hereby verify that I have authorized the filing of the attached Amended Verified Consolidated Shareholder Derivative Complaint, that I have reviewed the complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 17 · MAY - 2010          _____
                               David E. Hughes

<u>VERIFICATION</u>

I, Shane P. Sanders, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda LLP, counsel for plaintiffs in the action entitled *In re Bidz.com Inc Derivative Litigation*, No. CV09-04984-PSG.   I have read the foregoing Verified Amended Consolidated Shareholder Derivative Complaint and know the contents thereof.   I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification on behalf of plaintiff Farris Hassan because Mr. Hassan is absent from the County of San Diego where I maintain my office.

Executed this May 18, 2010, at San Diego, California

_____
SHANE P. SANDERS