1  GIBSON, DUNN & CRUTCHER LLP
   JOEL A. FEUER, SBN 100663
2  JFeuer@gibsondunn.com
   ANDREW J. DEMKO, SBN 247320
3  ADemko@gibsondunn.com
   2029 Century Park East, Suite 4000
4  Los Angeles, California 90067
   Telephone: (310) 552-8500
5  Facsimile: (310) 551-8741

6  GIBSON, DUNN & CRUTCHER LLP
   LINDSEY E. BLENKHORN, SBN 227484
7  lblenkhorn@gibsondunn.com
   555 Mission Street, Suite 3000
8  San Francisco, California 94105-2933
   Telephone: (415)393-8200
9  Facsimile: (415)393-8306

10 Attorneys for Defendants
   DAVID ZINBERG, LAWRENCE Y. KONG,
11 CLAUDIA Y. LIU, LEON KUPERMAN,
   PETER G. HANELT, GARRY Y. ITKIN, AND
12 MAN JIT SINGH

13

14                 UNITED STATES DISTRICT COURT

15                 CENTRAL DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| 17  In re BIDZ.COM, INC. DERIVATIVE LITIGATION | MASTER FILE NO. CV09-04984-PSG |
| 18 | **INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION** |
| 19  This Document Relates To:<br>ALL ACTIONS | **TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT UNDER** |
| 20 | **FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6);** |
| 21 | **SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| 22 | |
| 23 | [Request for Judicial Notice, Declaration of Lindsey E. Blenkhorn and [Proposed] |
| 24 | Order filed concurrently herewith] |
| 25 | DATE :       November 1, 2010<br>TIME:        1:30 p.m. |
| 26 | JUDGE:      The Hon. Philip S. Gutierrez |
| 27 | TRIAL DATE:        NONE SET |

28

NOTICE IS HEREBY GIVEN that on November 1, 2010, at 1:30 p.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Philip S. Gutierrez of the above-entitled Court, Courtroom 790, 255 East Temple Street, Los Angeles, CA 90012, defendants David Zinberg, Lawrence Y. Kong, Claudia Y. Liu, Leon Kuperman, Peter G. Hanlet, Garry Y. Itkin, and Man Jit Singh (collectively, "Individual Defendants"), shall and hereby do move the Court for an order dismissing Plaintiffs' Amended Consolidated Derivative Complaint without leave to amend.

Nominal Defendant Bidz.com, Inc. ("Bidz") has concurrently filed a Motion to Dismiss on the grounds that Plaintiffs have failed to make an adequate demand upon the Board of Directors and have not pled with particularity why demand should be excused, as required by Federal Rule of Civil Procedure 23.1 and governing Delaware law.  If the Court grants that Motion and dismisses the Amended Complaint, then the Court need not rule on this Motion, which will be moot.  If the Court does not grant Bidz's Motion to Dismiss for failure to properly plead demand futility, then the Individual Defendants respectfully request that the Court consider this Motion.

This Motion is brought by the Individual Defendants, and is made under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiffs' Amended Complaint fails to state a cause of action, even assuming all factual allegations are true, that any of the Individual Defendants breached their fiduciary duties to the corporation.  Accordingly, Plaintiffs' Amended Complaint should be dismissed with prejudice.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 6, 2010.

Dated: July 12, 2010                    GIBSON, DUNN & CRUTCHER LLP
                                                    /S/

                                        _____
                                        By:            Joel A. Feuer
                                        Attorneys for Defendants
                                        DAVID ZINBERG, LAWRENCE Y. KONG,
                                        CLAUDIA Y. LIU, LEON KUPERMAN,
                                        PETER G. HANLET, GARRY Y. ITKIN, AND
                                        MAN JIT SINGH

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................... 1

II.    SUMMARY OF PLAINTIFFS' PREEXISTING AND NEW
       ALLEGATIONS ................................................................................... 4

       A.    Plaintiffs' "New Sources" for Their Allegations of Shill Bidding
             Do Not Show Either Knowledge of, or Bad Faith By, Any Outside
             Director.................................................................................... 4

       B.    Plaintiffs Allegations Regarding Bidz's Auditor Are Irrelevant ............. 9

       C.    Plaintiffs' Allegations Regarding Bidz's Operational Issues Do Not
             Show Either Knowledge of, or Bad Faith By, Any Outside Director ...... 9

       D.    Plaintiffs' Allegations Regarding the SEC and FTC Investigations
             Do Not Show Either Knowledge of, or Bad Faith By, Any Outside
             Director.................................................................................... 11

       E.    Plaintiffs' Allegations Regarding the Sale of Purportedly
             Counterfeit Goods Are Similarly Irrelevant.................................... 11

       F.    Plaintiffs' Allegations Regarding Bidz's Predecessor, ALA and
             Union Pawn .............................................................................. 12

       G.    Plaintiffs' Allegations Regarding Specific Individual Defendants ........ 13

III.   PLAINTIFFS HAVE AGAIN FAILED TO STATE A CLAIM FOR
       BREACH OF FIDUCIARY DUTY ....................................................... 14

       A.    The Legal Rules Governing Whether Plaintiff Has Adequately
             Alleged Breach of Fiduciary Duty ................................................ 14

       B.    Plaintiffs Have Again Failed To Adequately Allege Bad Faith By
             Any Outside Director ................................................................. 15

             1.    Plaintiffs' Audit Committee Allegations Do Not Show Bad
                   Faith ............................................................................... 15

             2.    Plaintiffs' Remaining Allegations About Bidz's Business
                   Model Are Also Insufficient to Show Bad Faith ........................ 17

                   a.    Plaintiffs' Allegations Do Not Establish Bad Faith
                         With Respect to Purported Shill Bidding .......................... 17

                   b.    The Remaining Operational Allegations Do Not
                         Establish Bad Faith By Any Outside Director ................... 18

                   c.    Plaintiffs' Allegations About Itkin Do Not Establish
                         His Knowledge or Bad Faith ........................................ 19

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED DERIVATIVE COMPLAINT**

**Table of Contents**
**(Continued)**

Page

    C.    Plaintiffs Fail to Allege Bad Faith by Bidz's Inside Director Defendants..................................................................................19

IV.    PLAINTIFFS FAIL TO ALLEGE A CLAIM FOR INSIDER SELLING OR VIOLATION OF CALIFORNIA CORPORATION CODE SECTION 2540221

V.    PLAINTIFFS HAVE FAILED TO ALLEGE A CAUSE OF ACTION FOR WASTE OF CORPORATE ASSETS ......................................23

VI.    CONCLUSION ........................................................................24

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Laboratories Derivative Shareholders Litig.*,
  325 F.3d 795 (7th Cir. 2001) ............................................................... 5

*Ashcroft v. Iqbal*,
  566 U.S. __, 129 S.Ct. 1937 (2009) ........................................ 3, 14, 21

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................... 3, 14

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
  891 A.2d 150 (Del. Ch. 2005) ................................................................ 3

*Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*,
  906 A.2d 27 (Del. 2006)................................................................... 4, 23

*City of Roseville Employees' Ret. Syst. v. Horizon Lines, Inc.*,
  2009 U.S. Dist. LEXIS 106186 (D. Del. November 13, 2009)............... 23

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ........................................................... 2, 14

*Grimes v. Donaldson*,
  673 A.2d 1207 (Del. 1996)..................................................................... 23

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003) ......................................... 15, 16, 17, 20

*In re Caremark Int'l Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ............................... 2, 3, 5, 14, 16, 19, 21

*In re Citigroup Shareholder Derivative Litig.*,
  964 A.2d 106 (Del. Ch. 2009) ......................................................... 14, 19

*In re CNET Networks, Inc. Deriv. Litig.*,
  483 F.Supp.2d 947 (N.D. Cal. 2007).................................................... 16

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008)............................................ 21, 23

*In re Emerging Comm., Inc. Shareholders Litig.*,
  No. 16415, 2006 Del. Ch. LEXIS 25 (Del. Ch. May 3, 2004)............... 16

*In re Silicon Graphics Inc Securities Litigation*,
  183 F.3d 970 (9th Cir. 1999) .......................................................... 21, 22

*Loveman v. Lauder*,
  484 F. Supp. 2d 259 (S.D.N.Y. 2007) ................................................. 15

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

**Table of Authorities**
**(Continued)**

Page(s)

*Metzler Invest. GMBH v. Corinthian Colleges, Inc.,*
540 F.3d 1067 (9th Cir. 2008) ............................................................... 23

*Midland Grange No. 27 Patrons of Husbandry v. Walls,*
No. 2155-VCN, 2008 Del. Ch. LEXIS 28 ................................................ 3

*Raconi v. Larkin,*
253 F.3d 423 (9th Cir. 2001) ......................................................... 22, 23

*Rattner v. Bidzos,*
2003 Del. Ch. LEXIS 103 (Del. Ch. Sept. 30, 2003) ............................. 16

*Stiegele v. Bailey,*
2007 U.S. Dist. LEXIS 86469 (D. Mass Aug. 23, 2007) ........................ 22

*Stone v. Ritter,*
911 A.2d 362 (Del. 2006) .......................................................... 2, 14

*Wood v. Baum,*
953 A.2d 136 (Del. 2008) ........................................................... 19

**Statutes**

8 Del. Code § 102(b)(7) ........................................................................ 2

Cal. Corp. Code § 2116 ........................................................................ 1

Cal. Corp. Code § 25402 ............................................................... 21, 22

**Treatises**

Cal. Practice Guide:  *Corporations* § 6:368.2m (The Rutter Group 2009) ................ 22

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED DERIVATIVE COMPLAINT**

## MEMORANDUM OF POINTS & AUTHORITIES

## I.      INTRODUCTION

Plaintiffs Farris Hassan and David Hughes' Amended Consolidated Complaint, in addition to failing to properly plead demand futility, is legally deficient for the additional, fatal reason that, like the Consolidated Complaint (the "Consolidated Complaint" or "Consol. Compl."), it does not allege specific, individualized facts that any of the Individual Defendants David Zinberg, Lawrence Y. Kong, Claudia Y. Liu, Leon Kuperman, Peter G. Hanlet, Gary Y. Itkin, and Man Jit Singh (collectively, "Individual Defendants") breached their fiduciary duties as directors or officers, engaged in insider selling or misappropriation of information in violation of California Corporation Code Section 25402, wasted corporate assets or were unjustly enriched.

On April 27, 2010, this Court granted nominal defendant Bidz.com, Inc.'s ("Bidz") Motion to Dismiss the Consolidated Complaint on the grounds of demand futility and filed a detailed written Order explaining the reasons for its conclusion.  In the Order, the Court explained that the "gravamen of Plaintiffs' Complaint is that the Board failed to act, or otherwise permitted the alleged wrongdoing to persist."  Dkt. #78, Order at 6 & n.4 (attached hereto as Exhibit A); *see, e.g.*, Consol. Compl., ¶ 3 ("the Individual Defendants . . .  failed to maintain proper oversight over the online auction business"); ¶ 4 ("Bidz has no safeguards to prevent, among other online bidding abuses… "shill bidding….").

Like the Consolidated Complaint, **the gravamen of the Amended Complaint remains that the Board failed to properly oversee the company.**[1]  *See, e.g.*, Amended Compl. ("Am. Compl."), ¶ 11 ("defendants knew about the existence of shill bidding . . . and yet took no action to prevent or remedy the situation."); ¶ 77

---

[1]  Bidz is a Delaware corporation, and thus Delaware law governs the standards of director liability applied in this case because the law of a company's state of incorporation governs the standards for corporate fiduciary liability.  *See* Cal. Corp. Code § 2116 (codification of California's internal affairs doctrine, which provides that California courts will apply the law of the state of incorporation when determining the liability of a director of a foreign corporation).

Gibson, Dunn &
Crutcher LLP

("Defendants took no action to prevent or remedy the illegal shill bidding practices");

¶ 79 ("lack of computer controls necessary to prevent shill bidding"); ¶ 190 ("the Board

knew of serious wrongdoing at Bidz, yet took no action in response thereto"); ¶ 190

("the Board members knew that, at a minimum, such inadequate controls would permit

shill bidding"); ¶ 190 ("the Board has simply taken no action to prevent or correct

Bidz's shill bidding or these many other shoddy business practices"); and ¶ 190 ("the

Board failed to take any action to curb the shill bidding").

Accordingly, under applicable Delaware law, then, a claim based on the

Individual Defendants' alleged failure of oversight requires Plaintiffs to allege facts

showing that the Individual Defendants acted in **bad faith**.[2]  To meet this standard,

Plaintiffs must allege either that (a) the directors utterly failed to implement any system

of controls or oversight, or (b) having implemented a system of controls, the directors

consciously failed to monitor or oversee its operation.  *Stone v. Ritter*, 911 A.2d 362,

370 (Del. 2006).  A plaintiff must plead facts that show either the absence of controls or

the board's knowledge that the controls were inadequate but chose to do nothing about

it.  *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).  This is an extraordinarily

high burden for a plaintiff to meet:

> Generally where a claim of directorial liability for corporate loss is predicated
> upon ignorance of liability creating activities within the corporation. . . .in my
> opinion **only a sustained or systematic failure of the board to exercise
> oversight**—such as an utter failure to attempt to assure a reasonable
> information and reporting system exits—will establish the lack of good faith
> that is a necessary condition to liability.

---

[2]  As the Court noted in its April 27, 2010 Order, Bidz's Articles of Incorporation limit
director liability to breaches of fiduciary duty to the full extent permitted under
Delaware law, and therefore to the extent Plaintiffs seek to hold an Individual
Director Defendant liable for money damages for breach of the individual director's
duty of care, Plaintiffs' claim necessarily fails under the terms of the exculpatory
language of the Company's Certificate in the absence of showing acts or omissions
performed in bad faith.  Order, at 11-12; Dkt. # 59, Request for Judicial Notice in
Support of Consolidated Complaint, Exh. A, Art. 5, § 6; 8 Del. Code § 102(b)(7).

Gibson, Dunn &
Crutcher LLP

2

*In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996) (emphasis added). [3]

Plaintiffs' Amended Complaint seeks to shift away from the standard for oversight liability – described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *Caremark,* 698 A.2d at 971 – by removing the more overt language regarding a lack of oversight by the Board from its Amended Complaint.  But nothing has changed in the Amended Complaint to alter the application of the oversight liability standard here.

Examining the Amended Complaint against this oversight liability standard, Plaintiffs have again failed to plead any specific facts demonstrating any of the Directors' bad faith with respect to oversight and a system of controls.  Plaintiffs offer only conclusory, highly generalized allegations that the Individual Defendants knew of, participated in, or should have known of the alleged wrongdoing.  In sum, Plaintiffs allege wrongdoing by Bidz and that the Individual Defendants as directors must have known of and/or participated in the alleged wrongdoing, but Plaintiffs fail to support that assumed knowledge or participation with anything other than conclusory allegations.  Such a pleading unquestionably fails to meet the standard for breach of fiduciary duty imposed by the applicable Delaware law and the federal rules governing pleading as set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949–50 (2009).

Plaintiffs' claims against Individual Defendants David Zinberg, Bidz's CEO and founder, and Claudia Liu, Bidz's COO, for breach of fiduciary duty and violation of California Corporation Code Section 25402 by selling Bidz common stock while in

---

[3]  The same standard of "bad faith" applies to any claims against the Individual Defendants in their capacities as corporate officers for breach of the duty of loyalty. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005) (noting that the same duty of loyalty applies to all corporate fiduciaries, including both officers and directors); *see also Midland Grange No. 27 Patrons of Husbandry v. Walls*, No. 2155-VCN, 2008 Del. Ch. LEXIS 28 at *43-44 (applying the duty of loyalty's bad faith standard to corporate officers).

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

possession of adverse, material non-public information, also fails because Plaintiffs allege no facts tying the sales to Zinberg's or Liu's alleged knowledge of or participation in any wrongdoing.  Contrary to the conclusory allegation in the Amended Complaint (¶ 170), there was nothing suspicious about the sales.

Finally, Plaintiffs allege that the Individual Defendants wasted corporate assets by paying bonuses to its officers and by incurring legal fees to defend lawsuits, and as a result, were unjustly enriched.  Am. Compl., ¶¶ 216-218.  But Plaintiffs have failed to meet the "high burden" required in Delaware to plead corporate waste.  *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),* 906 A.2d 27, 74-75 (Del. 2006).

Accordingly, the Individual Defendants request that the Court dismiss the Amended Complaint with prejudice.

## II.    SUMMARY OF PLAINTIFFS' PREEXISTING AND NEW ALLEGATIONS

Plaintiffs again allege that the Individual Defendants breached their fiduciary duties to Bidz and its shareholders, committed corporate waste and were unjustly enriched as a result of a laundry list of alleged wrongdoing with respect to the operations of the company and alleged wrongdoing by the Company.

### A.    Plaintiffs' "New Sources" for Their Allegations of Shill Bidding Do Not Show Either Knowledge of, or Bad Faith By, Any Outside Director

Plaintiffs again contend that Bidz engaged in or permitted others to engage in shill bidding in connection with Bidz's online auctions for jewelry and other items.  Am. Compl., ¶¶ 3-11, 34-77.  Shill bidding is defined as a bogus or fake bid by a bidder who does not want to purchase the item but hopes to drive up the item's selling price.  *Id.* ¶ 3.  Plaintiffs contend that Bidz itself engaged in shill bidding in order to drive up the price of jewelry sales and its own revenues and increase interest in its website.  *Id.* ¶¶ 3, 35.  In Plaintiffs' Consolidated Complaint, Plaintiffs relied upon four "sources" for the assertion that shill bidding exists:  (1) the Citron Report; (2) anonymous complaints posted on the website the Ripoff Report; (3) the fact that during one 2-1/2 hour period in

4

a single day, they identified 100 bidders with "fake account names"; and (4) the federal securities action and the consumer class action against Bidz, both of which claimed that shill bidding occurred.  Consol. Compl., ¶¶ 6, 44, 47-48, 50-52.  In addition to repeating those alleged "sources" in the Amended Complaint (Am. Compl., ¶¶ 43, 49, 52, 55-56)[4], Plaintiffs now proffer additional "sources" for the existence of shill bidding in the form of stock analysts' and research reports and public filings by Bidz.

Plaintiffs contend these reports are a purported factual basis for alleging that the Outside Directors were aware of the alleged wrongdoing, and in bad faith, took no action, thereby exposing themselves to liability under the *Caremark* standard of liability.  Unlike the Citron Report and the anonymous internet posters (Am. Compl., ¶ 49), Plaintiffs implicitly urge that these professional stock analysts and research firms are credible sources for the allegations that Bidz engaged in shill bidding and that the Outside Directors were aware of the wrongful conduct.

However, the reports cited in the Amended Complaint fail to provide support for Plaintiffs' allegations of wrongdoing at Bidz or notice to Bidz's directors that Bidz was engaged in wrongful conduct that they should take steps to stop immediately.  *Cf., Abbott Laboratories Derivative Shareholders Litig.*, 325 F.3d 795 (7th Cir. 2001) (formal certified warning letters by U.S. Food and Drug Administration to the board put board members on notice of wrongdoing; board's failure to act in the face of such warnings supports demand futility); Order at 7-8 and n.5.  To the contrary, the analysts' and research reports do not signal the alarm bells or waive red flags.  Indeed, the reports either directly contradict Plaintiffs' allegations and/or recommend investors buy stock in Bidz.

(1)    *Merriman Curhan Ford Report.*

---

[4]  The anonymous reports are from a website, Ripoffreport.com, that disclaim the authenticity and accuracy of the reports.  Bidz Motion to Dismiss the Original Complaint, p.8, n.3; www.ripoffreport.com.; *see also* note 5, *infra*.

Gibson, Dunn &
Crutcher LLP

Merriman Curhan Ford is a stock analyst and research company that covers Bidz. The May 22, 2008 Merriman Curhan Ford Report cited by Plaintiffs as "proof" of shill bidding reported no such thing.  This Report stated the obvious; that because "Bidz.com starts every auction at $1.00, it obviously runs the risk of every item selling for only $1.00—which would significantly impact the company's revenues and gross margins." Am. Compl., ¶ 37.  Plaintiffs fail to explain that this very same Report described Bidz as "A Knight in Shining Armor for the Troubled Traditional Jewelry Industry" and deemed Bidz a "buy."  Declaration of Lindsey E. Blenkhorn ("Blenkhorn Decl."), Exh. A.

  (2) *Stanford Group Company Report.*

The Stanford Group is also a stock analyst and research company that covers Bidz.  Plaintiffs cite the October 8, 2008 Stanford Group Company Report, which Plaintiffs claim, stated that because auctions begin at $1.00, there is the "potential to result in sales below Bidz's purchase price"; that Bidz has a "23 person technology and development staff" that is a "significant expense"; that Bidz "rewrote its core auction platform"; and that Bidz's stock price fluctuated from $22 to 9 in two days as a result of the "revelations of shill bidding and other improper practices."  Am. Compl., ¶¶ 38, 47, 60.

Plaintiffs neglect to mention that the October 8, 2008 Stanford Report explained that the November 2007 stock price fluctuation likely related to "meaningful short interest.  Bidz claims that much of the negative pressure surrounding the stock and the depressed price was directly attributable to significant naked short-selling where sellers often failed to deliver the shares when called" (Blenkhorn Decl., Exh. B), not allegations of shill bidding or other "improper practices."[5]  Stanford opined that "we do not believe

---

[5]  The Citron Report was published on November 26 and 28, 2007 and the stock priced dropped from $19.94 on November 23 to $10.10 on November 28.  The reports are published anonymously and Citron, of course, not only disclaims any representation or warranty that its report is accurate or complete, also advises that it has an economic interest in the securities it covers.  In other words, Citron had an interest in seeing the stock price fall dramatically in order to profit from a short position in the stock.  Bidz's Motion to Dismiss Original Complaint, p. 11, nn 7 & 8; and http://www.citronresearch.com/index.php/disclaimer/

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

that the current business model is materially affected by any of the allegations.  We are comfortable with Bidz' inventory policy" and concluded that "the street appeared to accept the company's explanations, noting that the inventory policy was clearly stated in the company's long-term growth plan and that **Citron had essentially no solid evidence of any actual impropriety.**"  *Id* at 29 (emphasis added).

Similarly, regarding shill bidding, the Stanford Report stated that:

> With respect to the claim that Bidz engages in shill bidding . . . there has been **no firm evidence to date proving any wrongdoing regarding Bidz' jewelry auction platform.**  While approximately 30% of all auctions are recycled due to lack of receipt of payment from winning bidders, we note that Bidz takes losses on 15-20% of all auctions, a number which would likely be much lower if Bidz engaged in illegal bidding practices.

*Id.* (emphasis added).

The Stanford Report also concluded that "[w]e do not currently see the monthly planned sale of stock by CEO David Zinberg as disconcerting and believe that his past relationships are likely inconsequential."  *Id.*

(3)    *Roth Capital Partners Reports.*

Like Merriman Ford and Stanford, Roth Capital also provides analysis of Bidz to investors.  Plaintiffs cite the November 28, 2007 Roth Capital Partners Report that stated that the modifications to Bidz's auction system made the "company's model more susceptible to manipulation" and that Zinberg had a "tough time" addressing questions about Bidz's bidding practices.  Am. Compl., ¶¶ 48, 58.  Plaintiffs conveniently ignore that this same report also rated Bidz stock a "buy," and concluded that "the company did a decent job addressing each of the issues mentioned in the [Citron] report . . . management was able to refute [Citron's] claims," and reaffirmed that "we believe in the BIDZ business model . . . ."  Blenkhorn Decl., Exh. C.

Plaintiffs also refer to Roth's May 7, 2008 Report, which retained its "buy" rating and stated that "we recognize that the economy and the retail environment remain challenging, but we believe the company can deliver strong results given its strong value proposition."  Blenkhorn Decl., Exh. D.  Plaintiffs refer to Roth's August 6, 2008

Report, which also concluded that Bidz was "well positioned for growth, [and] reiterate[d its] buy rating." Blenkhorn Decl., Exh. E. Similarly, the November 11, 2008 Report referenced by Plaintiffs reiterated the "buy" rating and stated that "we believe the company offers some of the best values in the jewelry sector . . . we believe that the BIDZ model survives and thrives and in fact, we expect it to take market share during this period . . ." Blenkhorn Decl., Exh. F. Further, the February 23, 2009 Roth Report mentioned by Plaintiffs retained the "buy" rating, and it was not until the March 10, 2010 Roth report mentioned by Plaintiffs that Roth recommended a "hold" rating. Blenkhorn Decl., Exhs. G and H. And what Plaintiffs describe as Roth's repeated "warnings regarding manipulation of the Company's model on several occasions" are simply several "risk factors" such as "competition" and "general economic conditions" that Roth cut-and-pasted into all of its Bidz reports. *See* Blenkhorn Decl., Exhs. C-H.

(4)   *Bidz's April 22, 2005 Form 10-12G.*

Plaintiffs claim that that Bidz's April 22, 2005 Registration Statement Form 10-12G, which states that Bidz's user interface was "based on internally-developed proprietary software" that "notif[ies] users via email when they initially register for the service, they place a successful bid, they are outbid and when an auction ends" (Am. Compl., ¶ 46), somehow supports the existence of shill bidding. Putting aside the fact that this Registration Statement was filed more than two years before the Relevant Period, this statement merely explains how Bidz's proprietary software functions and provides no support for the existence of shill bidding. Request for Judicial Notice in Support of Amended Complaint ("RJN Am. Compl."), Exh. C, at 72.

(5)   *Bidz's March 9, 2010 Form 10-K.*

Plaintiffs cite Bidz's March 9, 2010 Form 10-K, which explained that there were "material weaknesses" relating Bidz's migration from one computer operating system to another. Am. Compl., ¶ 63. Plaintiffs allege that this technology conversion somehow "allowed shill bidding." *Id.* But as the previous November 9, 2009 10-Q explains, this migration had nothing to do with shill bidding:

> On October 2, 2009, we migrated from our proprietary enterprise operating system to an ERP system running on a customized Microsoft Dynamics AX. We have encountered unexpected deficiencies in implementing the new system, including a lack of controls to detect errors in account balances. We anticipate that these deficiencies will likely have a material adverse effect on our operations, results of operations and system of internal controls over financial reporting in the fourth quarter of 2009. In addition, the new system will require that we design and adopt new internal controls over financial reporting, and any failure by us to implement and test those new controls in a timely manner would likely result in a material weakness in our internal controls over financial reporting.

RJN Am. Compl., Exh. E, at 325.  Nowhere does this disclosure support an inference of shill bidding.  In Bidz's 10-Q for the first quarter of 2010, Bidz explained that "[n]otwithstanding the material weaknesses described below . . .  management has concluded that our financial statements for the periods covered by and included in this report are fairly stated in all material respects in accordance with generally accepted accounting principles in the United States for the periods presented herein."  RJN Am. Compl., Exh. F, at 367.

## B.    Plaintiffs Allegations Regarding Bidz's Auditor Are Irrelevant

Plaintiffs continue to complain that Bidz employed Stonefield Josephson, Inc., as its outside auditors, who according to Plaintiffs have been "harshly criticized" by the Public Company Accounting Oversight Board ("PCAOB") [6] (Am. Compl., ¶ 78), but as the Court stated in its Order, "[t]he alleged wrongdoing in selecting the Stonefield auditing firm does not directly establish the Outside Directors' knowledge of or complicity in the shill bidding."  Order, at 7.

## C.    Plaintiffs' Allegations Regarding Bidz's Operational Issues Do Not Show Either Knowledge of, or Bad Faith By, Any Outside Director

Plaintiffs still aver that the Individual Defendants were "aware of major issues concerning the Company's online auction practices," such as:

(a)    Bidz allegedly used a "suspect appraiser" to appraise jewelry sold on its site. Am. Compl., ¶¶ 12, 85-90.  Plaintiffs now argue that this suspect appraiser issued

---

[6] Bidz shareholders ratified the hiring of Stonefield Josephson by a vote of 12,677,921 in favor to 13,180 against.  Dkt. # 59, RJN Consol. Compl., Exh. D, at 92.

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

inflated appraisals, which artificially increased Bidz's revenues and earnings by giving the false impression to customers that those items were worth more than they actually were.  Am. Compl., ¶¶ 85-86.  Plaintiffs also now argue that the owner of AIG, Norman Monteau, admitted that he falsely appraised jewelry sold "via an online auction" (notably, not *Bidz)* (Am. Compl., ¶ 88);

(b)   Defendants Zinberg and Itkin allegedly had "suspicious relationships" with persons who were felons.  Am. Compl., ¶ 12.  Plaintiffs make no new allegations in this regard in their Amended Complaint.[7]

(c)   Bidz allegedly permitted the use of inaccurate descriptions and photographs of items sold to customers.  Am. Compl., ¶¶ 91-98.  Plaintiffs argue that Bidz "belatedly admitted that its product descriptions can be misleading" by referring to a November 9, 2009 Form 10-Q where Bidz – as it does in every one of its other Form 10-Qs, both before and after the Relevant Period – states that "mistakes or omissions of important information in our descriptions may occur" that may result in "negative publicity about and diminished customer confidence in our website."[8]  Am. Compl., ¶ 97; *see also* Dkt. # 59, RJN Consol. Compl., Exh. N, at 431; Exh. K, at 358.  Although Plaintiffs argue that this language means that "Bidz has now confirmed what the plaintiffs have alleged all along," (Am. Compl., ¶ 98), such cautionary language hardly constitutes an admission of anything given that it is merely one of many "risk factors" that Bidz is required to disclose by the SEC in all quarterly filings.

(d)   Plaintiffs continue to allege that Bidz took measures to stop auction sales if the winning bid was below a certain price.  Am. Compl., ¶ 99.  Plaintiffs' alleged

---

[7]  Perhaps because the Court noted that "[a]llegations that Itkin once owned an illegal strip club while serving as the CFO of Bidz do not add 'substantially more' to Plaintiffs' other allegations," (Order, at 11), Plaintiffs dropped that allegation.

[8]  Plaintiffs other "source" for their allegation that the Individual Defendants permitted the use of inaccurate descriptions is a confidential witness, CW2, who left Bidz's employ two years before the Relevant Period and does not state that any of the Individual Defendants were aware of the misconduct that CW2 claims to have witnessed in any event.  Am. Compl., ¶¶ 94-95.  On that basis, CW2 should be disregarded.

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

"source" for this allegation is apparently the same confidential witness (CW1) that Plaintiffs relied on in their Consolidated Complaint, who ended her employment at least three years before the Relevant Period. *Id.* ¶ 41.

Just like their Consolidated Complaint, Plaintiffs' Amended Complaint still fails to allege that the Individual Defendants, acting in bad faith, knew of the purported wrongful conduct and could have stopped it.

### D.   Plaintiffs' Allegations Regarding the SEC and FTC Investigations Do Not Show Either Knowledge of, or Bad Faith By, Any Outside Director

Plaintiffs expanded slightly on their allegations regarding the SEC by adding another investigation that occurred more than two years before the Relevant Period, before Bidz was a public company, and is therefore irrelevant.  Am. Compl., ¶¶ 124-125.  With respect to the other SEC investigations, Plaintiffs are again unable to report anything other than the fact that investigations have begun.  *Id*. ¶¶ 126-129.  As for the FTC investigation, Plaintiffs concede that on April 2, 2010, the FTC stated that it would not recommend enforcement against Bidz, and as such, this investigation is irrelevant.[9] Am. Compl., ¶ 134; RJN Am. Compl., Exh. I.  In any event, Plaintiffs' Amended Complaint still does not allege that Bidz, in fact, engaged in wrongful conduct relating to inventory accounting or email marketing practices exposing it to regulatory liability or that the Individual Defendants, acting in bad faith, knew of the purported wrongful conduct and could have stopped it.

### E.   Plaintiffs' Allegations Regarding the Sale of Purportedly Counterfeit Goods Are Similarly Irrelevant

Plaintiffs' Amended Complaint features new allegations about how Bidz "consciously permitted" the sale of counterfeit Cartier watches on Bidz's website. Am. Compl., ¶¶ 102-105.  As "support" for this assertion, Plaintiffs refer to a lawsuit filed by

---

[9]  Plaintiffs needlessly cite to "CW3" who, although having worked at Bidz before the Relevant Period, nevertheless confirms that "email campaigns were conducted on a frequent basis." Am. Compl., ¶ 132.  Given that the FTC investigation has concluded and that email campaigns hardly constitute a breach of fiduciary duty, CW3's statements are irrelevant.

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

Cartier against Bidz before the Relevant Period, in April 2006, in which Cartier alleged that Bidz engaged in trade dress and trademark infringement, copyright infringement, and design patent infringement.  Am. Compl., ¶ 102; RJN Am. Compl., Exh. G.  This action was ultimately settled and dismissed in August 2008, and no findings of law or fact ever provided that Bidz had, in fact, sold counterfeit Cartier watches.  RJN Am. Compl., Exh. H.  Conceding its irrelevance, Plaintiffs attempt to make the Cartier lawsuit rise to the level of a breach of fiduciary duty by arguing that Bidz's ability to secure a $10 million line of credit was contingent upon the lender's approval of Bidz's "plan to resolve the litigation."  Am. Compl., ¶ 104.  Although Plaintiffs do not explain whether the litigation plan was approved, and whether the $10 million line of credit was issued, that either of these events do not constitute a breach of fiduciary duty is obvious.  And Plaintiffs fail to allege that the Individual Defendants were acting in bad faith by knowing of or permitting the alleged sale of counterfeit watches.

**F.    Plaintiffs' Allegations Regarding Bidz's Predecessor, ALA and Union Pawn**

Plaintiffs' Amended Complaint features numerous allegations about the predecessor companies to Bidz, ALA and Union Pawn.  Plaintiffs' allegations in this regard go back as far as 1994 in some cases, arguing that Union Pawn sold unregistered securities in an unrelated entity known as Zinberg Pawn Brokers, Inc.  and "other businesses" and sold securities by unlicensed brokers.  Am. Compl., ¶¶ 136-159.  Plaintiffs then refer to a number of lawsuits against Union Pawn, Zinberg, and other unrelated events that all occurred either before Bidz existed or before Bidz was a public company – and all well outside the Relevant Period.  Am. Compl., ¶¶ 136-159.  Given that these allegations (1) relate to companies other than Bidz; (2) relate to alleged events that occurred before Bidz was public; (3) occur outside of the Relevant Period; and (4) do not involve any allegations of bad faith on the part of any of the Individual Defendants, they are irrelevant.

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

## G.   Plaintiffs' Allegations Regarding Specific Individual Defendants

As with the Consolidated Complaint, Plaintiffs make few specific allegations as to outside director Defendants Hanelt and Singh aside from their names, board positions, and years of service.  Am. Compl., ¶¶ 28-29.  Plaintiffs' new Complaint alleges, with no support of any kind, that just because Singh was once the CEO of "a predictive web analytics firm, which tracks internet activity," that this previous job history somehow means that Singh "would have and did come to know about" various operational issues at Bidz.  Am. Compl., ¶ 75.

Much of the allegations in Plaintiffs' Amended Complaint center on Defendant Itkin.  Plaintiffs allege not only that Itkin is now an "'insider director' because he previously worked as the CFO of Bidz" from February 1999 to December 2000 (Am. Compl., ¶ 24), but they also allege that Itkin was involved in the 1990s in unrelated companies called "Union Pawn" and "Asset Lenders of America" ("ALA"), and that the SEC is allegedly looking into Bidz's accounting practices (even though those practices were enacted seven years after Itkin was the CFO).  Am. Compl., ¶¶ 24, 194-195.  Plaintiffs also aver that Itkin was involved in the sale of unregistered securities – before Bidz was a public company and before the Relevant Period.  Am. Compl.  ¶¶ 136-159.

Plaintiffs only new allegation with respect to Defendant Kong is that he was the CFO during a period of time – four to six years before the Relevant Period in this case – when Bidz allegedly sold "illegal" shares in Bidz.  Am. Compl., ¶ 157.  Plaintiffs do not aver that Defendant Kong was aware of these allegedly "illegal stock sales" or that Bidz suffered any harm therefrom.  Plaintiffs also continue to assume that Kong "could not have been blind" to either the operational issues or the false and misleading statements in the financials, and must have approved or ratified them.  Am. Compl., ¶¶ 74, 113, 190.

Plaintiffs continue to claim that Defendants Liu and Zinberg breached their fiduciary duties by engaging in insider selling.  Am. Compl., ¶¶ 13, 207.  There are no

supporting factual allegations showing what Zinberg and Liu each knew with regard to the relevant operations and conduct of the Company's business.

Plaintiffs still claim that Zinberg has "extensive contacts with criminals and other untrustworthy characters" and was responsible for making or causing to make various false and misleading statements regarding Bidz and its business model.  Am. Compl., ¶¶ 110-123.

## III.   PLAINTIFFS HAVE AGAIN FAILED TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY

### A.   The Legal Rules Governing Whether Plaintiff Has Adequately Alleged Breach of Fiduciary Duty

In cases that involve the alleged failure of a board of directors to oversee the company, a plaintiff must allege either (a) that the directors utterly failed to implement any system of controls or oversight, or (b) having implemented a system of controls, the directors consciously failed to monitor or oversee its operation.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (dismissing derivative complaint for failing to meet the *Caremark* standard).  A plaintiff must plead facts that show either the absence of controls or the board's knowledge that the controls were inadequate but chose to do nothing about it.  *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).

The difficulty of alleging a breach of fiduciary duty based on a failure to oversee the company's actions under Delware law, and the the burden required to allege a claim for relief after *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 570 (2007) and *Ashcroft v. Iqbal*, *supra*, 129 S.Ct. 1937, 1949–50 (2009), is clear.  *Twombly* and *Iqbal* require Plaintiffs to plead *facts*—not merely conclusions or ultimate facts—that plausibly establish the elements of each cause of action.  *Id.*  And as already noted, the theory of oversight liability expressed in *Caremark* has been described as one of the most difficult theories of liability to adequately plead.  *In re Citigroup Shareholder Derivative Litig.*, 964 A.2d 106, 123-125 (Del. Ch. 2009); *Desimone v. Barrows*, 924 A.2d 908, 928 (Del. Ch. 2007).  Like the Consolidated Complaint, Plaintiffs have not

alleged particularized factual allegations—as opposed to mere conclusions—that any of the Individual Defendants acted in **bad faith.**

## B. Plaintiffs Have Again Failed To Adequately Allege Bad Faith By Any Outside Director

Plaintiffs again rely on sweeping, unsupported conclusions of liability.  *See, e.g.,* Am. Compl., ¶¶ 1-16 (alleging, without any factual support, that the Individual Defendants engaged in and failed to disclose accounting irregularities, deceptive sales practices, improper relationships with suppliers, fraudulent bidding schemes and caused or allowed the Company to violate the law).  Plaintiffs make no new factual allegations regarding the information the Individual Defendants purportedly had that would have alerted them to the alleged problems at the Company.  *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003) (no liability where a "complaint does not plead a single fact suggesting specific red—or even yellow—flags were waved").

Plaintiffs have not connected the Individual Defendants to the alleged wrongdoing through factual allegations; instead, they simply put forth conclusory assumptions and argue that the Individual Defendants must have known and/or participated in the wrongdoing "because of their positions of control and authority."  Am. Compl., ¶ 32.  Such allegations are legally inadequate.  *Loveman v. Lauder*, 484 F. Supp. 2d 259, 264 n.24 (S.D.N.Y. 2007).

### 1. Plaintiffs' Audit Committee Allegations Do Not Show Bad Faith

Plaintiffs continue to allege that the Outside Director Defendants served on the Audit Committee, during which they claim that the Outside Directors "would have and did uncover the existence of shill bidding and . . . control deficiencies."  Am. Compl., ¶ 75.  Plaintiffs argue that as Audit Committee members, the Outside Directors were required to engage in an "ongoing evaluation of the 'tone at the top,'" which therefore means that they knew about the alleged operational problems.  *Id.*

First, as this Court has already pointed out, "Plaintiffs allege that the Outside Defendants, by virtue of their positions on the Audit Committee, must have known of

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

the problems at the company . . . **Allegations of a director's responsibilities, however, are insufficient to establish the director's bad faith.**" Order, at 12-13 (emphasis added).  The mere fact that directors were members on a particular committee, without "specific allegations as to the defendants' roles and conduct" on that committee, is insufficient.  *In re CNET Networks, Inc. Deriv. Litig.*, 483 F.Supp.2d 947, 963 (N.D. Cal. 2007); *In re Emerging Comm., Inc. Shareholders Litig*, No. 16415, 2006 Del. Ch. LEXIS 25, at *152-53 (Del. Ch. May 3, 2004) (membership on a committee does not change the standard of director liability under *Caremark*, which requires a showing of bad faith).  Plaintiffs instead must show a "sustained or systematic failure of the board to exercise oversight," a standard that is a "quite high."  *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003).

Plaintiffs aver only that the Outside Director Defendants, as members of the Audit Committee, "would have and did come to know about" the fact that 44% of winning auction bids did not result in sales and that they "would have and did uncover the existence of shill bidding" as well as the alleged, but vaguely described "material weaknesses concerning . . . control deficiencies."  Am. Compl., ¶ 75.  These allegations – which lack particularity and fail completely to set forth the respective "role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information," *Rattner v. Bidzos,* 2003 Del. Ch. LEXIS 103, at *47-48 (Del. Ch. Sept. 30, 2003) – are hardly the kind of "sustained or systematic failure . . . to exercise reasonable oversight" that is necessary to establish bad faith.  *Guttman,* 823 A.2d at 506. Moreover, the allegations constitute a non-sequitur.  It is certainly not obvious why the fact that some percentage of winning auction bids do not result in completed transactions must necessarily meant that shill bidding is occurring as opposed to buyer's regret or bidder's inability to actually pay for the goods won through the auction.

With respect to the Outside Directors' involvement in disseminating what Plaintiffs claim were false and misleading financial statements and press releases, Plaintiffs have abandoned their previous claim that Hanelt and Singh "oversaw and

Gibson, Dunn & Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT**

1  directly participated in the dissemination of Bidz's improper press releases" (Consol.

2  Compl., ¶ 124), averring now in an even more conclusory fashion in the Amended

3  Complaint that the various statements were "false and misleading . . . which were

4  known by the Individual Defendants." Am. Compl., ¶ 116.  These allegations are

5  insufficient to establish bad faith on the part of the Outside Directors (or the Inside

6  Directors, for that matter).  *See Guttman*, 823 A.2d at 503.

7      **2.      Plaintiffs' Remaining Allegations About Bidz's Business Model Are
            Also Insufficient to Show Bad Faith**

8
            **a.      Plaintiffs' Allegations Do Not Establish Bad Faith With Respect
9                      to Purported Shill Bidding**

10          Plaintiffs again fail to show that the Outside Directors were aware of and ratified

11  shill bidding.  Although Plaintiffs repeatedly claim that the "Board members were on

12  notice of the shill bidding practices at Bidz," (Am. Compl., ¶ 190), Plaintiffs fail to

13  ground such "notice" in any facts, let alone tie that alleged knowledge to the Outside

14  Directors, simply concluding that because they were directors, they knew about shill

15  bidding.  Am. Compl., ¶ 190 ("Itkin, Singh and Hanelt *would have* and did uncover the

16  existence of shill bidding . . . .") (emphasis added).

17          The hearsay of anonymous posters on a third party website and confidential

18  witnesses from another action[10] are not sufficient to establish bad faith (and in any event,

19  neither the anonymous posters nor the confidential sources tie knowledge and approval

20  of shill bidding to the Outside Directors).  Am. Compl., ¶¶ 41, 49-51.  The confidential

21  witness who allegedly provides "additional support for the existence of shill bidding"

22  (Am. Compl., ¶ 41) **ended her employment at least three years before the Relevant**

23  **Period.** *Id.* ¶ 41.  Moreover, the allegations regarding CW1 still do not state that the

24  Individual Defendants, including the Outside Directors, knew about what CW1

25  _____
    [10]  Plaintiffs refer to a "former Bidz employee in a related securities class action" who
26      allegedly confirmed the use of shill bidders.  Am. Compl., ¶ 41, n.1.  That witness,
        however, left his or her employment at Bidz more than four years before the
27      Relevant Period in this case.  RJN Am. Compl., Exh. J, *Gomez v. Bidz.com*
        Consolidated Class Action Complaint, ¶ 122.  That complaint was dismissed by
28      Judge Marshall.  RJN Am. Compl., Exh. K.

allegedly witnessed.  Nor do the "new" sources of information, mainly stock analysts' reports, or Bidz's disclosure of "material weaknesses" relating to Bidz's migration from one computer operating system to another somehow show either the existence of shill bidding or that the Outside Directors knew anything about it.  Am. Compl., ¶ 63; RJN Am. Compl., Exh. E, at 325 and Exh. F, at 367.

### b. The Remaining Operational Allegations Do Not Establish Bad Faith By Any Outside Director

Plaintiffs cite Norman Monteau, the owner of the alleged "appraisal mill," AIG, who admitted that he falsely appraised jewelry sold "via an online auction"; notably, he does not identify *Bidz* as the auction provider.  Am. Compl., ¶ 88.  In any event, Plaintiffs again do not tie these allegations to knowledge on the part of the Outside directors that a vendor Bidz was using was making false statements to Bidz's customers.

Likewise, Plaintiffs fail to allege that the Outside Directors had any knowledge of, participated in, or otherwise ratified the alleged refusal by Bidz to either provide customers with accurate descriptions and photos of items or to honor winning bids if they were less than the cost that Bidz paid for the item.  Am. Compl., ¶¶ 91-98. Similarly, Plaintiffs' allegations that Bidz took measures to stop auction sales if the winning bid was below a certain price (Am. Compl., ¶ 99) do not state that the Individual Defendants, including the Outside Directors, knew about this alleged practice.

Further, Plaintiffs' averment that the Individual Defendants "consciously permitted" the sale of counterfeit Cartier watches on Bidz's website as evidenced by the Cartier lawsuit (Am. Compl., ¶¶ 102-105) are insufficient as a matter of law.  The existence of a long-since resolved lawsuit does not establish bad faith, and in any event, Plaintiffs do not even allege that any of the Outside Directors were aware of the actual sale of counterfeit watches by Bidz.

### c.   Plaintiffs' Allegations About Itkin Do Not Establish His Knowledge or Bad Faith

Plaintiffs allege that Itkin facilitated the sale of unregistered securities in Union Pawn in 1994 (Am. Compl., ¶ 137), which is not a party to this case and occurred more than 13 years before the Relevant Period in this case.  Itkin's alleged involvement in ALA or the alleged "illegal stock sales and exchanges" in 1999 also predate the Relevant Period and are irrelevant to whether he knew about shill bidding or Bidz's other operational problems, and in bad faith, failed to do anything about it.  Am. Compl., ¶¶ 147, 155-156.  Finally, Plaintiffs take issue with Itkin's "extensive contacts with criminals" (Am. Compl., ¶ 163), but it goes without saying that a director's relationships with individuals outside of the company and beyond of the scope of his directorial duties are both irrelevant and insufficient to establish a director's bad faith.

### C.   Plaintiffs Fail to Allege Bad Faith by Bidz's Inside Director Defendants

With respect to Individual Defendant Kong, Plaintiffs' only specific allegations about Kong relate to the retention of Stonefield as an auditor (which fail for the reasons explained above), and the "unmistakable picture of shill bidding and other improper practices" that Kong "could not have been blind to" by virtue of his position as the CFO.  Am. Compl., ¶¶ 74, 83.  Plaintiffs also assume that Kong had access to information and must have approved or ratified the purported false and misleading statements, particularly in Bidz's financials.  But execution of financial reports, without more, is insufficient to create an inference that a director had actual or constructive notice of impropriety or illegality.  *Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008).  Plaintiffs also fail to accompany their conclusory allegations with facts regarding the kind of information Kong was supposedly privy to, how he purportedly got the information, or his role in approving or ratifying the purportedly false and misleading statements.  *See Citigroup*, 964 A.2d at 133 n.88 (allegations that the director defendants "caused or allowed" certain statements do not make clear "how the board was actually involved in creating or approving the statements").  That Kong was the CFO is not enough to

1   establish bad faith or the kind of "sustained or systematic failure . . . to exercise

2   oversight" necessary to survive dismissal. *Caremark*, 698 A.2d at 971. Further,

3   Plaintiffs also argue that Kong was the CFO during a period in which Bidz engaged in

4   "illegal stock sales", but all such sales allegedly occurred before Bidz became a public

5   company and several years before the Relevant Period in this case. Am. Compl., ¶ 157.

6          With respect to Defendant Zinberg, Plaintiffs allege that Zinberg and his sister are

7   both officers of Bidz, and based on that fact conclude that Zinberg therefore had access

8   to information and approved or ratified false and misleading statements. Am. Compl.,

9   ¶¶ 23, 106-123. But, as with Kong, these allegations are not supported by factual

10  allegations. Plaintiffs also conclude specifically as to Zinberg that he engaged in

11  activities that created a substantial likelihood of liability for securities and consumer

12  fraud, and that he failed to disclose improper relationships, deceit and defrauding of

13  customers and fraudulent bidding schemes. *Id.* ¶¶ 54-58, 106-123. Plaintiffs also allege

14  that Zinberg personally made certain false and misleading statements. *See e.g.*, *id.*

15  ¶¶ 110-123. But here again, Plaintiffs have failed to allege any particular facts

16  indicating that Zinberg had specific information and therefore acted in bad faith when he

17  made the allegedly false statements. *See Guttman*, 823 A.2d at 503.

18         Plaintiffs also argue that Zinberg was aware of and tolerated shill bidding, and

19  made false and misleading statements about the fact that 20% of the winning bids in

20  Bidz's auctions do not result in transactions, which Plaintiffs claim was contradicted by

21  a declaration from Defendant Liu. *Id.* ¶¶ 57, 73. Defendant Liu's Declaration explains

22  that from 2004 through 2008, Bidz conducted 25,730,845 online auctions, which

23  resulted in the sale of 14,402,007 items. RJN Consol. Compl., Exh. M, at 402.

24  Defendant Liu explained, however, that the difference between these two figures

25  represents the number of winning bidders who did not pay for the items they won. *Id.*

26  Plaintiffs claim that this discrepancy indicates not only that Zinberg made a false and

27  misleading statement, but also that fraud was "rampant" at Bidz. Am. Compl., ¶ 14.

28

20

Even if it is true, as Plaintiffs allege, that 44% of Bidz's auctions do not end in a sale, that fact alone does not establish that Bidz's business model is based on shill bidding or that the Individual Defendants were aware of, and encouraged, shill bidding. Bidz's business model, as stated, is designed to generate high traffic, some of which does not result in completed transactions.  The desire by Bidz to generate high traffic, even at the expense in some cases of completing transactions, does not in any way demonstrate bad faith by Zinberg or any of the other Individual Defendants.  Yet Plaintiffs ask the Court to infer from Liu's statement that the Individual Directors not only were aware of shill bidding, but that their very business plan was based on it.  Such an inferential leap is unwarranted, especially where the pleading standard for bad faith is so stringent.  *Caremark,* 698 A.2d at 967; *Iqbal,* 129 S.Ct. at 1949.

Similarly, the various allegations regarding Zinberg's alleged participation in unrelated enterprises, Union Pawn and ALA, Zinberg's alleged illicit ownership of stock options, or Zinberg's alleged sale of unregistered securities – events that all occurred long before the Relevant Period in this case – are irrelevant and do not establish bad faith on the part of Zinberg.  Am. Compl., ¶¶ 136-154.

## IV.     PLAINTIFFS FAIL TO ALLEGE A CLAIM FOR INSIDER SELLING OR VIOLATION OF CALIFORNIA CORPORATION CODE SECTION 25402

In order to state a claim for breach of fiduciary duty based on insider selling and violation of California Corporation Code Section 25402, Plaintiffs must allege that Zinberg and Liu acted with actual knowledge, by trading, in whole or in part, because they possessed material, adverse, nonpublic information.  *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1079 (C.D. Cal. 2008) (requiring actual knowledge; deliberate recklessness deemed insufficient).

To amount to the federal concept of "scienter," which would require only deliberate recklessness, allegations of insider trading, must amount to "suspicious stock sales by corporate insiders . . . [that] are dramatically out of line with prior trading

practices at times calculated to maximize personal benefit from the undisclosed inside information." *See id.* (noting the deliberate recklessness standard); *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999).  Instead of making such a showing, Plaintiffs simply list Zinberg and Liu's stock sales and note that the sales were "rather suspicious" because neither of them sold shares before August 15, 2007.  Am. Compl., ¶ 176.  However, Bidz's stock only began trading on the NASDAQ on June 6, 2007; before then, there was not an established market in which to sell Bidz's securities.  RJN Consol. Compl., Exh. I, at 233.  Absent an active market in which to sell Bidz's securities, it is impossible to find Zinberg and Liu's sales "suspicious" simply because they follow a period of time in which the parties could not easily sell their stock.  *See Raconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (noting that the "seven month trading period prior to the class period offered by plaintiffs to prove the defendants' pattern of trading does not prove much about their trading habits, since they were not able to trade during some or much of that time"); *see also Silicon Graphics*, 183 F.3d at 987-88 (same).

Nor does the timing of both Zinberg's and Liu's sales raise suspicion.  Zinberg's alleged "suspicious" stock sales took place between August 15, 2007 and November 19, 2007.  Am. Compl., ¶ 169.  During that period, Zinberg took no salary from Bidz, and Zinberg continued to sell stock at relatively the same pace following the alleged disclosure of fraud.  Am. Compl., ¶ 172; RJN Consol. Compl., Exh. T, at 492; Exh. U, at 495.  Moreover, the bulk of Zinberg's sales were made pursuant to Bidz's 10b5-1 plan.  RJN Consol. Compl., Exh. P, at 480; Exh. Q, at 483.  Although Plaintiffs aver that the 10b5-1 stock plan was "never valid," Plaintiffs provide no allegations as to why that is the case.  Am. Compl., ¶¶ 171, 174.  As a result, all of Zinberg's stock sales that were made during the Relevant Period pursuant to the 10b5-1 plan cannot support a claim of scienter because "the presence of a trading plan rebuts an inference of scienter and supports the reasonable inference that stock sales were pre-scheduled and not

suspicious." *Stiegele v. Bailey,* 2007 U.S. Dist. LEXIS 86469, at *34-35 (D. Mass Aug. 23, 2007). [11]

As for Defendant Liu, she had options that she had to exercise before December 15, 2007, which must vest by a certain date or they may expire. *See e.g., Metzler Invest. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1067 (9th Cir. 2008); RJN Consol. Compl., Exh. R, at 486; Exh. S, at 489. Neither Zinberg nor Liu sold stock at the high price of approximately $20 per share in the Relevant Period. In fact, Zinberg never sold stock above $13.07 a share, and Liu sold her shares at $16.79 and $17.82 per share in an effort to exercise her options before they expired on December 15, 2007. Am. Compl., ¶ 169. *See Larkin*, 253 F.3d at 435 ("When insiders miss the boat . . . their sales do not support an inference" of scienter). "Absent evidence of unusual … scope or timing, we will not infer fraudulent intent from the mere fact that some officers sold stock." *City of Roseville Employees' Ret. Syst. v. Horizon Lines, Inc.*, 2009 U.S. Dist. LEXIS 106186, at *57 (D. Del. November 13, 2009) (internal quotations omitted).

In sum, Plaintiffs cannot establish scienter—let alone *actual knowledge*. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d at 1079. There are no facts alleged that support the allegation that Zinberg or Liu had any knowledge of the alleged wrongdoing or that any wrongdoing occurred, and thus, this claim fails.

## V.   PLAINTIFFS HAVE FAILED TO ALLEGE A CAUSE OF ACTION FOR WASTE OF CORPORATE ASSETS

Plaintiffs claim that the Individual Defendants committed corporate waste by paying bonuses to its executives and by incurring legal liability and costs to defend Defendants' various unlawful actions. Am. Compl., ¶ 217. These allegations are not enough, however, to satisfy the "high hurdle required" in order to establish a claim for

---

[11] For the purposes of Section 25402, an insider is deemed not to have traded with knowledge of material inside information if the trade complied with a Rule 10b5-1 plan. Cal. Practice Guide: *Corporations* § 6:368.2m (The Rutter Group 2009). As discussed above, Zinberg's trades were made pursuant to a 10b5-1 plan, and as such, Plaintiffs have failed to state a claim for violation of Section 25402 against Zinberg.

INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT

waste. *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.),* 906 A.2d 27, 75 (Del. 2006). Paying for legal expenses to defend a lawsuit or paying bonuses is hardly the type of one-sided transaction that "no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Id.*; *see also Grimes v. Donaldson*, 673 A.2d 1207, 1215 (Del. 1996). Thus, Plaintiffs have failed to allege a claim for corporate waste.

## VI.   CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss Plaintiffs' Amended Consolidated Complaint with prejudice.

Dated: July 12, 2010                    GIBSON, DUNN & CRUTCHER LLP

/S/
_____
By:   Joel A. Feuer

Attorneys for Defendants
DAVID ZINBERG, LAWRENCE Y.
KONG, CLAUDIA Y. LIU, LEON
KUPERMAN, PETER G. HANELT,
GARY Y. ITKIN, AND MAN JIT
SINGH

Gibson, Dunn &
Crutcher LLP

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED
CONSOLIDATED DERIVATIVE COMPLAINT**

# DECLARATION OF SERVICE

I, Elizabeth Sperry, declare as follows:

I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, 94105, in said County and State.  On July 12, 2010, I served the within:

**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED DERIVATIVE COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6); SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

to all interested parties as follows:

☑       **BY CM/ECF FILE & SERVE**:  on July 12, 2010**,** I served a true and correct copy of the above listed document(s) electronically through CM/ECF by uploading the electronic files for each of the above listed document(s). CM/ECF notifies all registered parties via e-mail.

I certify under penalty of perjury that the foregoing is true and correct, that the foregoing document(s) were printed on recycled paper, and that this Declaration of Service was executed by me on July 12, 2010, at San Francisco, California.

 /s:/ Elizabeth Sperry_____
Elizabeth Sperry

Gibson, Dunn & Crutcher LLP

25